UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
------------------------------------------------------------------------x
KELLI D. HAKE, et al.,                                          :
                                                                :
                     Plaintiffs,                                :
                                                                :    Case No.: 17-cv-114 (ESH)
-against-                                                       :
                                                                :
BANK MARKAZI JOMHOURI ISLAMI IRAN, et al.,    :
                                                                :
                     Defendants.                                :
------------------------------------------------------------------------x

**<u>BRIEF ON JURISDICTION</u>**

## **Table of Contents**

I.   Summary of the Allegations in the Amended Complaint ...................................... 1

   A.   Plaintiffs' Injuries .................................................................................... 1

   B.   Role of Defendants ................................................................................... 3

II.   This Court Has Subject Matter and Personal Jurisdiction Over This Action. ....... 8

   A.   This Court Has Subject Matter Jurisdiction Over This Action. ...................... 8

   B.   This Court Has Personal Jurisdiction Over Defendants as to All of Plaintiffs' Claims. ................................................................................................... 11

      1.   Statutory Basis for Personal Jurisdiction Over Defendants ........................... 12

      2.   Plaintiffs Have Served Each Party ............................................................ 12

      3.   Constitutional Basis for Personal Jurisdiction Over All Defendants ............... 13

## **Table of Authorities**

### Cases

*Bennett v. Islamic Republic of Iran*
   825 F.3d 949 (9th Cir. 2016) ................................................................... 4, 9

*Ben-Rafael v. Islamic Republic of Iran*
   718 F. Supp. 2d 25 (D.D.C. 2010) ............................................................... 14

*Brewer v. Islamic Republic of Iran*
   664 F. Supp. 2d 43 (D.D.C. 2009) ........................................................... 11, 12

*Cohen v. Islamic Republic of Iran*
   No. 12-CV-01496 (CRC), 2017 WL 818208 (D.D.C. Mar. 1, 2017) ..................... 10

*Doe v. Constant*
   No. 04 Civ. 10108 (SHS), 2006 WL 3490503 (S.D.N.Y. Oct. 24, 2006) ............... 11

*Gill v. Arab Bank, PLC*
   893 F. Supp. 2d 474 (E.D.N.Y. 2012) ........................................................... 1

*Gill v. Islamic Republic of Iran*
   No. CV 15-2272 (RBW), 2017 WL 1289938 (D.D.C. Apr. 6, 2017) ..................... 10

*GSS Grp. Ltd v. Nat'l Port Auth.*
   680 F.3d 805 (D.C. Cir. 2012) ............................................................... 14, 15

*Holland v. Islamic Republic of Iran*
 496 F. Supp. 2d 1 (D.D.C. 2005) ........................................................................ 11

*Morris v. Khadr*
 415 F. Supp. 2d 1323 (D. Utah 2006) ................................................................ 15

*Mwani v. bin Laden*
 417 F.3d 1 (D.C. Cir. 2005) ............................................................... 11, 15, 16

*National Iranian Oil Co. v. Ashland Oil, Inc.*
 817 F. 2d 326 (5th Cir. 1987) .............................................................................. 9

*Peterson v. Islamic Republic of Iran*
 758 F.3d 185 (2d Cir. 2014) ................................................................................ 9

*Shoham v. Islamic Republic of Iran*
 No. 12-CV-508 (RCL), 2017 WL 2399454 (D.D.C. June 1, 2017) ...................... 14

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*
 411 F.3d 296 (D.C. Cir. 2005) .......................................................................... 14

*Warfaa v. Ali*
 33 F. Supp. 3d 653 (E.D. Va. 2014) ................................................................. 11

**Statutes**

18 U.S.C. § 2331 .......................................................................................................... 1

18 U.S.C. § 2336 .......................................................................................................... 1

28 U.S.C. § 1330 ........................................................................................................ 12

28 U.S.C. § 1602 .......................................................................................................... 8

28 U.S.C. § 1603 ....................................................................................................... 8, 9

28 U.S.C. § 1605A ................................................................................................. 10, 11

28 U.S.C. § 1608 ................................................................................................... 12, 13

**Regulations**

22 C.F.R. § 126.1(d) ................................................................................................. 11

31 C.F.R. § 596.201 .................................................................................................. 11

Pursuant to this Court's August 24, 2017 Order, Plaintiffs set out below the bases for the Court's jurisdiction over this matter.

## I.      Summary of the Allegations in the Amended Complaint

### A.      Plaintiffs' Injuries

Plaintiffs are American service members[1] and family members of American service members who were killed or injured in terrorist attacks while serving in Iraq. Each of the attacks at issue was committed by terrorists[2] trained, funded, and otherwise supported by the Islamic Republic of Iran (inclusive of its agencies and instrumentalities). Second Amended Complaint, ECF No. 23 ("SAC"), ¶¶ 1, 57-67, 127-134. After major combat operations in Iraq ended on May 1, 2003, and U.S. peacekeeping operations in Iraq commenced under United Nations mandate, Iran increased its flow of material support and resources to terrorist groups in Iraq, specifically to target U.S. and other Coalition peace-keeping forces. *Id.* ¶¶ 60-67. Iran provided this support primarily through its paramilitary force, the Islamic Revolutionary Guard Corps ("IRGC"); the IRGC's "special operations" branch, Qods Force ("IRGC-QF"), *id.* ¶¶ 79-83; and Iran's Lebanon-based terrorism proxy, Hezbollah, *id.* ¶¶ 53-60, 63-64.

Hezbollah has been a designated Foreign Terrorist Organization since 1997, and the IRGC-QF has been a Specially Designated Global Terrorist ("SDGT") since 2007. *Id.* ¶ 2. Congress recently enacted the Countering America's Adversaries Through Sanctions Act ("CAATSA"), which expressly extends the reach of that designation to the IRGC itself: "[t]he IRGC, *not just the*

---

[1]      In two cases, however, the decedent was a military contractor.

[2]      The Terrorism Exception to the Foreign Sovereign Immunities Act does *not* contain an "Act of War" exception equivalent to Section 2336(a) of the Anti-Terrorism Act ("ATA"). In any event, even had these claims been brought under the ATA, the terrorist groups that committed the attacks at issue did not conduct themselves as military forces within the definition set forth in the ATA, 18 U.S.C. § 2331(4). In order to qualify as a "military force of any origin," for purposes of the act-of-war defense, a group would have to act like the armed forces of a nation by meeting the same conditions. *See, e.g., Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 515 (E.D.N.Y. 2012).

*IRGC–QF*, is responsible for implementing Iran's international program of destabilizing activities, support for acts of international terrorism, and ballistic missile program."[3] Thus, as a matter of U.S. law, the IRGC *itself* is an instrument of Iran's "support for acts of international terrorism."

At Iran's direction, the IRGC and Hezbollah cultivated, armed, trained, financed and supplied Shi'a terrorist groups in Iraq, called "Special Groups" by the U.S. military. SAC ¶¶ 88-95, 97-101, 104-119, 123-126. For instance, Iran provided the Special Groups with sophisticated explosive devices with far more destructive power than the improvised explosives that terrorists in the region had access to, including Explosively Formed Penetrators ("EFPs") and Improvised Rocket-Assisted Munitions ("IRAMs"). *Id.* ¶¶ 68-83. EFPs are a particularly effective form of machine-manufactured explosive weapon, usually made with steel tubing filled with explosives packed behind a concave copper disk. *Id.* To produce these weapons, copper sheets are shaped into disks in industrial hydraulic presses and annealed in furnaces—processes beyond the technical capabilities of "ordinary" insurgents disgruntled by the post-war occupation of Iraq. *Id.* When the explosives inside an EFP detonate, the blast energy inverts the copper disk into a ragged slug weighing several pounds and traveling over a mile per second[4] and capable of punching through military-grade armor. *Id.* Numerous U.S. government reports have identified Iran's role in supplying the Special Groups with these weapons and have detailed the devastating effect they have had on U.S military vehicles and soldiers. *Id.*

Each Plaintiff's injuries resulted from attacks committed by these Special Groups. Most of these attacks involved Iranian EFPs, *see e.g.*, *id.* 348-362, 492-502, 543-558, or IRAMs, *see e.g.*,

---

[3]     Pub. L. 115-44, § 105(a)(3) (emphasis added). Section 105(c) directs the President to impose sanctions on the IRGC co-extensive with those imposed on SDGTs under Executive Order No. 13224.

[4]     *See* Rick Atkinson, *'There was a two-year learning curve . . . and a lot of people died in those two years,'* Wash. Post., Oct. 1, 2007, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2007/09/30/AR2007093001675_pf.html.

*id.* ¶¶ 1173-1183, 1185-1196. Other attacks are attributable to the Special Groups by other means, *see, e.g.*, *id.* ¶¶ 459-471, 1128-1133; for instance, in a coordinated attack on a joint U.S./Iraqi military installation planned by Hezbollah and directly supported by Iran and the IRGC, Special Group terrorists dressed as U.S. and Iraqi security forces kidnapped and executed several U.S. soldiers and killed others during the ensuing firefight. *See id.* ¶¶ 185-282.

### B.    Role of Defendants[5]

In order to fund its terror campaign in Iraq and other nefarious activities, Iran, Defendants, and other Iranian agencies and organs conspired with several Western financial institutions to launder Eurodollars through the United States in violation of U.S. and international economic sanctions. *Id.* ¶¶ 5, 12-14, 26-27, 29-35, 47-50. Defendants also conducted illicit trade-finance transactions and disguised financial payments to and from U.S. dollar-denominated accounts resulting in the transfer of U.S. dollars to Hezbollah and the IRGC. *Id.* ¶¶ 5, 12, 26-27. Hezbollah and the IRGC, in turn, trained, armed, supplied and funded Iran's terrorist agents in Iraq in carrying out their attacks against Plaintiffs and their family members. *Id*. ¶¶ 57-83.

### Bank Markazi Jomhouri Islami Iran

Defendant Bank Markazi Jomhouri Islami Iran ("Bank Markazi," "Central Bank of Iran" or "CBI") is an alter-ego and instrumentality of the Iranian government and its Supreme Leader. CBI has routinely used Iranian banks like Defendant Bank Melli Iran as conduits for terror financing and weapons proliferation on behalf of the Iranian regime. *Id*. ¶¶ 12-14. CBI has provided millions of dollars to terrorist organizations via other Iranian-owned and controlled banks.  For example, a 2007 U.S. Treasury press release regarding the designation of the Iranian-owned Bank Saderat as an SDGT, noted that:

---

[5]      Plaintiffs have voluntarily dismissed their claims against Melli Bank, plc. *See* ECF Docket No. 39.

> Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat *transferred $50 million from the **Central Bank of Iran** through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence*. (Emphasis added.)

*Id.* ¶ 12.

Likewise, according to the United States' Financial Crimes Enforcement Network ("FinCEN"):

> The Central Bank of Iran, which regulates Iranian banks, has assisted designated Iranian banks by transferring billions of dollars to these banks in 2011. In mid-2011, the CBI transferred several billion dollars to designated banks, including Saderat, Mellat, EDBI and Melli, through a variety of payment schemes. In making these transfers, the CBI attempted to evade sanctions by minimizing the direct involvement of large international banks with both CBI and designated Iranian banks.

*Id.* ¶ 13.

### Bank Melli Iran

Defendant Bank Melli Iran, one of the largest banks in Iran, was established in 1927 by order of the Iranian Parliament, and remained a state-owned bank thereafter.[6] According to the U.S. government, between 2004 and 2011, Bank Melli Iran transferred approximately 100 million USD to the IRGC. *Id.* ¶¶ 26-27. In October 2007 and throughout the remainder of the relevant period, Bank Melli Iran and its wholly-owned London-based subsidiary Melli Bank Plc were each designated as a Specially Designated National ("SDN") pursuant to Executive Order ("E.O.")

---

[6]     *See, e.g., Bennett v. Islamic Republic of Iran*, 825 F.3d 949, 954-957 (9th Cir. 2016) ("Bank Melli is an instrumentality of Iran. It asserts that Plaintiffs cannot execute on the assets … because Bank Melli enjoys sovereign immunity under the Foreign Sovereign Immunities Act of 1976 …. It is undisputed that Bank Melli qualifies as an instrumentality of Iran under the FSIA.").

13382, and included on the Office of Foreign Assets Control's SDN list.[7] The U.S. Treasury

Department press release announcing the designations stated:

> Bank Melli also provides banking services to the [Iranian Revolutionary
> Guard Corps] and the Qods Force. Entities owned or controlled by the IRGC
> or the Qods Force use Bank Melli for a variety of financial services. From
> 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods
> Force. When handling financial transactions on behalf of the IRGC, Bank
> Melli has employed deceptive banking practices to obscure its involvement
> from the international banking system. For example, Bank Melli has
> requested that its name be removed from financial transactions.

*Id.* ¶ 27.

A State Department diplomatic cable from March 2008 noted that:

> Bank Melli and the Central Bank of Iran also provide crucial banking
> services to the Qods Force, the IRGC's terrorist supporting arm that was
> headed by UNSCR 1747 designee Commander Ghassem Soleimani.
> Soleimani's Qods Force leads Iranian support for the Taliban, Hezbollah,
> Hamas and the Palestinian Islamic Jihad. Entities owned or controlled by
> the IRGC or the Qods Force use Bank Melli for a variety of financial
> services.

*Id.*, ¶ 28.

In addition, during the relevant period, Bank Melli Iran provided financing to the Iranian-

owned airline and SDGT Mahan Airlines and Iran's Ministry of Defense and Armed Forces

Logistics in order to assist them in evading U.S. sanctions. *Id.* ¶ 29. For example, Bank Melli Iran

issued a Letter of Credit to Mahan Airlines in August 2004 to help Mahan Airlines illegally acquire

aircraft engines subject to U.S. embargo. *Id.* ¶ 30. Bank Melli Iran's financial support and

assistance to Mahan Airlines is particularly significant because on October 12, 2011, the United

---

[7]     "The Office of Foreign Assets Control ('OFAC') of the U.S. Department of the Treasury administers and enforces economic and trade sanctions based on US foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy or economy of the United States." https://www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx.

States designated Mahan Airlines an SDGT for "providing financial, material and technological support to the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF)" and specifically for "facilitat[ing] the covert travel of suspected IRGC-QF officers into and out of Iraq." *Id.* ¶ 31. The United States also designated Mahan Airlines for "transport[ing] personnel, weapons and goods on behalf of Hezbollah." *Id.* ¶ 32.

## National Iranian Oil Company

The National Iranian Oil Company ("NIOC"), owned and overseen by the government of Iran through its Ministry of Petroleum, is responsible for the exploration, production, refining and export of oil and petroleum products in Iran. *Id.* ¶ 36.[8] In 2008, the U.S. Treasury identified NIOC (and other Iranian agencies) as "centrally involved in the sale of Iranian oil, as entities that are owned or controlled by the [Government of Iran]." *Id.* ¶ 39.  Pursuant to E.O. 13382, the U.S. government designated NIOC an SDN.

In September 2012, the U.S. Treasury Department reported to Congress that:

> Recently, the IRGC has been coordinating a campaign to sell Iranian oil in an effort to evade international sanctions, specifically those imposed by the European Union that prohibit the import, shipping, and purchase of Iranian oil, which went into full effect on July 1, 2012.

> Under the current Iranian regime, the IRGC's influence has grown within National Iranian Oil Co. For example, on August 3, 2011, Iran's parliament approved the appointment of Rostam Qasemi, a Brigadier General in the IRGC, as Minister of Petroleum. Prior to his appointment, Qasemi was the commander of Khatam Al-Anbia, a construction and development wing of the IRGC that generates income and funds operations for the IRGC. Even in his new role as Minister of Petroleum, Qasemi has publicly stated his allegiance to the IRGC.

*Id.* ¶ 42.

---

[8]    *See* Press Release, U.S. Dep't of the Treasury, Treasury Submits Report to Congress on NIOC and NITC (Sept. 24, 2012), *available at* https://www.treasury.gov/press-center/press-releases/Pages/tg1718.aspx.

Under the Iran Threat Reduction and Syria Human Rights Act of 2012 ("ITRSHRA"), the U.S. government determined that NIOC is an agent or affiliate of the IRGC under section 104(c)(2)(E)(i) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 and section 302 of ITRSHRA. *Id.* ¶ 44.  As part of that 2012 certification, NIOC was formally determined to be part of the government of Iran. *Id.*

In addition, the ITRSHRA provided that:

> It is the sense of Congress that the National Iranian Oil Company and the National Iranian Tanker Company are not only owned and controlled by the Government of Iran but that those companies provide significant support to Iran's Revolutionary Guard Corps and its affiliates.[9]

NIOC has supported the IRGC's terror operations in multiple ways. For instance, NIOC used its oil and natural gas revenues to launder money for the IRGC, often using Defendant CBI for this purpose. NIOC obtained letters of credit from western banks to provide financing and credit to the IRGC.[10]

NIOC has also supported Iranian attacks on U.S. forces in Iraq. In 2009, the Combatting Terrorism Center at West Point reported on NIOC's role in studying U.S. troop movements in Iraq:

> The establishment of a new U.S. and Iraqi [Forward Operating Base] on the Iranian border has resulted in three waves of attacks in an area that was formerly devoid of incidents .... The incident occurred in the same district as the February 2007 EFP attack on a British aircraft at a Buzurgan dirt airstrip, itself a reaction by Special Groups to UK long-range patrolling of

---

[9]     *See*      https://www.treasury.gov/resource-center/sanctions/Documents/hr_1905_pl_112_158.pdf.      In designating certain financial institutions and businessmen in September 2013, the U.S. Treasury Department identified entities "willing to engage in deceptive transactions to conceal the direct involvement of the Iranian Government and its instrumentalities such as the National Iranian Oil Company (NIOC)..." Treas. JL-2158 (Dept. Treas.), 2013 WL 4768326. After the events giving rise to the claims herein, the U.S. government withdrew this determination as of 2016. On January 16, 2016 as part of "Implementation Day" for the U.S. government's understanding with Iran relating to its nuclear weapons program, the U.S. Treasury Department "determined that NIOC is no longer an agent or affiliate of the IRGC." It remains wholly owned and controlled by Iran.

[10]     The Superseding Indictment filed in *U.S. v. Zarrab* (filed in the S.D.N.Y (1:15-cr-00867)), Exhibit C to the accompanying Declaration of William A. Friedman, dated Sept. 11, 2017 ("Friedman Decl."), demonstrates that, as late as 2013, NIOC continued to illegally launder U.S. dollars through U.S. financial institutions.

> the Iranian border. This part of the border is increasingly the scene of U.S.
> and Iranian countermoves to support their proxies and patrol the frontier;
> Iranian intelligence gathering takes place using National Iranian Oil
> Company helicopters and border guards, while U.S.-Iraqi helicopter-borne
> joint patrols provide moral and material support to isolated Iraqi border
> posts and local communities.

*Id.* ¶ 48.

## II.    This Court Has Subject Matter and Personal Jurisdiction Over This Action.

### A.    This Court Has Subject Matter Jurisdiction Over This Action.

This Court has subject matter jurisdiction over Plaintiffs' personal injury claims resulting

from Defendants' material support of Iranian-backed terrorists in Iraq. As shown below, CBI,

Bank Melli Iran, and NIOC are agencies or instrumentalities of Iran, and this Court has subject

matter jurisdiction over them under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 *et*

*seq.* ("FSIA").

United States district courts have original jurisdiction over personal injury claims against

a foreign state where an exception to that state's sovereign immunity applies:

> The district courts shall have original jurisdiction without regard to amount in
> controversy of any nonjury civil action against a foreign state as defined in section
> 1603(a) of this title as to any claim for relief *in personam* with respect to which the
> foreign state is not entitled to immunity either under sections 1605-1607 of this title
> or under any applicable international agreement.

28 U.S.C. § 1330(a).

For the purposes of the FSIA, a "foreign state . . . includes a political subdivision of a

foreign state or an agency or instrumentality of a foreign state. . ." 28 U.S.C. § 1603(a). Subsection

(b) of the FSIA defines an "agency or instrumentality of a foreign state" as any entity:

> (1)    Which is a separate legal person, corporate or otherwise; and

> (2)    Which is an organ of a foreign state or political subdivision thereof, or a
>        majority of whose shares or other ownership interest is owned by a foreign
>        state or political subdivision thereof; and

8

(3)     Which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

Plaintiffs have brought a nonjury civil action against three Iranian-owned and controlled entities. Each Defendant is an "agency or instrumentality" of Iran as defined by 28 U.S.C. § 1603(b) because each is a separate legal corporate person, wholly owned by Iran, and not a citizen of the United States or created under the laws of a third country. Further, each of the Defendants was created as a state-owned entity prior to the events alleged in the SAC and remain state-owned to this day.

As shown in the summary of allegations above, each of the Defendants is owned by Iran. Judicial opinions, public records, and the Defendants' own statements agree:

- CBI "is wholly owned by the Iranian government." *Peterson v. Islamic Republic of Iran*, 758 F.3d 185, 188 (2d Cir. 2014), *aff'd sub nom. Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016). According to CBI, as Iran's central bank, it is "responsible for the design and implementation of the monetary and credit policies with due regard to the general economic policy of the country."[11]

- Bank Melli Iran is "state owned"[12] and "[i]t is undisputed that Bank Melli [Iran] qualifies as an instrumentality of Iran under the FSIA." *See also Bennett v. Islamic Republic of Iran*, 825 F.3d 949, 957 (9th Cir. 2016). Bank Melli Iran describes itself as "a powerful arm of the government."[13]

- NIOC is owned by Iran through its Ministry of Petroleum and has operated as an "agent or affiliate of the [IRGC]." *See also National Iranian Oil Co. v. Ashland Oil, Inc.*, 817 F. 2d 326, 328 (5th Cir. 1987) (finding that NIOC is "an instrumentality of the Islamic Republic of Iran"). According to its website, "NIOC, in accordance

---

[11]     CBI, "General Information," *available at* http://www.cbi.ir/Page/GeneralInformation.aspx (last accessed Sept. 7, 2017). *See* SAC ¶ 10.

[12]     *See* U.S. Dep't of the Treasury, "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism" *available at* https://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx (describing Bank Melli Iran as state-owned) (last accessed Sept.7, 2017).

[13]     Bank Mell Iran Corporate History, *available at* http://bmi.ir/En/BMIHistory.aspx?smnuid=10011 (last accessed Sept. 7, 2017). CBI's website also lists Bank Melli Iran as a state-owned bank. *See* http://www.cbi.ir/simplelist/3088.aspx (last accessed Sept. 7, 2017).

with Article 44 of the Constitution, gives authority to different sectors, while supervising oil industry activities."[14]

These Defendants are not immune from Plaintiffs' claims as those claims are brought under the "State-Sponsored Terrorism" exception to sovereign immunity set forth in 28 U.S.C. § 1605A. Under that exception, a foreign state, inclusive of its agencies and instrumentalities, waives its sovereign immunity against claims for personal injury or death caused by "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment or agency." 28 U.S.C. § 1605A(a)(1). Plaintiffs have alleged that Defendants provided material support or resources for each of the acts of extrajudicial killing and hostage taking, constituting 84 terrorist attacks, that killed the estate Plaintiffs, injured the surviving Plaintiffs, and intentionally inflicted emotional distress on the family member Plaintiffs.

Seventy-three of these 84 terrorist attacks resulted in the death of a victim (whether represented in this matter or not).[15] In 11 of the 84 attacks, however, the evidence currently suggests that all the victims of those attacks survived. For example, Plaintiff Robert Canine sustained near fatal injuries, losing both legs and nearly dying during emergency treatment, because of a terrorist attack that did not result in any fatalities. However, acts of attempted extrajudicial killing, "even if no one died as a result of that attempt," qualify under section 1605A. *Gill v. Islamic Republic of Iran*, No. CV 15-2272 (RBW), 2017 WL 1289938, at *7 (D.D.C. Apr. 6, 2017). *See also Doe v. Constant*, No. 04 Civ. 10108 (SHS), 2006 WL 3490503 (S.D.N.Y. Oct.

---

[14]     "NIOC at a Glance," *available at* http://www.nioc.ir/portal/home/?generaltext/81026/81171/67776/ (last accessed Sept. 8, 2017).

[15]     *See Cohen v. Islamic Republic of Iran*, No. 12-CV-01496 (CRC), 2017 WL 818208, at *5 (D.D.C. Mar. 1, 2017) ("It is not necessary . . . for one of the plaintiffs to have died in the attack in order for the state-sponsor-of-terrorism exception to apply").

24, 2006), *aff'd*, 354 Fed. Appx. 543 (2d Cir. 2009) (finding that attacks that resulted in no deaths qualified as "extrajudicial killings" under 28 U.S.C. § 1350 note, which definition section 1605A(h)(7) explicitly incorporates by reference); *Warfaa v. Ali*, 33 F. Supp. 3d 653 (E.D. Va. 2014), *aff'd*, 811 F.3d 653 (4th Cir. 2016), *cert. denied* 137 S. Ct. 2289 (2017) (same).

Section 1605A conditions subject matter jurisdiction on fulfilling three additional requirements: "The court shall hear a claim under this section if" (1) "the foreign state was designated as a state sponsor of terrorism at the time the" terrorist attacks at issue occurred and "remains so designated when the claim is filed," (2) "the claimant or the victim was a national of the United States or a member of the armed forces," and, if the attack occurred in the foreign state, (3) the foreign state was afforded the opportunity to arbitrate. 28 U.S.C. § 1605A(a)(2)(A).

Each of these requirements is met here. First, Iran was designated a State Sponsor of Terrorism in 1984 and has been on the State Department's list of State Sponsors of Terrorism since that time. *See* 22 C.F.R. § 126.1(d) (2006); 31 C.F.R. § 596.201 (2006); Determination Pursuant to Section 6(i) of the Export Administration Act of 1979-Iran, 49 Fed. Reg. 2836 (Jan. 23, 1984). *See also Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 52 (D.D.C. 2009) (Huvelle, J.). Second, all of the victims were United States nationals. Third, the attacks did not occur in Iran, so Iran is not entitled to the opportunity to arbitrate the dispute. Therefore, this Court has subject matter jurisdiction over this matter. *See, e.g.*, *Holland v. Islamic Republic of Iran*, 496 F. Supp. 2d 1, 8 (D.D.C. 2005) (finding subject matter jurisdiction over claims relating to murders of U.S. servicemen in attack committed by Hezbollah and supported by Iran).

**B.    This Court Has Personal Jurisdiction Over Defendants as to All of Plaintiffs' Claims.**

Plaintiffs have the "burden of proving personal jurisdiction," which they can do "with a *prima facie* showing." *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005) (quoting *Edmond v.*

*United States Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991)).  Plaintiffs "are not limited to evidence that meets the standards of admissibility required by the district court. Rather, they may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Id.* To meet that burden, Plaintiffs must demonstrate adequate service, a statutory basis for personal jurisdiction, and a constitutionally sufficient relationship between defendants and the forum. *Id.*

### 1. Statutory Basis for Personal Jurisdiction Over Defendants

Under the FSIA, this Court has personal jurisdiction "over a foreign state . . . as to every claim for relief over which the district courts have jurisdiction under [§ 1330(a)] where service has been made under section 1608 of this title." 28 U.S.C. § 1330(b). *See also Brewer*, 664 F. Supp. 2d at 50 ("a court can obtain personal jurisdiction over a defendant if the plaintiff properly serves the defendant in accordance with 28 U.S.C. § 1608"). As shown below, Plaintiffs have served each of the Defendants in accordance with 28 U.S.C. § 1608.

### 2. Plaintiffs Have Served Each Party

Service of process upon agencies and instrumentalities of foreign states is governed by 28 U.S.C. § 1608(b), which provides that:

> (b)   Service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:
>
> (1)   By delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or
>
> (2)   If no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or

(3)     If service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—

(A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request, or

(B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

(C) as directed by order of the court consistent with the law of the place where service is to be made.

No special arrangement exists between Plaintiffs and Defendants, and Defendants have no officer or agent authorized to receive service of process in the United States. No applicable international convention exists between the United States and Iranian parties. Thus, pursuant to § 1608(b)(3)(B), the Clerk of this Court addressed and dispatched copies of the Summons and Second Amended Complaint in this matter (both in English and translated into Farsi) via DHL Express to CBI (Waybill No. 2826447702), Bank Melli Iran (Waybill No. 7695887581) and NIOC (Waybill No. 7695917272). *See* ECF No. 21. Representatives of Bank Melli Iran and CBI signed for their packages on May 8, 2017 (ECF Nos. 29 and 30, respectively), and a representative of NIOC signed for its package on May 6, 2017. (ECF No. 28). Thus, service has been made on all Defendants under the FSIA.

### 3.     Constitutional Basis for Personal Jurisdiction Over All Defendants

Instrumentalities controlled by Iran, like the Defendants here, are not entitled to the due process protection of requiring minimum contacts with the United States for jurisdictional purposes. "Whenever a foreign sovereign controls an instrumentality to such a degree that a principal-agent relationship arises between them, the instrumentality receives the same due process protection as the sovereign: none." *GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 815 (D.C. Cir.

13

2012). *See also TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 301 (D.C. Cir.

2005) ("If the State of Ukraine exerted sufficient control over the SPF to make it an agent of the

State, then there is no reason to extend to the SPF a constitutional right that is denied to the

sovereign itself."). Where the constitutional right is denied, "no further minimum contacts analysis

is required, and the Court may exercise personal jurisdiction over defendant . . . based solely on

service under 28 U.S.C. § 1330." *Shoham v. Islamic Republic of Iran*, No. 12-CV-508 (RCL),

2017 WL 2399454, at *15 (D.D.C. June 1, 2017).

As shown above, Defendants are not merely owned by Iran, they are "extensively

controlled" by Iran. *GSS Grp.*, 680 F.3d at 814. Notably, this Court found Bank Saderat, a state-

owned bank similarly situated to Bank Melli, to be an agent of Iran:

> Bank Saderat was nationalized by the Iranian government in 1979 and has operated
> as a state-run bank since. It is funded, regulated by, and primarily owned by Iran or
> persons and entities under control of the Iranian government. Further, it is used by
> the Iranian government to further state policies of supporting and funding terrorist
> organizations around the world. The Court therefore finds that Iran exercises
> sufficient control over Bank Saderat to make it an agent of the state, barely
> distinguishable from an executive department of the government of Iran.

*Id.* at *15. All three Defendants act as arms of the government or set government policy, and their

activities are governed by the constitution and legislative acts of Iran. *See TMR*, 411 F.3d at 301-

02 (describing features of defendant that make it an agent of the foreign state). CBI sets "monetary

and credit policies for Iran and regulates Iranian banks. SAC ¶¶ 10, 13. As stated above, Bank

Melli Iran describes itself as a "powerful arm of the government." NIOC "is responsible for the

exploration, production, refining, and export of oil and petroleum products in Iran," which it does

"in accordance with Article 44 of the Constitution." Further, each Defendant acted at the behest of

the IRGC, which this Court has found is "not a 'separate legal person'" from Iran, but is "part and

parcel" of it. *Ben-Rafael v. Islamic Republic of Iran*, 718 F. Supp. 2d 25, 31, 33 (D.D.C. 2010)

(Huvelle, J.), and each acted as agents and co-conspirators of Iran in transferring hundreds of millions of dollars to the IRGC and Hezbollah.

Even if Defendants somehow did not have a principal-agent relationship with Iran, Defendants' support for terrorism specifically targeting Americans establishes their minimum contacts with this forum.[16] In *Mwani*, the D.C. Circuit credited "plaintiffs' allegations and evidence . . . that bin Laden and al Qaeda orchestrated the bombing of the American embassy in Nairobi, not only to kill both American and Kenyan employees inside the building, but to cause pain and sow terror in the embassy's home country, the United States." 417 F.3d at 13. The district court had personal jurisdiction over bin Laden and al Qaeda because they "'purposefully directed [their] activities at residents' of the United States, and [] this litigation results from injuries to the plaintiffs 'that arise out of or relate to' those activities.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). *See also Morris v. Khadr*, 415 F. Supp. 2d 1323, 1333-34 (D. Utah 2006) ("[C]ourts have held that the Due Process Clause's 'minimum contacts' requirement for personal jurisdiction is met when terrorists 'engage[] in unabashedly malignant actions directed at [and] felt in' the forum.").

Defendants knowingly conspired with Iran, Hezbollah, and the IRGC to commit these attacks specifically directed at U.S. service members and U.S. nationals and provided crucial material support for those attacks. *See* SAC ¶¶ 6, 12-13, 27-28, 47-50, 57-67, 77-83. Defendants not only operated at the behest of the IRGC, they were in some cases operated *by* the IRGC. For instance, as shown above, the Ministry of Petroleum, which owns and controls NIOC, was headed during some of the relevant period by IRGC brigadier general Rostam Qasemi.

---

[16] For an FSIA claim, it is the United States as a whole that is the appropriate forum for measuring defendant's contacts. *GSS Grp.*, 680 F.3d at 810 n.3.

*Mwani* also noted that the Nairobi embassy attacks were part of "an ongoing conspiracy to attack the United States, with overt acts occurring within this country's borders." 417 F.3d at 13. Likewise, Iran's targeting of U.S. service members in Iraq relied on a conspiracy with overt acts occurring within the United States. As alleged in the Complaint, SAC ¶ 5, and described in a number of public documents,[17] Defendants have engaged in a conspiracy to launder Eurodollars (which necessarily must be cleared through United States correspondent accounts and the S.W.I.F.T. messaging system in the United States) to support Iran's terror apparatus. *See* SAC. ¶¶ 12-13, 27-28, 47. Defendants therefore directed their actions at the United States and should anticipate being haled into a U.S. court. Accordingly, this Court has personal jurisdiction over the Defendants.

## CONCLUSION

Plaintiffs respectfully request that this Court find that it has subject matter and personal jurisdiction over Plaintiffs' claims.

Dated: September 11, 2017

Respectfully submitted,

OSEN LLC

By    /s/ Gary M. Osen
      Gary M. Osen (DC Bar No. NJ009)
      Ari Ungar (DC Bar No. NJ008)
      Michael J. Radine (DC Bar No. NJ015)
      William A. Friedman (DC Bar No. NJ012)
      2 University Plaza, Suite 402
      Hackensack, NJ 07601
      Tel. (201) 265-6400

---

[17]    *See* Exs. A, B, and C to the Friedman Decl. The Factual Statements annexed to Deferred Prosecution Agreements between the United States and Standard Chartered Bank and Lloyds TSB Bank Plc, respectively (Exs. A and B), describe the banks' roles in a conspiracy laundering Eurodollars for CBI, Bank Melli Iran, and others through the United States (acknowledged by each bank, Ex. A ¶ 2 and Ex. B ¶ 2). Some of the Eurodollars laundered through the United States as a result of the conspiracy were then transferred on behalf of Hezbollah and the IRGC. The indictment of Reza Zarrab (Ex. C) describes his role in laundering money for NIOC through the United States through several unnamed banks.

TURNER & ASSOCIATES, P.A.
C. Tab Turner
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
Tel. (501) 791-2277

Attorneys for Plaintiffs