UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
------------------------------------------------------------------------x
KELLI D. HAKE, et al.,                                  :
                                                        :
        Plaintiffs,                                  :
                                                        :  Case No.: 17-cv-114 (TJK)
-against-                                               :
                                                        :
BANK MARKAZI JOMHOURI ISLAMI IRAN, et al.,              :
                                                        :
        Defendants.                                  :
------------------------------------------------------------------------x


# MEMORANDUM OF LAW SETTING FORTH PLAINTIFFS' THEORY OF LIABILITY AGAINST ALL DEFENDANTS PURSUANT TO THE COURT'S ORDER DATED APRIL 18, 2018

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

I.   Plaintiffs' Theory of Liability Against All Defendants ........................................... 1

II.  Plaintiffs' Evidence Will Show That Defendants Are Agencies or Instrumentalities of Iran and Vicariously Liable for Plaintiffs' Injuries ................................................. 6

   A.   Bank Markazi Jomhouri Islami Iran ................................................................. 6

   B.   Bank Melli Iran ................................................................................................. 8

   C.   National Iranian Oil Company ........................................................................ 10

CONCLUSION .................................................................................................................... 12

# **TABLE OF AUTHORITIES**

**Cases**

*Bennett v. Islamic Republic of Iran*,
   825 F.3d 949 (9th Cir. 2016) ................................................................................................... 9

*Braun v. Islamic Republic of Iran*,
   228 F. Supp. 3d 64 (D.D.C. 2017) ............................................................................................ 3

*Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*,
   919 F. Supp. 2d 411 (S.D.N.Y. 2013) ...................................................................................... 9

*Flanagan v. Islamic Republic of Iran*,
   87 F. Supp. 3d 93 (D.D.C. 2015) .............................................................................................. 4

*Havlish v. Usama Bin Laden (In re Terrorist Attacks on Sept. 11, 2001)*,
   No. 03 MDL 1570 (GBD), 2011 WL 13244047 (S.D.N.Y. Dec. 22, 2011) ..................... *passim*

*National Iranian Oil Co. v. Ashland Oil, Inc.*,
   817 F. 2d 326 (5th Cir. 1987) ................................................................................................. 12

*Peterson v. Islamic Republic of Iran*,
   758 F.3d 185 (2d Cir. 2014) ..................................................................................................... 7

*Roth v. Islamic Republic of Iran*,
   78 F. Supp. 3d 379 (D.D.C. 2015) ..................................................................................... 3, 12

*Shoham v. Islamic Republic of Iran*,
   No. 12-cv-508 (RCL), 2017 WL 2399454 (D.D.C. June 1, 2017) ........................................ 5, 6

*Stansell v. Republic of Cuba*,
   217 F. Supp. 3d 320 (D.D.C. 2016) ...................................................................................... 3, 4

*Thuneibat v. Syrian Arab Republic*,
   167 F. Supp. 3d 22 (D.D.C. 2016) ........................................................................................... 4

**Statutes**

28 U.S.C. § 1603(b) ..................................................................................................................... 3, 6

28 U.S.C. § 1605A .................................................................................................................. 3, 4, 6

Iran Threat Reduction and Syria Human Rights Act of 2012, Pub. L. 112-158,
   126 Stat. 1214 (August 10, 2012) .......................................................................................... 11

**INTRODUCTION**

Pursuant to this Court's April 18, 2018 Order, Plaintiffs set out below (1) their theory of liability against all three Defendants, including a detailed description of the evidence upon which they intend to rely at time of trial that Defendants qualify as "agents" or "instrumentalities" of the Islamic Republic of Iran ("Iran"); and (2) relevant case law in which courts have found (or failed to find) liability in similar circumstances. Notably, one district court has previously found two of these Defendants liable as "agents and instrumentalities" of Iran under the terrorism exception to sovereign immunity in the Foreign Sovereign Immunities Act ("FSIA"). *See Havlish v. Usama Bin Laden (In re Terrorist Attacks on Sept. 11, 2001)*, No. 03 MDL 1570 (GBD), 2011 WL 13244047, at *41 (S.D.N.Y. Dec. 22, 2011) (finding Defendants Bank Markazi Jomhouri Islami Iran and the National Iranian Oil Company subject to liability "as agents of Iran under § 160[5]A of the FSIA").

**I.  Plaintiffs' Theory of Liability Against All Defendants**

Plaintiffs provided the Court with a more detailed summary of the allegations in the Second Amended Complaint in their Brief on Jurisdiction filed on September 11, 2017, ECF No. 40. In short, Plaintiffs are American service members[1] who were killed or injured in terrorist attacks while serving in Iraq, and their family members. Each attack at issue was committed by terrorists directed, trained, funded and otherwise supported by Iran (inclusive of its agencies and instrumentalities). Second Amended Complaint, ECF No. 23 ("SAC"), ¶¶ 1, 57-67, 127-134. After major combat operations in Iraq ended on May 1, 2003 and U.S. peacekeeping operations in Iraq commenced under United Nations mandate, Iran increased its flow of material support and resources to terrorist groups in Iraq, specifically to target U.S. and other Coalition peace-keeping

---

[1]  In two cases, however, the decedents were military contractors.

forces. *Id.*, ¶¶ 60-67. Iran provided this support primarily through its paramilitary force, the Islamic Revolutionary Guard Corps ("IRGC"); the IRGC's "special operations" branch, Qods Force ("IRGC-QF"), *id.*, ¶¶ 79-83; and Iran's Lebanon-based terrorism proxy, Hezbollah, *id.*, ¶¶ 53-60, 63-64.

Through the IRGC and Hezbollah, Iran cultivated, armed, trained, financed and supplied Shi'a terrorist groups in Iraq called "Special Groups" by the U.S. military. *Id.*, ¶¶ 88-95, 97-101, 104-19, 123-26. For example, Iran provided the Special Groups with sophisticated explosive devices with far more destructive power than the improvised explosives that terrorists in the region had access to, including Explosively Formed Penetrators ("EFPs") and Improvised Rocket-Assisted Munitions ("IRAMs"). *Id.*, ¶¶ 68-83. EFPs are a particularly effective form of machine-manufactured explosive weapon, usually made with steel tubing filled with explosives packed behind a concave copper disk. *Id.* Numerous U.S. government reports have identified Iran's role in supplying the Special Groups with these weapons and have detailed the devastating effect they have had on U.S. military vehicles and soldiers. *Id.*

The SAC alleges that Iran funded its terror campaign in Iraq with the direct knowledge and assistance of the Defendants who, together with other Iranian agencies, laundered more than $100 million in U.S. dollar-denominated assets for the benefit of Hezbollah and the IRGC through the United States in violation of U.S. and international economic sanctions. *Id.*, ¶¶ 5, 12-14, 26-27, 29-35, 47-50. Hezbollah and the IRGC, in turn, directed, trained, armed, supplied and funded the Special Groups. *Id.*, ¶¶ 57-83.

In their prior briefing, Plaintiffs provided the Court with the legal basis for the exercise of its jurisdiction over Defendants Bank Markazi Jomhouri Islami Iran ("Bank Markazi," "Central Bank of Iran" or "CBI"), Bank Melli Iran, and the National Iranian Oil Company ("NIOC").

Namely, that each entity (1) is a separate legal person, corporate or otherwise, (2) is an organ of a foreign state or of a political subdivision thereof, or a majority of whose shares or ownership interest is owned by a foreign state or political subdivision thereof, and (3) is not a citizen of the United States or created under the laws of any third country. 28 U.S.C. § 1603(b).

It is well-established in FSIA case law that provision of material support or resources to terrorists by a foreign state or by any political subdivision, agency, or instrumentality thereof, gives rise to vicarious liability pursuant to 28 U.S.C. § 1605A under a theory of civil conspiracy or aiding and abetting. *See Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 76 (D.D.C. 2017) (plaintiffs' liability claims against Iran for Hamas attack were valid based on showing that that attack "was perpetrated by Hamas, which has received long-standing material support and resources from the [Iranian] defendants.").

The FSIA defines "material support or resources" as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . , and transportation . . . ." *Stansell v. Republic of Cuba*, 217 F. Supp. 3d 320, 339 (D.D.C. 2016) (citing 28 U.S.C. § 1605A(h)(3) and 18 U.S.C. § 2339A). The court in *Stansell* found Cuba liable for terrorist acts committed by the foreign terrorist organization FARC in Colombia because plaintiffs there "presented satisfactory evidence to establish that their damages [arose] from Cuba's provision of material support and resources to the FARC . . . ." *Id.* at 338.

This District Court has found that liability for the "provision of material support and resources" under the FSIA applies to foreign states and their agencies and instrumentalities alike. For example, in *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 389 (D.D.C. 2015), this

Court found Iran's Ministry of Intelligence and Security (the "MOIS") liable for attacks committed by Hamas in Israel because "Iran route[d] its financial support for Hamas through MOIS," "a component organization of MOIS provide[d] training to Hamas operatives," and MOIS had been found by the Canadian government to have "transfer[red] $35,000,000 . . . to Hamas operatives." *Id.* Similarly, in *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 36 (D.D.C. 2016), this Court concluded that plaintiffs had provided "satisfactory proof that the defendants [including Syrian Military Intelligence] provided material support to [prominent Jordanian terrorist Abu Musab al-]Zarqawi and [al-Qaeda in Iraq], enabling them to perpetrate [the] attacks," in part by providing "essential financial services to Zarqawi, who financed the attacks using funds that moved through Syria." *Id*. (internal citations and quotation marks omitted).

Plaintiffs' evidence, which will be presented via expert testimony and other admissible means, will show that Iran used its central bank (i.e., Defendant CBI), its largest commercial bank (Bank Melli) and the National Iranian Oil Company to effect the transfer of hundreds of millions of U.S. dollar-denominated assets to the IRGC and Hezbollah, thus providing them with essential material support and resources necessary to orchestrate spectacular and catastrophic attacks against American service members. SAC, ¶¶ 57-67, 78-126. *See Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 106 (D.D.C. 2015) (finding IRGC liable under § 1605A as agency or instrumentality of Iran for al-Qaeda's bombing of the U.S.S. Cole based upon the IRGC's provision of financial support and training to al-Qaeda operatives and support for "Hezbollah, which in turn provided training for [a]l-Qaeda . . . .").

As noted above, the Southern District of New York district court found both CBI and NIOC to be agencies and instrumentalities of Iran legally responsible under § 1605A for the terrorist attacks of September 11, 2001:

4

>Defendants Hizballah, the National Iranian Tanker Corporation, *the National Iranian Oil Corporation*, the National Iranian Gas Company, Iran Airlines, the National Iranian Petrochemical Company, and *the Central Bank of the Islamic Republic of Iran*, at all relevant times acted as agents or instrumentalities of defendant Iran. Each of these Defendants is subject to liability as agents of Iran under § 160[5]A(c) of the FSIA . . . .

*In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *41 (emphasis added).

In finding CBI liable for its provision of material support, the *In re Terrorist Attacks on Sept. 11, 2001* court noted that "[t]he transfers of huge sums of Iranian money to terrorist organizations such as Hamas and Hizballah . . . can only be accomplished with the complicity and/or knowledge and acquiescence of [CBI]. The same must be true in the case of banking transactions between Iranian agencies and instrumentalities and terrorist organizations. *The Central Bank of Iran facilitates the transfer of money to terrorist groups*." *Id.* at *9 (emphasis added, internal citations omitted).

Additionally, at least one decision issued in this district observed (in *dicta*) that Iran's state-owned financial institutions could be liable for Iranian-sponsored terrorist attacks under the FSIA. In *Shoham*, plaintiffs argued that Iran and Bank Saderat, a major Iranian bank,[2] "materially supported Hezbollah and [Palestinian political and terrorist group] Fatah, which led to" the terrorist attack that caused plaintiffs' injuries. *Shoham v. Islamic Republic of Iran*, No. 12-cv-508 (RCL), 2017 WL 2399454, at *3 (D.D.C. June 1, 2017). Although ultimately concluding that the plaintiffs failed to establish which terrorist group was responsible for the terrorist attack, the Court found that "Bank Saderat is an instrumentality of Iran and was generally used to further the state policy of Iran, including the incitement and support of terrorist attacks . . . ." *Id.* at *8. The *Shoham* Court

---

[2]   Unlike Defendants here, Bank Saderat was purportedly privatized by Iran; however, the Court in *Shoham* found that the alleged "privatization" of Bank Saderat was a sham, and, accordingly, that the bank was an instrumentality of Iran. *Id.* at *8.

5

also found that it had both subject matter and personal jurisdiction over the Iranian state-owned Bank Saderat pursuant to the FSIA since, "as an agency or instrumentality of Iran, [the bank] was a serial participant in coordinating finances for Hezbollah and distributing funds to terrorist organizations . . . ." *Id.* at *13-15.

In sum, the three Defendants in this action qualify as "agents and instrumentalities" of Iran under 28 U.S.C. § 1603(b), and their alleged conduct in this case satisfies § 1605A's requirement of "the provision of material support or resources" for the acts of terrorism that injured the Plaintiffs here.

## II. Plaintiffs' Evidence Will Show That Defendants Are Agencies or Instrumentalities of Iran and Vicariously Liable for Plaintiffs' Injuries.

### A. Bank Markazi Jomhouri Islami Iran

Defendant Bank Markazi is an alter-ego and instrumentality of the Iranian government. According to CBI itself, as Iran's central bank, it is "responsible for the design and implementation of the monetary and credit policies with due regard to the general economic policy of the country."[3] Courts have agreed. For example, one district court has found that "the Central Bank of the Islamic Republic of Iran [is an] agenc[y] and instrumentalit[y] of the state of Iran. [It] has a legal corporate existence outside the government and core functions which are commercial, not governmental, in nature. [It] is, however, tightly connected to the government of Iran, and [it] is an organ of the government and/or has been owned, directed, and controlled by the Iranian state." *In re Terrorist Attacks on Sept. 11, 2001,* 2011 WL 13244047, at *7.

The same court also found that:

The entire apparatus of the Iranian state and government, and many parts of Iran's private sector, including corporations (e.g., National Iranian Oil Company, Iran Air,

---

[3] CBI, *General Information*, http://www.cbi.ir/Page/GeneralInformation.aspx (last accessed June 15, 2018). *See* SAC, ¶ 10.

> Iran Shipping Lines); banks (e.g., Central Bank [of Iran], Bank Sepah); state-run media (e.g., IRIB television, the Islamic Revolution News Agency ("IRNA"), Kayhan, and other daily newspapers); private individuals; and even charities are at the service of [Iran's] Supreme Leader, the IRGC, and the [Ministry of Intelligence] *when it comes to support of terrorism.*

*Id*. at *6 (emphasis added). The Second Circuit has also confirmed that CBI "is wholly owned by the Iranian government." *Peterson v. Islamic Republic of Iran*, 758 F.3d 185, 188 (2d Cir. 2014), *aff'd sub nom. Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016).

CBI has routinely used Iranian banks like Defendant Bank Melli Iran as conduits for terror financing and weapons proliferation on behalf of the Iranian regime. SAC, ¶¶ 12-14. For example, a 2007 U.S. Treasury press release regarding the designation of the Iranian-owned Bank Saderat as a Specially Designated Global Terrorist ("SDGT") noted that:

> Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hezbollah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat *transferred $50 million from the **Central Bank of Iran** through its subsidiary in London to its branch in Beirut for the benefit of Hezbollah fronts in Lebanon that support acts of violence*.

*Id*., ¶ 12 (emphasis added in SAC).

Likewise, according to the U.S. Treasury's Financial Crimes Enforcement Network ("FinCEN"):

> The Central Bank of Iran, which regulates Iranian banks, has assisted designated Iranian banks by transferring billions of dollars to these banks in 2011. In mid-2011, the CBI transferred several billion dollars to designated banks, including Saderat, Mellat, EDBI and Melli, through a variety of payment schemes. In making these transfers, the CBI attempted to evade sanctions by minimizing the direct involvement of large international banks with both CBI and designated Iranian banks.

*Id.*, ¶ 13.

B.     **Bank Melli Iran**

Defendant Bank Melli Iran, Iran's largest commercial bank, was established in 1927 by order of the Iranian Parliament and has remained a state-owned bank thereafter. Bank Melli Iran describes itself as "a powerful arm of the government."[4] According to the U.S. government, between 2004 and 2011, Bank Melli Iran transferred at least $100 million to the IRGC. SAC, ¶ 26. In October 2007 and throughout the remainder of the relevant period, Bank Melli Iran was designated a Specially Designated National ("SDN") pursuant to Executive Order ("E.O.") 13,382.[5] The U.S. Treasury Department press release announcing the designations stated:

> Bank Melli also provides banking services to the [IRGC] and the Qods Force. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

*Id.*, ¶ 27.

A State Department diplomatic cable from March 2008 noted that:

> Bank Melli and the Central Bank of Iran also provide crucial banking services to the Qods Force, the IRGC's terrorist supporting arm that was headed by UNSCR 1747 designee Commander Ghassem Soleimani. Soleimani's Qods Force leads Iranian support for the Taliban, Hezbollah, Hamas and the Palestinian Islamic Jihad. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services.

---

[4]     Bank Melli Iran, History of Bank Melli Iran, http://bmi.ir/En/BMIHistory.aspx?smnuid=10011 (last accessed June 15, 2018). CBI's website also lists Bank Melli Iran as a government-owned bank. *See* http://www.cbi.ir/simplelist/3088.aspx (last accessed June 15, 2018).

[5]     "The Office of Foreign Assets Control ('OFAC') of the U.S. Department of the Treasury administers and enforces economic and trade sanctions based on US foreign policy and national security goals against targeted foreign countries and regimes, terrorists, international narcotics traffickers, those engaged in activities related to the proliferation of weapons of mass destruction, and other threats to the national security, foreign policy or economy of the United States." https://www.treasury.gov/about/organizational-structure/offices/Pages/Office-of-Foreign-Assets-Control.aspx.

*Id.*, ¶ 28.

In addition, during the relevant period, Bank Melli Iran provided financing to the Iranian-owned Mahan Airlines (itself an SDGT) and Iran's Ministry of Defense and Armed Forces Logistics in order to assist them in evading U.S. sanctions. *Id.*, ¶ 29. For example, Bank Melli Iran issued a Letter of Credit to Mahan Airlines in August 2004 to help Mahan Airlines illegally acquire aircraft engines subject to U.S. embargo. *Id.*, ¶ 30. Bank Melli Iran's financial support and assistance to Mahan Airlines is particularly significant because on October 12, 2011, the United States designated Mahan Airlines an SDGT for "providing financial, material and technological support to the" IRGC-QF and specifically for "facilitat[ing] the covert travel of suspected IRGC-QF officers into and out of Iraq." *Id.*, ¶¶ 31-32. The United States also designated Mahan Airlines for "transport[ing] personnel, weapons and goods on behalf of Hezbollah." *Id.*, ¶ 32.

In addition to the U.S. government-issued reports of the types described above, Plaintiffs will rely on the factual findings of other U.S. district courts to establish that Bank Melli is an agency or instrumentality of Iran. *See, e.g.*, *Bennett v. Islamic Republic of Iran*, 825 F.3d 949, 954-957 (9th Cir. 2016) ("Bank Melli is an instrumentality of Iran. It asserts that Plaintiffs cannot execute on the assets . . . because Bank Melli enjoys sovereign immunity under the Foreign Sovereign Immunities Act of 1976 . . . . It is undisputed that Bank Melli qualifies as an instrumentality of Iran under the FSIA."); *Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*, 919 F. Supp. 2d 411, 418-19 (S.D.N.Y. 2013) ("[T]he Central Bank of Iran expressly recognizes Bank Melli Iran as a 'commercial government-owned bank.' Bank Melli states in a financial report available on its website that '[t]he capital is completely owned by the Government of the Islamic Republic of Iran.' Based on the express statements of Bank Melli, the petitioners

have established that Bank Melli is an 'instrumentality' of the government of Iran. 28 U.S.C. § 1603(b).") (internal citations omitted).

### C. National Iranian Oil Company

The National Iranian Oil Company, owned and overseen by the government of Iran through its Ministry of Petroleum, is responsible for the exploration, production, refining and exporting of oil and petroleum products in Iran. SAC, ¶ 36.[6] According to its website, "NIOC, in accordance with Article 44 of the Constitution, gives authority to different sectors, while supervising oil industry activities."[7] In 2008, the U.S. Treasury identified NIOC (and other Iranian agencies) as "centrally involved in the sale of Iranian oil, as entities that are owned or controlled by the [Government of Iran]." *Id.*, ¶ 39. Pursuant to E.O. 13,382, the U.S. government designated NIOC an SDN.

> In September 2012, the U.S. Treasury Department reported to Congress that:
>
> Recently, the IRGC has been coordinating a campaign to sell Iranian oil in an effort to evade international sanctions, specifically those imposed by the European Union that prohibit the import, shipping, and purchase of Iranian oil, which went into full effect on July 1, 2012.
>
> Under the current Iranian regime, the IRGC's influence has grown within National Iranian Oil Co. For example, on August 3, 2011, Iran's parliament approved the appointment of Rostam Qasemi, a Brigadier General in the IRGC, as Minister of Petroleum. Prior to his appointment, Qasemi was the commander of Khatam Al-Anbia, a construction and development wing of the IRGC that generates income and funds operations for the IRGC. Even in his new role as Minister of Petroleum, Qasemi has publicly stated his allegiance to the IRGC.

*Id.*, ¶ 42.

---

[6]     *See* Press Release, U.S. Dep't of the Treasury, Treasury Submits Report to Congress on NIOC and NITC (Sept. 24, 2012), *available at* https://www.treasury.gov/press-center/press-releases/Pages/tg1718.aspx.

[7]     NIOC, *NIOC at a Glance*, http://www.nioc.ir/portal/home/?generaltext/81026/81171/67776/ (last accessed June 15, 2018).

Under the Iran Threat Reduction and Syria Human Rights Act of 2012 ("ITRSHRA"), Pub. L. 112-158, 126 Stat. 1214 (August 10, 2012), the U.S. government determined that NIOC is an agent or affiliate of the IRGC under section 104(c)(2)(E)(i) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 and section 302 of ITRSHRA. *Id.*, ¶ 44. As part of that 2012 certification, NIOC was formally determined to be part of the government of Iran. *Id*.

In addition, the ITRSHRA provided that:

> It is the sense of Congress that the National Iranian Oil Company and the National Iranian Tanker Company are not only owned and controlled by the Government of Iran but that those companies provide significant support to Iran's Revolutionary Guard Corps and its affiliates.[8]

NIOC has supported the IRGC's terror operations in multiple ways. For example, NIOC used its oil and natural gas revenues to launder money for the IRGC, often using Defendant CBI for this purpose. *See In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *5. NIOC obtained letters of credit from Western banks to provide financing and credit to the IRGC.[9] NIOC has also supported Iranian attacks on U.S. forces in Iraq. In 2009, the Combatting Terrorism Center at West Point reported on NIOC's role in studying U.S. troop movements in Iraq:

> The establishment of a new U.S. and Iraqi [Forward Operating Base] on the Iranian border has resulted in three waves of attacks in an area that was formerly devoid of incidents …. The incident occurred in the same district as the February 2007 EFP attack on a British aircraft at a Buzurgan dirt airstrip, itself a reaction by Special Groups to UK long-range patrolling of the Iranian border. This part of the border is

---

[8] In designating certain financial institutions and businessmen in September 2013, the U.S. Treasury Department identified entities "willing to engage in deceptive transactions to conceal the direct involvement of the Iranian Government and its instrumentalities such as the National Iranian Oil Company (NIOC)…." Treas. JL-2158 (Dept. Treas.), 2013 WL 4768326. After the events giving rise to the claims herein, the U.S. government temporarily withdrew this determination as of 2016. On January 16, 2016 as part of "Implementation Day" for the U.S. government's understanding with Iran relating to its nuclear weapons program ("JCPOA"), the U.S. Treasury Department "determined that NIOC is no longer an agent or affiliate of the IRGC." It remains wholly owned and controlled by Iran. With the recent U.S. withdrawal from the JCPOA, that determination may be revisited.

[9] The Superseding Indictment filed in *U.S. v. Zarrab*, No. 15-cr-00867 (S.D.N.Y March 30, 2016), Exhibit C to the previously filed Declaration of William A. Friedman, dated Sept. 11, 2017, ECF No. 40-4, demonstrates that, as late as 2013, NIOC continued to illegally launder U.S. dollars through U.S. financial institutions.

11

increasingly the scene of U.S. and Iranian countermoves to support their proxies and patrol the frontier; Iranian intelligence gathering takes place using National Iranian Oil Company helicopters and border guards, while U.S.-Iraqi helicopter-borne joint patrols provide moral and material support to isolated Iraqi border posts and local communities.

SAC, ¶ 48.

U.S. courts have also identified NIOC as an agency or instrumentality of Iran that materially supports terrorism. *See, e.g., In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 1344047 at *8 ("[T]he National Iranian Oil Company is owned, controlled, and managed by the Government of Iran. A large cash flow of money was funneled to terrorist organizations through the NIOC."). *National Iranian Oil Co. v. Ashland Oil, Inc.*, 817 F. 2d 326, 328 (5th Cir. 1987) (finding that NIOC is "an instrumentality of the Islamic Republic of Iran").

## CONCLUSION

For the foregoing reasons, Plaintiffs' evidence will prove that Defendants were at all time relevant to the action agencies or instrumentalities of Iran pursuant to 28 U.S.C. § 1603(b) and are vicariously liable to Plaintiffs pursuant to 28 U.S.C. § 1605A.

Dated: June 18, 2018
Hackensack, New Jersey

                        Respectfully submitted,

                        OSEN LLC

                By    /s/ Gary M. Osen
                        Gary M. Osen (DC Bar No. NJ009)
                        Ari Ungar (DC Bar No. NJ008)
                        Michael J. Radine (DC Bar No. NJ015)
                        William A. Friedman (DC Bar No. NJ012)
                        2 University Plaza, Suite 402
                        Hackensack, NJ 07601
                        Tel. (201) 265-6400

TURNER & ASSOCIATES, P.A.
C. Tab Turner
4705 Somers Avenue, Suite 100
North Little Rock, AR 72116
Tel. (501) 791-2277

Attorneys for Plaintiffs