UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
------------------------------------------------------------------------x
KELLI D. HAKE, et al.,                                         :
                                                              :
                          Plaintiffs,                         :          Case No. 17-cv-114 (TJK)
                                                              :
-against-                                                     :
                                                              :
BANK MARKAZI JOMHOURI ISLAMI IRAN, et al.,                    :
                                                              :
                          Defendants.                         :
------------------------------------------------------------------------x

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ vi

I.   BACKGROUND ...................................................................... 3

   A.   Overview of the Action ....................................................... 3

   B.   Plaintiffs' Burden of Proof under 28 U.S.C. § 1608(e) .................... 5

   C.   The Court's Evidentiary Standards under 28 U.S.C. § 1608(e) ............. 6

   D.   Plaintiffs' Evidence ......................................................... 7

      1.   Plaintiffs' Expert Witnesses ........................................... 7

      2.   Plaintiffs' Exhibits and Fact Witness Evidence ........................ 12

II.  PROPOSED FINDINGS OF FACT ..................................................... 15

   A.   Iran's Longstanding History of Orchestrating Acts of International Terrorism as an Instrument of Regime Policy ............................. 16

      1.   Formation and Development of Hezbollah ............................... 20

      2.   Hezbollah's Longstanding History of Launching Terrorist Attacks at Iran's Behest ......................................................... 22

      3.   Hezbollah's Development of Advanced Tactics ......................... 23

         a.   Hezbollah's TTP for Emplacing IEDs .............................. 24

         b.   Hezbollah's TTP for Indirect Fire ............................... 26

   B.   Iran's Strategic Goals in Iraq After the 2003 U.S.-Led Invasion ........ 28

      1.   The IRGC-QF's Role in Iraq .......................................... 31

      2.   Hezbollah and the IRGC-QF Introduced EFPs into Iraq ................. 33

      3.   Indicators of Hezbollah Training in the "TTP" Used by IRGC/Hezbollah Proxy Groups ..................................................... 34

      4.   Hezbollah's Central Role in Training Iranian Terror Cells in Iraq .... 36

         a.   Hezbollah's Role in Training EFP Cells .......................... 37

         b.   Hezbollah's Role in Training Iranian Terror Cells on Indirect Fire .... 38

i

5. The U.S. Military's Response ..................................................... 39

    a. Technological and Material Counter-Measures ...................................... 40

    b. Tracing Materials and Technology Back to Iran .................................... 41

    c. Military and Intelligence Efforts to Combat Malign Iranian Influence ................. 45

C. Hezbollah's Development of EFPs .................................................... 46

  1. Metallic Properties and Structural Design ........................................ 47

  2. Chemical and Metallurgical Composition of EFPs .................................. 49

  3. EFP Trigger Mechanisms ....................................................... 52

D. The IRGC-QF and Hezbollah's Initial Proxies in Iraq .................................. 55

  1. The Supreme Council for the Islamic Revolution in Iraq ("SCIRI") and the Badr Corps ......................................................................... 55

  2. Muqtada al-Sadr and Jaysh al-Mahdi ("JAM") .................................... 57

  3. The Emergence of IRGC and Hezbollah Proxy Groups 2004 – 2011 .................. 61

    a. JAM Special Groups .......................................................... 61

    b. Asa'ib Ahl al-Haq ("AAH") .................................................... 66

      1. Establishment of AAH ...................................................... 66

      2. Ali Musa Daqduq's Role in Directing AAH .................................... 68

    c. Sheibani Network (Badr) ...................................................... 70

    d. Kata'ib Hezbollah ("KH") ..................................................... 72

    e. Promised Day Brigades ("PDB") ................................................ 75

E. Defendants' Provision of Material Support to Iranian Agents ............................ 76

  1. The CBI's Provision of Material Support for Iranian Terrorism ...................... 81

    a. The CBI Is a Tool of the Government of Iran and Operates as Its Banker ............ 81

    b. The CBI's Legal Framework Consists of Government Regulations and Officials ...................................................................... 83

      c.    The CBI's Operations Are Controlled by the Government in Practice Even More than Permitted by Statute. .................................................................................... 84

      d.    Iran Used the CBI to Support Its Terrorist Activities. .............................................. 88

   2.    Bank Melli's Provision of Material Support for Iranian Terrorism ........................... 96

      a.    Bank Melli Is 100% Government-Owned and Is the Largest Provider of Banking Services to the Iranian Government. ......................................................... 96

      b.    Bank Melli Provided Material Support to the IRGC. .............................................. 99

      c.    Bank Melli Provided Material Support to Mahan Air. ......................................... 101

      d.    Bank Melli Provided Material Support to Iran's Defense Industries Organization. ....................................................................................................... 103

   3.    NIOC's Provision of Material Support for Iranian Terrorism .................................. 104

      a.    NIOC is Owned by, and Generates Billions of Dollars in Annual Revenue for, Iran. ......................................................................................................... 104

      b.    NIOC Supports the IRGC and Iranian Terrorism. ................................................ 105

F.    Mechanisms Defendants Used to Launder Funds Through the International Financial System ...................................................................................................... 110

   1.    Defendants' Money Laundering Scheme Enabled Them to Divert U.S. Dollar Funds to the IRGC and Hezbollah in Support of Iranian-Sponsored Terrorism. ................. 110

      a.    The CBI Orchestrated Illicit Transactions on Behalf of Iran. ............................... 114

      b.    Bank Melli Orchestrated Illicit Transactions on Behalf of Iran. .......................... 115

      c.    NIOC, Aided by CBI, Orchestrated Illicit Transactions on Behalf of Iran. ......... 116

   2.    Defendants' Money Laundering Scheme Enabled Iran to Acquire Restricted Items for Use in Terrorism. ............................................................................................... 119

III.    THE BELLWETHER ATTACKS ................................................................................... 120

  A.    The May 3, 2005 Attack – Baghdad ............................................................................ 120

  B.    The October 22, 2006 Attack – Baghdad .................................................................... 124

  C.    The March 17, 2008 Attack – New Baghdad .............................................................. 129

  D.    The March 23, 2008 Attack – Baghdad ....................................................................... 133

    E.    The May 9, 2008 Attack – Baghdad ........................................................... 140

    F.    The May 17, 2009 Attack – Baghdad ......................................................... 145

    G.    The January 20, 2007 Attack on the Karbala PJCC ..................................... 151

IV.    THE COURT SHOULD TAKE JUDICIAL NOTICE OF FACTUAL FINDINGS IN
    *KARCHER* .................................................................................................... 162

V.    CONCLUSIONS OF LAW: JURISDICTION .............................................. 165

    A.    This Court Has Subject Matter Jurisdiction ............................................... 165

    B.    Defendants Are Not Entitled to Sovereign Immunity ................................. 167

        1.    Elements One Through Four ............................................................ 168

        2.    Fifth Element: Terrorist Acts .......................................................... 169

        3.    Sixth and Seventh Elements ........................................................... 171

        4.    Additional Jurisdictional Requirements ......................................... 173

    C.    This Court Has Personal Jurisdiction ......................................................... 174

        1.    Statutory Basis for Personal Jurisdiction Over Defendants.................... 174

        2.    Plaintiffs Have Served Each Party.................................................. 174

        3.    Constitutional Basis for Personal Jurisdiction Over All Defendants ...................... 176

VI.    CONCLUSIONS OF LAW: LIABILITY ...................................................... 178

    A.    Defendants Are Vicariously Liable for Plaintiffs' Injuries .......................... 179

    B.    Defendants Met the *Mens Rea* Requirements for Vicarious Liability ........... 181

    C.    Defendants Proximately Caused Plaintiffs' Injuries ................................... 182

        1.    CBI's Provision of Material Support Was a Substantial Factor in the Sequence of
            Events that Led to Plaintiffs' Injuries....................................................... 184

        2.    Bank Melli's Provision of Material Support Was a Substantial Factor in the Sequence
            of Events that Led to Plaintiffs' Injuries. ................................................ 188

        3.    NIOC's Provision of Material Support Was a Substantial Factor in the Sequence of
            Events that Led to Plaintiffs' Injuries....................................................... 190

        4.    The Attacks Were a Foreseeable Result of Defendants' Conduct............................ 192

iv

D.   Federal Cause of Action ............................................................................ 193

  1.   Generally ............................................................................................... 193

  2.   Theories of Liability ............................................................................. 194

      a.   Intentional Infliction of Emotional Distress ......................... 195

      b.   Assault..................................................................................... 197

      c.   Battery ..................................................................................... 197

      d.   Wrongful Death ...................................................................... 197

      e.   Survival ................................................................................... 198

      f.   Solatium ................................................................................... 198

CONCLUSION........................................................................................................ 199

## TABLE OF AUTHORITIES

**Cases**

*Acosta v. Islamic Republic of Iran*,
   574 F. Supp. 2d 15 (D.D.C. 2008) ................................................................. 179, 181

*Allan v. Islamic Republic of Iran*,
   No. 17-cv-338 (RJL), 2019 WL 2185037 (D.D.C. May 21, 2019)................................ 168, 179

*Beech Aircraft Corp. v. Rainey*,
   488 U.S. 153 (1988) ................................................................................. 13

*Belkin v. Islamic Republic of Iran*,
   667 F. Supp. 2d 8 (D.D.C. 2009) ..................................................................... 179

*Bennett v. Islamic Republic of Iran*,
   825 F.3d 949 (9th Cir. 2016)........................................................................... 167

*Bettis v. Islamic Republic of Iran*,
   315 F.3d 325 (D.C. Cir. 2003) ...................................................................... 195

*Bodoff v. Islamic Republic of Iran*,
   424 F. Supp. 2d 74 (D.D.C. 2006) ................................................................... 181

*Brewer v. Islamic Republic of Iran*,
   664 F. Supp. 2d 43 (D.D.C. 2009) ................................................ 163, 174, 175, 193

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ................................................................................. 177

*Campuzano v. Islamic Republic of Iran*,
   281 F. Supp. 2d 258 (D.D.C. 2003) .................................................................... 5

*Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya*,
   811 F. Supp. 2d 53 (D.D.C. 2011) ................................................................... 180

*Cohen v. Islamic Republic of Iran*,
   238 F. Supp. 3d 71 (D.D.C. 2017) ................................................................... 170

*Dammarell v. Islamic Republic of Iran*,
   404 F. Supp. 2d 261 (D.D.C. 2005). ................................................................ 196

*Edmond v. United States Postal Serv. Gen. Counsel*,
   949 F.2d 415 (D.C. Cir. 1991) ...................................................................... 174

*Eisenfeld v. Islamic Republic of Iran,*
  172 F. Supp. 2d 1 (D.D.C. 2000) ........................................................ 196, 198

*Elahi v. Islamic Republic of Iran,*
  124 F. Supp. 2d 97 (D.D.C. 2000) ............................................................... 198

*Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch,*
  919 F. Supp. 2d 411 (S.D.N.Y. 2013) ......................................................... 167

*Estate of Heiser v. Islamic Republic of Iran,*
  659 F. Supp. 2d 20 (D.D.C. 2009) ...................................................... 196, 199

*Flanagan v. Islamic Republic of Iran,*
  87 F. Supp. 3d 93 (D.D.C. 2015) ................................................................... 14

*Flatow v. Islamic Republic of Iran,*
  999 F. Supp. 1 (D.D.C. 1998) ...................................................................... 197

*Foley v. Syrian Arab Republic,*
  249 F. Supp. 3d 186 (D.D.C. 2017) ............................................................. 179

*Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran,*
  313 F. Supp. 3d 50 (D.D.C. May 1, 2018) .................................................... 15

*Fritz v. Islamic Republic of Iran,*
  320 F. Supp. 3d 48 (D.D.C. 2018) ........................................................ *passim*

*Gang Luan v. United States,*
  722 F.3d 388 (D.C. Cir. 2013) .................................................................... 165

*Gill v. Islamic Republic of Iran,*
  249 F. Supp. 3d 88 (D.D.C. 2017) ................................... 169, 170, 179, 197

*GSS Grp. Ltd v. Nat'l Port Auth.,*
  680 F.3d 805 (D.C. Cir. 2012) .................................................................... 176

*Halberstam v. Welch,*
  705 F.2d 472 (D.C. Cir. 1983) ............................................................. 180, 181

*Han Kim v. Democratic People's Republic of Korea,*
  774 F.3d 1044 (D.C. Cir. 2014) ............................................................ 6, 169

*Harrison v. Republic of Sudan,*
  882 F. Supp. 2d 23 (D.D.C. 2012 ....................................................... 162, 163

*Havlish v. Usama Bin Laden (In re Terrorist Attacks on Sept. 11, 2001),*
  No. 03 MDL 1570 (GBD), 2011 WL 13244047 (S.D.N.Y. Dec. 22, 2011) ..................... *passim*

*Holland v. Islamic Republic of Iran*,
496 F. Supp. 2d 1 (D.D.C. 2005) ...................................................................... 174

*Holliday v. J S Exp., Inc.*,
No. 12-cv-1732 (ERW), 2013 WL 2395333 (E.D. Mo. May 30, 2013) ................................. 13

*In re Islamic Republic of Iran Terrorism Litig.*,
659 F. Supp. 2d 31 (D.D.C. 2009) ..................................................................... 195

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*,
513 U.S. 527 (1995) ..................................................................................... 182

*Karcher v. Islamic Republic of Iran*,
396 F. Supp. 3d 12 (D.D.C. 2019) ............................................................... *passim*

*Karcher v. Islamic Republic of Iran*,
No. 16-cv-232 (CKK), 2019 WL 4305482, (D.D.C. Sept. 11, 2019) ............................... 3, 165

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
376 F.3d 1123 (D.C. Cir. 2004) ........................................................... 172, 182, 183

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
732 F.3d 161 (2d Cir. 2013) ............................................................................ 178

*Maalouf v. Islamic Republic of Iran*,
923 F.3d 1095 (D.C. Cir. 2019) ........................................................................ 194

*Mohammadi v. Islamic Republic of Iran*,
782 F.3d 9 (D.C. Cir. 2015) ............................................................................ 170

*Morris v. Khadr*,
415 F. Supp. 2d 1323 (D. Utah 2006) ................................................................. 177

*Moss v. Ole S. Real Estate, Inc.*,
933 F.2d 1300 (5th Cir. 1991) .......................................................................... 13

*Murphy v. Islamic Republic of Iran*,
740 F. Supp. 2d 51 (D.D.C. 2010) ..................................................................... 199

*Mwani v. bin Laden*,
417 F.3d 1 (D.C. Cir. 2005) ..................................................... 174, 176, 177, 178

*National Iranian Oil Co. v. Ashland Oil, Inc.*,
817 F.2d 326 (5th Cir. 1987) .......................................................................... 167

*Owens v. Republic of Sudan*,
374 F. Supp. 2d 1 (D.D.C. 2005) ...................................................................... 183

*Owens v. Republic of Sudan,*
   826 F. Supp. 2d 128 (D.D.C. 2011) .................................................................. 5, 194

*Owens v. Republic of Sudan,*
   864 F.3d 751 (D.C. Cir. 2017) ........................................................... *passim*

*Paroline v. United States,*
   572 U.S. 434 (2014) ................................................................................ 182

*Peterson v. Islamic Republic of Iran,*
   264 F. Supp. 2d 46 (D.D.C. 2003) ........................................................ 15, 21

*Peterson v. Islamic Republic of Iran,*
   No. 10-cv-4518 KBF, 2013 WL 1155576 (S.D.N.Y. Mar. 13, 2013) ...................................... 83

*Rimkus v. Islamic Republic of Iran,*
   750 F. Supp. 2d 163 (D.D.C. 2010) .................................................... 162, 163

*Roeder v. Islamic Republic of Iran,*
   333 F.3d 228 (D.C. Cir. 2003) ............................................................. 166

*Rothstein v. UBS AG,*
   708 F.3d 82 (2d Cir. 2013) .................................................................. 182

*S.E.C. v. Pentagon Capital Management PLC,*
   722 F. Supp. 2d 440 (S.D.N.Y. 2010) ...................................................... 13

*Schertzman Cohen v. Islamic Republic of Iran,*
   No. 17-cv-1214 (JEB), 2019 WL 3037868  (D.D.C. July 11, 2019) ...................... 194, 195, 197

*Shoham v. Islamic Republic of Iran,*
   No. 12-cv-508 (RCL), 2017 WL 2399454 (D.D.C. June 1, 2017) ................ 166, 176, 177, 183

*Stern v. Islamic Republic of Iran,*
   271 F. Supp. 2d 286 (D.D.C. 2003) ..................................................... 15, 198

*Stethem v. Islamic Republic of Iran,*
   201 F. Supp. 2d 78 (D.D.C. 2002) ......................................................... 196

*Tavoulareas v. Piro,*
   759 F.2d 90 (D.C. Cir. 1985) ............................................................... 172

*Taylor v. Islamic Republic of Iran,*
   811 F. Supp. 2d 1 (D.D.C. 2011) ......................................................... 162

*TMR Energy Ltd. v. State Prop. Fund of Ukraine,*
   411 F.3d 296 (D.C. Cir. 2005) ............................................................. 176

*Tracinda Corp. v. DaimlerChrysler AG,*
  502 F.3d 212 (3d Cir. 2007) ................................................................ 172

*Union Pac. R.R. Co. v. Kirby Inland Marine, Inc. of Miss.,*
  296 F.3d 671 (8th Cir. 2002) .............................................................. 14

*United States v. Atilla,*
  No. 15-cr-867 (RMB), 2018 WL 791348 (S.D.N.Y. Feb. 7, 2018) ..................... 79

*United States v. Midwest Fireworks Mfg. Co., Inc.,*
  248 F.3d 563 (2d Cir. 2001) ............................................................... 14

*Valencia v. Islamic Republic of Iran,*
  774 F. Supp. 2d 1 (D.D.C. 2010) ........................................................ 199

*Valore v. Islamic Republic of Iran,*
  700 F. Supp. 2d 52 (D.D.C. 2010) ................................................. *passim*

*Weinstein v. Islamic Republic of Iran,*
  175 F. Supp. 2d 13 (D.D.C. 2001) ..................................................... 167

*Weinstein v. Islamic Republic of Iran,*
  184 F. Supp. 2d 13 (D.D.C. 2002) ....................................................... 5

*Weinstein v. Islamic Republic of Iran,*
  609 F.3d 43 (2d Cir. 2010) ............................................................. 167

*Wultz v. Islamic Republic of Iran,*
  864 F. Supp. 2d 24 (D.D.C. 2012) ..................................................... 197

**Statutes**

18 U.S.C. § 2339A ..................................................................... 172

22 U.S.C. § 8513 ....................................................................... 92

28 U.S.C. § 1330(a) ................................................................... 165

28 U.S.C. § 1330(b) ................................................................... 174

28 U.S.C. § 1603(a) ................................................................... 165

28 U.S.C. § 1603(b) ................................................................... 166

28 U.S.C. § 1605A ........................................................... 1, 165, 173

28 U.S.C. § 1605A(a)(1) .............................................................. 168

28 U.S.C. § 1605A(c) ...................................................... 179, 193, 194

x

28 U.S.C. § 1605A(c)(4) ............................................................................................ 198

28 U.S.C. § 1605A(h)(2) ............................................................................................ 170

28 U.S.C. § 1605A(h)(3) ............................................................................................ 172

28 U.S.C. § 1605A(h)(7) ...................................................................................... 169, 171

28 U.S.C. § 1608(b) ............................................................................................. 174, 175

28 U.S.C. § 1608(e) .................................................................................................... 5, 6

Countering America's Adversaries Through Sanctions Act, Pub. L. 115-44,
    131 Stat. 886 (2017) ............................................................................................. 18

Iran and Libya Sanctions Act of 1996, Pub. L. No. 104-172, 110 Stat. 1541 (Aug. 5, 1996)...... 79

Iran Oil Sanctions Act of 1996, HR Rep 104-523, 104th Cong, 2d Sess. (1996) ...................... 79

Torture Victims Protection Act of 1991, 28 U.S.C. § 1350 note ...................................... 169, 171

**Rules**

Fed. R. Evid. 201(b) .................................................................................................. 162

Fed. R. Evid. 703 ....................................................................................................... 13

Fed. R. Evid. 801(d)(2) ............................................................................................... 14

Fed. R. Evid. 803(8) .................................................................................................... 14

Fed. R. Evid. 804(b)(3) ................................................................................................ 14

**Regulations**

22 C.F.R. § 126.1(d) (2006) ......................................................................................... 173

31 C.F.R. § 596.201 (2006) .......................................................................................... 173

Determination Pursuant to Section 6(i) of the Export Administration Act of 1979-Iran,
    49 Fed. Reg. 2836-02 (Jan. 23, 1984) ................................................................... 173

This case arises from the deaths of, and grievous injuries sustained by, significant numbers of American service members[1] in Iraq between 2004 and 2011 as a result of a multifaceted terrorist campaign sponsored and perpetrated by the Islamic Republic of Iran ("Iran"), with the instrumental assistance of Defendants Bank Markazi Jomhouri Islami Iran ("Bank Markazi" or "CBI"—the Central Bank of Iran), Bank Melli Iran ("Bank Melli"), and the National Iranian Oil Company ("NIOC"), each an agent of Iran. The 756 Plaintiffs in this consolidated action[2] include (1) estates of deceased victims of the implicated terrorist attacks (the "Attacks"), (2) injured survivors of the Attacks, and (3) family members of the injured and deceased victims of the Attacks ("Family Member Plaintiffs"). They allege that the Attacks were committed by Iran's chief foreign proxy, Lebanese Hezbollah (or simply "Hezbollah" below); the principal instrument of Iran's terror apparatus, the Islamic Revolutionary Guard Corps ("IRGC"); and the IRGC's external operations directorate, the IRGC-Qods Force ("IRGC-QF"). These entities committed the Attacks through their Iraqi proxies—Shi'a terrorist cells that they established, funded and directed to execute them.

Proceeding under the terrorism exception in the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, Plaintiffs allege that Defendants provided massive material support on Iran's behalf to the IRGC and Hezbollah (and thus to the IRGC's and Hezbollah's Iraqi terrorist cells) for the purpose of committing the Attacks in Iraq that injured Plaintiffs. The material support included providing the IRGC with access to *billions* of dollars, which the IRGC used, in part, to provide funding, resources, and training to its Iraqi terrorist cells, including supplying them with specific lethal aid in the form of Explosively Formed Penetrators ("EFPs")—a particularly deadly type of roadside anti-armor weapon—and other weapons. Iran, using the Defendants which

---

[1]     Some of the decedents were military contractors and one was a journalist.

[2]     *See* Sept. 17, 2020 Minute Order.

operated under its control, provided these resources specifically intending that its proxies would attack U.S. service members on its behalf. *See, e.g.*, PX-157 (Expert Report of Russell L. McIntyre) at 37-48. Accordingly, Defendants should be held liable for these deaths and injuries.

Iran—a political and ideological enemy of the United States since the 1979 Iranian Revolution—viewed the U.S. presence in neighboring Iraq as a threat to its regime and its strategic aims. The United States officially designated Iran a State Sponsor of Terrorism on January 19, 1984, pursuant to § 6(j) of the Export Administration Act of 1979, and Iran has remained so designated from that time through the present. *See* PX-1 (U.S. Dep't of State list of State Sponsors of Terrorism).[3] Defendants are core, state-owned Iranian institutions, including its central bank (CBI), its largest commercial bank (Bank Melli, also Iran's former central bank), and its largest oil concern (NIOC) in a country dominated by the oil industry. As explained below, the United States has at various times taken legal steps against each Defendant, highlighting its role in promoting Iranian terrorism.

This case follows *Karcher v. Islamic Republic of Iran*, No. 16-cv-232-CKK (D.D.C.), along with similar actions *Stearns v. Islamic Republic of Iran*, No. 17-cv-131-RCL (D.D.C.) and *Lee v. Islamic Republic of Iran*, No. 18-cv-830-APM (D.D.C.). These three cases are also brought under § 1605A and involve largely the same Plaintiffs and attacks as those implicated in *Hake*, though they seek relief against Iran (alone).

The *Karcher* court held a bench trial on December 3, 4 and 6, 2018 on Iran's liability for seven "bellwether" attacks (which are also at issue here) and on the uniquely severe physical and

---

[3]     Plaintiffs' exhibits are named "PX-__." For the Court's convenience, Plaintiffs retain the numbering from *Karcher* for all the exhibits filed in that case. Exhibits filed only in *Hake* begin at PX-199. Plaintiffs will provide a revised exhibit list describing all of the PXs with their notice that sets forth the grounds for admission into evidence for each of their exhibits. *See* Oct. 6, 2020 Minute Order.

emotional injuries associated with an EFP attack (*Stearns and Lee* are at earlier stages). The *Karcher* court found Iran liable for all seven bellwether attacks (hereinafter "the bellwether attacks"). *See Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 33, 35, 38, 40, 42, 45, 52 (D.D.C. 2019); *Karcher*, No. 16-cv-232 (CKK), 2019 WL 4305482, at *2 (D.D.C. Sept. 11, 2019). The *Karcher* court also appointed a special master to propose a damages framework for injured victims of EFP attacks and determine the specific damages for the plaintiffs injured as a result of the bellwether attacks in that case (all of whom are Plaintiffs here). *See Karcher*, 396 F. Supp. 3d at 65. Once the *Karcher* court issues its decision on the special master's reports and recommendations, Plaintiffs will update the Court in accordance with the Court's October 16, 2020 Minute Order.

Plaintiffs respectfully request that the Court here:

- Find that Defendants are not entitled to sovereign immunity;

- Judicially notice the *Karcher* court's findings that the IRGC and Hezbollah committed acts of terrorism directed at U.S. service members (and others) in Iraq between 2004 and 2011;

- Judicially notice the *Karcher* court's findings that the IRGC and Hezbollah are responsible for the bellwether attacks; and

- Find that Defendants are liable for the Attacks, committed in Iraq by the IRGC and Hezbollah during the relevant period.

## I.    BACKGROUND

### A.    Overview of the Action

As Plaintiffs established in *Karcher*, Iran orchestrated a massive terror campaign against U.S. forces providing security and stability in Iraq. That campaign had several major players, including Hezbollah, the IRGC, and IRGC-QF. The United States designated Hezbollah a Specially Designated Terrorist ("SDT") in 1995 (*see* PX-2 (Executive Order 12947)), a Foreign Terrorist Organization ("FTO") in 1997 (*see* PX-3 (U.S. State Department list of FTOs)), and a

Specially Designated Global Terrorist ("SDGT") in 2001 (*see* PX-4 (U.S. Treasury Department Press Notification, dated November 2, 2001)). The United States designated the IRGC-QF an SDGT in 2007 (*see* PX-5 ("U.S. Dep't of the Treasury, Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Entities and Support for Terrorism")), in part for the Attacks. It designated the IRGC itself an SDGT in 2017 (PX-6 ("U.S. Dep't of the Treasury, Fact Sheet: Treasury Designates the IRGC under Terrorism Authority and Targets IRGC and Military Supporters under Counter-Proliferation Authority")),[4] and both the IRGC and IRGC-QF as FTOs in 2019 (PX-213 ("U.S. Dep't of State, Press Release: Designation of the Islamic Revolutionary Guard Corps")),[5] in part for the IRGC's role in the Attacks.[6] As noted above, the United States designated Iran as a State Sponsor of Terrorism in 1984; this limited its access to the U.S. financial system and export-controlled technologies, spare parts and raw materials.

Central to Iran's terror campaign was the financing role played by Defendants, which collectively transferred *billions* of dollars to Hezbollah, the IRGC, and the IRGC-QF. Because much of Iran's sovereign wealth during the relevant period was held overseas in U.S.-dollar denominated accounts ("Eurodollar" accounts), the Iranian regime required access to the U.S. financial system to fund its terror campaign in Iraq (and other nefarious activities). To circumvent

---

[4]     The IRGC was also designated on October 25, 2007 under Executive Order 13382 as a proliferator of weapons of mass destruction. PX-5.

[5]     The State Department stated at that time that "the IRGC, part of Iran's official military, has engaged in terrorist activity or terrorism since its inception 40 years ago." *See* PX-213 (Press Release, U.S. Dep't of State, "Designation of the Islamic Revolutionary Guard Corps" (Apr. 8, 2019)).

[6]     PX-213 (noting that the "Iranian regime is responsible for the deaths of at least 603 American service members in Iraq since 2003. This accounts for 17% of all deaths of U.S. personnel in Iraq from 2003 to 2011, and is in addition to the many thousands of Iraqis killed by the IRGC's proxies").

the U.S. and international economic sanctions, Iran directed its state-owned and -operated banks and companies, including Defendants, to conspire with an assortment of non-Iranian financial institutions willing to assist Iran in evading those sanctions by conducting illicit trade-finance transactions and by disguising financial payments to and from U.S. dollar-denominated accounts. Billions of dollars of these payments were then transferred for the benefit of Hezbollah and the IRGC/IRGC-QF.

### B.    Plaintiffs' Burden of Proof under 28 U.S.C. § 1608(e)

To award the bellwether Plaintiffs relief, this Court must determine that those Plaintiffs have established their claims "by evidence satisfactory to the court," 28 U.S.C. § 1608(e), a standard which may be satisfied "through uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (internal quotation marks omitted). "This 'satisfactory to the court' standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e)," and "[i]n evaluating the plaintiffs' proof, the court may 'accept as true the plaintiffs' uncontroverted evidence.'" *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (citations omitted). "In FSIA default judgment proceedings, the plaintiffs may establish proof by affidavit." *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 135 (D.D.C. 2011) (citing *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002)). The D.C. Circuit affirmed this decision and emphasized:

> While both § 1608(e) and Rule 55(d) give an unresponsive sovereign some protection against an unfounded default judgment, neither provision relieves the sovereign from the duty to defend cases. Moreover, § 1608(e) does not require the court to demand more or different evidence than it would ordinarily receive; indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required.

*Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (citations and internal quotation marks omitted), *vac'd on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

In short, section 1608(e)'s standard is met "when the plaintiff shows her claim has some factual basis, even if she might not have prevailed in a contested proceeding." *Owens*, 864 F.3d at 785 (citations and internal quotation marks omitted). "This lenient standard is particularly appropriate for a FSIA terrorism case, for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Id.*

### C.    The Court's Evidentiary Standards under 28 U.S.C. § 1608(e)

In step with the relaxed burden of proof under § 1608(e), "the district court also has an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism," and appellate courts "have allowed plaintiffs to prove their claims using evidence that might not be admissible in a trial." *Id.* (citing *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048-51 (D.C. Cir. 2014) (noting "'courts have the authority—indeed, we think, the obligation—to adjust evidentiary requirements to differing situations' and admitting affidavits in a FSIA default proceeding")). A district court's "broad discretion" in such cases "extends to the admission of expert testimony, which, even in the ordinary case, 'does not constitute an abuse of discretion merely because the factual bases for an expert's opinion are weak.'" *Id.* (citation omitted). In sum, "Section 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion. This is part of the risk a sovereign runs when it does not appear and alert the court to evidentiary problems." *Id.* at 785-86.

### D.      Plaintiffs' Evidence

Plaintiffs rely on testimonial and documentary evidence submitted in both *Hake* and *Karcher*.[7] Below, Plaintiffs summarize that evidence and describe the relevant evidentiary rulings in *Karcher*. **Plaintiffs will provide specific information supporting admission of each exhibit—including the exhibits unique to *Hake*—in their upcoming evidentiary notice.** *See* Oct. 6, 2020 Minute Order (ordering Plaintiffs to "file on the docket a notice that sets forth the grounds for admission into evidence for each of their exhibits" by November 16, 2020).

### 1.      Plaintiffs' Expert Witnesses

This case, like *Karcher* and most § 1605A cases, relies heavily on expert evidence, rather than "primary" evidence, supporting Plaintiffs' allegations. Courts in this District "[r]ecogniz[e] that expert testimony is not only entirely proper, but often sufficient, and even indispensable in 'terrorism cases ... because firsthand evidence of terrorist activities is difficult, if not impossible to obtain.'" *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 57 (D.D.C. 2018) (citing *Owens*, 864 F.3d at 787-88).

These experts include those relied upon in *Karcher* (who fall into two categories: liability and medical experts—only liability witnesses are described below) and two additional liability expert witnesses providing evidence in *Hake*, Dr. Patrick Clawson and Ms. Katherine Bauer. Plaintiffs provide proposed findings below relating to all of these witnesses to aid the Court in reviewing the *Karcher* opinions as well as the evidence unique to the Defendants here. In order of

---

[7]      The transcripts from the *Karcher* trial were filed as (and are provided here as) five volumes, which were designated T1 through T5 in *Karcher*. T1 and T2 refer to the transcripts from the morning and afternoon sessions on December 3, respectively; T3 and T4 refer to the transcripts from the morning and afternoon sessions on December 4, respectively; and T5 refers to the transcript from the final day of trial on December 6. As in *Karcher*, Plaintiffs cite to transcripts by providing the testifying witness's last name, T1 through T5, and the page (and, if useful, line) pincites—*e.g.*, Levitt T1-56:10-57:12.

appearance, below is a brief summary of the qualifications of each of the expert witnesses in *Karcher* and *Hake*. Plaintiffs note that the *Karcher* court qualified each of the expert witnesses in that case during the bench trial and admitted their expert reports into evidence (each witness adopted their reports on the stand). *See Karcher*, 396 F. Supp. 3d at 17-19.

**Dr. Matthew Levitt**, the Director of the Reinhard Program on Counterterrorism and Intelligence at the Washington Institute for Near East Policy ("Washington Institute"), worked as a counterterrorism intelligence analyst at the Federal Bureau of Investigation, and was a Deputy Assistant Secretary for Intelligence and Analysis at the U.S. Treasury Department, where he served as both a senior official within the department's terrorism and financial intelligence branch and as deputy chief of the Office of Intelligence and Analysis. Dr. Levitt also served as a State Department counterterrorism advisor to the special envoy for Middle East regional security. He authored a leading scholarly book on Hezbollah and has been qualified as an expert on numerous occasions in both civil and criminal terrorism cases. *See* Levitt T1-15-26; PX-154 (Expert Report of Dr. Matthew Levitt) at Exhibit A. Dr. Levitt was qualified as an expert on Iran's role as a State Sponsor of Terrorism; the IRGC; IRGC-QF; Hezbollah; and those entities' support and training of the Iraqi terrorist groups in Iraq known as the Special Groups. *See* Levitt T1-26:6-14.

**Lieutenant General (Ret.) Michael Oates** served in the United States Army for 32 years, most recently as Director of the Joint Improvised Explosive Device Defeat Organization ("JIEDDO"), the Defense Department's lead agency for providing counter-improvised explosive device ("C-IED") capabilities in support of combat forces in Iraq and Afghanistan. Between 2003 and 2009, he served in several capacities in Iraq, including as Chief of Staff to the Deputy Administrator and Chief Operating Officer, Coalition Provisional Authority, Deputy Commanding General of the 101st Airborne Division, Commanding General of the 10th Mountain Division, and

Commanding General, Multi-National Division Center/South. *See* Oates T1-81:25-86:8; PX-153 (Expert Report of Lieutenant General (Ret.) Michael L. Oates) at 2. Mr. Oates was qualified as an expert on the tactical and strategic threats faced by U.S. and Coalition Forces in Iraq from 2003 to 2008, including the specific threat to U.S. military forces from IEDs and other ordnance, including EFPs. *See* Oates T1-86:15-22.

**Colonel (Ret.) Leo Bradley** served in the U.S. Army for 29 years, including as the commander of the 184th Ordnance Battalion EOD (explosive ordnance disposal), which at the time was the main U.S. Army EOD component in Iraq. He also served as commander of the 71st Ordnance Group EOD, and Commander of the Combined Joint Task Force Paladin, the C-IED task force in Afghanistan. *See* Bradley T2-7-9; PX-156 (Expert Report of Colonel (Ret.) Leo E. Bradley III) at Exhibit A. Mr. Bradley was qualified as an expert on U.S. military EOD operations and IED investigations. *See* Bradley T2-12:9-13.

**Captain (Ret.) Donald Wade Barker** served in the U.S. Army in various capacities, including as the Officer in Charge of the 101st AASLT (air assault) Asymmetric Warfare unit developing and implementing C-IED and counter insurgency strategies. He was selected to stand up and command the first C-IED Company in the Army, the 101st AASLT, which developed training plans for deployments into Iraq and Afghanistan. Mr. Barker subsequently served as a research scientist at the Georgia Tech Research Institute at the Georgia Institute of Technology, where he assessed IED and C-IED technology. *See* T3-8:4-23; Exhibit 1 to PX-158 (Expert Report of Captain (Ret.) Donald Wade Barker). Mr. Barker was qualified as an expert on IEDs, EFPs, and C-IED technology. *See* Barker T3-10:8-12.

**Colonel (Ret.) Kevin Lutz** served in the U.S. Army in various capacities, and was selected to establish and command Combined Joint Task Force-Troy ("CJTF-Troy"), which was

responsible for all EOD and C-IED efforts in Iraq. Mr. Lutz also commanded the Army's 52nd EOD Group. *See* Lutz T5-6:18-15:2; PX-159 (Expert Report of Colonel (Ret.) Kevin Lutz) at Exhibit A. Mr. Lutz was qualified as an expert on the use of explosive devices, including IEDs and other ordnance, by transnational terrorist organizations, and specifically the tactics, techniques, and procedures used by terrorist groups in Iraq between 2003 and 2011. *See* Lutz T5-15:4-11.

**Russell McIntyre** served in the U.S. Army for 26 years before joining the Office of the Secretary of Defense as a program manager and analyst focusing on Hezbollah, its activities, and its weapons technological capability and development. He also served as a senior intelligence officer with the Multi-National Corp Iraq C-IED cell, as a senior intelligence officer supporting JIEDDO, and as Chief of the Defense Intelligence Agency's Office of Forensic Intelligence. *See* McIntyre T5-59:10-64:15; PX-157 (Expert Report of Russell L. McIntyre) at Exhibit A. Mr. McIntyre was qualified as an expert on IED threats to U.S. forces, specifically in Iraq between 2003 and 2011, and with an additional focus on EFPs. *See* McIntyre T5-64:16-22.

**Michael Pregent**, a Senior Fellow at the Hudson Institute and retired intelligence officer with over 28 years of experience, served in the U.S. Army for 20 years as an intelligence officer with a focus on the Middle East. He subsequently served as the Senior Lead Middle East Analyst at the Defense Intelligence Agency and as a subject matter expert on Islamic terrorist groups with the United States Central Command ("CENTCOM") Intelligence Directorate. *See* Pregent T5-165-72; PX-155 (Expert Report of Michael Pregent) at 1-2. Mr. Pregent was qualified as an expert on intelligence matters, including attribution of terror attacks, evidence collection, and analysis in the intelligence field. *See* Pregent T5-173:3-7.

**Dr. Patrick L. Clawson** is an expert on issues relating to Iran, including Iran's support for terrorism and the Iranian economy. *See* Declaration of Patrick L. Clawson ("Clawson Decl."), ¶ 1. He is the Director of Research at the Washington Institute. *See id.*, ¶ 2. In that capacity, Dr. Clawson performs extensive research regarding the Iranian Ministry of Intelligence and Security ("MOIS"), the IRGC and IRGC-QF, and the Iranian financial and banking system. *See id.*, ¶ 3. He has worked with the Clinton and Obama administrations on Middle East politics and policy, and has testified before the House International Relations, National Security, and Banking and Financial Services Committees and the Senate Foreign Relations and Banking Committees about Iran, Iranian terrorism, and the use of economic measures to discourage Iran from supporting terrorism. *See id.*, ¶¶ 4, 7. Dr. Clawson also conducts presentations regarding Iran, including its support for terrorism, in various think tanks worldwide. *See id.*, ¶ 8. He has previously been designated and qualified by federal courts as an expert witness in over 20 FSIA cases brought against Iran. *See id.*, ¶ 6.

**Katherine Bauer** is an expert on terrorism financing and methods Iran employed to finance its IRGC, its proxy Hezbollah, and terrorist groups across the Middle East. *See* Declaration of Katherine Bauer ("Bauer Decl."), ¶ 1. She is a senior fellow in the Reinhard Program on Counterterrorism and Intelligence at the Washington Institute, where her work includes studying Middle Eastern terrorist groups, front organizations, and state sponsors, and the logistical and financial support networks that facilitate their activities. *See id.*, ¶¶ 9, 11. Ms. Bauer is also an adjunct associate professor in the Security Studies Program at Georgetown University's Edmund A. Walsh School of Foreign Service, where she teaches a course on Combatting the Financing of Transnational Threats. *See id.*, ¶ 9. Previously, Ms. Bauer served as the Assistant Director in the Office of Terrorist Financing and Financial Crimes at the Treasury Department, where she

coordinated Treasury policy with regard to illicit finance in the Middle East, Africa, and the Western Hemisphere, and led the U.S. delegation to the Middle East and North Africa Financial Action Task Force ("MENA FATF"), requiring expert knowledge and understanding of illicit and terrorist financing typologies, U.S. foreign policy in the Middle East, and the international framework to combat money laundering, terrorism financing, and other illicit financial threats. *See id.*, ¶ 7. Ms. Bauer has served as the U.S. Department of the Treasury's financial attaché in Jerusalem (2009-2011), with responsibility for policy, sanctions, and technical assistance in the West Bank and Gaza, as well as in the Persian Gulf (2013-2015), where she tracked and reported on illicit finance trends and typologies in the region, with a specific emphasis on Iran and terrorist financing. *See id.*, ¶¶ 6, 8. Ms. Bauer has testified in front of Congress and has been cited in major media outlets, such as *The New York Times*, *The Washington Post*, and Bloomberg. *See id.*, ¶ 9.

## 2. Plaintiffs' Exhibits and Fact Witness Evidence

Plaintiffs rely on documentary and fact witness evidence submitted in both *Hake* and *Karcher*. Fact witnesses include several bellwether plaintiffs who described the attacks and their injuries, along with two eyewitnesses to attacks. The documentary exhibits submitted in *Karcher* are notated PX-1 through PX-198; the exhibits submitted in *Hake* are notated PX-199 through PX-231, as well as the lettered exhibits to the declarations of Dr. Clawson and Ms. Bauer. As set forth herein, the *Karcher* court received 120 exhibits into evidence before and during the trial in that case (no proffered exhibits were denied admission), which included documentary evidence, encompassing documents, photographs, videos, and diagrams. *See Karcher*, Nov. 27, 2018 Pre-Admission Order, ECF No. 64 ("Pre-Admission Order," which Plaintiffs will annex to the evidentiary notice). Plaintiffs' exhibits admitted before trial consisted of official U.S. government designations, reports, records, and statements regarding the support for terrorism of Iran, the IRGC, the IRGC-QF, Hezbollah, and the Special Groups and their involvement in, and responsibility for,

the specific attacks alleged in the *Karcher* Amended Complaint. These exhibits were authenticated under Fed. R. Evid. 901 through evidence showing that the exhibits were obtained from the U.S. government and other sources either directly or from the public domain. *See id. See also Karcher*, Pls.' Mot. to Pre-Admit Evidence, ECF No. 61, and accompanying declarations.

As the Court properly found, the government records at issue are admissible to prove facts in dispute under Fed. R. Evid. 803(8). *See* Pre-Admission Order. Admission is proper under Rule 803(8) if a document is "[a] record or statement of a public office" that "sets out: (i) the office's activities; (ii) a matter observed while under a legal duty to report … ; or (iii) in a civil case … factual findings from a legally authorized investigation[.]" Fed. R. Evid. 803(8)(A). As the D.C. Court of Appeals stated in *Owens*, "[p]ursuant to the 'broad approach to admissibility' under Rule 803(8), a court may also admit 'conclusion[s] or opinion[s]' contained within a public record." 864 F.3d at 792 (citing *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988)). *See also Beech Aircraft Corp.*, 488 U.S. at 170 ("[a]s long as the conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement, it should be admissible along with other portions of the report."); *S.E.C. v. Pentagon Capital Management PLC*, 722 F. Supp. 2d 440, 442 (S.D.N.Y. 2010) ("The legal authority giving rise to the investigation *need only permit the investigation, not require it*.") (citations omitted and emphasis added).[8]

---

[8]    Further, a government report is admissible even if it contains a layer of hearsay from unidentified witnesses. *See Holliday v. J S Express, Inc.,* No. 12-cv-1732 (ERW), 2013 WL 2395333, at *5 (E.D. Mo. May 30, 2013). *See also Moss v. Ole S. Real Estate, Inc.*, 933 F.2d 1300, 1309-10 (5th Cir. 1991) ("[M]any government reports, as with many expert witnesses, have to rely in part on hearsay evidence, and the reports are not generally excluded for this reason."). This conclusion is guided by Fed. R. Evid. 703, which allows experts to rely on otherwise inadmissible facts to reach their opinions if experts in that field would reasonably rely on those facts in forming an opinion on that subject. Accordingly, "[t]here is no reason that government officials preparing reports do not have the same latitude." *Holliday*, 2013 WL 2395333, at *5 (citing *Moss*, 933 F.2d at 1310).

Additionally, some statements included in the exhibits are admissible under Fed. R. Evid. 801(d)(2) as made by agents or co-conspirators of Defendants and under Fed. R. Evid. 804(b)(3) as admissions of illegal conduct performed on Defendants' behalf (examples may include statements made by various leaders of IRGC and Hezbollah proxy groups).

Exhibits admitted by the *Karcher* court include types of items specifically accepted pursuant to Rule 803(8) in other cases. Examples include government designations of terrorists and terrorist organizations, investigative reports following a terrorist attack, interrogation reports of detainees, and State Department Country Reports on Terrorism. *See Fritz*, 320 F. Supp. 3d at 59 n.3. *See also Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 99-100, 102, 107 (D.D.C. 2015) (relying on both agency press release and State Department reports in a § 1605A case); *Owens*, 864 F.3d at 792-93 (holding that the State Department Country Reports "fit squarely within the public records exception" and were therefore admissible under Rule 803(8)).

Rule 803(8) requires the party opposing admission to demonstrate that "the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(B). Not only did the *Karcher* plaintiffs demonstrate that their proffered evidence is trustworthy, neither defendant Iran there nor Defendants here have appeared to argue otherwise. *See, e.g.*, *Union Pac. R.R. Co. v. Kirby Inland Marine, Inc. of Miss.*, 296 F.3d 671, 679 (8th Cir. 2002) (holding that the burden of showing untrustworthiness is on the party opposing admission); *Owens*, 864 F.3d at 793 (same). That presumption of trustworthiness was further supported by the testimony presented by multiple witnesses appearing at the trial. *See United States v. Midwest Fireworks Mfg. Co., Inc.*, 248 F.3d 563, 566 (2d Cir. 2001) (noting that the presumption of admissibility for Rule 803(8) reports was "further bolstered by testimony" presented to the district court).

As stated above, the *Karcher* court admitted additional exhibits at trial (along with demonstratives including several videos and video animations), including a website capture of a terrorist group's claim of responsibility for one of the bellwether attacks, photographs produced by some of the bellwether Plaintiffs, an additional government report, and each expert's report. The witnesses laid the proper foundation for the admission of these exhibits during their testimony. Exhibits PX-61, 63, and 122, were admitted after trial. *See Karcher*, Dec. 11, 2018 Minute Order.

## II.     PROPOSED FINDINGS OF FACT

Sections <u>A</u> through <u>D</u> below are adapted from the proposed findings of fact and conclusions of law filed in *Karcher*, and guide the Court through the evidence relied upon by the *Karcher* court in finding Iran liable for the seven bellwether attacks.[9] They focus on three intersecting issues that implicate Iran's—and ultimately Defendants'—liability for the Attacks. The first is the evidence of Iran's use of its IRGC and IRGC-QF, in concert with Hezbollah,[10] to direct a multifaceted terror campaign against U.S. and Coalition Forces in Iraq between 2004 and 2011. The second is the evidence of Iran's use of the IRGC, IRGC-QF and Hezbollah to develop, supply, and deploy EFPs (alleged to be responsible for most of the Attacks) against American service members in Iraq and to finance, train, and direct their Iraqi proxies to emplace them. The third is the forensic (and other) evidence that confirms that a particular Attack, including six of the seven bellwether attacks, was in fact caused by Iranian-supplied EFPs.

---

[9]     Plaintiffs have added a limited number of updates to these sections, along with findings from the *Karcher* decisions themselves.

[10]     Numerous other decisions from this Court have found that Hezbollah is an Iranian proxy. *See, e.g., Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*, 313 F. Supp. 3d 50, 54-55, (D.D.C. 2018); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 292 (D.D.C. 2003); *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 53 (D.D.C. 2003).

Sections E and F are taken from Plaintiffs' prior proposed findings of fact and conclusions of law previously submitted in *Hake*. *See* ECF No. 100-1. These sections show Defendants' role in transferring massive sums of money for the benefit of the IRGC and Hezbollah at Iran's direction.

Given the strong record of testimonial and documentary evidence, including the public findings and conclusions of offices and officials of the U.S. government, that Plaintiffs present here, Plaintiffs respectfully request that the Court make the following findings of fact.

### A.    Iran's Longstanding History of Orchestrating Acts of International Terrorism as an Instrument of Regime Policy

As stated above, Iran was designated a State Sponsor of Terrorism on January 19, 1984. *See* PX-1, Levitt T1-27:16-17. It has retained that designation from that date through the present, including throughout the period during which the Attacks were perpetrated. *See id.* at 29:1-15. Since the establishment of the Islamic Republic of Iran in 1979, the Iranian regime has supported acts of international terrorism, first through its IRGC[11] and later through the IRGC-QF.[12] "On May 5, 1979, Ayatollah Ruhollah Khomeini, the first Supreme Leader of the Islamic Republic of Iran, promulgated a decree establishing the *Pasdaran e-Enqelab* (literally the 'Guardians of the Revolution,' also referred to in English as the 'Revolutionary Guard' and later as the 'Islamic

---

[11]    The IRGC was designated on October 25, 2007 under Executive Order 13382 as a proliferator of weapons of mass destruction. *See* PX-5 ("U.S. Dep't of the Treasury, Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Entities and Support for Terrorism"). It was again designated on October 13, 2017 under Executive Order 13224 as an SDGT. *See* PX-6 ("U.S. Dep't of the Treasury, Fact Sheet: Treasury Designates the IRGC under Terrorism Authority and Targets IRGC and Military Supporters under Counter-Proliferation Authority").

[12]    *See* Levitt T1-27:16-21 ("The US government has designated Iran as a state sponsor of terrorism since we started that list in 1984. And the primary tools that Iran uses to engage in terrorism abroad and to protect the revolution are the Islamic Revolutionary Guard Corps and its subsidiary for its operations abroad, the Qods Force."). *See also* PX-5.

Revolutionary Guard Corps') three months after the fall of the Shah and his government." PX-157

(Expert Report of Russell L. McIntyre) at 4.

Dr. Levitt testified that the IRGC is not synonymous with Iran's armed forces. *See* Levitt

T1-28:3-8 ("[W]hat's important to understand about the IRGC is that it is something that runs

parallel to the actual Armed Forces of Iran. They have an army and a navy and an air force. The

IRGC also has the same, because one is intended to protect the borders of Iran and the other, the

IRGC and the Qods Force, is there to protect the revolution."). The *Karcher* court cited Dr. Levitt's

testimony in adopting this description of the IRGC: "While the Iranian armed forces would 'protect

the borders of Iran,' the IRGC with its 'parallel' military structure was tasked with 'protect[ing]

the revolution.'" 396 F. Supp. 3d at 22 (citing Levitt T1-28:3-8). The IRGC-QF was formed as a

sub-directorate of the IRGC dedicated to advancing the Iranian Revolution's ambitions to create,

cultivate and support terrorist groups around the world to further the regime's policies and punish

its enemies. As Dr. Levitt testified:

> [T]he Qods Force is the sharp end of the spear for Iran's extraterritorial activities, almost like its version of a special operations unit for the IRGC engaged in activities abroad. And it has different branches or corps for operations and activities in different countries around in the region. It's been designated as a terrorist group. It's led by Major General Qasem Soleimani…[who] has himself been designated as a specially designated global terrorist. Actually, he's been designated under three different authorities.

*Id.* at 33:10-20.[13]

The *Karcher* court cited this testimony as well, finding that "A subsidiary of the IRGC—

the Qods Force, or IRGC-QF—is responsible for its international operations, including training

Muslim groups to support the revolution through insurgency and terrorism." 396 F. Supp. 3d at 22

---

[13]    General Soleimani was subsequently killed by U.S. forces on January 2, 2020. Dr. Levitt's testimony pre-dated Soleimani's death.

(citing McIntyre Rep. at 6; Levitt T1-27:18-21, and quoting Dr. Levitt's observation "likening the Qods Force to 'the sharp end of [a] spear' when it comes to 'Iran's extraterritorial activities,'" Levitt T1-33:6-16).

A decade after designating the IRGC-QF as an SDGT, Congress reaffirmed these findings in 2017 in the Countering America's Adversaries Through Sanctions Act, Pub. L. 115-44, § 105(a), 131 Stat. 886, 892 (2017):

> The Iranian Revolutionary Guard Corps-Quds Force (in this section referred to as the "IRGC-QF'") is the primary arm of the Government of Iran for executing its policy of supporting terrorist and insurgent groups. The IRGC-QF provides material, logistical assistance, training, and financial support to militants and terrorist operatives throughout the Middle East and South Asia and was designated for the imposition of sanctions . . . in October 2007 for its support of terrorism.

As part of the same Act, Congress also extended these findings to the IRGC itself:

> The IRGC, not just the IRGC-QF, is responsible for implementing Iran's international program of destabilizing activities, support for acts of international terrorism, and ballistic missile program.

Clawson Decl., ¶ 29.

Just as Iran employs the IRGC-QF to project terrorism outside its borders, the Lebanese terrorist organization Hezbollah is, in turn, the IRGC-QF's most reliable foreign terror proxy. *See* PX-154 (Expert Report of Dr. Matthew Levitt) at 9-18; PX-157 at 7-8. Iran has used Hezbollah for decades to strike targets all over the world. Describing Hezbollah's symbiotic relationship with the Iranian regime, Dr. Levitt testified:

> [T]hese groups have been both ideologically and operationally connected at the hip with weapons and funds and intelligence and training as a constant between them. The ide[o]logical affinity, this shared subscription to the idea of *wilayat al-faqih*, the rule of the jurisprudent, explains how this is something that is much more than just transactional. And they both get something out of this. Hezbollah obviously gets all of this tremendous support without which it wouldn't be a fraction of what it has become. And Iran gets an incredibly capable proxy that is deeply committed to it and is willing to do things on its behalf abroad in ways that it, Iran, can claim reasonable deniability and that it can call upon to go to other places to help train

and build up new militants that will be shaped in the image of Hezbollah in different places.

Levitt T1-49:4-20.

> A CENTCOM assessment provides a helpful summary of the relationship:

> When Hezbollah leader Hassan Nasrallah met with Iranian supreme leader Khamenei in 2001, Nasrallah publicly kissed Khamenei's hand, a gesture heavy with meaning among Shi'ites: it implied that Nasrallah accepts Khamenei as his leader. Iranian interests in Lebanon go far beyond supporting the "resistance" against Israel; Hezbollah is a tool to expand its regional influence and challenge Western interests. Iran has helped Hezbollah to reach an incredible popularity among the Lebanese Shi'ite community. The popularity of Iran and Hezbollah in Lebanon is not based primarily on Hezbollah's military capability, but rather on Iran's economic support through public service institutions and charities. Without those economic mechanisms, Hezbollah's guerrillas could not have become a political force in the country.

Clawson Decl., ¶ 39 (citing Exhibit A to Clawson Decl., CENTCOM Report [undated], "*Hezbollahization or Iranian Exploitation?*" at 7). In fact, in June 2016, long-time Hezbollah leader Hassan Nasrallah himself stated:

> We are open about the fact that Hezbollah's budget, its income, its expenses, everything it eats and drinks, its weapons and rockets, are from the Islamic Republic of Iran.  As long as Iran has money, we have money... Just as we receive the rockets that we use to threaten Israel, we are receiving our money."

*Id.*, ¶ 32 (citing "Hezbollah brushes off US sanctions, says money comes via Iran," Al-Monitor (June 24, 2016), *available at* http://www.al-monitor.com/pulse/afp/2016/06/lebanon-hezbollah-banks.html).

From 1998 until his death in January 2020, the IRGC-QF was commanded by General Qasem Soleimani, who reported directly to Supreme Leader Ayatollah Ali Khamenei. *See* PX-154 at 7, 21. The United States designated Soleimani three times for his roles in the IRGC. *See* Levitt T1-33:17-20, 34:1-14. *See also* PX-23 (Treasury designation of Soleimani and describing his prior designations). The IRGC-QF set up different regional commands for its worldwide activities. The First Corps, also referred to as the "Ramazan Headquarters," "Ramazan Corps," or "Department

9000," and headquartered in Tehran, was (and is) focused on implementing Iranian government policy in Iraq. *See* PX-154 at 6-7.[14] Parallel to the Ramazan Corps, Hezbollah established Unit 3800 to assist and coordinate with the IRGC-QF to implement Iranian policy in Iraq. *See id.* at 9. *See also* Levitt T1-57:15-58:12 (describing Unit 3800 as created at Iran's behest to train Iraqi Shi'a terrorists to attack U.S. forces and to itself engage in attacks on U.S. forces). These two "sub-agencies" of the IRGC-QF and Hezbollah, respectively, were responsible for directing and orchestrating a sophisticated terror campaign against U.S. service members in Iraq. *See id*. As Dr. Levitt testified, "the Qods Force operates exceptionally closely with Lebanese Hezbollah, sometimes so much so that they will work with Hezbollah to build up and train other proxy groups in an effort to build them in the image of Lebanese Hezbollah." *Id.* at 33:21-25.

### 1.    Formation and Development of Hezbollah

To understand how Iran carefully and methodically built up its terrorism capabilities in Iraq after 2003, it is important to consider its successful effort to transform fractious Shi'a militia in southern Lebanon into what later became the formidable fighting force and most reliable IRGC proxy now known as Hezbollah. *See* PX-154 at 10. "In 1982, despite being heavily engaged in combat with Iraqi forces, the Iranian government sent IRGC members to assist the Lebanese Shi'a community build a political movement and military capable of pushing the Israeli army out of

---

[14]    Dr. Levitt explained: "[T]he Ramazan Corps was the Qods Force entity most responsible for coordinating attacks by Shi'a militants against Coalition Forces and against the Iraqi government based on the Iranian side of the border in Iran, training people, smuggling operatives back into Iraq, smuggling weapons systems of all kinds from the IEDs and the EFPs to small arms, et cetera, into Iraq to be able to carry out attacks. And they functioned as a…very effective command structure for these groups and operations happening across the border in Iraq from the safety of their headquarters in Iran." Levitt T1-68:25-69:10. Mr. McIntyre testified that "[General Shahlai] was a brigadier general. He was in charge of what was known as Department 9000 within the IRGC. And Department 9000 was responsible for external lethal support to Shi'a resistance groups." McIntyre T5-84:8-11.

Southern Lebanon (following the Israeli army's 1982 incursion known as 'Operation Peace for Galilee' to evict the Palestine Liberation Organization from Lebanon)." PX-157 at 7. "From Hezbollah's inception, the IRGC funded, armed, and supported it and provided it with the ability to attack Israeli forces in southern Lebanon." *Id.* at 9. "[The] relationship [between the IRGC and Hezbollah] is especially close because the IRGC played such a critical role in the founding of Hezbollah and the molding of Hezbollah and, from its inception through today, supplies material support, money, weapons, training and intelligence to Hezbollah. And Hezbollah carries out many operations on Iran's behalf in part so that Iran can have those done with reasonable deniability." Levitt T1-30:12-19.[15] "Over time, Hezbollah became increasingly adept at inflicting casualties on the Israeli military, and it eventually forced the IDF [Israel Defense Forces] in 1985 to withdraw into what Israel called a 'Security Zone' in Southern Lebanon…. For 15 years, the IDF maintained this buffer zone until increasing IDF casualties precipitated an Israeli withdrawal in 2000 to its current border with Lebanon." PX-157 at 9. The *Karcher* court adopted this testimony regarding Iran's early influence over Hezbollah:

> Meanwhile, Iran had long exerted its influence in Lebanon, as well. Beginning in the early 1980s, IRGC shaped the development and military capabilities of Lebanese Hezbollah (herein, "Hezbollah"), a militant Shi'a political party that wanted to oust Israeli forces from Southern Lebanon. McIntyre Rep. at 7-8. As the relationship between IRGC and Hezbollah grew, Hezbollah reciprocated by executing terrorist missions against Israeli and American targets at Iran's request, offering Iran "reasonable deniability" after the fact. Levitt T1-30:10-19; *see also* McIntyre Rep. at 7-8; Annual Threat Assessment at 13 (describing Hezbollah as "Iran's main terrorist ally" and "capable of attacks against US interests if it feels its Iranian patron is threatened").

396 F. Supp. 3d at 23 (footnote omitted).

---

[15]    This Court in *Peterson*, 264 F. Supp. 2d at 53, found: "It is clear that the formation and emergence of Hezbollah as a major terrorist organization is due to the government of Iran. Hezbollah presently receives extensive financial and military technical support from Iran, which funds and supports terrorist activities."

2. **Hezbollah's Longstanding History of Launching Terrorist Attacks at Iran's Behest**

Although Hezbollah is a complex organization with many components, including a highly successful political party apparatus, its ideological core is most embodied by its terror apparatus.[16] *See* PX-154 at 11-16. Dr. Levitt described Hezbollah's terrorist apparatus as follows: "there are many constituent parts to an organization as large as Hezbollah, including one that engages in terrorist activities abroad. They call that their Islamic Jihad Organization, or IJO." Levitt T1-54:11-14. As Mr. McIntyre testified, the IJO, also known as Hezbollah's External Security Organization, "conducted terrorist operations outside of Lebanon in collaboration very often with the IRGC and then later with the IRGC-Qods Force. And then also they conducted combat operations against Israeli Defense Forces while they were deployed in southern Lebanon and also outside of the Middle East…" McIntyre T5-68:11-16.

As stated above, Hezbollah was designated an SDT on January 23, 1995, *see* PX-2 at 4, an FTO on October 8, 1997, *see* PX-3, and an SDGT on October 31, 2001, *see* PX-4 at 4. Mr. McIntyre testified regarding the central role senior Hezbollah leader Imad Mughniyah played in overseeing Hezbollah's IJO. *See* McIntyre T5-66:24-25, 67:19-25, 68:1-18. *See also* PX-154 at 16 ("Until he was assassinated in February 2008, Imad Mughniyeh was Hezbollah's 'top militant commander' and reportedly led the Jihad Council himself."). *See also* Levitt T1-54:18-21.

As Plaintiffs' experts explained, Hezbollah's most prominent attacks perpetrated at Iran's behest include:

- "The October 23, 1983 bombing of the U.S. Marine Corps barracks in Beirut, Lebanon (that resulted in the death of 220 Marines, 18 Sailors and 3 Soldiers) was

---

[16]     Hezbollah Deputy Secretary General Naim Qassem underscored that Hezbollah was, nonetheless, one holistic entity: "Hezbollah has one single leadership . . . ." PX-154 at 14.

a coordinated attack sponsored and planned by the IRGC and carried out by Hezbollah operatives." PX-157 at 8. *See also* PX-154 at 13.

- In 1983, Hezbollah joined with operatives of Iraq's Da'wa Party (discussed *infra* at 29, 72) to plan the bombings of the U.S. and French embassies in Kuwait City, and the 1985 assassination attempt on the Kuwaiti Emir. *See* PX-153 (Expert Report of Lieutenant General (Ret.) Michael L. Oates) at 33; PX-154 at 17; Levitt T1-46:21-47:4.

- "In 1985, Hezbollah operatives hijacked TWA Flight 847 from Cairo to Athens, torturing and then murdering one hostage, Robert Stethem a U.S. Navy Steel Worker 2nd Class (SW2), dumping his body on the tarmac of Beirut International Airport, and holding the rest of the hostages for weeks." PX-157 at 8.

- "In March 1992, Hezbollah operatives carried out a truck bombing of the Israeli Embassy in Buenos Aires, killing twenty-nine people and then helped the IRGC bomb the Argentine-Israeli Mutual Association, also in Buenos Aires." PX-157 at 8. *See also* Levitt T1-47:5-12.

- "In June 1996, Hezbollah also bombed the American Khobar Towers housing complex in Saudi Arabia, killing 19." PX-157 at 8. *See also* Levitt T1-47:13-21.

### 3.    Hezbollah's Development of Advanced Tactics

The 15-year period (1985-2000) that Hezbollah fought an insurgency against the IDF in southern Lebanon provided a battle laboratory for Hezbollah to hone its tactical war-fighting skills and weapons development. *See* PX-157 at 9. Hezbollah studied and improved its insurgent tactics against the IDF, including: (1) effectively ambushing Israeli patrols, (2) deploying IEDs, (3) kidnapping Israeli soldiers,[17] and (4) developing and deploying EFPs in the 1990s against Israeli armored vehicles. *See id.* As Mr. McIntyre explained:

The relatively rapid evolution of Hezbollah TTP [Tactics, Techniques and Procedures] was a product of at least three related factors. First, Hezbollah's operatives were highly motivated and willing to risk heavy losses in their

---

[17]    *See* PX-61 (Video released by Hezbollah-affiliated *Al-Mayadeen* showing Hezbollah operatives practicing a kidnapping extraction from a vehicle, under the tutelage of Imad Mughniyah, at the time the Commander of Hezbollah's IJO.). *See also* McIntyre T5-75:21-76:1 ("And also, they developed the training, tactics and procedures for battlefield abduction of enemy combatants, the Israeli soldiers, which in one instance in July 2006 they abducted two Israeli soldiers. They ambushed a patrol. And it led to over a month-long conflict between Hezbollah and Israel.").

confrontations with Israel. Second, they benefited enormously from Iranian financial support and IRGC training and technology transfers. Finally, Hezbollah took advantage of the first two factors and perfected its TTP through trial and error against the SLA [Southern Lebanese Army, a Christian-dominated militia aligned with Israel] and IDF. These combined factors allowed Hezbollah to inflict significant casualty levels on the IDF.

*Id.* at 12. This testimony was among the "several expert reports" cited by the *Karcher* court in its finding that "EFPs were first seen in combat when Hezbollah attacked one or more Israeli Humvees in Southern Lebanon on October 5, 1998." 396 F. Supp. 3d at 27-28 (citing Barker Rep. at 6; McIntyre Rep. at 12).

### a.     Hezbollah's TTP for Emplacing IEDs

One of Hezbollah's signature tactics was to develop effective camouflage for its IEDs and EFPs. As Mr. Lutz, Plaintiffs' expert on explosive devices and other ordnance used by transnational terrorist organizations, testified, the camouflaging techniques Hezbollah developed in Lebanon resurfaced in Iraq:

> You could have a three- to five-inch; you could have an eight- to ten-inch; you could have a 10- to 12-inch explosively formed penetrator. They were purposely designed against different weapons systems…once the foam is overlaid, then they get dirt, something that's similar to where they're going to place that EFP. Hezbollah mastered that in the Bekaa Valley to make it look like it was in the surroundings....

Lutz T5-44:6-15. Dr. Levitt similarly testified that:

> Hezbollah perfected…the art of building and deploying, often camouflaged as rocks or other things that just fit into the roadside, these exceptionally powerful shaped charges, EFPs, which proved to be able, through this kind of molten, hot projectile of a bullet, to penetrate even armored vehicles and proved to be the single most devastating weapon deployed against Coalition -- American and other Coalition, including Iraqi, forces in Iraq, leading to the majority of deaths and injuries.

Levitt T1-59:1-10.

Beginning in August 1991, Hezbollah began regularly detonating bombs in Lebanon by remote radio control, eliminating the need for detectable command wire. *See* PX-157 at 11. The

IDF attempted to counter the remote-control detonations by sweeping a wide spectrum of radio frequencies from its listening bases on the peak of Mount Hermon to explode the bombs prematurely. *See id.* Hezbollah adjusted to Israeli tactics, first returning to the use of command-wire and victim-initiated pressure plates and mat detonations, before introducing a new coded remote-control system in mid-1993 that fitted its bombs with two receivers and scramblers. *See id.* By 1995, Hezbollah was equipping its IEDs with cellular phone receivers to trigger firing switches. In turn, Israel jammed cell phone frequencies from aircraft flying high above southern Lebanon. *See id.* Hezbollah responded by using passive infrared devices ("PIRs"). *See id.*

In addition, Hezbollah developed methods to arm their IEDs with a simplified process that made it faster and simpler to emplace the explosives "on target" (i.e. the targeted location for placing the device). As Mr. Lutz testified, Hezbollah developed a set of connecting switches for their IEDs:

> What Hezbollah had done – and when I looked at them in the late 1990s, they created these – they were connect-and-disconnect switches which allowed you to quickly insert like a male-female connecter. And you could just quickly push those together. They did that for a couple reasons: One was, it limited the time on target. So they could quickly place the IED there, put these male-female connecters together, and then they could be off target. They wouldn't be exposed. The second part was, it was a safe mechanism where you didn't have an emplacer trying to wire up, you know, and get their wires wrong. It was a simple plug that goes into this connect. That facilitated the efficiency of the system so that they didn't fail and they were successful in executing their operations.

Lutz T5-38:13-39:2. He also provided an example of these signature Hezbollah switches. *See id.*

Mr. Lutz went on to testify that:

> [F]or Lebanese Hezbollah, they had taken the time based on the battlefield training and conditioning and learning experiences in the Bekaa Valley and realized that if they were going to be successful and their emplacers were going to be successful, they would have to create a mechanism that allowed the quick connect of the components together that prevented it from detonating as well as making sure that it operated when they needed it to operate.

*Id.* at 40:1-9.

Mr. Lutz also testified concerning a February 2007 presentation made by the U.S. military using photographs provided by CJTF-Troy. *See* Lutz T5-40:13-43:13. *See also* PX-65 (MNF-I[18] Report on EFPs). Mr. Lutz described one of the photographs featured in the presentation:

> [Y]ou would typically as you were driving by, fully up-armored, you've got your gear on, to try and pick this out of trash that was alongside the road. Then you see that lens that was mentioned. They had scoped that down to more like a pencil, so you narrowed the view of the lens. So it wasn't wide and it prematurely detonated. It was narrowed so that it would hit the target as intended.

Lutz T5-44:15-23. Mr. Lutz confirmed that "this [was] a hallmark of Lebanese Hezbollah TTP[.]"

*Id.*

> Discussing the evolution of Hezbollah's sophisticated tactics, Mr. McIntyre testified:

> There was a series of counter-countermeasures at the beginning of the use of Hezbollah employment of IEDs [in Lebanon]. They didn't start with EFPs. That was a later development. They started with IEDs, very simple IEDs, using command wire as a trigger…The Israelis became very adept at using native trackers and sweeping along or patrolling along the sides of the road to discover those command wires. Hezbollah noted that. Then they moved on to the use of electronic devices to trigger the IED. Then the IDF, of course, noticed that; and then they developed the ability to first identify the radio frequencies that Hezbollah was using and then developing a jamming capability, a steady stream of RF energy, to protect their vehicle … convoys and dismounted patrols. Hezbollah noted that. They moved to the passive infrared receiver, which the Israelis could not jam, and of course very difficult to detect. Then they later used the PIR, combined it with the EFP, again encasing it within foam, foam insulation, a spray can…and then cleverly camouflaging it and placing it by the side of the road.

McIntyre T5-79:23-80:21.

### b.  Hezbollah's TTP for Indirect Fire

During the 1980s and 1990s, Hezbollah also frequently deployed 107mm and 122mm artillery rockets (frequently referred to as "Katyusha rockets") against IDF positions in southern

---

[18]  MNF-I, or Multi-National Force – Iraq, referred to the "Coalition Forces" responsible for security operations in Iraq from 2003 to 2011.

Lebanon and against Israeli border towns in northern Israel. *See* PX-157 at 59. Iran supplied these weapons to both Hezbollah and (later) Iran's Iraqi Shi'a proxies,[19] and Hezbollah also transferred its experience with these indirect fire weapons to the Iraqi landscape. *See id.* As Mr. McIntyre testified:

> [Hezbollah tactics] included use of 107-millimeter and 122-millimeter rockets and fairly precise targeting of Israeli Defense Forces', IDF's, forward operating base that were in southern Lebanon. It also included developing the tactics, techniques and procedures for incorporating IEDs in ambushes, some of them complex ambushes, against Israeli Defense Forces. It also included learning through experience and engaging in a very active counter-countermeasure, electronic warfare struggle or challenge with the Israeli Defense Forces...

McIntyre T5-75:8-15.

Mr. Lutz testified that "Lebanese Hezbollah used … 107-millimeter rockets, as well as other indirect weapons, and battle-tested those against the Israeli Defense Force to improve their capabilities and effectiveness, particularly along the employment of tactics, techniques and procedures." Lutz T5-15:25-16:5. The 107mm and 122mm rockets were later supplied by the IRGC-QF to its proxies in Iraq between 2003 and 2011. *See* McIntyre T5-109:1-10.[20]

---

[19]    Hezbollah proxies in Iraq used these same types of artillery rockets in their indirect fire attacks on U.S. and Coalition Forward Operating Bases and MNF-I Headquarters in the Green Zone. *See* PX-157 at 59.

[20]    The 2010 National Defense Authorization Act Conference Report issued by the Office of the Secretary of Defense confirmed that "Iran continues to provide money, weapons and training to select Iraqi Shia militants and terrorists despite pledges by senior Iranian officials to stop such support. The weapons include: Explosively Formed Penetrators (EFPs) with radio-controlled, remote arming and passive infrared detonators, Improvised Explosive Devices (IED), Anti-aircraft weapons, mortars, 107 and 122 millimeter rockets …." PX-39 (U.S. Department of Defense Briefing, dated April 2010) at 2.

### B.      Iran's Strategic Goals in Iraq After the 2003 U.S.-Led Invasion

Iran's primary strategic goal in Iraq after the 2003 U.S.-led invasion was to incorporate Iraq into its sphere of influence while degrading American power and influence in the region. *See* PX-154 at 8.[21] In order to do so, it needed to drive the United States and its allies out of Iraq without provoking a full-scale conflict with the U.S. military. *See id.* To that end, it directed a sophisticated and carefully calibrated campaign of terrorism directed against Coalition Forces in Iraq. *See, e.g.*, McIntyre T5-112:20-23 ("[The goal] was to bleed American forces and make our presence there as difficult as possible and hurry us out of Iraq, because obviously they did not want US forces in their immediate neighborhood. They wanted us out."). To implement its policy objectives in Iraq, Iran embarked on a multi-pronged strategy[22] spearheaded by the IRGC-QF's Ramazan Corps.

The first part of that strategy was to support Shi'a political parties that would ultimately dominate Iraq's nascent democratic political process. *See* PX-153 at 19. The *Karcher* court emphasized that as part of this strategy, "[i]n order to bolster its influence in Iraq, and counter American efforts there, Iran continued to sponsor Shi'a political movements—now vying for

---

[21]     *See also* PX-16 (Annual Threat Assessment of the Director of National Intelligence for the Senate Select Committee on Intelligence, February 2, 2006) at 12 ("Iranian policy toward Iraq and its activities there represent a particular concern. Iran seeks a Shia-dominated and unified Iraq but also wants the US to experience continued setbacks in our efforts to promote democracy and stability. Accordingly, Iran provides guidance and training to select Iraqi Shia political groups and weapons and training to Shia militant groups to enable anti-Coalition attacks.").

[22]     *See* PX-153 at 21 ("The Islamic Republic gained regional influence through the Shi'a-dominated political parties that relied upon Iran for money, weapons and training. Iran had diversified its 'investments' in Iraq through a dual-track approach of: (a) cultivating ties with and supporting Iraqi Shi'a politicians and their parties, and (b) training, financing, arming and directing Iraqi Shi'a militias to threaten, coerce, and murder Iraqis, and U.S. and Coalition Forces to advance Iran's strategic objectives.").

control of the post-Hussein government—while funding and facilitating the training of Shi'a militia groups, with Hezbollah's help." 396 F. Supp. 3d at 23 (citing Oates Rep. at 14-17). Of the three main Shi'a factions that emerged after 2003, one answered directly to Iran and was financed by it (the Supreme Council for the Islamic Revolution in Iraq ("SCIRI")), the second was sympathetic to Iran and had historically received support from it (Da'wa Party), and the third was ambivalent toward Iran but was partially financed by the IRGC (the faction led by Muqtada al-Sadr, discussed *infra*). *See* PX-153 at 14-17; Oates T1-109:10-110:15.

The second part of the strategy—interconnected with the first—was to infiltrate IRGC-QF proxies into the Iraqi police and security forces (while simultaneously using those forces to assassinate former Saddam Hussein regime elements). *See* Oates T1-89:17-19, 111:25-112:10; Pregent T5-170:7-21; PX-157 at 19-21; PX-81 at Bates No. 01407 (44th Tactical Interrogation Report of Qais Khazali). The *Karcher* court found that "[a]mong the downstream effects of that Iranian support was militia infiltration of the Iraqi police and security forces, resulting in widespread corruption and 'death squads' targeting at least Sunnis, if not Western officials as well." 396 F. Supp. 3d at 23 (citing McIntyre Rep. at 19-21; Oates Rep. at 15-16).

The third part of Iran's strategy was to use Hezbollah and the IRGC-QF to establish a multitude of terror cells that could be directed to target American and Coalition Forces in Iraq. *See* Levitt T1-68:18-69:10. *See also* Lutz T5-16:6-14.[23] As discussed further below, this strategy included "Iranian arms, funding, and operatives flow[ing] into Iraq through the Sheibani Network

---

[23]    According to an August 2007 National Intelligence Estimate, "Iran has been intensifying aspects of its lethal support for select groups of Iraqi Shia militants, particularly the JAM [Jaysh al-Mahdi], since at least the beginning of 2006. Explosively formed penetrator (EFP) attacks have risen dramatically." PX-20 (National Intelligence Estimate: *Prospects for Iraq's Stability: Some Security Progress but Political Reconciliation Elusive*) at 4.

and other smuggling operations, while some Iraqi allies made the reverse trip to Iran for training."

*Karcher*, 396 F. Supp. 3d at 23 (citing McIntyre Rep. at 26). Moreover, to ensure that it could

calibrate the violence directed against Coalition personnel, Iran directed Hezbollah and the IRGC-

QF to supply their Iraqi proxies with EFPs but to control the flow and use of these and other

weapons. *See* McIntyre T5-109:1-112:4.[24]

  This had two benefits from the Iranian perspective. First, by controlling the flow of EFPs

into Iraq and selecting the specific terrorists who would receive training in emplacing them, Iran

was able to keep its Iraqi proxies extremely dependent on Hezbollah and the IRGC-QF and

therefore obedient. *See* McIntyre T5-96:20-97:2. Second, Iran sought to inflict significant

casualties on American personnel in Iraq but not to a point that would provoke a devastating

response from the American military. EFPs (and later Improvised Rocket-Assisted Munitions

("IRAMs") and other weapons) provided Iran with a highly lethal but controlled weapon system

that matched its objective of inflicting calibrated but lethal force against American and Coalition

Forces. *See id.* at 109:19-25 (testifying that the IRGC-QF provided 240mm rockets only to the

"proxy militias that they directly established and fielded and supported in Iraq. And they would

directly control their operations, to include weapons-use targets as well as the tempo of combat

operation against US forces as well.").

---

[24] Hezbollah and the IRGC-QF's role in training their Iraqi proxies is attested to in many U.S.
government designations. *See, e.g.*, PX-18 (State Dep't "Country Reports on Terrorism" 2006-
2012), 2011 Report, at 172 ("Iran was responsible for the increase of lethal attacks on U.S. forces
and provided militants with the capability to assemble explosives designed to defeat armored
vehicles. The IRGC-QF, in concert with Lebanese Hizballah, provided training outside of Iraq as
well as advisors inside Iraq for Shia militants in the construction and use of sophisticated
improvised explosive device technology and other advanced weaponry.").

### 1. The IRGC-QF's Role in Iraq

As explained above, Iran used the IRGC-QF to direct its deadly terror campaign in Iraq. On October 25, 2007, the IRGC-QF was designated an SDGT by the U.S. Department of the Treasury. The press release announcing the designation described the U.S. government's finding that:

> The Qods Force has had a long history of supporting Hizballah's military, paramilitary, and terrorist activities, providing it with guidance, funding, weapons, intelligence, and logistical support. The Qods Force operates training camps for Hizballah in Lebanon's Bekaa Valley and has reportedly trained more than 3,000 Hizballah fighters at IRGC training facilities in Iran. The Qods Force provides roughly $100 to $200 million in funding a year to Hizballah and has assisted Hizballah in rearming in violation of UN Security Council Resolution 1701.
>
> In addition, the Qods Force provides lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces and innocent Iraqi civilians.

PX-5 (U.S. Treasury Department Press Notification, dated October 25, 2007) at 3.

A few months later in early 2008, IRGC-QF Brigadier General Ahmed Foruzandeh was designated by the U.S. Treasury Department, which identified him as the Commanding Officer of the Ramazan Corps, and noted that he "leads terrorist operations against Coalition Forces and Iraqi Security Forces, and directs assassinations of Iraqi figures . . . ." PX-8 (U.S. Treasury Designation of Sheibani and others) at 1. The 2010 National Defense Authorization Act ("NDAA") Conference Report issued by the Office of the Secretary of Defense also confirmed that the "IRGC-QF Ramazan Corps is responsible for carrying out Iran's policy in Iraq." PX-39 (U.S. Department of Defense Briefing, dated April 2010) at 2.[25]

---

[25]    It also noted that "the IRGC-QF posts its officers in Iran's diplomatic missions throughout Iraq, including Iran's outgoing Ambassador to Iraq, Hassan Kazemi-Qomi. The incoming Ambassador to Iraq, Hassan Danafar, is also a Qods Force officer." *Id.*

On September 16, 2008, the U.S. Treasury Department designated Abdul Reza Shahlai, an

IRGC-QF deputy commander, noting that he was responsible for:

> [P]lanning Jaysh al-Mahdi (JAM) Special Groups attacks against Coalition Forces
> in Iraq. Shahlai has also provided material and logistical support to Shia extremist
> groups—to include JAM Special Groups—that conduct attacks against U.S. and
> Coalition Forces. In one instance, Shahlai planned the January 20, 2007 attack by
> JAM Special Groups against U.S. soldiers stationed at the Provincial Joint
> Coordination Center in Karbala, Iraq. Five U.S. soldiers were killed and three were
> wounded during the attack.
>
> In late-August 2006, Shahlai provided material support to JAM Special Groups by
> supplying JAM Special Groups members with 122mm grad rockets, 240mm
> rockets, 107mm Katyushas, RPG-7s, 81mms, 60mm mortars, and a large quantity
> of C-4.
>
> Shahlai also approved and coordinated the training of JAM Special Groups. As of
> May 2007, Shahlai served as the final approving and coordinating authority for all
> Iran-based Lebanese Hizballah training for JAM Special Groups to fight Coalition
> Forces in Iraq. In late-August 2006, Shahlai instructed a senior Lebanese Hizballah
> official to coordinate anti-aircraft rocket training for JAM Special Groups.

PX-9 (U.S. Treasury Department Press Notification, dated September 16, 2008) at 1 ("RPGs" are

rocket-propelled grenades).

General Shahlai was a key lieutenant of IRGC-QF commander Qasem Soleimani and was

responsible for training, arming, funding and directing what would later be known as the "Special

Groups" in Iraq.[26] *See* PX-157 at 25 ("Shahlai…was the primary intermediary between the senior

leadership of the Special Groups and Qasem Soleimani, head of the IRGC-QF.").

The *Karcher* court found that "the IRGC-QF spearheaded a closely coordinated campaign

to equip the Shi'a militia for proxy warfare" and that the "campaign is well attested to in U.S.

Government documents." 396 F. Supp. 3d at 24.

---

[26]     Soleimani was directly responsible for Iranian policy in Iraq. *See, e.g.*, PX-75 at 56 (MNF-
I Weekly Update to the Secretary of Defense, August 5-11, 2007) ("Soleimani told Waeli that he
(Soleimani) is the sole decision-maker on Iranian activities in Iraq and he offered to make a deal
involving our release of Qais Khazali in exchange for decreased JAM Special Group activity.").

### 2.     Hezbollah and the IRGC-QF Introduced EFPs into Iraq

Hezbollah and the IRGC-QF first introduced EFPs into Iraq in 2004. *See* Lutz T5-20:17-20 ("[T]he intelligence will tell you that EFPs were seen in 2004 starting in Basra, which is in southern Iraq, and then they moved up into Baghdad and the east area of Baghdad in 2004."). The *Karcher* court found: "Although Hezbollah appears to have developed the first EFPs, both Iran and Hezbollah were instrumental to their use in Iraq, beginning in 2004." 396 F. Supp. 3d at 28 (citing Lutz T5-20:2-21:2). The IRGC-QF used long-established supply lines that the IRGC had developed during the Iran-Iraq war in the 1980s. Mr. McIntyre testified that:

> This was a very well-developed network that had actually been established relatively soon after the 1980 to 1988 Iran-Iraq War began to enable Iranian forces to support clandestine activity behind Iraqi lines. They . . . identified and then they developed a network of supply bases, cache sites, to hide and conceal the weapons for temporary periods of time, areas on the border where they could – between Iran and Iraq where they could move undetected. And then there were a series of safe houses that would move from Maysan Province, which was right here, up into Baghdad.

McIntyre T5-96:24-97:11. *See also* Lutz T5-47:24-48:4. ("They would run these through what we would call logistic rat lines. And so somebody that was not of my background or an ammunition background would easily just pass these and discard these as US ammunition or in this case C4 being moved from one location inside the theater to the next and completely dismiss it.").

Mr. Lutz testified that Hezbollah's EFP manufacturing process was of a high quality. *See* Lutz T5-17:1-18:19. Mr. Lutz's assessment was consistent with the Department of Defense's view set forth in a March 2007 report to Congress: "EFPs require advanced manufacturing processes and training for employment that clearly place them outside the category of 'improvised explosive devices.'" PX-35 (U.S. Department of Defense Report on Iraq, dated March 2007) at 17. The steel casings in many EFPs found in Iraq were traced back to Iran. *See* Lutz T5-48:5-15. ("[I]ntelligence reports did identify large shipments of steel going into Iran to a specific manufacturing plant that

had the capability to cut and mill the casings themselves."). Likewise, the U.S. military was able to determine that the explosives often used to detonate EFPs in Iraq were in fact Iranian-sourced C4 well-disguised to look like a close approximation of American C4 explosives, as explained *infra* at 43, 51-52.

> The Department of Defense also agreed that those weapons included EFPs:
>
> Consistent with the National Intelligence Estimate, Iranian support to Shi'a militias, such as JAM and the Badr Organization, includes providing lethal weapons, training, financing, and technical support. This includes supplying some Shi'a extremist groups with explosively formed projectiles (EFPs), the most effective of the roadside bombs. Shi'a extremist groups have been implicated in direct attacks against Coalition forces, including with EFP technology.

PX-35 at 17 (the Badr Organization is discussed further below). Mr. Lutz testified that the "overwhelming majority" of EFPs deployed in Iraq were "conducted by or facilitated by the IRGC or Lebanese Hezbollah," but he acknowledged that not 100 percent of them were. *See* Lutz T5-52:7-14.

### 3. Indicators of Hezbollah Training in the "TTP" Used by IRGC/Hezbollah Proxy Groups

Mr. Bradley testified that successfully emplacing EFPs required considerable experience and training. *See* Bradley T2-27:6-15 ("[T]hink of the EFP as a rifle bullet. You had to make sure that the scope was aiming towards where the bullet was going to go. And then you had to figure out how far were you going to be from the vehicle. And there's a certain amount of trigonometry involved in how fast is the vehicle going and where you're going to aim the EFP so that…it would trigger and then the EFPs would arrive at the right place at the right time. So there was a lot of trial and error you would have to do to be able to develop that.").

Mr. Lutz also testified that the successful emplacement of EFPs in Iraq required that the terrorists involved understand the likely speed of the vehicle being targeted, the general range of the jamming devices carried by American armored vehicles (the so-called electronic

countermeasure ("ECM") bubble that protects the vehicle), and deploy technological measures to arm the passive infrared devices that would initiate the EFP. *See* Lutz T5-36:17-37:24. (The terrorists "were masters at judging our speed and knowing when we were coming in. So they had the time to facilitate arming the passive infrared within the time frame that it requires to activate." Lutz T5-31:2-5). Mr. Lutz further testified that victim-initiated passive infrared triggers were a hallmark or signature of Hezbollah. *See* Lutz T5-36:11-16. Mr. Oates testified that "as we watched the rapid capability development of the Shi'a militia in Iraq from a weapons training and tactics procedure, the speed with which they achieved this capability and their ability to adapt led me to believe that there was external assistance provided." Oates T1-98:5-10. The *Karcher* court credited this testimony, noting Mr. Oates's "metaphor that a turtle found atop a fence post required some outside help to get there"—that is, Iran's efforts were responsible for the Special Groups' remarkable capabilities. *Karcher*, 396 F. Supp. 3d at 29 (citing Oates T1-97:23-98:10).

Mr. Barker likewise testified that EFP emplacers quickly learned how to defeat U.S. counter-measures such as "Rhinos" (metal and electronic appendages attached to the front of American vehicles intended to trigger EFPs prematurely). *See* Barker T3-30:10-18 ("So our enemy is very adaptive. A lot of training. And it's easy to see this very large device sticking out front. So what they did is they started to offset the PIR. They also angled it. So if my EFPs were oriented forward, I can turn my PIR, say, 25 degrees to the right. Now, when the Rhino comes in front of it, by the time the Rhino sets off the PIR, the warheads are aimed at the crew cabin and punch the warheads through the vehicle.").

### 4.    Hezbollah's Central Role in Training Iranian Terror Cells in Iraq

As discussed herein, Hezbollah was instrumental in establishing and organizing the IRGC-

QF's terror proxy groups in Iraq. A Department of Defense report on Hezbollah detainees

explained:

> Additional detainee reporting further highlights the significant role that L[ebanese] H[ezbollah] plays in the training of Shi'a extremist groups in Iraq. Senior Shi'a extremist leaders obtain administrative, logistics, financial, religious and small-unit tactics, leadership training in Lebanon. Multiple detainees have claimed that the training received from LH instructors in Iran is of notably higher quality than those from Iranian instructors, also noting the difficulty overcoming language obstacles.

PX-107 (detainee documents regarding Layth Khazali and Ali Musa Daqduq) at 1-2.

Likewise, Mr. McIntyre testified that:

> Lebanese Hezbollah spent an extended period of time, again, from 1982 to 2000, including engagements up until 2006, with Israeli Defense Forces. They went to school, again, on one of the best armies in the region. The Iraqi students knew that. And of course, Hezbollah was very careful to make sure that their exploits were propagandized throughout the region as well. The IRGC-Qods Force members, not only could they not speak Arabic; often, they were not familiar with Iraqi Shi'a Arabic culture, which was different than Persian. For example, Persian culture was much more cosmopolitan. Iraqi Shi'a culture still had large vestiges of tribal, clanal [sic], familial networks and relationships that were not that omnipresent in Iran itself. So it was very, very understandable. As one detainee put it when commenting on the capability of Hezbollah instructors, he simply said, "They did it. They are the real article, the real deal."

McIntyre T5-108:2-20. *See also* PX-154 at 22.

And as the 2010 NDAA Conference Report issued by the Office of the Secretary of

Defense noted:

> In addition to providing arms and support, IRGC-QF is responsible for training Iraqi insurgents in Iran, sometimes using Lebanese Hizballah instructors. Lebanese Hizballah provides insurgents with the training, tactics and technology to conduct kidnappings, small unit tactical operations and employ sophisticated IEDs. In addition to weapons and support, Iran continues training Shia militants in the use of IEDs, EFPs, and the counter-measures designed to defeat these weapons and the networks that design, build, emplace and fund them draw persistent counter-responses. The flow of new IED technologies and highly creative emplacement and

employment methods underscore the enemy's ability to adapt and react quickly and efficiently to CF countermeasures.

PX-39 at 3.

### a.       Hezbollah's Role in Training EFP Cells

Hezbollah trained Iran's proxy Special Groups on the use of EFPs specifically. The State

Department's Country Reports on Terrorism 2006 noted that:

> Iranian government forces have been responsible for at least some of the increasing lethality of anti-Coalition attacks by providing Shia militants with the capability to build IEDs with explosively formed projectiles similar to those developed by Iran and Lebanese Hizballah. The Iranian Revolutionary Guard was linked to armor-piercing explosives that resulted in the deaths of Coalition Forces. The Revolutionary Guard, along with Lebanese Hizballah, implemented training programs for Iraqi militants in the construction and use of sophisticated IED technology. These individuals then passed on this training to additional militants in Iraq.

PX-18 (State Department Country Reports on Terrorism), 2006 Report, at 147. It went on

to observe that:

> Since at least 2004, Hizballah has provided training and logistics to select Iraqi Shia militants, including for the construction and use of shaped charge IEDs, which Hizballah developed against Israeli forces in southern Lebanon during the late 1990s and which can penetrate heavily armored vehicles.

*Id*. at 251.

> The State Department's Country Reports on Terrorism 2008 noted that Iran was:

> Provid[ing] lethal support, including weapons, training, funding, and guidance, to Iraqi militant groups that targeted Coalition and Iraqi forces and killed innocent Iraqi civilians. Iran's Qods Force continued to provide Iraqi militants with Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces as well as civilians. Tehran was […] providing militants with the capability to assemble improvised explosive devices (IEDs) with explosively formed projectiles (EFPs) that were specially designed to defeat armored vehicles. The Qods Force, in concert with Lebanese Hezbollah, provided training both inside and outside of Iraq for Iraqi militants in the construction and use of sophisticated IED technology and other advanced weaponry.

*Id.*, 2008 Report, at 183.

Dr. Levitt testified that his research and findings was consistent with the language set forth in these and similar Country Reports related to the relevant period. *See* Levitt T1-60:3-64:3. Mr. Lutz testified that "the Iran IRGC-QF and Hezbollah also facilitated the training of the JAM Special Forces Groups as well as the Badr Corps in the employment of explosively formed penetrators against US forces in Iraq." Lutz T5-16:10-14. Similarly, the Treasury Department announcement of former Badr Corps leader and Special Group Kata'ib Hezbollah ("KH") (discussed *infra*) founder Abu Mahdi al-Muhandis's designation noted that "[a]s of 2008, Kata'ib Hizballah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided training—to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks—to Kata'ib Hizballah members in Iran." PX-11 (U.S. Treasury Department Press Notification, dated July 2, 2009) at 2.

> As the *Karcher* court found:
>
> IRGC-QF and Hezbollah conducted trainings in a combination of Iraq, Iran, and Lebanon for Iraqi Shi'a militant leaders in the effective use of EFPs. Compared with Iranian instructors, Hezbollah instructors were reportedly more effective, in part because they shared a language (Arabic) and culture (tribal relationships and other networks) with Iraqi Shi'a that Iranians coming from a Persian, cosmopolitan culture generally did not. Whatever their nationality, the trainers offered critical assistance that, for example, enabled Shi'a militia groups to understand how to position EFPs' PIR triggers based on the likely speed of a moving target vehicle.

396 F. Supp. 3d at 29 (citations omitted).

### b.    Hezbollah's Role in Training Iranian Terror Cells on Indirect Fire

Hezbollah's role in training its proxies and developing and implementing sophisticated methods to overcome American military counter-measures relating to EFPs is discussed *infra*. But Hezbollah also contributed significantly in other ways to the training and effectiveness of the terror cells that were tasked with attacking American and Coalition Forces. For example, during

a July 2, 2007 press briefing, Brigadier General Kevin J. Bergner noted that the Special Groups were trained in Iran by Hezbollah instructors in a four-week course titled "Artillery." According to General Bergner, U.S. intelligence concluded that: "This course teaches the use of indirect fire weapons including 60mm and 120mm mortars, and 107mm, 122mm and 240mm rockets." PX-106 (MNF-I July 2, 2007 Press Briefing). The use of this training was clear—U.S. and Coalition Forces raids regularly uncovered cache sites that contained Iranian-supplied artillery rockets, along with other weaponry. "[W]e continue to seize significant caches. Finds this week include one in south Baghdad that contained 105 mortar rounds and another in [Baghdad neighborhood] Sadr City that had 28 Iranian 107mm rockets, 63 Iranian mortar rounds, 7 Soviet 122mm rockets, and a large assortment of other weapons and ammunition, all in very good condition." PX-78 at 61 (MNF-I Weekly Update to the Secretary of Defense, August 4-10, 2008).

### 5. The U.S. Military's Response

Following the U.S.-led invasion of Iraq in 2003, the United States military did not have enough explosive ordnance disposal assets in Iraq to deal with the growing IED threat because it did not anticipate the use of IEDs employed against Coalition Forces and the significant number of resulting casualties. *See* Oates T1-94:11-22. *See also* Bradley T2-16:9-17:25 ("we were unprepared for the IED threat. We didn't believe that they would be there. And it wasn't widely known."); *id.* at 46:9-47:9 (describing improvement in EOD capacities in Iraq). To deal with the ballooning IED problem, the Department of Defense established CJTF-Troy in 2005 as an operational force in Iraq that fused intelligence, explosive ordnance expertise, and engineering expertise to help the U.S. military better understand what weapons were being used against Coalition Forces and what terrorist and smuggling networks were involved in using them. *See* PX-158 (Expert Report of Captain (Ret.) Donald Wade Barker) at 15; PX-159 (Expert Report of Colonel (Ret.) Kevin Lutz) at 2; PX-156 (Expert Report of Colonel (Ret.) Leo E. Bradley III) at

25-27. In assessing EFPs, for instance, CJTF-Troy concluded that the "principal source of the materials and the completed munition, the EFP, was being provided from Iran." Oates T1-95:11-18.

### a.      Technological and Material Counter-Measures

As the IED threat became more apparent in Iraq, the U.S. Army added up-armored versions of palette loaders, flatbeds, wreckers, and other utility vehicles, and increased the number and use of Bradley Fighting Vehicles ("Bradleys") and up-armored HMMWVs (High-Mobility Multipurpose Wheeled Vehicles) in theater. *See* PX-158 at 15. *See also* Bradley T2-21:17-22:17 (describing the U.S. military's improvement in vehicular armor in Iraq); PX-156 at 10-11 (same). As the proliferation of armored vehicles used by the U.S. military caused terrorists in Iraq to turn to more powerful IEDs, U.S. forces eventually developed and deployed Mine-Resistant Ambush Protected vehicles ("MRAPs"). *See* PX-156 at 11.

In addition to increasing the armor on the vehicles used by American forces, the U.S. military began to deploy tactical counter-measures, designed to disrupt EFPs at either the arming or the triggering phase of their deployment, because the terrorists usually camouflaged the devices too well to be spotted by passing vehicles before detonation. *See* PX-158 at 16; PX-159 at 10. EFP counter-measures developed and deployed included CREW (Counter-Remote Controlled Improvised Explosive Device Electronic Warfare) systems (jammers) to prevent the arming of RF transmitters such as cell phones, long-range cordless phones and key fobs. *See* PX-159 at 10; Barker T3-27:21-28:7. The introduction of more heavily armored vehicles and the addition of Rolled Homogenous Armor ("RHA") to vehicles like HMMWVs proved helpful against conventional IEDs but wholly ineffectual against EFPs. *See* Barker T3-14:7-12 ("It's the hardest steel that we can make. We use it in layers on the vehicles to prevent penetration. It's graded

against armor-piercing bullets, RPGs, large artillery shells, things like that. It has no defense against EFPs.").

Similarly, by deploying PIR, victim-operated triggers to initiate the EFPs, Hezbollah was able to help Iran's proxies defeat U.S. military electronic counter-measures.[27] As explained *supra* at 34-35, 38-41, Hezbollah-trained cells learned to overcome U.S. counter-measures such as the Rhino. *See also* PX-159 at 21-22.

### b.    Tracing Materials and Technology Back to Iran

In addition to adding armor, U.S. forces also added manpower in the form of increased forensics and analysis of IED attacks. Starting in 2004, MNF-I stood up the Combined Explosives Exploitation Cell ("CEXC"), an in-theater laboratory dedicated to performing strategic analysis on materials collected by members of the Army's EOD units during their post-blast analyses. *See* PX-156 at 32; PX-158 at 15. In 2005, the Army approved doubling the size of its EOD force, although it took three years to build the approved strength level. *See* PX-158 at 15. *See also* Bradley T2-35:6-36:5 (describing process of increasing EOD forces in Iraq); PX-156 at 24-25 (same). By September 2005, Multi-National Corps Iraq ("MNC-I") had established Task Force Troy (under the command of then-Colonel Kevin Lutz) as the first operational C-IED task force in U.S. military history. *See* PX-159 at 10. Task Force Troy was subsequently partnered with the FBI's Terrorist Explosive Device Analytical Center ("TEDAC"), and CEXC was placed under CJTF-Troy's

---

[27]    As Mr. Lutz explained, Shi'a terror cells' ability to overcome U.S. CREW systems can be linked directly to the IRGC. *See* PX-159 at 21 ("CREW systems cost hundreds of millions of dollars to design, maintain and deploy and were well beyond the capacity of a local terror cell—limited by education, experience and access to technology—to overcome. In my professional opinion, the Special Groups and other local Shi'a terror cells could not have deployed and implemented throughout southern Iraq the sophisticated radio-frequency technology necessary to defeat our next-gen CREW systems without the IRGC's active involvement, training, equipment and support.").

authority. *See id. See also* PX-156 at 25-27. In 2006, the Department of Defense established

JIEDDO to lead and coordinate all Department of Defense efforts to counteract IEDs as weapons

of "strategic influence." PX-159 at 10-11. Mr. Oates explained:

> The JIEDDO organization was created by the Department of Defense once we realized there was a significant IED threat to our soldiers, the principal killer of our soldiers in Iraq, to coordinate all of the defense activities to understand this explosive, how we might mitigate the effects from a material solution or from training and furthermore to understand the intelligence components associated with the networks that are being used against Coalition Forces with these devices. And it was the entire range of improvised explosive devices.

Oates T1-85:18-86:2.

Mr. Lutz described the process by which his task force worked to exploit the IEDs

recovered in Iraq:

> When you came across an IED event or a cache, you would do exploitation so that you would recover that material. You would bring it back. It would be exploited. You would exploit what you could on site. You'd bring it back and it would get exploited there at the different labs. And we would look at the components and look for the technology that was being used, capture the radio frequencies. You could identify signatures by bomb makers. Literally, we had codes for them. You could identify where they were on the -- in the Iraqi theater.

Lutz T5-27:16-25.

Once evidence was analyzed in theater, it was sent back to the U.S. for further analysis.

Mr. Bradley described part of the process by which the FBI's TEDAC and its UK equivalent, the

Defence Science and Technology Laboratory, set about to learn the origin of IED components, the

tradecraft of the bomb-makers and the identity of IED cells:

> TEDAC actually maintains all of the material that we collected overseas as the U.S. main hub for terrorist explosive devices. So every IED that we recovered, everything that we got from a cache, everything that we rendered safe was exploited in theater and then was sent back to the FBI where they would conduct additional exploitation. They would double check our work and then provide some things like trace evidence fibers and some other things that we were not doing forward; they would do that level of exploitation back here in the United States.

Bradley T2-43:25-44:16.

Mr. Oates testified that the United States military was able to trace the actual metal used in these EFPs, as well as the actual manufacture of the weapons, back to Iran. *See* Oates T1-95:11-25. He further testified that:

> The devices, some that were actually exploded and some that we captured in caches, we were able to use a significant amount of forensic examination to determine that the components, the detonating devices themselves, came from Iran… the exact milling requirements on the copper have to be precise or it doesn't work. That machine tooling was tied back to Iran.

*Id.* at 96:9-16.

Mr. Lutz testified that "intelligence reports did identify large shipments of steel going into Iran to a specific manufacturing plant that had the capability to cut and mill the casings themselves." Lutz T5-48:13-15. He also described the process of confirming that the large quantities of C4 explosives being used to detonate EFPs in Iraq were counterfeit. "[W]e went through our chemical analyzers and analyzed that this was not the same property, nor did it have the taggant inside it. So we were able to say that this came from a source outside the US and most likely from Iran through the IRGC." *Id.* at 47:14-18.

Mr. Lutz also described how high-end components found in EFPs were linked to Iran:

> [CJTF-Troy] came across a device…that was acquired in the US, tens of thousands of them that wreaked havoc on our CREW systems that were imported through the UAE into Iran. And then they started to appear, like most of the EFP threat did, starting in the south and Basra. And it moved its way up into Baghdad until we were able to recover an EFP with this technology. We assessed it…Several of our vehicles were hit because the CREW systems weren't effective because their technology circumvented the capability that the technology provided.

*Id.* at 48:25-49:12.

The U.S. military also developed systems for tracking IED data, in order to develop patterns and test hypotheses relating to discovering the provenance of IEDs. *See* Bradley T2-38:15-39:1 (describing the importance of standardized reporting); PX-156 at 35-37 (describing the standardized reporting system). This included standardized reporting, using forms such as:

- **SIGACT Reports.** Reports created by units responding to the scene of militarily significant activity, such as a terrorist attack, the discovery of a weapons cache or the detention of a suspected terrorist. These reports are often updated as intelligence and other units add more information following further investigation.

- **IED Reports.** Similar to SIGACT reports, IED reports set forth findings of a unit responding to an IED discovery or attack.

- **CEXC Records**. Reports, photographs, and images prepared by CEXC as a part of the IED exploitation process.

*See id. See also* PX-159 at 3-5. The military relied on other reporting tools as well, such as each service branch's line of duty reports prepared following the death of a service member. Most common in this case are AR 15-6 Reports, which are prepared by a U.S. Army investigator following the injury or death of Army personnel.[28] Many of these documents were stored on the Combined Information Data Network Exchange ("CIDNE"), an electronic database adopted by MNF-I and later CENTCOM, which allowed document sharing across the U.S. military's (and some allied militaries') C-IED landscape. *See* PX-156 at 36-37. For instance, the U.S. Army's Operations Research/Systems Analysis personnel applied advanced mathematical modeling to the data, to help determine, *inter alia*, the provenance of EFPs and other IEDs. *See id.* at 32-34.

In sum, Mr. Bradley explained that the U.S. military partnered with the foremost law enforcement experts in the world to build the capability for IED site exploitation. "[W]e built a superb system of systems to be able to . . . provide evidentiary tools. Those links are very strong and well proven." Bradley T2-47:16-19. As a result of that system, "[t]he U.S. military traced

---

[28]     Mr. Barker explained that an AR 15-6 investigation is "an internal military investigation within a unit. An officer from outside the brigade is brought in. It could be something stateside, where maybe two soldiers got in a fight, something was stolen, or it could be something as devastating as a major vehicle and several soldiers being killed." Barker T3-54:18-24; *see also* PX-158 at 3. Mr. Barker testified that, as an officer in the U.S. Army, he himself was the investigating officer for multiple AR 15-6 reports. *See* Barker T3-55:5-7.

much of the machinery used to manufacture the EFPs, high explosives and PIR devices deployed in Iraq to Iran and its illicit supply chain." PX-153 at 25.

### c.   Military and Intelligence Efforts to Combat Malign Iranian Influence

The gradual recognition of the Iranian threat in Iraq did not immediately translate into a U.S. strategic plan to counter it. However, an important first step occurred in late 2006 when General George Casey directed the Combined Joint Special Operations Command Task Force ("CJSOTF") to create a new subordinate command or task force focused exclusively on Shi'a terror cells with the goal of taking direct action against major EFP networks. *See* PX-153 at 26.

This effort began to bear fruit in late 2006 when U.S. Special Forces apprehended IRGC-QF General Mohsen Chirazi in the SCIRI compound. *See* Oates T1-116:15-22. ("[We] [f]ound with him…a significant amount of documentation and materiel that clearly identified their direct involvement with militia in Iraq."). However, while the raid yielded a substantial amount of intelligence[29] on the IRGC-QF and its work with the Badr Corps and Special Groups (discussed *infra*), Chirazi and his IRGC-QF team were quickly released. *See* PX-153 at 26.

In January 2007, a special operations task force captured five mid-level IRGC officers posing as Iranian diplomats in Erbil, in Kurdish northern Iraq. *See id.* Thereafter known as the "Erbil Five," they were held until 2009. *See id.*; Oates T1-116:23-17:3. *See also* PX-65 at 5; PX-8 at 1 ("Qods Force officers often use various cover mechanisms – including diplomatic, non-governmental organization, humanitarian, and media – for conducting operational activity, belying their military affiliation."). In March 2007, as noted *infra,* Coalition Forces arrested the senior leaders of the IRGC-QF-directed Special Group network known as Asa'ib Ahl al-Haq ("AAH"),

---

[29]     "The safe house contained a military operations center with maps, computers, videotapes, and receipts confirming weapons shipments from Iran." PX-153 at 26.

brothers Qais and Laith Khazali, and a senior Hezbollah commander, Ali Musa Daqduq. Commenting on these arrests, General Bergner, spokesman for the MNF-I, noted during a July 2, 2007 press briefing that Iranian-backed Special Groups operated across Iraq and:

> [P]lanned and executed a string of bombings, kidnappings, sectarian murders and more against Iraqi citizens, Iraqi forces and coalition personnel. They receive arms – including explosively formed penetrators, the most deadly form of improvised explosive device – and funding from Iran. They also have received planning help and orders from Iran …. They also moved money into and around Iraq to fund their operations.

PX-153 at 29. U.S. forces also regularly detained Iraqis who had spent time training with Hezbollah and the IRGC in Iran. *See* PX-63 (SIGACT reports describing, *inter alia*, detentions) at 3, 10, 14-15, 17, 28, 40, 63, 72, 74-76, 79, 82, 84, 85, 88, 95); PX-66-70 (summaries of detainee interrogations and investigations into smuggling operations). Ultimately, despite the deployment of a dedicated CJSOTF task force to counter malign Iranian activity, the IRGC-QF was never held responsible in a meaningful way by the U.S. government for its conduct. *See* Oates T1-129:3-6. *See also* McIntyre T5-113:3-5.

C.      **Hezbollah's Development of EFPs**

Hezbollah developed and refined its design, manufacturing process and emplacement of EFPs in the Bekaa Valley and southern Lebanon several years before the U.S.-led invasion of Iraq in 2003. *See* Lutz T5-19:15-21. Mr. Lutz testified that "Lebanese Hezbollah was the first that developed the explosively formed penetrator as well as the associated tactics, techniques and procedures that were eventually used by the Special Groups inside of Iraq against US forces." Lutz T5-15:20-24. Mr. McIntyre testified that the first EFP deployed by Hezbollah that was identified by the U.S. intelligence community was fielded in July 1998. *See* McIntyre T5-79:2-7.

During the *Karcher* trial, Mr. Lutz presented a Hezbollah EFP training video, *see* PX-60, that was confiscated from a fishing boat seized by an Israeli special operations force in 2003. *See* Lutz T5-17:1-3. As Mr. Lutz testified:

> The video really shows you … the advanced machining and processing of explosively formed penetrators. It's not a weapons system that you simply can just hack up some metal, put in some copper, add some explosives and you get an effective result. So it's more of a propaganda film that they built. This is in 2003, before we started to see the EFP threat evolve in Iraq….
>
> As you see the video, again, they're showing you the advanced technical machine that's required to mill to the precise angle and thickness of an explosively formed liner…. Just to reiterate, this is not something that you just cut a piece of copper and insert into a pipe. And you'll see at the end -- and I'll illustrate the machine -- the quality…. As you can see here, the liner perfectly is seated into the casing. If there were gaps or the welding was incorrect, then you would not get the … effectiveness that you've seen or heard about from EFP initiations, looking at the door on the model there.
>
> And what they're aiming at is a sheet of metal, just showing in a propaganda film how this weapons system is effective against steel and armored vehicles and, as identified, that M113 vehicle that they described in the video at the beginning. Again, the hole looks very similar to the hole that's inside – that's shown there on the Humvee inside the courtroom.

*Id.* at 17:8-18:19. Mr. Lutz testified that PX-60 was filmed before the conflict in Iraq and was not intended for the benefit of Hezbollah's proxies in Iraq, but rather reflected the EFPs deployed in the Bekaa Valley and southern Lebanon against Israeli forces. *See id.* at 19:8-21.

### 1.        Metallic Properties and Structural Design

Plaintiffs' explosives expert, Mr. Wade Barker, testified that the EFP is a "purpose-built weapon designed to penetrate armor. It has no other purpose." Barker T3-13:6-7. "Unlike a shaped charge, which has a conical metal liner that projects a hypervelocity jet of metal capable of penetrating armor to great depths (like an RPG or anti-tank missile), the EFP liner is shaped like an inverted metal dish or platter." PX-158 at 5.

As Mr. Barker explained, "[w]hile shaped charges have been employed on battlefields since the 19th century, EFPs are a more recent innovation, first appearing on modern battlefields in the 1990s as a weapon deployed in Lebanon by Hezbollah against Israeli armored vehicles." *Id.* at 6. "The first recorded use of an EFP occurred in Southern Lebanon, on October 5, 1998 when Hezbollah attacked Israeli HMMWVs and armored vehicles resulting in the deaths of two Israeli soldiers and wounding of six more." *Id.*

"The EFP derives its armor-defeating power by focusing the energy of an explosive blast behind its metal liner, utilizing what is sometimes referred to as the Misznay-Schardin effect."[30] PX-158 at 6. The warhead itself is normally constructed with a 3- to 12-inch diameter, steel pipe, approximately one quarter to one half inch thick, with one end sealed with a welded steel plate and a priming hole for the insertion of a detonator. *See id.* "The open end of the pipe is then packed with high-energy ("HE") explosive and closed with a copper plate." *Id.*

Once the explosive is detonated, the copper liner inverts and turns into a slug, easily penetrating through rolled homogenous armor. *See id.* at 8-9. "The EFP's destructive capabilities were not limited solely to penetrating a vehicle's armor, however. The contained explosion created a massive blast overpressure, capable of blowing the doors and turrets from vehicles close to the device." *Id.* at 7. "Moreover, the heat and force of the penetrator would shatter the vehicle's armor and materials inward, sending hundreds or even thousands of razor-sharp shards of Teflon and steel ripping through the interior compartment." *Id. See also* Barker T3-20:3-20; PX-58 (video of

---

[30] According to Mr. Barker, the Misznay-Schardin effect occurs when an explosive charge is directed toward a particular target, as opposed to exploding in all directions at the same time, "i.e., an antitank mine can punch through the bottom of a tank, or in [the] case [of] an EFP . . . I direct that copper slug at the armor and it pierces the armor." Barker T3-15:24-16:1.

EFP test fire). "The heat from the penetrator could ignite engine fuel and set vehicles ablaze." PX-158 at 7.

### 2.    Chemical and Metallurgical Composition of EFPs

HE explosives are chemical compounds or mixtures that are capable of supporting or sustaining a detonation wave. *See* PX-158 at 6 n.13. HE explosives do not require confinement because they combust instantaneously, producing heat, gas, a rapid expansion of matter, and a detonation shock wave. *See id.* HE explosives detonate with explosive velocity ranging from 3 to 9 km/s. *See id.* For instance, TNT has a detonation (burn) rate of approximately 5.8 km/s (19,000 feet per second), detonating cord of 6.7 km/s (22,000 feet per second), and C4 about 8.5 km/s (29,000 feet per second). *See id.* Low-energy explosives, by contrast, are compounds where the rate of decomposition proceeds through the material at less than the speed of sound. *See id.* The decomposition is propagated by a flame front (deflagration) which travels much more slowly through the explosive material than a shock wave of an HE explosive. *See id.* Under normal conditions, low explosives undergo deflagration at rates that vary from a few centimeters per second to approximately 400 meters per second. *See id.* A low explosive is usually a mixture of a combustible substance and an oxidant that decomposes rapidly. *See id.*

The use of an HE explosive is key to generating enough heat and force to melt the liner, invert it, and propel it forward with sufficient speed so as to penetrate several inches of steel armor. *See* Barker T3-16:9-25; PX-158 at 8. Mr. Barker explained that HE explosives are rated by their "relative effectiveness" or "RE" in which a baseline value of 1 is assigned to the explosive force created by trinitrotoluene (i.e., TNT, commonly referred to as "dynamite"). *See* Barker T3-16:9-15. Homemade explosives ("HME"), Mr. Barker testified, would have an RE of ".75 or .8, so about 28 percent less effective than dynamite." *Id.* at 16:16-18. HE explosives, on the other hand, "go

far past 1. C4, Semtex, RDX: These explosives can reach a relative effectiveness of a 1.7, so 70 percent stronger than TNT." *Id.* at 16:19-22.

Mr. Barker testified that an HE explosive such as C4 will detonate at "about 26,000 feet per second and 2,000 degrees Fahrenheit . . . . So during the blast, the copper . . . inverts [and] turns into a slug; and as it passes through [the] atmosphere, it turns into kind of a teardrop shape, which is very aerodynamically sound, flies upon the target, producing about 460 kilojoules of energy, which is enough to penetrate half its diameter of rolled homogenous armor." Barker T3-13:20-14:4.

Even a fairly powerful industrial bulk explosive like ammonium nitrate fuel oil ("ANFO") is not sufficient to reliably defeat U.S. armor. *See* PX-158 at 8.[31] For instance, ANFO has a maximum detonation temperature below the melting point of copper (1,984 degrees Fahrenheit) and an explosive speed of approximately 3,200 meters per second. *See id.* "Accordingly, even if an EFP packed with ANFO could generate enough heat at detonation to melt the copper liner, it would lack the explosive speed to invert the liner into a fully formed slug and propel it through several inches of armor." *Id.*

Mr. Barker also testified as to the importance of the use of a copper liner, as pure copper has an ideal melting point for use with HE explosives, just below the maximum detonation temperature of C4. *See* Barker T3-13:12-14:4; PX-158 at 9. Copper, Mr. Barker explained, "is just malleable enough that it will begin to shape properly, but not so malleable that it'll fly apart" upon detonation of the HE explosive. Barker T3-17:4-8. This allows the copper liner to invert and form

---

[31]     "ANFO is classified as a blasting agent, meaning that it decomposes through detonation rather than deflagration at a velocity higher than the speed of sound in the material but has a moderate velocity compared to other explosives, such as C4, a military-grade plastic explosive, which has a maximum detonation temperature of 2,060F and an explosive speed of 8,092 m/s." PX-158 at 8 n.19.

into the penetrating slug. *See* Barker T3-13:20-14:4. Steel liners, by contrast, will not "begin to melt until north of 2,500 degrees Fahrenheit," causing the liner to turn into "a big chunk of steel" that "destabilizes and then strikes the vehicle, denting the vehicle as opposed to penetrating" its armor. Barker T3-17:12-18. An aluminum liner will simply melt and shatter when employed with HE explosives. *See* PX-158 at 9.

Mr. Barker further testified that the liner of an EFP *must* be precisely milled to an exact thickness and a 140-degree angle to ensure that the liner inverts and properly forms into the penetrating slug:

> So what we found through experimentation is that, deeper than 140 degrees, the cone actually collapses on itself. So the slug again destabilized in flight, comes apart. [If i]t's too shallow[, t]he blast tears the copper apart, becomes multiple slugs that are again destabilized in flight and don't hit the target.

Barker T3-17:21-18:1. Accordingly, "[i]f a liner is milled too thin, the explosive blast will shatter it; too thick and it will fail to invert and gain enough heat and speed to penetrate armor." PX-158 at 9. "Likewise, liners milled with improper or imprecise angles will fail to invert and/or lose structural integrity before striking the target." *Id.*

As the *Karcher* court concluded:

> Inflicting this damage requires precision craftsmanship of the EFP. Nowhere is this more apparent than in the specifications for the copper disk. Mr. Barker indicated, for example, that this disk must be milled to a specific "thickness and angle." If the depth of the disk is too thick or too thin, or if the curvature of the disk is incorrect, then the slug may be unable to form or may split into multiple pieces during flight. As a result, the slug may be unable to penetrate the target or may miss it entirely. Moreover, the disk must consist of copper, rather than other metals whose melting points are not conducive to proper formation of an effective slug. The explosive too must be of a certain type and strength in order to shape and propel the slug fast enough to cut through RHA.

396 F. Supp. 3d at 26 (citations and footnote omitted).

In Iraq, the Coalition Forces recovered large caches of explosives together with EFP component parts. *See* PX-44 (Dep't of Defense Images); PX-65 at 8. These supplies often closely

resembled C4, the HE explosive mostly widely used by the U.S. military. Mr. Lutz testified concerning a photograph of one weapons cache in Iraq showing counterfeit (American) C4 explosives:

> What you're seeing here is what looks like US C4 high-energy explosives. It's how we package our C4. In our laboratories, we had the capability to chemically analyze explosives. So we had a sample of our own C4. It has its own chemical properties.
>
> We also use a tag called taggant . . . . Taggant is basically a chemical that's inserted so when our explosives are found, we know where they came from. We know what manufacturing plant manufactured them and potentially when they were manufactured.
>
> [T]he explosives that are shown in this picture – they looked like ours; but unless you understood how we stamp-marked our production line with the lot number, the date, you would just assume that this was US C4. But in fact, if you look closely at the lot markings, there was a difference.
>
> Further, to confirm that, we went through our chemical analyzers and analyzed that this was not the same property, nor did it have the taggant inside it. So we were able to say that this came from a source outside the US and most likely from Iran through the IRGC.

Lutz T5-46:22-47:18; PX-44 at 24, 28.

### 3.    EFP Trigger Mechanisms

As with many explosive devices, EFPs must first be armed then triggered. *See* PX-158 at 10. "Arming" an EFP can best be described as transitioning the weapon from a passive or standby mode into an active, or ready, mode. *See id.* Once armed, an EFP is primed to detonate only upon the occurrence of a given event. *See id.* That event is known as the "trigger." *See id.* In Iraq, EFPs were usually armed either by remote frequency ("RF") or by the use of a command wire capable of carrying a low-level electric charge with a maximum range of around 100 meters, and usually triggered with a PIR. *See id.* RF arming could be achieved using something as simple as a key-fob or as complex as the dual-tone multi-function ("DTMF") reference board found inside a cell phone. *See id.*

Mr. Barker testified that EFPs in Iraq could be armed by placing a call to a cell phone wired into the device and keying in "anywhere from a four-digit to a ten-digit PIN," which would allow a bombmaker to arm the device from "1,000 miles away." *See* Barker T3-25:4-6, 28:12-13. Mr. Barker further testified that the emplacers of EFPs in Iraq preferred operating at a distance for "safety, because when the emplacers placed the device, if it didn't have a safety system, it could go off. So they would wire in the safety system with a PIN code. So then [the terrorist] calls, dials in the PIN code. The PIR comes on. And there's nobody there when the device goes off." Barker T3-33:4-9.

"Given that the individual arming the EFP was often at a considerable distance from the target, successful attacks often required the tactical use of a fixed geographic features to create an aiming point, such as a lamp post or solitary tree." PX-158 at 10. "As a military convoy passed the aiming point, the terrorist operator would remotely arm the EFP to explode from hundreds of feet away." *Id.* "Once remotely armed, the EFP would be triggered using a passive infra-red device ('PIR') attached to the EFP." *Id.* According to Mr. Barker, "once the PIR is on, there's no turning it off." Barker T3-28:14-15. Mr. Barker explained that this two-step method of arming and triggering EFPs is referred to as a "dual-phase initiation system." *See id.* at 25:16-19.

After arming, the PIR detected the heat signature of a passing vehicle and, as that event occurred, the PIR sent an electrical current that set off the explosion within the EFP's casing. *See* PX-158 at 10. Mr. Barker explained the process in the following terms when describing a five-array EFP:

> And so when something with enough heat and movement passes in front of [the PIR], it collapses another circuit and sends one and a half volts to each one of the blasting caps [in the EFP array] . . . and sets them off all at once, sending anywhere from 10 to 20 warheads . . . passing through the vehicle.

Barker T3-25:10-15. As Mr. Barker explained, the process was simple—and deadly:

Q.      And now that we have this turned on, this PIR sensor is now active?

A.      Yes. If you walk in front of it, it'll light up again, which would set the device off. That's all it takes.

Q.      Just heat and motion?

A.      And everybody's dead.

Barker T3-32:2-7.

"In essence, the passing vehicle itself would trigger the EFP. In military parlance, this is a Victim Operated IED ('VOIED')." PX-158 at 10. "A VOIED is just what it sounds like: The intended target or victim triggers the detonation, eliminating the need for human intervention once the device was armed." *Id*. Barker T3-11:10-24, 28:16-20. Mr. Barker testified that constructing and implementing these types of dual-phase initiation systems was beyond the abilities of the average Iraqi insurgent, stating unequivocally that "you need to be a classically trained engineer to build one of these." *See id.* at 33:11-16.

"When emplacing and detonating EFPs, this two-step arming and triggering process provided the operative activating the weapon with the ability to selectively target U.S. military vehicles, and thus avoid civilian casualties (unless that was the specific intended target)." PX-158 at 12. Unfortunately, at times, the U.S. military unintentionally developed predictable travel patterns that allowed terrorist spotters to arm a device when a specific target entered the area before a military vehicle's electronic counter-measures (discussed *supra* at 34-35, 38-41) could jam the RF signal that allowed the terrorist to arm the EFP. *See* PX-158 at 12; Barker T3-64:15-25.

As the *Karcher* court concluded:

Detonating an EFP relies on a "two-step arming and triggering process" akin to that of other explosive weapons. At least for EFPs in the Iraqi theater, the operator typically would arm the EFP using either a command wire ("CW") or remote frequency ("RF"). Whereas the CW approach had a range of 100 meters or less, the RF approach enabled the operator to arm the EFP from more than 300 meters away. Often a spotter closer to the site of the EFP would alert the operator when the target

54

vehicle approached. The operator of an RF-equipped EFP would then send the signal "using something as simple as a key-fob or as complex as a dual-tone multi-function reference board found inside a cell phone." The cell phone method permitted the EFP maker to incorporate a safety system requiring the operator to enter a four- to ten-digit PIN into the cell phone in order to arm the device. After arming the EFP, the operator did not need to take any further action. Upon moving from passive into active mode, the armed device awaits only a triggering event in order to detonate. An approaching vehicle would generate enough heat to cause a passive infra-red device ("PIR") attached to the EFP to send an electrical current to the EFP, thereby triggering detonation….

Effectively deploying the EFP called for a further layer of technical know-how combined with substantial strategic planning. Identifying precisely the right directional focus, distance from the target, and timing of the PIR-enabled weapon would require an extensive "trial and error" process. The EFP emplacers were also adept, for example, at camouflaging the weapon to avoid tipping off U.S. forces. EFPs could be embedded in piles of trash, trash barrels, concrete street curbing, or synthetic rocks made out of foam and covered with dirt. The sophistication of EFP attacks also evolved in step with the U.S. military's countermeasures ….

396 F. Supp. 3d at 27 (citations and footnote omitted).

### D.     The IRGC-QF and Hezbollah's Initial Proxies in Iraq

#### 1.     The Supreme Council for the Islamic Revolution in Iraq ("SCIRI") and the Badr Corps

The Supreme Council for the Islamic Revolution in Iraq ("SCIRI") was founded by Muhammad Baqr Hakim in Iran in 1982 during the Iran-Iraq War. *See* PX-153 at 14. The IRGC cultivated SCIRI and bankrolled it as a Shi'a political party in exile. *See id.* The *Karcher* court cited expert testimony in explaining the basis for this early support: "Among Iran's foreign activities, its campaign in Iraq figures prominently. Dating at least to the Iran-Iraq War in the 1980s, the Shi'a Muslim regime in Iran sought to undermine Saddam Hussein's largely Sunni Muslim government by supporting Shi'a political groups in Iraq." 396 F. Supp. 3d at 22 (citing McIntyre Rep. at 14; Levitt Rep. at 16).

SCIRI played an important role in the post-2003 period as Iran's most reliable proxy within the electoral process overseen by the U.S. and its Coalition partners. *See* PX-154 at 8; Oates T1-

109:19-21. From SCIRI's inception, however, the IRGC had also established and cultivated SCIRI's armed wing, the Badr Corps, as an IRGC proxy that was used to conduct sabotage operations, intelligence gathering, and weapons smuggling across the border into Iraq. *See* PX-153 at 14; Oates T1-109:22-110:8. Before 2003, the Badr Corps served as the IRGC's most important anti-Ba'athist surrogate inside Iraq, acting as a de facto arm of the IRGC-QF. *See* Oates T1-109:22-110:8; PX-153 at 14. *See also* PX-154 at 17. As Dr. Levitt testified:

> The Badr Corps was the military wing of the Supreme Council for Islamic Revolution in Iraq, or SCIRI, both of which were forged in the early 1980s in the context of the Iran-Iraq war. These are Iraqi Shi'a entities, partnering not with Iraq, but with Iran, against the regime of Saddam Hussein in the context of the Iran-Iraq war…Until 2003, Badr was Iran's most important surrogate inside Iraq. And it, too, was very intimate with the IRGC Qods Force.

Levitt T1-64:6-19.[32]

In the months following the U.S.-led invasion, the Badr Corps devoted most of its energies to targeting (and eliminating) former members of Saddam Hussein's regime and methodically infiltrating the new Iraqi police and security services. *See* PX-153 at 19-20, 23 n.44; PX-154 at 7; PX-157 at 15; PX-81 at Bates Nos. 01439 (49th Tactical Interrogation Report of Qais Khazali), 01441. At the same time (in 2003), the IRGC-QF also developed certain cells within the Badr Corps for the express purpose of attacking Coalition Forces. *See* PX-157 at 15; Oates T1-110. As Mr. Oates testified, "[The Badr Corps] was formed by [the IRGC-QF] early, probably the first of

---

[32]     The *Karcher* court found that: "In the political sphere, the Da'wa Party, the Supreme Council for the Islamic Revolution in Iraq ('SCIRI'), and Muqtada al-Sadr's Office of the Martyr Sadr ('OMS') filled varying niches but each benefitted from Iranian support. The armed wings of SCIRI and OMS—the Badr Corps and Jaysh al-Mahdi ('JAM'), respectively—were likewise closely affiliated with IRGC-QF. Among the downstream effects of that Iranian support was militia infiltration of the Iraqi police and security forces, resulting in widespread corruption and 'death squads' targeting at least Sunnis, if not Western officials as well." 396 F. Supp. 3d at 23 (citing McIntyre Rep. at 19-21; Oates Rep. at 14-17).

the Special Groups, because they had such a longstanding relationship with the Iranians." Oates

T1-125:1-3. Mr. McIntyre confirmed a Badr Corps element called the Sheibani Network was the

first Iranian proxy to deploy EFPs in Iraq in 2004. *See* McIntyre T5-97:16-98:2. Mr. Lutz testified

that the IRGC-QF and Hezbollah also facilitated the training of "the Badr Corps in the employment

of explosively formed penetrators against US forces in Iraq." Lutz T5-16:10-14.

According to Qais Khazali, a high-value detainee (discussed *infra*), the Badr Corps terror

cells under Abu Mustafa al-Sheibani, an Iranian national and Badr Corps commander, enjoyed a

privileged status among the Special Groups sponsored by Iran:

> The Khamenei groups in Iraq are led by Abu Mustafa al Shaibani [sic] and although
> there are many groups under him, detainee does not know the names of the groups,
> the number of groups, or any of the leaders of the groups. This is due to the
> secretiveness of the Khameini groups… All of the provinces that border Iran are
> controlled by Badr Corps and this causes some troubles with other groups in the
> area. Badr Corps is more militarily oriented than the other groups and generally
> target U.S. forces. They are better equipped than the other groups and have superior
> weapons such as SAM and RPG-29s. In general, the Badr Corps are fewer in
> numbers but more effective than other groups.

PX-81 at Bates No. 01221 (10th Tactical Interrogation Report of Qais Khazali).

### 2.    Muqtada al-Sadr and Jaysh al-Mahdi ("JAM")

During Saddam Hussein's rule in Iraq, a prominent Iraqi Shi'a cleric known as Ayatollah

Sadiq al-Sadr developed a cohesive network of mosques and social welfare organizations under

his guidance and control. *See* PX-153 at 16-17. He was particularly popular in the Shi'a slums of

Baghdad and Basra, and his network of mosques and social institutions attempted to mirror

Hezbollah's model in Lebanon. *See id.* Eventually, the Hussein regime came to regard Sadr as a

political threat and assassinated him and his two eldest sons. *See id.* at 16; PX-157 at 14-15.

Muqtada al-Sadr, the Ayatollah's surviving son, then became the de facto successor to what became known as the Sadrist Movement.[33] *See* PX-153 at 16. *See also* Oates T1-98:14-99:8.

The Sadrist Movement commanded the loyalty of perhaps millions of Iraqi Shi'a, but under the Hussein regime's rule it had no military capacity; it was almost exclusively a social and political movement. *See* PX-153 at 17; Oates T1-99:9-100:24. The overthrow of the Hussein regime in 2003, however, freed Muqtada al-Sadr and his followers from the constraints previously placed on them, and the young Sadr set his sights on becoming the preeminent leader of Iraq's Shi'a community. *See* Oates T1-99:15-19. Hezbollah, having long-standing ties to the Sadrist Movement, made sure to cultivate Sadr and establish high-level lines of communication with him and his senior deputies almost immediately. *See* PX-154 at 24-25. *See also* PX-153 at 17; Oates T1-99:22-100:24.

That cultivation was managed by Muhammad Kawtharani, a member of Hezbollah's Political Council. *See* PX-157 at 34-35. Kawtharani was tasked with overall responsibilities for the terrorist organization's Iraq portfolio. *See id.* As the U.S. Treasury Department noted when it designated him an SDGT on August 22, 2013, Kawtharani was "the individual in charge of Hizballah's Iraq activities, Kawtharani has worked on behalf of Hizballah's leadership to promote the group's interests in Iraq, including Hizballah efforts to provide training, funding, political, and

---

[33]     *See also* McIntyre T5-81:17-82:2 ("[al-Sadr] established what was called the Sadrist movement in Iraq. The Sadrist movement was based upon the Hezbollah social services network that was established in Lebanon. And this is where the mosque serves as a focal point or conduit for…the distribution of money, food, aid for the poor Shi'a population in order to assist them. So…he adopted a Lebanese model. In 1999, he and his two older sons were assassinated by Saddam Hussein's police. He's also the father of Muqtada al-Sadr…"); PX-153 at 16 ("Because Mohammad Sadeq al-Sadr's two eldest sons were assassinated in 1999 with their father, Muqtada al-Sadr essentially inherited a network of schools and charities built by his family and perpetuated by the elder Sadr's former students and deputies, most of whom (like Mustafa al-Yacoubi and Qais Khazali) would later play larger roles in post-2003 Iraq.").

logistical support to Iraqi Shi'a insurgent groups." PX-76 (August 22, 2013 Treasury Designation of Hezbollah Leadership) at 1.

According to declassified detainee interrogation reports, Kawtharani made contact with Sadr's deputy soon after (and possibly before) the overthrow of the Hussein regime in 2003:

> Mustafa al-Yaqubi has frequent contact with Lebanese Hezbollah. He speaks often by phone with al-Kawtharani, who is Lebanese Hezbollah's political spokesperson on Iraq issues. Al-Kawtharani has served in that position since shortly after Saddam Hussein's regime fell. Al-Kawtharani is a former student of the Najaf al-Hawza. But he is Lebanese-one of two Lebanese students who attended. He and Mustafa discuss major events that take place in Iraq.

PX-81 at Bates No. 01311-12 (28th Tactical Interrogation Report of Qais Khazali). At the invitation of Iran's Supreme Leader, Ayatollah Khamenei, Mr. Sadr and his key deputies were formally received in Iran in June 2003, shortly after the U.S. invasion. *See* PX-157 at 34; PX-81 at Bates No. 01207 (9th Tactical Interrogation Report of Qais Khazali); Oates T1-99:22-100:24.

General Abdul Reza Shahlai, a deputy IRGC-QF commander, served as the "chief of protocol" for the visit, and IRGC-QF commander Qasem Soleimani served as host to the Sadr delegation. *See* PX-81 at Bates No. 01207; PX-157 at 34. Sadr also met with Ayatollah Khamenei during the visit and received assurances from General Shahlai that the IRGC-QF wanted to financially support the Sadrist movement. *See* PX-81 at Bates No. 01207; PX-157 at 34. *See also* McIntyre T5-87:9-13 ("They made three principal offers: first, the offer of funding, amounts of three-quarters of a million to a million dollars and, under special circumstances, $2 million per month; they offered arms; and they also offered training.").

Shortly thereafter, the IRGC dispatched two of Hezbollah's most senior terror operatives to Iraq, Imad Mughniyah, then commander of Hezbollah's IJO, and his brother-in-law, cousin, and successor in that role, Mustafa Badr al-Din, to help organize and birth the creation of the Sadrist Movement's armed faction, which Sadr called "Jaysh al-Mahdi" or the Mahdi Army. *See* McIntyre

T5-71:3-5 ("They worked together in 2003, specifically, early 2003, in establishing the early beginnings of the…Iranian Shi'a proxy militia groups in Iraq."). As a later U.S. intelligence report dated August 5, 2007, noted, Sadr's movement received approximately a third of its funding (or more) from Iran. *See* PX-84 (MNF-I CIOC information paper) at 1. *See also* Oates T1-105:7-106:4.

     As former Badr Corps leader and Special Group Kata'ib Hezbollah founder Abu Mahdi al-Muhandis (discussed *infra*) later explained to the Hezbollah-affiliated channel *Al-Mayadeen*:

| | |
|---|---|
| Al-Muhandis: | Of course, my relationship with martyr Imad, the great martyr Imad [Mughniyah], and martyr Mustafa Badr a-Din, started in the early 1980s. This was a strong and operational relationship. The first ones to train the first Iraqi jihadi resistance groups in the beginning of the 1980s were Imad and Mustafa. They also had a major role in organizing the resistance cells against the Americans in Iraq. |
| Host: | Training Iraqis here, to fight the Americans? |
| Al-Muhandis: | Sure, they trained Iraqis. The first Iraqi cells, I was among them, after 2003. |
| Host: | After 2003… |
| Al-Muhandis: | They had a major role; their brothers and men still have an essential role in training and planning… they have a very important role. |

PX-122 (video).[34]

     With the substantial loyalty of the Shi'a slums, the financial support of the IRGC-QF, and the advice and training provided by Hezbollah under the tutelage of Imad Mughniyah and Mustafa

---

[34]    Muhandis masterminded the 1983 Kuwait bombings, and later became a senior advisor to IRGC-QF commander Qasem Soleimani. *See* PX-157 at 43-44. Mustafa Badr al-Din, one of Hezbollah's leading bomb-makers at the time, was arrested by Kuwaiti authorities after the attacks and convicted for his role in the bombings. *See* McIntyre T5-70:3-24. He later became a leading figure in Hezbollah after his escape from a Kuwaiti prison. *See* Levitt T1-56:10-57:12; PX-27 (U.S. Treasury Department designation of Mustafa Badreddine as an SDGT); PX-157 at 43-44.

Badr al-Din, the Sadrist trend and its paramilitary arm, JAM, rapidly expanded their territorial control in predominantly Shi'a neighborhoods in Baghdad (like Sadr City, a 20 km. area comprising tenements and inhabited by over 2 million Shi'a in East Baghdad, (re)named for Sadiq al-Sadr), as well as over time, in religiously mixed areas, displacing or killing local Sunnis. *See* PX-153 at 17.

Yet, despite Hezbollah's training and assistance and the IRGC-QF's financial backing, from JAM's inception in June 2003 through the first half of 2004, it had limited capacity to challenge Coalition Forces. *See* McIntyre T5-92:10-12. ("They were more like a street gang. And they had a modicum of local leadership, someone whom they trusted or respected, that was very much neighborhood-based."). Nonetheless, Sadr and JAM received significant financial support from Iran during this period. An American intelligence analysis from August 2007 estimated that: "Using estimates of various sources of funding, DIA [the Defense Intelligence Agency] assessed that current Sadrist income from domestic sources is at least approximately $17 million per year, compared $8 million to $12 million per year from Iran." PX-84 at 1.

### 3.    The Emergence of IRGC and Hezbollah Proxy Groups 2004 – 2011

#### a.    JAM Special Groups

On March 28, 2004, Coalition Forces shut down the main Sadrist newspaper, *al-Hawza*, for inciting violence. *See* PX-153 at 21-22. A few days later, Coalition Forces arrested a senior cleric close to Sadr. *See id.* JAM responded within a few days with major uprisings in Baghdad, Karbala, Najaf, and other southern Iraqi cities. *See id.* The initial uprising showcased JAM's capabilities by demonstrating Sadr's ability to coordinate violence across southern and central Iraq. *See id.* In Najaf, Sadr agreed to a ceasefire with Coalition Forces in June 2004 that was largely favorable to JAM, securing certain no-go zones for Coalition Forces. *See id.*

The ceasefire was, however, short-lived: in early August 2004, JAM attacked a U.S. patrol in Najaf. *See id.* at 22. This engagement was followed by another, in which JAM mounted several attacks in one day against an Iraqi Police station, leading to a large-scale response by U.S. and Iraqi forces. *See id.* The resulting battle was devastating for JAM, which suffered more than 1,000 fatalities and lost much of its prestige as a fighting force. *See id.*; Oates T1-103:24-104:1 ("[W]ithin his organization, many people were – some of his subordinate leaders were unhappy with the outcome . . . .").

According to later interrogation reports, IRGC-QF personnel were present during the battle. *See* PX-81 at Bates No. 01412 (45th Tactical Interrogation Report of Qais Khazali) ("Sheikh Ansari was in Najaf, so he could personally assess the need for mortars and RPG's. During the fighting in Najaf, a small number of weapons did arrive from the Iran [sic]."). And although the results were disastrous for JAM, some of its commanders gained valuable experience from it and burnished their reputations. *See id.* at Bates No. 01413 ("Akram [Kaabi] was given the position of Commander in Chief of all of Jaysh al-Mahdi. Akram was allotted this position because he demonstrated deft control over the Sadr trend forces in the Battle of Najaf.").

During a January 1, 2019 interview on *Al-Nujaba* TV (a channel operated by Al-Nujaba, an Iranian-backed Shi'a group formed in 2013 as an outgrowth of Special Group Asa'ib Ahl al-Haq), Akram Kaabi stated that:

> After [the 2004 Battle of Najaf], we realized that we needed a new method, especially since the brothers from Hezbollah and from the IRGC helped us in that battle in Najaf. Even in Sadr City, there were Iranian consultants. There was an IRGC officer called Abu Ali, who was originally from Ahwaz and spoke fluent Arabic. He was with us in Najaf, and he helped us with the battle management and provided much-needed basic and important advice.

PX-231.

He went on to say:

> Our chief engineer in Najaf, Dr. Jassem Al-Abadi, who was martyred, was among the first to be trained by that brother from Hezbollah and by the brothers from the IRGC. So, we realized that if we acquired more capabilities, things would improve. Our morale was high. Our mujahideen were ready to make sacrifices. So, we decided to take this path and acquire a lot of expertise. So, we developed our relationship with the brothers in Hezbollah and the IRGC. Both Hezbollah and the IRGC were open with us about everything....

*Id.*

Kaabi was also explicit about the degree to which his exploits in Iraq were directed and coordinated with Hezbollah's senior leadership:

> After the battle of Najaf, I traveled by land to Syria and then to Lebanon, and I met Hassan Nasrallah for the first time. The brothers [in Hezbollah] did not keep any secrets from us. They were forthcoming with their years of experience. They summarized this experience and presented it to us in full detail and this, indeed, led to a significant change in our resistance on the ground.
>
> The late Imad Mughniyah participated in my meeting [with Nasrallah]. Nasrallah and Mughniyah asked me to debrief them about the battle of Najaf – the events, and the deployment of the forces and the vehicles. Mughniyah even asked me to present everything on a blackboard so that they would get a feel for what had happened on the ground. So, I reviewed all the details. Nasrallah was... Obviously, all this happened in the second meeting. The first meeting was an official introductory meeting. Then, since I was still in Lebanon, the second meeting was held. Both Nasrallah and Mughniyah sympathized with us. Both said that they had tried to contact us many times prior to the events in Najaf and that had they succeeded we would have been able to accomplish greater victories, and to change the balance of power significantly. But they said that this was the will of the Lord and that Hezbollah will not deny us anything. They said: 'All of our capabilities and expertise are at your disposal.'

*Id.*

Moreover, Kaabi discussed the role of EFPs in targeting American forces in Iraq:

> At first, we used old anti-aircraft missiles to manufacture IEDs. They would cause a large explosion, with a loud noise and lots of smoke, but they had little effect on the heavily armored [American] vehicles. Penetrating this armor was no easy task. But later, our IEDs improved. We started using explosively formed penetrators. These charges would not cause a lot of smoke or a loud explosion, but they would penetrate the armor of the tanks through a certain hole. They would explode inside the tank, destroying it and killing everyone inside.

*Id.*

Although the precise timing remains somewhat uncertain, sometime after the 2004 JAM-sponsored uprising in Najaf, Muqtada al-Sadr authorized his deputies to create what became known as the Special Groups. *See* Levitt T1-69:13-70:14; PX-157 at 37. Though it is unclear whether Sadr was primarily acceding to pressure from his disgruntled subordinates, saw a genuine need to rethink his strategy, or was lured by the promise of Iranian financial and logistical support, what was clear after the August 2004 uprising was that ordinary JAM operatives were little more than street criminals who were largely ineffective in confronting U.S. and British military units.[35] *See* PX-157 at 37. Accordingly, Sadr wanted to be able to deploy more professional (and lethal) forces that could successfully attack Coalition Forces in Iraq while his "regular" militia concentrated on murdering and kidnapping Sunnis and engaging in traditional criminal enterprises.[36] *See id. See also* Levitt T1-70:7-14. From that point forward, "regular" JAM forces primarily focused on ethnic cleansing of Sunni neighborhoods, revenge killings, kidnapping, and extortion, and Sadr relied on the newly formed JAM "Special Groups" to execute the fight against the U.S. and Coalition Forces. *See* PX-153 at 22.

The *Karcher* court summarized the evidence finding that:

After American and Iraqi forces inflicted tremendous casualties on JAM in the battle of Najaf in 2004, Mr. al-Sadr permitted the formation of JAM "Special Groups" with enhanced capabilities to attack American and Coalition forces, while the remainder of JAM would focus on anti-Sunni violence and other criminal activities. This resulted in a realignment of leadership, where local commanders of JAM Special Groups operated with some autonomy from Mr. al-Sadr and "received

---

[35] There were several notable exceptions to this rule, but they fall outside the scope of the present case.

[36] *See* PX-83 at 1 (MNF-I Intelligence Information Paper) ("The Special Groups were to function separate from JAM and focus on conducting attacks against Americans (likely CF) and Wahabis (presumably Sunnis). Sadr's initial letter regarding the groups' formation indicated they would be formed in several cities divided into three regions: Baghdad, the South (Basrah, Nasiriyah, Amarah, Kut, and possibly Samawah and Diwaniyah), and the Central (Hilla, Karbala, and Najaf).").

their training, weapons and operational direction directly from Hezbollah and the IRGC-QF." IRGC-QF funding and equipment for Special Groups reached an estimated $750,000 to $3 million per month by August 2007.

396 F. Supp. 3d at 24 (citing Oates Rep. at 22-23; McIntyre Rep. at 37; Pregent Rep. at 12).

From September 2004 to late 2005, these newly-formed Special Groups conducted low-intensity operations against the British and U.S. military. *See* PX-153 at 23. Mostly, they trained in Iran and Lebanon with Hezbollah and the IRGC-QF and developed their TTP, preparing for the next round of conflict. *See id.* Initially, the Special Groups functioned essentially as regional commands under the overall leadership of Muqtada al-Sadr's senior deputies, including Qais Khazali and Akram al-Kaabi (a/k/a Akram Abbas al-Kabi). *See* PX-57 at Bates No. 000324 (MNF-I Magistrate Review). As the U.S. military later noted:

> When [S]pecial [G]roups were formed, Qais [sic] and Akram al Kabi were named the general supervisors, or members of the Ishraf Committee (Ishraf means oversight and supervision). Qais and Layth [Qais' brother] were directly involved with [S]pecial [G]roups, and in this position they would negotiate and procure weapons and IEDs from Iran and distribute them to JAM.

*Id.* Kaabi was designated by the U.S. Treasury Department in 2008, for threatening the peace and stability of Iraq and the Government of Iraq. *See* PX-9 at 2.

From the initial formation of JAM's Special Groups in 2004 through much of 2006, the IRGC used JAM and its Special Groups to target Coalition Forces, gradually providing them with EFPs and advanced training on how best to emplace them. *See* PX-157 at 37-38. Mr. Oates testified that after the formation of the JAM Special Groups, Hezbollah and the IRGC-QF assumed a greater role in training the Special Groups "and then their level of direction to these teams grew over time to where it became almost exclusively directed by Lebanese Hezbollah and the IRGC." T1-104:17-23.

In June 2007, the Commanding General of MNF-I, General David Petraeus, reported to

Secretary of Defense Robert Gates:

> This past week we briefed DPM Barham Saleh and NSA Mowafak al-Rubaie on what we have learned about Iranian and Lebanese Hezbollah activity in Iraq from those we've detained. They were properly taken aback and left for Iran on Sunday determined to take a strong message to Tehran. The evidence is impressive. The five-page Qais Khazali sworn statement, made last week and marked with his inked fingerprints, is an unequivocal indictment of Iranian interference. His statement, along with those of his brother and other detainees, provides incontrovertible evidence that Iran is arming, funding, training, equipping, and advising Shi'a extremists operating in Iraq. Iranian interference began shortly after the Coalition began operations, but advanced significantly after the Najaf operation in 2004. The statements of those interrogated are buttressed by dozens of documents taken from the captured laptops. As Qais asserted, without Iranian funding, JAM special groups would not be able to function. We will brief the Prime Minister this Tuesday on the same material.

PX-75 at 25 (MNF-I Weekly Update to the Secretary of Defense, June 3-9, 2007).

### b.      Asa'ib Ahl al-Haq ("AAH")

#### 1.      Establishment of AAH

In 2006, Qais Khazali, one of Muqtada al-Sadr's senior deputies and a commander of one

or more of the Special Groups, began calling the terror cells under his command "Asa'ib Ahl al-

Haq." *See* PX-153 at 32. Mr. Oates testified that: "In . . . late 2005-early 2006, Qais Khazali was

ostensibly subordinate to Mr. Sadr. But he was much more interested in conducting direct attacks

against the Americans; and he was supported and encouraged by the Qods Force to do so, and they

took more direct control of him at that point." Oates T1-120:9-14.

According to a report by the U.S. military:

> In August 2006 MAS [Muqtada al-Sadr] asked [Qais Khazali] to lead a delegation to Tehran to discuss the situation in Iraq and Iranian support for JAM. According to reporting, Ali Khomeini [sic] [Sayyid Ali Hosseini Khamenei was then and is still now the Supreme Leader of Iran] met with [Qais Khazali] and recruited him to lead a special group known as Asayb al-Haq, or the K2 network. The K2 network would operate with the knowledge or authorization of MAS. [Qais Khazali] agreed. Iran was interested in working with [Qais Khazali] because of his influence on MAS. Layth [Khazali's brother, captured with him on 20 March, 2007 in Basra,

served as the Operations Chief for Asayb al-Haq] served as a liaison between the secret network formed by [Qais Khazali] and the Iranians. In this position, Layth traveled frequently between Iraq, Iran and Syria.

PX-57 at Bates No. 000324.

Mr. McIntyre testified that the August 2006 recruitment of Khazali began with a summons from Tehran directed at Muqtada al-Sadr, who declined to attend and sent the Khazali brothers in his stead. *See* McIntyre T5-104:3-22. "There," according to Mr. McIntyre's assessment, the Khazali brothers "met again with General Shahlai; they met Qasem Soleimani. But more specifically, they met with again the Supreme Leader of Iran, who asked Qais Khazali, would he form a special militia initially called K2, but later known as the League of the Righteous? And this was the first instance where the IRGC-Qods Force, the Supreme Leader of Iran, directed a specific entity militia to be formed, to include naming it." *Id.*

In March 2007, the Khazali brothers were captured by Coalition Forces. *See* PX-154 at 35; PX-155 (Expert Report of Michael Pregent) at 31. Yet, despite the capture and detention of the Khazali brothers, AAH continued to function operationally because of the significant funding, training, and weapons it received from the IRGC, and from the training it received from, and close cooperation it maintained with, Hezbollah. AAH was able to maintain a high-level offensive tempo from mid-2007 until the departure of U.S. forces at the end of 2011. *See* PX-157 at 39-40. Qais Khazali emerged from U.S. detention in early 2010, *see id.* at 51, and went on to become one of Iraq's most important political leaders, *see* Pregent T5-223:24-224:1. In sum, from 2006 to 2011, AAH operated as Iran's direct terror proxy targeting U.S. personnel at the direction of Hezbollah and the IRGC-QF. Iran harbored elements of AAH's leadership (and their families), trained and supplied its operatives, funded the AAH cells, and directed them to commit attacks on Americans in Iraq. *See* PX-153 at 33. *See also* Pregent T5-223:4-13 (testifying that AAH was "funded, directed, trained and equipped by the IRGC-Qods Force and Lebanese Hezbollah"). The *Karcher*

court cited this testimony when it found that "[a]lthough AAH was later deprived for some time of the leadership of Qais Khazali and his brother, Layth, during their detention by U.S. forces, the group 'was able to maintain a fairly high-level offensive tempo' and 'operated as Iran's direct terror proxy targeting U.S. personnel at the direction of Hezbollah and the IRGC-QF' from 2006 through 2011." 396 F. Supp. 3d at 25 (citing Oates Rep. at 33; McIntyre Rep. at 39, 51; Pregent T5-223:4-13) (footnote omitted).

## 2.    Ali Musa Daqduq's Role in Directing AAH

The Khazali brothers not only received instructions from Iran's Supreme Leader to establish AAH, they also received guidance and direction from Ali Musa Daqduq, the longtime Hezbollah commander who had served in numerous leadership positions with Hezbollah before being dispatched to Iraq. *See* PX-155 at 14; Pregent T5-221:25-222:5. Notably, Daqduq joined Hezbollah back in the early 1980s and spent from 1994-1996 "in charge of external protection" for Hezbollah's General Secretary, Hassan Nasrallah. *See* PX-106 at Bates No. 001150. By the early 2000s, Daqduq had become one of Hezbollah's senior IJO leaders. *See id.* In mid-2005, senior Hezbollah leadership tasked Daqduq with combating "the occupying force" (i.e., the Coalition Forces) in Iraq. *See id.* at Bates No. 01151.

At the IRGC-QF's direction, Daqduq made trips in and out of Iraq and reported on the training and arming of AAH operatives in mortars and rockets, deployment of EFPs, and kidnapping operations. *See* PX-155 at 14. Specifically, he was tasked with organizing AAH and other Special Groups in ways that mirrored the way Iran had organized Hezbollah in Lebanon. *See id.*; PX-106 at Bates No. 001156. Daqduq and the Khazali brothers reported directly to General Shahlai, the deputy commander of the IRGC-QF, Department of External Special Operations. *See* PX-155 at 14-15; Pregent T5-222:2-5.

68

On March 20, 2007, the Khazali brothers and Daqduq were captured by Coalition Forces in Basra. *See* PX-155 at 31; PX-154 at 35; Pregent T5-179:5-17. The British and American special operators also seized computers and documents during the raid, including a 22-page memorandum that "detailed the planning, preparation, approval process and conduct of the [Karbala] operation," as well as Daqduq's role in overseeing other AAH and Special Groups operations. *See* PX-155 at 31. *See also* PX-103 (translated Daqduq memorandum); PX-71 (MNF-I Report on Captured Special Groups in Iraq); Pregent T5-180:19-23.

After extensive, closely monitored interrogations[37] of Daqduq, the Khazali brothers and the other detainees captured in the Basra raid, Daqduq revealed himself (as explained below, he initially pretended to be a mute named Hamid). *See* PX-155 at 32. As noted in a May 31, 2007 MNF-I memorandum:

> [Daqduq] has knowledge of Iranian surrogate networks operating in Iraq and has admitted to meeting Iranian Revolutionary Guard Corps-Quds Force (IRGC-QF) personalities on multiple occasions including Hajj Yusif, who is assessed to be Abdul Reza Shahlai, the Department 9000 (Lethal Aid) Deputy Commander.

PX-56.

According to U.S. military officials, both Daqduq and Qais Khazali admitted that senior leadership within the IRGC-QF knew of and helped plan the Karbala attack. *See* PX-81 at Bates Nos. 01189-93, 01257-61 and 01343-47 (6th, 18th, and 34th Tactical Interrogation Reports of Qais Khazali). General Bergner also stated that the IRGC-QF and Hezbollah were jointly operating camps near Tehran in which they trained Iraqi fighters before sending them back to Iraq to conduct attacks. *See* PX-155 at 32; PX-71. According to General Bergner, Daqduq was the liaison between

---

[37]   Mr. McIntyre testified that the interrogations were conducted by "what was called the strategic interrogation unit. And this was a special, highly experienced elite interrogation team that . . . worked on high-value detainees." McIntyre T5-88:9-17.

the IRGC-QF, Hezbollah, and AAH, and Daqduq confirmed that AAH operatives had carried out the Karbala attack. *See* PX-155 at 32. Daqduq also told his interrogators that the Karbala attackers "could not have conducted this complex operation without the support and direction of the [IRGC-QF]." *Id*. In April 2007, General Petraeus, then Commander of MNF-I, gave a press briefing:

> The Iranian involvement has really become much clearer to us and brought into much more focus during the interrogation of the members – the heads of the Qazali [sic] network and some of the key members of that network that have been in detention now for a month or more. This is the head of the secret cell network, the extremist secret cells. They were provided substantial funding, training on Iranian soil, advanced explosive munitions and technologies as well as run of the mill arms and ammunition, in some cases advice and in some cases even a degree of direction.

> When we captured these individuals – the initial capture, and then there have been a number of others since then – we discovered, for example, a 22-page memorandum on a computer that detailed the planning, preparation, approval process and conduct of the operation that resulted in five of our soldiers being killed in Karbala.

> It also detailed – there are numerous documents which detailed a number of different attacks on coalition forces, and our sense is that these records were kept so that they could be handed in to whoever it is that is financing them. And there's no question, again, that Iranian financing is taking place through the Quds force of the Iranian Republican Guards Corps.

*Id.* at 32-33.

### c.     Sheibani Network (Badr)

As discussed above, even before it helped establish the JAM Special Groups, the IRGC-QF deployed the Sheibani Network, named for Abu Mustafa al-Sheibani, an Iranian national and Badr Corps commander, to smuggle weapons, money, and Special Groups operatives into Iraq and exfiltrate select operatives from Iraq to Iran (and sometimes Lebanon) for additional training.[38] *See* PX-157 at 26. The Sheibani Network was a hybrid Special Group that received training from

---

[38]     In subsequent interrogations, Qais Khazali described Sheibani as "an Iranian Republican Guard Force (IRGC) Intelligence Officer and [] one of the Badr Corps Leaders." *See* PX-81 at 1244 (15th Tactical Interrogation Report of Qais Khazali).

Hezbollah, and weapons, financing, and training from the IRGC-QF. *See* PX-153 at 36. Sheibani was effectively an IRGC-QF operative who ran Badr Corps smuggling operations into Iraq before 2003 and was dispatched after the U.S.-led invasion to cement his arms-trafficking network and infiltrate Badr Corps operatives back into Iraq. *See id.*; PX-157 at 26; PX-81 at Bates No. 01244 (15th Tactical Interrogation Report of Qais Khazali). Sheibani's network extensively supplied JAM Special Groups after 2004 and was a key supplier of EFPs to them. *See* PX-153 at 36. In addition to supplying weapons to the Badr Corps and JAM Special Groups, Sheibani developed and commanded his own terror cells, responsible for numerous attacks against Coalition and Iraqi forces. *See id.*

The network's center of operations was in southern Iraq, with nodes extending into central Iraq, including Baghdad. *See* PX-157 at 26. The Sheibani Network was able to conduct its smuggling activities with relative ease across a relatively porous Iraqi border with Iran that was loosely guarded by Iraqi border guards who were frequently favorably disposed toward the group and did not interfere with the weapons smuggling. *See id.* The network also conducted attacks against U.S. and Coalition Forces, killed Iraqi government officials, *see* Levitt T1-68:2-4 ("And so Iran had groups like Sheibani's network specifically carry out assassinations of Iraqi politicians, including Iraqi Shi'a politicians who stood in their way[]"), engaged in criminal activity, and employed death squads engaged in sectarian based murder directed against the Sunni population. *See* PX-157 at 26. Notably, EFPs were one of the most important weapons that the network smuggled from Iran into Iraq. *See id.* at 26, 28-29. *See also supra* at 57 (Khazali's description of the Badr Corps' effectiveness).

On January 9, 2008 the U.S. Department of the Treasury designated Abu Mustafa Al Sheibani under Executive Order 13438 for threatening the peace and stability of Iraq and the

Government of Iraq for committing, directing, supporting, or posing a significant risk of committing acts of violence against Iraqi citizens, Iraqi government officials, and Coalition Forces. *See* PX-8 at 1-2. *See also* Levitt T1-65:13-67:8. The Treasury Department announcement stated:

> Iran-based Abu Mustafa Al-Sheibani leads a network of Shia extremists that commit and provide logistical and material support for acts of violence that threaten the peace and stability of Iraq and the Government of Iraq. Al-Sheibani's Iran-sponsored network was created to affect the Iraqi political process in Iran's favor. The network's first objective is to fight U.S. forces, attacking convoys and killing soldiers. Its second objective is to eliminate Iraqi politicians opposed to Iran's influence. Elements of the IRGC were also sending funds and weapons to Al-Sheibani's network. Al-Sheibani's network – consisting of several hundred members – conducted IED attacks against Americans in the Baghdad region. As of March 2007, Al-Sheibani, known to transport Katyusha rockets to be used for attacks against Coalition Forces, launched rockets against Americans and made videos of the attacks to get money from Iran. As of April 2007, a member of Al-Sheibani's network supervised the transport of money and explosives from Iran for eventual arrival in Baghdad. In early-May 2007, Al-Sheibani's network assisted members of a Shia militia group by transporting them to Iran for training and providing them with weapons for their activities in Iraq.

PX-8 at 1-2.

### d.  Kata'ib Hezbollah ("KH")

Encouraged by their success establishing AAH as an IRGC-QF-directed Special Group, in early 2007 Hezbollah and the IRGC-QF tapped former Da'wa Party and Badr Corps veteran Abu Mahdi al Muhandis to form a new Special Group called Kata'ib Hezbollah ("KH" or "Hezbollah Brigades") that they even more tightly controlled. *See* PX-153 at 33. Levitt T1-71:1-20. ("Kata'ib Hezbollah, in large part because it's led by people like Muhandis, who had been a senior advisor to Qods Force's General Qasem Soleimani, is intimately close and operating closely with both Iran's Qods Force and its primary proxy, Lebanese Hezbollah."). *See Karcher*, 396 F. Supp. 3d at 25 ("Iran directed the formation of still another militia group—Kata'ib Hezbollah ('KH' or 'Hezbollah Brigades')—in 2007") (citing Oates Rep. at 33; Oates T1-123:24-25).

Mr. Oates explained that KH was an IRGC creation: "Kata'ib Hezbollah was founded, we believe, in early 2007. It was a whole-cloth creation of the IRGC. Mr. Abu Mahdi al-Muhandis was placed in charge. He was a very senior advisor to Qasem Soleimani, a former Badr Corps member as well. And he began operations exclusively against Coalition force." Oates T1-123:24-125:4. Its overall operations were run by Karim Ja'far Muhsin al-Ghanimi, described by the U.S. Treasury Department as "the overall leader of KH, which has used facilities in Iran to send weapons to Iraq." PX-13 (U.S. Treasury Department Press Notification, dated November 8, 2012) at 5; PX-153 at 35. According to the U.S. government, "Ghanimi has organized KH military-related training in Iran from the IRGC-QF and Lebanese Hizballah. Ghanimi has sent money provided by the IRGC-QF to KH leaders in Iraq." PX-13 at 5; PX-153 at 35.

KH operated mainly in Shi'a areas of Baghdad, such as Sadr City, and throughout southeastern Iraq, conducting attacks on U.S. and Coalition Forces with (1) RPGs;[39] (2) 107mm and 240mm rockets;[40] (3) IRAMs;[41] and (4) EFPs. *See* PX-157 at 41. KH was also supplied by

---

[39]     "[The RPG-29 is] an antitank weapon with a tandem warhead. And it was the only rocket-propelled grenade that appeared in Iraq that had a tandem warhead… It's absolutely lethal. This first element, the first warhead, would strip away any kind of reactive armor on the vehicle itself and soften the metal. And then it would be followed by the main portion of the shell, which would be another high-explosive antitank warhead. And that would follow in behind almost immediately the initial contact made by the first element here." McIntyre T5-111:1-13 (noting the RPG-29s were only supplied by the IRGC-QF to KH).

[40]     The IRGC-QF supplied 107- and 122-mm rockets. *See* McIntyre T5-109:1-10. ("[A 240 mm rocket] was only going to be employed by [the IRGC-QF's] proxy militias that they directly established and fielded and supported in Iraq. And they would directly control their operations, to include weapons-use targets as well as the tempo of combat operation against US forces as well." *Id.* at 109:19-25.

[41]     As Mr. McIntyre explained, "IRAM is an improvised weapon which was used exclusively by Hezbollah Brigades. And it was a 107-millimeter rocket motor that was removed from the rocket itself. And then they would take a propane gas tank, of course, that was empty. They would cut it open. They would fill it with C4 explosives. Then they would attach a nose cone that was a

Iran with their production model of the RPG-29 anti-tank rocket launcher. *See id.* It was first used against U.S. forces during operations in Sadr City, Baghdad. *Id.*

On June 26, 2009, the U.S. Department of State designated Kata'ib Hezbollah an FTO, noting that "KH has been responsible for numerous violent terrorist attacks since 2007, including improvised explosive device bombings, rocket propelled grenade attacks and sniper operations." PX-10 (U.S. State Department Notification, dated June 26, 2009). On July 2, 2009, the U.S. Department of the Treasury designated KH an SDGT, finding:

> Between March 2007 and June 2008, Baghdad-based Kata'ib Hizballah cell members participated in multiple rocket-propelled grenade (RPG) and improvised rocket-assisted mortar (IRAM) attacks against U.S. forces. These attacks included a May 13, 2008 RPG-29 attack on a U.S. tank located in Sha'ab, Iraq, and a February 19, 2008 IRAM attack on a U.S. base near Rustamiya, Iraq. A February 19, 2008 rocket attack in the Rustamiya area resulted in one U.S. civilian killed and injuries to U.S. civilian and Coalition Forces personnel.

> As of 2008, Kata'ib Hizballah was funded by the IRGC-Qods Force and received weapons training and support from Lebanon-based Hizballah. In one instance, Hizballah provided training--to include building and planting IEDs and training in coordinating small and medium arms attacks, sniper attacks, mortar attacks, and rocket attacks--to Kata'ib Hizballah members in Iran.

> Recordings made by Kata'ib Hizballah for release to the public as propaganda videos further demonstrate that Kata'ib Hizballah conducted attacks against Coalition Forces. In mid-August 2008, Coalition Forces seized four hard drives from a storage facility associated with a Kata'ib Hizballah media facilitator. The four hard drives included approximately 1,200 videos showing Kata'ib Hizballah's sophisticated planning and attack tactics, techniques, and procedures, and Kata'ib Hizballah's use of the most lethal weapons--including RPG-29s, IRAMs, and EFPs—against Coalition Forces in Iraq.

---

detonator for the system, as well as usually a grazing fuse on the side, so if it didn't hit directly, the grazing fuse would initiate the device. They could include up to 75 pounds of plastic explosive. They also would put in there, nails, pieces of chain, for a shrapnel effect which would be truly horrific." McIntyre T5-110:1-15. In a designation announcement, the U.S. Treasury Department described Sayyid Salah Mandi Hantush al-Maksusi as "a senior KH operations officer who personally oversaw and executed improvised rocket assisted mortar (IRAM) attacks against Coalition forces in Iraq." PX-13. The U.S. Treasury Department also noted that "Maksusi has received training from the IRGC-QF and from Lebanese Hizballah." *Id.*

One of the hard drives contained 35 attack videos edited with the Kata'ib Hizballah logo in the top right corner. Additionally, between February and September 2008, Al-Manar in Beirut, Lebanon, broadcast several videos showing Kata'ib Hizballah conducting multiple attacks against Coalition Forces in Iraq.

Immediately preceding the Government of Iraq's approval of the United States-Iraq security agreement in late November 2008, Kata'ib Hizballah posted a statement that the group would continue fighting Coalition Forces and threatened to conduct attacks against the Government of Iraq if it signed the security agreement with the United States.

PX-11 at 2-3.

As Mr. Oates testified, "[The IRGC-QF] were…the exclusive director of [Kata'ib Hezbollah's] operations. They were, in fact, their proxy organization operating in Iraq." Oates T1-124:16-21.

### e.      Promised Day Brigades ("PDB")

After Sadr's rift with Qais Khazali became final and the IRGC's formation of AAH was solidified, the Special Groups largely fell under the direct control of Hezbollah and the IRGC-QF. *See* PX-157 at 46. Over the next 20-24 months, JAM retained its role as a criminal organization soliciting kickbacks, protection money, and other illicit revenue streams, and it remained active in fostering death squads targeting Sunnis and systematically driving them from mixed ethnic neighborhoods in Baghdad. *See id.* In June 2008, Sadr announced that JAM would transition its efforts to non-military social service activities focusing on assisting Shi'a communities under the name "Mumahidun" that would promote Islamic heritage and ideology. *See id*. Nonetheless, later in 2008, Sadr, still seeking to maintain his nationalist bona fides and with Iranian support, formed a new JAM Special Group called the Promised Day Brigades, established to carry out attacks against Coalition Forces. *See id.* The PDB was a mere shadow of the JAM forces that Sadr commanded in 2004-2006, but, like other Special Groups, it received funding, training and weapons from the IRGC-QF and Hezbollah. *See* PX-153 at 38; PX-79 (MNF-I Weekly Update to

the Secretary of Defense, May 11-17, 2009) at 58. *See Karcher*, 396 F. Supp. 3d at 25 ("This group too was supported by the IRGC-QF and Hezbollah, 'in keeping with the IRGC's long-time policy of investing in all Shi'a factions.' And it was responsible for its own string of attacks on U.S. and Coalition forces.") (quoting Oates Rep. at 38).

The PDB also made extensive use of EFPs. *See* PX-157 at 46.

According to a May 2009 report from MNF-I commander General Ray Odierno to the Secretary of Defense:

> Reporting indicates that Iran continues its support of Iraqi militants, including Kata'ib Hizballah, (KH), Promised Day Brigade, and Asaib Ahl al-Haqq (AAH), and that AAH, and these groups intend to leverage these activities in June. The training, including the use of explosively formed projectiles and global positioning systems, reveals no new tactics or weapons, but indicates that Iranian facilitated attacks may increase next month.

PX-79 at 58.

Similarly, in an August 2009 report to the Secretary of Defense, General Odierno reported that the PDB was responsible for the 15 EFP attacks that were perpetrated that month in Baghdad, as "many of their fighters are now returning from Iran, following extensive training, in time to influence elections." *Id.* at 90 (MNF-I Weekly Update to the Secretary of Defense, August 24-30, 2009). Despite the fact that the U.S. military moved aggressively to neutralize PDB, it nonetheless survived and continued to attack Coalition Forces, in part because Sadr's movement was too large and entrenched to disappear entirely, but primarily because the IRGC-QF and Hezbollah sustained it—in keeping with the IRGC's long-time policy of investing in all Shi'a factions. *See* PX-153 at 38.

### E.   Defendants' Provision of Material Support to Iranian Agents

Understanding the importance of Defendants' roles in supporting Iranian terrorism requires understanding the costs of running a terrorism apparatus the size of Iran's. Iran spends hundreds

of millions of dollars a year on terrorism. *See* Clawson Decl., ¶¶ 50-51. The State Department's Country Reports on Terrorism 2018 characterizes Iran as "the world's worst state sponsor of terrorism" and states that Iran has spent nearly $1 billion dollars annually to "support terrorist groups that serve as its proxies and expand its malign influence across the globe." *Id.*, ¶ 51 (citing PX-222 (U.S. State Dep't, Country Reports on Terrorism, 2018 Report), at 9). Then-Treasury Department Under Secretary for Terrorism and Financial Intelligence Stuart Levey testified on August 23, 2004 before Congress:

> There are some who question the effectiveness of our strategy to prevent terrorism by attacking the financing that supports it. They note that terrorist attacks themselves cost very little money to carry out – the trivial cost of a suicide belt or similar device – and then leap to the conclusion that our efforts to combat terrorism by attacking terrorist resources are wasted or futile.
>
> The 9/11 Commission wisely rejected this point of view. In the first place, the cost of financing terrorist activity cannot be measured by the cost of a primitive destructive act. The maintenance of those terrorist networks, like al Qaeda, which threaten our national security, is expensive – even if a particular attack does not cost much to carry out. As the 9/11 Commission explained, groups like al Qaeda must spend money for many purposes – to recruit, train, travel, plan operations, and bribe corrupt officials, for example. If we can eliminate or even reduce their sources and conduits of money, we can degrade their ability to do all of these things, and thus can make them less dangerous.

*Id.*, ¶ 52 (citing Press Release, U.S. Dep't of the Treasury, Testimony of Stuart A. Levey, Under Secretary Terrorism and Financial Intelligence (Aug. 23, 2004), available at https://www.treasury.gov/press-center/press-releases/Pages/js1869.aspx).

Indeed, since the Financial Action Task Force ("FATF")—the global money laundering and terrorist financing watchdog, *see* Bauer Decl., ¶ 38[42]—compiled a so-called "black" list in

---

[42]    The Financial Action Task Force is an inter-governmental body whose 37 members include China, Russia, Japan, Korea, Australia, Canada, Mexico, the United States, and all the countries of the European Union, among others. Its purpose is to develop and promote policies to combat money laundering and terrorist financing around the world. *See* Clawson Decl., ¶ 83 n.37.

2008 of high-risk jurisdictions where member-states are recommended to apply countermeasures to protect the international financial system from money laundering and **terror financing risks** posed by these jurisdictions, Iran has been on that black list. *See* Bauer Decl., ¶¶ 39, 43-44. A significant obstacle to Iran's compliance has been its exemption of "liberation organizations" from counter-terrorist financing provisions, which in practical terms means exemptions for designated terrorist groups such as Hezbollah and Hamas, and for Iran's Shia proxies in Iraq, among others. For example, Iranian legislation ratifying the UN Convention on the Suppression of the Financing of Terrorism noted that Iran's recognition of "the struggles of peoples against colonial domination and foreign occupation" does not allow it to recognize the convention's "written framework of terrorism." Likewise, a sister bill containing amendments to Iran's CFT (combating the financing of terrorism) law noted that terrorist designations will only be issued in line with Article 154 of the Iranian constitution, which supports "the struggles of the oppressed for their rights against oppressors anywhere in the world." *Id.*, ¶ 48 (citing http://cabinetoffice.ir/files/fa/news/1396/8/30/11809_266.pdf).

Iran has in the past acquired the funds it spends on terrorism by selling its considerable petrochemical-related resources. Iran controls vast oil and gas reserves, including "the world's fourth-largest proved crude oil reserves and the world's second-largest natural gas reserves." *See* Clawson Decl., ¶ 53 (citing U.S. Dep't of Energy, Country Report: Iran (2015 figures), available at: https://www.eia.gov/beta/international/country.cfm?iso=IRN). These reserves, worth hundreds of billions of dollars, *see id.* (citing U.S. Dep't of Energy, Analysis: Iran, available at https://www.eia.gov/beta/international/analysis.cfm?iso=IRN), and typically priced in U.S. dollars, *see id.* (citing Lan Cao, *Currency Wars and the Erosion of Dollar Hegemony*, 38(1) MICH. J. INT'L L. 57, 67 (2016) ("Any country that buys Gulf oil must pay in dollars – hence the term

petrodollars."")), are central to Iran's economy. *See United States v. Atilla*, No. 15-cr-867 (RMB), 2018 WL 791348, at *11 (S.D.N.Y. Feb. 7, 2018) (quoting testimony that "the Iranian economy is primarily petroleum based. The petroleum industry is predominantly U.S. dollar based. In order for the Iranian economy to function, it, therefore, must conduct a lot of its business in U.S. dollars."). *See* Clawson Decl., ¶ 53.

In 1995, Under Secretary of State Peter Tarnoff testified before the Senate that "a straight-line links Iran's oil income and its ability to sponsor terrorism, build weapons of mass destruction, and acquire sophisticated armaments." Bauer Decl., ¶ 62 (citing Iran Oil Sanctions Act of 1996, HR Rep 104-523, pt 1, 104th Cong, 2d Sess. (1996), *available at* https://www.congress.gov/congressional-report/104th-congress/house-report/523/1). In 1996, Congress directly linked Iran's revenues from its export sales of crude oil to the regime's ability to materially support international terrorism, acquire nuclear weapons and develop ballistic missile delivery systems:

> The Congress declares that it is the policy of the United States to deny Iran the ability to support acts of international terrorism and to fund the development and acquisition of weapons of mass destruction and the means to deliver them by limiting the development of Iran's ability to explore for, extract, refine, or transport by pipeline petroleum resources of Iran.

*Id.*, ¶ 63 (citing Iran and Libya Sanctions Act of 1996, Pub. L. No. 104-172, § 3, 110 Stat. 1541 (Aug. 5, 1996)).

During the relevant period in this case, oil and gas revenues continued to play a strategic role in the structure of the Iranian economy. In 2000, the Iranian government began depositing some of its oil revenues in an Oil Stabilization Fund ("OSF"). *See id.*, ¶ 56. There are credible reports, including from Iranian sources, that some of this oil revenue was not officially reported, making it available for nefarious purposes such as corruption or support for terrorism. *See* Clawson Decl., ¶ 54. An Iranian government audit in 2009 found that more than one *billion dollars* in oil revenue from the previous year was missing from the state coffers. *See id.* (citing "Iran looking for

missing oil revenue," UPI (Nov. 20, 2009) https://www.upi.com/Business_News/Energy-Industry/2009/11/20/Iran-looking-for-missing-oil-revenue/UPI-97311258729114/). Defendant National Iranian Oil Company ("NIOC"), which is entitled under Iranian law to retain 14.5% of the oil revenues it generates, likewise provides little transparency concerning the use of these funds. Some of this revenue was likely directly controlled by the IRGC itself. *See* Bauer Decl., ¶ 58 (citing Mark Gregory, "Expanding Business Empire of Iran's Revolutionary Guards," BBC News (July 26, 2010), *available at* http://www.bbc.com/news/world-middle-east-10743580).

For example, during the Ahmadinejad administration (2005-2013), the Iranian regime granted billions of dollars in no-bid contracts to Khatam Al-Anbiya (controlled by the IRGC) that were funded out of the "OSF," Iran's oil stabilization fund into which it began saving some of its oil revenues in 2000. *See id.*, ¶¶ 56, 59 (citing Amir Naghshineh-Pour, "A Review and Analysis of Iran's Current Economic Status," Munich Personal RePEc Archive (Oct. 15, 2008), at 2, *available at* https://mpra.ub.uni-muenchen.de/13313/1/MPRA_paper_13313.pdf). The Iranian regime also offered a subsidy of free (or significantly discounted) gasoline to the IRGC and its Basij Militia. In turn, the IRGC has generated billions of U.S. dollars of additional revenue from exporting portions of its gasoline subsidy. *See id.*, ¶ 60 (citing Frederic Wehrey, Jerrold D. Green, Brian Nichiporuk, Alireza Nader, Lydia Hansell, Rasool Nafisi and S. R. Bohandy, *The Rise of the Pasdaran: Assessing the Domestic Roles of Iran's Islamic Revolutionary Guards Corps*, at 65, *available at* https://www.rand.org/content/dam/rand/pubs/monographs/2008/RAND_MG821.pdf ("Facilities such as the Martyr Rajai Port Complex in Hormuzgan province are reportedly used to export state subsidized gasoline outside the country. The IRGC is estimated to yield a 200–300 percent profit on such illegal sales.")).

In announcing a series of designations in October 2007 (including of the IRGC-QF and Bank Melli, the latter under Executive Order 13382 for proliferation of weapons of mass destruction), then-Secretary of the Treasury Henry Paulson noted that "[t]he IRGC is so deeply entrenched in Iran's economy and commercial enterprises, it is increasingly likely that, if you are doing business with Iran, you are doing business with the IRGC," which was responsible for "proliferation activities and . . . for providing material support to the Taliban and other terrorist organizations." *Id.*, ¶ 36 (citing PX-199 (Press Release, U.S. Dep't of the Treasury, Statement by Secretary Paulson on Iran Designations (Oct. 25, 2007)).

In short, historically, Iran's export earnings and most of its government revenues have derived from oil and natural gas sales in U.S. dollars and those sales, in turn, have helped fuel the IRGC's support for international terrorism. *See id.*, ¶ 61.

## 1.     The CBI's Provision of Material Support for Iranian Terrorism

### a.     The CBI Is a Tool of the Government of Iran and Operates as Its Banker.

Defendant Bank Markazi Jomhouri Islami Iran—or in English, the Central Bank of the Islamic Republic of Iran ("CBI")—is not an independent entity. Instead, it acts at the direction of the Iranian government and pursuant to its policies. *See* Clawson Decl., ¶ 56. The Iranian Revolutionary Constitution of 1979 provides that all Iranian banks are to be "owned publicly and administered by the state." *Id.*, ¶ 57 (citing PX-221 (Feb. 23, 2001 Country Reports on Human Rights Practices for Iran)). (Defendant Bank Melli is an example.) Even though the government has not strictly enforced this provision, in practice allowing some private and semi-private banks, the Research Division of the Library of Congress has correctly noted all state and private banks in Iran are "strictly overseen by the Central Bank of Iran." *Id.* (citing May 2008, Country Profile:

Iran, Library of Congress – Federal Research Division, *available at* http://www.loc.gov/rr/frd/cs/profiles/Iran.pdf).

Both by law and in practice, the CBI is the Iranian government's banker. *Id.*, ¶ 60 ("[I]t is my expert opinion that the CBI is a tool of the government of Iran and operates as the Iranian government's banker, including during the relevant period."). Government revenue is deposited in the CBI; government expenditures are carried out through the CBI. The relationship between the CBI and the government is even closer than specified in law or recommended by economists, and the government misuses the CBI in ways contrary to Iranian law and to good economic practice. *Id.*, ¶ 58. For example, the Council of Ministers, a cabinet of ministers serving under Iran's president, issues orders about how the CBI will administer credit policy, including to which sectors of the Iranian economy the CBI will extend loans. This has had some disastrous effects on the Iranian economy, especially when loans equal to at least ten percent of national income were extended for ill-conceived and poorly planned housing projects. *Id.*

A Southern District of New York decision, ultimately upheld by the Supreme Court, found that the CBI acts as an instrument of Iran's terror financing apparatus, not a typical, independent central bank:

> Beyond the statutory language, E.O. 13599 suggests that Bank Markazi is not engaged in activities protected by § 1611(b) [immunizing the assets of central banks, *typically defined*, from judgment creditors], and thus is not entitled to immunity. The Order makes a finding that Bank Markazi's assets are blocked "in light of the deceptive practices of [Bank Markazi] and other Iranian banks to conceal transactions of sanctioned parties ... and the continuing and unacceptable risk posed to the international financial system by Iran's activities ..." E.O. 13599. This executive determination suggests that the activities of Bank Markazi are not central banking activities that would provide § 1611(b) immunity. *See NML* [*Capital, Ltd. v. Banco Central de la Republica Argentina*]*,* 652 F.3d [] 172 [2d Cir. 2011] (setting forth functional test for central banking activities).

*Peterson v. Islamic Republic of Iran*, No. 10-cv-4518 KBF, 2013 WL 1155576, at \*26 (S.D.N.Y. Mar. 13, 2013), *aff'd*, 758 F.3d 185 (2d Cir. 2014), *aff'd sub nom. Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016).

> **b.      The CBI's Legal Framework Consists of Government Regulations and Officials.**

The CBI's legal foundation remains the 1972 Monetary and Banking Law ("MBL")[43]— also referred to as the Monetary and Banking Act—despite the intervening 1979 revolution. *See* Clawson Decl., ¶ 61. The post-revolutionary laws related to banking—the Nationalization of Banks Law, the Law on Usury-Free (i.e., interest-free) Banking Operations ("UFBO"), and the Administration Law of Banks—have little, if any, implication for the CBI's legal foundation. *Id.*

The MBL provides that the CBI is a joint-stock company exempt, unless otherwise stipulated, from the general laws and regulations applying to ministries and other government entities. The capital is set at five billion rials, which in 1972 was equal to approximately $70 million, but is now equal to only approximately $500,000. That capital is "wholly owned by the Government," according to MBL Article 10(e). *Id.*, ¶ 62.

The CBI Governor is appointed for a five-year term by "Royal Decree," pursuant to the terms of the MBL, upon recommendation of the Minister of Finance and Economic Affairs and subject to approval by the cabinet, comprising the Council Ministers—members of the President of Iran's cabinet—and the President of Iran. *Id.*, ¶ 65. The Deputy Governor is also appointed for a five-year term by "Royal Decree," upon the recommendation of the Governor, with approval from the Minister of Finance and Economic Affairs and rest of the cabinet. The Governor is the CBI's highest executive and administrative authority and is responsible for the proper conduct of

---

[43]      The MBL can be viewed (PDF) at http://www.cbi.ir/simplelist/1457.aspx.

the affairs of the CBI and implementation of the MBL. The Governor, Deputy Governor, Secretary General, and Vice Governors comprise the Executive Board. *Id.*

The MBL provides that the forum of the shareholders is the General Meeting, whose attendees are the CBI Governor and Council Ministers. Members of other organs of CBI may attend meetings of the General Meeting but do not have a vote. The General Meeting approves the balance sheet and the amount of net profit. MBL Article 25(b) provides that all CBI profit after provisions for a contingency reserve "shall go to the Government." *Id.*, ¶ 63. The General Meeting also elects the Supervisory Board, which consists of five auditors or other persons versed in accounting or banking; they are responsible for auditing the accounts. *See id.*, ¶ 64.

The CBI Governor, various government officials such as the Prosecutor General and one of the undersecretaries of the Economics and Finance Minister, prominent businessmen (e.g., the president of the Chamber of Commerce and the managing director of the Banking Association), and experts appointed by the Economics and Finance Minister comprise the Currency and Credit Council ("CCC"), which is tasked under Article 18 of the MBL to "[r]eview and approve the regulations drawn up under the provisions of this Act;" "[e]xamine and approve the organization, budget, employment code, and internal regulations of the CBI;" and "[c]omment upon the banking, monetary and credit issues of the country," among other responsibilities. *Id.*, ¶ 66.

c.     **The CBI's Operations Are Controlled by the Government in Practice Even More than Permitted by Statute.**

In practice, the government has exerted even more control over the CBI than that already called for by the MBL. *See id.*, ¶ 67. First, the General Meetings often appear to be attended by economic ministers other than those required by the MBL. *See id.*, ¶ 68. The actual composition of the CCC also appears to vary from that specified by the MBL; for instance, two non-voting legislative deputies chosen by the Majlis (Parliament) have been included. Though not mentioned

in the MBL, there is in practice a "High Banking Council" comprising the CBI Governor, the CBI General Secretary, the managing director of Defendant Bank Melli (as discussed below, Bank Melli is Iran's largest bank, and completely state-owned), and representatives of various ministers—typically the same ministers who attend the General Meeting. *See id.*

Second, the CBI Governor in practice serves at the pleasure of the President. Article 19 of the MBL specifies a five-year term of office for the Governor, with no mention of procedures by which the Governor may be dismissed before the end of his term of office. That provision has been ignored. In August 2007, Ebrahim Sheybani resigned as CBI Governor under strong pressure from then-President Mahmoud Ahmadinejad; in 2008, Sheybani's successor, Tahmasb Mazaheri, was asked to resign after refusing to issue certain loans he was asked to extend. His last letter to Ahmadinejad, which leaked to the press, includes complaints that his recommendations "are not and will not be accepted," his suggestion about reforms "was not attended to," and "necessary measures were not taken" about problems he identified. He added that he knew "sending a report to the leader means the end of my cooperation at the central bank." Upon receiving the letter, Ahmadinejad summarily replaced him, in apparent violation of the MBL's fixed five-year term for the CBI Governor. *See id.*, ¶ 69.

Third, the government cabinet regularly votes to order the CBI to extend loans for specific purposes, without following the procedures required by the MBL, including consulting the CCC. *See id.*, ¶ 70 (citing Article 13 of the MBL providing that the CBI "shall be vested with the following powers: (1) Granting of loans and credits to ministries and government organizations, subject to legal authorization..."). For instance, on March 15 and April 20, 2007, Ahmadinejad's cabinet ordered the CBI to lend a combined 200 billion rials for marriage, medical treatment, education, and housing loans. *See id.*

Fourth, the CCC plays little of the role laid out for it in the MBL. Major decisions about monetary policy are made directly by the government. During the Ahmadinejad era, these decisions were often made personally by the president without consulting the CCC. On July 14, 2009, the semi-official Mehr News Agency announced that the CCC had met for the first time in *two years*. In August 2007, Ahmadinejad announced he had dissolved the CCC; press reports stated that this action was what precipitated Sheybani's resignation as CBI Governor. This action was inconsistent with the MBL's provision that the CCC approves monetary regulations and the CBI's budget. *See id.*, ¶ 71.

A telling illustration of the government's total control of CBI has been the issue of setting interest rates. CBI charges interest on its loans, and the term "interest rate" is used widely in discussion of the issue in Iran, but an elaborate ruse is used to suggest that "interest rates" are somehow consistent with a strict interpretation of Islamic law, which bans interest. *See id.*, ¶ 72. Then-President Ahmadinejad insisted that interest rates be kept low, which he thought would reduce inflation—a viewpoint for which he has been harshly criticized by Iranian economists. *See id.* His insistence on this point is what led him to force the resignation of one CBI Governor and to dismiss another, as well as to order that the CCC be dissolved. The interest rate on loans has been well below the inflation rate, which distorts the economy by making the demand for loans extremely high. In practice, loans nearly always go to those with good political connections. The low interest rates have also led to an explosion of non-bank financial institutions, vaguely similar to U.S. credit unions, many of which are run by politically well-connected institutions such as the IRGC. The chief beneficiaries of the low-interest-rate policy and loose banking regulations have been the political elite, especially the IRGC, which is able to generate from the financial

institutions it controls considerable sums that it uses to fund its activities, including its support for terrorism. *See id.*

Under current President Hassan Rouhani's regime, the government's focus has been on reducing the inflation rate. This has led to a restrictive monetary policy, an artificially fixed exchange rate to keep import prices low, and a contractionary fiscal stance (at first, running a budget surplus and then, when collapsing oil prices slashed government revenue, sharply curtailing government spending). The CBI has been the principal implementer of the first two of these policies, which pushed Iran into a recession. *See id.*, ¶ 73. The Rouhani stance was highly controversial, to the point that four important cabinet ministers sent him a letter criticizing his economic policy (the letter was subsequently leaked to the press). *See id.* In the debates about the policy, it was extremely clear that the CBI policies were being implemented at Rouhani's direction, rather than as a result of decisions made by the CCC or the CBI General Meeting. *See id.*

Within Iran, many complaints have been heard that the CBI lacks independence from the government. *See id.*, ¶ 74. In a 2006 interview about the government's Fourth Development Plan (a document setting out government economic goals and policies for the following five years), former Deputy Minister of Economic Affairs and Finance Mohsen Safa'i-Farahani praised the Plan because "[t]he Central Bank will be taken out of government control. In other words, this will put an end to the interference of the government's economic sectors, such as the Ministry of Finance and Economic Affairs, in the Central Bank." *See id.* The reforms envisaged in 2006 were not carried out. *See id.* On June 10, 2006, CBI Governor Sheybani "once again called for more independence for the Central Bank," according to the newspaper Siyasat-e Ruz, arguing, "An independent central bank can wisely outline and execute monetary policies; otherwise it must be a mere follower of the government." *Id.* After Sheybani resigned as Governor in August 2007,

Iranian press reports stated that the CBI's loss of independence from the government, as evidenced by the dispute over interest rates, was the main factor in his resignation. Currently, the CBI remains an institution dependent on Iran's government. *See id.*

### d.    Iran Used the CBI to Support Its Terrorist Activities.

Plaintiffs' experts have opined that during the relevant period Iran used the CBI to transfer funds to support terrorism, principally to the IRGC-QF and Hezbollah. *See* Bauer Decl., ¶¶ 85, 181 ("In my expert opinion, based on my professional experience and the detailed findings of the U.S. government, CBI has knowingly provided material support to Hezbollah and the IRGC during the relevant period."); Clawson Decl., ¶¶ 75, 95, 128 ("The CBI is owned by the government of Iran and is an agency or instrumentality of the Iranian government. In my expert opinion, during the relevant period it provided material support to Hezbollah and the IRGC, knowing that they were actively engaged in terrorism and providing material support to other terrorist groups and, in doing so, the CBI was acting at the behest of and under the orders of the government of Iran."). Iran's transfer of millions of dollars to a foreign terrorist group could not take place without those funds passing through the CBI. *See* Clawson Decl., ¶ 75. Indeed, repeated statements by U.S. government officials reflect CBI's support for terrorism. The Treasury Department, in explaining its 2007 designation of the Iranian state-run Bank Saderat reported:

> Bank Saderat, which has approximately 3200 branch offices, has been used by the Government of Iran to channel funds to terrorist organizations, including Hizballah and EU-designated terrorist groups Hamas, PFLP-GC, and Palestinian Islamic Jihad. For example, from 2001 to 2006, Bank Saderat transferred $50 million from the ***Central Bank of Iran*** through its subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts in Lebanon that support acts of violence. Hizballah has used Bank Saderat to send money to other terrorist organizations, including millions of dollars on occasion, to support the activities of Hamas. As of early 2005, Hamas had substantial assets deposited in Bank Saderat, and, in the past year, Bank Saderat has transferred several million dollars to Hamas.

*Id.*, ¶ 76 (citing PX-5) (emphasis added).

At a Press Roundtable in Germany on July 12, 2007, then-U.S. Under Secretary of the

Treasury for Terrorism and Financial Intelligence, Stuart A. Levey, explained:

> The [Iranian] regime does ***use its banks*** to pursue not only its proliferation
> ambitions but also its funding of terrorism … we in the United States have taken
> action against Bank Saderat for its role in funneling money ***from the Central Bank
> of Iran*** to terrorist organizations [including] Hezbollah … Iran not only uses its
> banks for that purpose, but also ***its banks engage in deceptive practices in order to
> engage in that business***.

*Id.*, ¶ 78 (citing July 7, 2007 Press Roundtable with Under Secretary of the Treasury Stuart A.

Levey, *available at* http://germany.usembassy.gov/levey-roundtable.html (emphasis added)). A

State Department cable from March 2008 detailed the CBI's support for the IRGC-QF, stating:

"Bank Melli and the Central Bank of Iran also provide crucial banking services to the Qods Force,

the IRGC's terrorist supporting arm that was headed by UNSCR 1747 designee[44] Commander

Ghassem Soleimani." *Id.*, ¶ 77 (citing https://wikileaks.org/plusd/cables/08STATE24292_a.html).

Two Treasury Department press releases dated October 25, 2007 and November 6, 2008 stated,

"[b]etween 2001 and 2006, Bank Saderat transferred $50 million from the Central Bank of Iran

through Bank Saderat's subsidiary in London to its branch in Beirut for the benefit of Hezbollah

fronts that support acts of violence." *Id.* (citing PX-5 and PX-200 (Press Release, U.S. Dep't of

the Treasury, "Fact Sheet: Treasury Strengthens Preventive Measures Against Iran" (Nov. 6,

2008)).

Under Secretary Levey testified similarly before the United States Congress on April 1,

2008, stating that "Iran uses its state-owned banks … for financing terrorism." *Id.*, ¶ 78 (citing

April 1, 2008 Testimony of Under Secretary for Terrorism and Financial Intelligence Stuart A.

Levey before the Senate Committee on Finance, *available at* http://www.finance.senate.gov/

---

[44]     United Nations Security Council Resolution 1747 designates certain Iranian entities
involved in Iran's illegal nuclear weapons program. *See id.*, ¶ 77 n.28.

imo/media/doc/040108sltest.pdf). As a direct result of the deceptive financial practices described by Under Secretary Levey, the U.S. government has subjected Iranian banks, including the CBI, to sanctions. Deputy Assistant Secretary of Treasury for Terrorism Financing and Financial Crimes Daniel Glaser provided a summary of these sanctions in his April 17, 2008 testimony before the House Committee on Foreign Affairs Subcommittee on the Middle East and South Asia and Subcommittee on Terrorism, Nonproliferation and Trade. Consistent with Levey's statements, Glaser explained the basis for the sanctions, as follows:

> Iran uses its global financial ties to pursue both the threat of terrorism and a nuclear program through an array of deceptive practices specifically designed to avoid suspicion and evade detection from the international financial community.... *[One] method Iranian banks use to evade controls is to ask other financial institutions to remove their names when processing transactions through the international financial system....This practice is even used by the Central Bank of Iran* to facilitate transactions for sanctioned Iranian banks.

*Id.*, ¶ 79 (citing April 17, 2008 Testimony of Daniel Glaser before Subcommittee on the Middle East and South Asia and the Subcommittee on Terrorism, Nonproliferation and Trade, *available at* http://www.iranwatch.org/sites/default/files/glaser-prepared-041708.pdf (emphasis added)).

In a March 2008 Advisory, Treasury's Financial Crimes Enforcement Network ("FinCEN") similarly stated:

> Through state-owned banks, the Government of Iran disguises its involvement in … terrorism activities through an array of deceptive practices specifically designed to evade detection. *The Central Bank of Iran and Iranian commercial banks have requested that their names be removed from global transactions in order to make it more difficult for intermediary financial institutions to determine the true parties in the transaction* …. The U.S. Department of the Treasury is particularly concerned that the Central Bank of Iran may be facilitating transactions for sanctioned Iranian banks.

*Id.*, ¶ 80 (citing PX-223 (March 20, 2008 Advisory, Department of the Treasury Financial Crimes Enforcement Network) (emphasis added)).

On November 6, 2008, the United States revoked the so-called "U-turn exemption," that, for more than a decade, had permitted Iran to engage in *transparent* cross-border U.S. dollar-denominated transactions, so long as all parties to the transaction were disclosed, the transaction was initiated offshore by non-Iranian foreign banks and only passed through the U.S. financial system on the way to other non-Iranian foreign banks, and involved no blocked entities. In revoking the U-Turn exemption, the U.S. government explained:

> Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation. The Iranian regime disguises its involvement in these illicit activities through the use of a wide array of deceptive techniques, specifically designed to avoid suspicion and evade detection by responsible financial institutions and companies. Iran also is finding ways to adapt to existing sanctions, including by turning to non-designated Iranian banks to handle illicit transactions.
>
> . . .
>
> The Central Bank of Iran (CBI), the sole Iranian entity that regulates all Iranian banks, has not only engaged in deceptive practices itself – such as asking for its name to be removed from transactions – but has also encouraged such practices among Iran's state-owned banks. For example, prior to EU and UN sanctions, the CBI attempted to help Banks Sepah and Melli protect their assets from being frozen. Later, the CBI instructed non-sanctioned Iranian state-owned banks to issue payment instructions on behalf of Sepah in order to circumvent sanctions. In the case of Bank Melli, the CBI provided substantive assistance to minimize the impact of sanctions. In fact, between January and March 2008, the CBI handled tens of millions of dollars in transactions to and from the accounts of U.S.- and UN-designated banks held at the CBI.

*Id.*, ¶ 81 (citing PX-200). FinCEN reiterated the "serious threat of money laundering, terrorism finance, and proliferation finance emanating from the Islamic Republic of Iran" in a June 22, 2010 Advisory, stating it was "issuing this advisory to supplement information previously provided… and to provide guidance to financial institutions regarding United Nations Security Council Resolution (UNSCR) 1929, adopted on June 9, 2010." *Id.*, ¶ 82 (citing PX-225 (June 22, 2010 Advisory FIN-2010-A008, Department of the Treasury, Financial Crimes Enforcement Network,

"Update on the Continuing Illicit Finance Threat Emanating from Iran") (emphasis added). FinCEN added:

> As noted in prior FinCEN guidance, ***the Department of the Treasury is particularly concerned that the Central Bank of Iran may be facilitating transactions for sanctioned banks***, and notes that the Central Bank of Iran and Iranian commercial banks have requested that their names be removed from global transactions to make it more difficult for intermediary financial institutions to determine the true parties in the transaction.

*Id.*

Various Security Council actions, in addition to FATF statements regarding the risks posed by Iran and calling for countries to impose counter-measures, illustrated the increasing risk during the relevant period to the integrity of the international financial system posed by the Iranian financial sector as a whole, which is led by the Iranian government, primarily through the CBI. *See id.*, ¶ 83. On November 21, 2011, the U.S. Department of the Treasury issued a finding that:

> identified the Islamic Republic of Iran as ***a jurisdiction of primary money laundering concern*** under Section 311 of the USA PATRIOT Act (Section 311) based on Iran's support for terrorism; pursuit of weapons of mass destruction (WMD); reliance on state-owned or controlled agencies to facilitate WMD proliferation; ***and the illicit and deceptive financial activities that Iranian financial institutions – including the Central Bank of Iran*** – and other state-controlled entities engage in to facilitate Iran's illicit conduct and evade sanctions.

*Id.*, ¶ 84 (citing PX-204 (U.S. Dep't of the Treasury, Press Release, "Fact Sheet: New Sanctions on Iran" (Nov. 21, 2011)) (emphasis added).

In response to Treasury's finding under Section 311 of the PATRIOT Act, Congress passed a series of provisions concerning the CBI that were included in the National Defense Authorization Act for FY2012 ("NDAA FY2012"), now codified as 22 U.S.C. § 8513, as follows:

(a) Findings

Congress makes the following findings:

(1) On November 21, 2011, the Secretary of the Treasury issued a finding under section 5318A of title 31 that identified Iran as a jurisdiction of primary money laundering concern.

(2) In that finding, the Financial Crimes Enforcement Network of the Department of the Treasury wrote, "The Central Bank of Iran, which regulates Iranian banks, has assisted designated Iranian banks by transferring billions of dollars to these banks in 2011. *In mid-2011, the CBI transferred several billion dollars to designated banks, including Saderat, Mellat, EDBI and Melli, through a variety of payment schemes. In making these transfers, the CBI attempted to evade sanctions by minimizing the direct involvement of large international banks with both CBI and designated Iranian banks*.

(3) On November 22, 2011, the Under Secretary of the Treasury for Terrorism and Financial Intelligence, David Cohen, wrote, "Treasury is calling out the entire Iranian banking sector, including the Central Bank of Iran, as posing terrorist financing, proliferation financing, and money laundering risks for the global financial system."

(b) Designation of financial sector of Iran as of primary money laundering concern

The financial sector of Iran, *including the Central Bank of Iran*, is designated as a primary money laundering concern for purposes of section 5318A of title 31 because of the threat to government and financial institutions resulting from the illicit activities of the Government of Iran, including its pursuit of nuclear weapons, support for international terrorism, and efforts to deceive responsible financial institutions and evade sanctions.

(c) Freezing of assets of Iranian financial institutions

The President shall, pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.), block and prohibit all transactions in all property and interests in property of an Iranian financial institution if such property and interests in property are in the United States, come within the United States, or are or come within the possession or control of a United States person.

(d) *Imposition of sanctions with respect to the Central Bank of Iran and other Iranian financial institutions*

(1) In general

Except as specifically provided in this subsection, beginning on the date that is 60 days after December 31, 2011, the President--

(A) shall prohibit the opening, and prohibit or impose strict conditions on the maintaining, in the United States of a correspondent account or a payable-through account by a foreign financial institution that the President determines has knowingly conducted or facilitated any significant financial transaction with the

Central Bank of Iran or another Iranian financial institution designated by the Secretary of the Treasury for the imposition of sanctions pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.); and

(B) may impose sanctions pursuant to the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) with respect to the Central Bank of Iran.

*Id.*, ¶ 85.

While the NDAA FY2012 contains certain specified exemptions (e.g., for agricultural goods) and permits presidential waivers in very limited circumstances (in the interests of U.S. national security), these exemptions in no way impact the underlying finding that the CBI is involved in financing terrorism. *See id.*, ¶ 86.

In fact, after the U.S.'s May 2018 withdrawal from the Iran nuclear deal, officially known as the Joint Comprehensive Plan of Action ("JCPOA"), which previously lifted sanctions on a large number of Iranian entities, the U.S. government in 2019 updated and finalized the proposed rule relating to its 2011 finding of Iran as a "Jurisdiction of Primary Money Laundering Concern." *See id.*, ¶ 87 (citing PX-226 (FinCEN, Imposition of Fifth Special Measure Against the Islamic Republic of Iran as a Jurisdiction of Primary Money Laundering Concern: A Rule by the Financial Crimes Enforcement Network (Nov. 4, 2019)). FinCEN also reiterated its prior findings that Iran has "developed covert methods for accessing the international financial system and pursuing its malign activities," including by "masking illicit transactions using senior officials, including those at the Central Bank of Iran," which "efforts often serve to fund the Islamic Revolutionary Guard Corps (IRGC), its Islamic Revolutionary Guard Corps Qods Force (IRGC-QF), Lebanese Hizballah … terrorist groups." *Id.*; Bauer Decl., ¶ 80.

Shortly before these findings were issued, the CBI was designated an SDGT in 2019 for having "provided billions of dollars to the Islamic Revolutionary Guards Corps (IRGC), its Qods Force (IRGC-QF) and its terrorist proxy, Hizballah." Clawson Decl., ¶ 89 (citing PX-217 (Press

Release, U.S. Dep't of the Treasury, "Treasury Sanctions Iran's Central Bank and National Development Fund" (Sept. 20, 2019)). As shown above, however, the CBI's role as a conduit for the IRGC's terror financing dates back more than two decades. The Treasury Department also recently designated four of the CBI's executive employees for conducting financial transfers for the IRGC-QF and Hezbollah. In its May 15, 2018 designation of the CBI's former governor as an SDGT, the Treasury Department reported:

> Iran's Central Bank Governor covertly funneled millions of dollars on behalf of the IRGC-QF through Iraq-based al-Bilad Islamic Bank to enrich and support the violent and radical agenda of Hizballah. It is appalling, but not surprising, that Iran's senior-most banking official would conspire with the IRGC-QF to facilitate funding of terror groups like Hizballah, and it undermines any credibility he could claim in protecting the integrity of the institution as a central bank governor," said Treasury Secretary Steven T. Mnuchin.
>
> . . .
>
> OFAC is designating Valiollah Seif, Iran's Central Bank Governor, for assisting, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF. Seif has conspired with the IRGC-QF to move millions of dollars through the international financial system in a variety of foreign currencies to allow the IRGC-QF to fund its activities abroad. Seif has also supported the transfer of IRGC-QF-associated funds to al-Bilad Islamic Bank, an Iraq-based bank which is also being designated today.

*Id.*, ¶ 91 (citing PX-210 (Press Release, U.S. Dep't of the Treasury, "Treasury Targets Iran's Central Bank Governor and an Iraqi Bank Moving Millions of Dollars for IRGC-Qods Force" (May 15, 2018)).

In the same designation, the Treasury Department also designated Ali Tarzali, the assistant director of the International Department at the CBI "for assisting, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of,

the IRGC-QF," emphasizing that "Tarzali has worked with Hizballah and proposed that the terrorist group send funds through Iraq-based al-Bilad Islamic Bank." *Id.*, ¶ 92.[45]

Treasury also emphasized how "Iran's Central Bank was complicit in the IRGC-QF's scheme and actively supported this network's currency conversion and enabled its access to funds that it held in its foreign bank accounts" in its 2018 designation of an "extensive currency exchange network" in Iran and the United Arab Emirates "that has procured and transferred millions in U.S. dollar-denominated bulk cash to [] IRGC-QF[] to fund its malign activities and regional proxy groups." *Id.*, ¶ 93 (citing PX-209 (Press Release, U.S. Dep't of the Treasury, "United States and United Arab Emirates Disrupt Large Scale Currency Exchange Network Transferring Millions of Dollars to the IRGC-QF" (May 10, 2018)).

### 2. Bank Melli's Provision of Material Support for Iranian Terrorism

#### a. Bank Melli Is 100% Government-Owned and Is the Largest Provider of Banking Services to the Iranian Government.

Defendant Bank Melli is Iran's largest commercial bank, *see id.*, ¶ 96, and it is listed by the CBI as a "commercial government owned bank." *Id.*, ¶ 102 (citing http://www.cbi.ir/simplelist/ 3088.aspx). One indication of its great weight in the Iranian economy is that in its 2014/15 financial report in English, Bank Melli reported that it had issued 36,272,018 bank cards—in a country with a population of 85 million. *See id.*, ¶ 96 (citing http://bmi.ir/Fa/uploadedFiles/ FinanceReportFiles/2016_1_20/b464c254b3__b754ca6cf7._pdf). It also reported 56,576 employees, 3,165 branches, and 6,480 ATMs. *See id.*

---

[45]     In November 2018, Treasury also designated the CBI's International Department Director Rasul Sajjad, and the CBI's International Department Director, Hossein Yaghoobi, for conducting financial transactions for the IRGC-QF. *See id.*, ¶ 92 n.42 (citing PX-217).

Bank Melli was founded in 1928 as Iran's first domestically-owned commercial bank, *see id.*, ¶ 97 (citing http://bmi.ir/En/BMIHistory.aspx?smnuid=10011); in fact, its very name means "National Bank of Iran." Until 1959 (shortly before the CBI was established), Bank Melli was in effect the country's central bank; among other duties, it was responsible for issuing the country's currency. *See id.* Bank Melli remains central to the government's banking needs. According to its website, "[c]ompared to other commercial banks in the country a greater volume of the foreign exchange operations, government banking services and a sizeable share of project and trade financing are handled and managed by Bank Melli Iran, making it the largest provider of finance for the country's 5-year development plans." *Id.* As this statement makes clear, Bank Melli is the largest provider of banking services to the Iranian government. *See id.*

Bank Melli is particularly active in international transactions. *See id.*, ¶ 98. According to the 2014/15 annual report, "[d]ue to its prominent position in the country's banking system and because of benefiting [sic] from its extensive and powerful international network; BMI [Bank Melli Iran] bears the responsibility of a major part of the country's foreign currency transactions." *Id.* (citing https://bmi.ir/fa/uploadedfiles/financereportfiles/2016_1_20/b464c254b3__b754 ca6cf7.pdf). These operations are closely supervised by the CBI, as described on the Bank Melli website, which states, "[t]he branches of Bank Melli Iran dealing in foreign exchange transactions will be ready to address the requirements of both exporters and importers in line with the country's foreign exchange policies and on the basis of the guidelines issued by Central Bank of the Islamic Republic of Iran." *Id.*, ¶ 98 (citing http://bmi.ir/En/BMIHistory.aspx?smnuid=10011).

Bank Melli has an active presence overseas. As its 2014/15 annual report describes, "[t]he first overseas branch of BMI was established in Hamburg, Germany, in 1965. From then, BMI has fortified its international presence by rapidly expanding its foreign network. Currently, BMI has

20 units in foreign countries including branches and subsidiaries (independent banks) in England, Germany, France, Russia, United Arab Emirates, Hong Kong, Afghanistan, Azerbaijan, Oman, Iraq and Bahrain." *Id.*, ¶ 99.

In its 2014/15 annual report, Bank Melli claims to have made a 2014/15 profit of 255 billion rials (about $80 million) after a 2013/14 loss of 41,760 billion rials (about $14 billion), although these figures appear to seriously understate the extent of the bank's bad loans and poor assets. *See id.*, ¶ 100. The lack of published results for 2015/16 and 2016/17 appears to be the product of ongoing efforts by the CBI to improve the accuracy of bank reports, which have not even followed Iran's declared "generally accepted accounting practices," much less internationally accepted practices. *See id.* Given the size of the bank—with 958,120 billion rials (about $300 billion) in deposits—even the declared results are woeful from a business perspective. *See id.* The inability of Bank Melli to make a profit remotely approximating what would be expected from a bank its size is in no small part due to the government's orders to the bank to engage in lending for social and political purposes. *See id.* As the country's largest bank, Bank Melli has been particularly subject to orders from the government relating to the allocation of lending, as described above in reference to the CBI. *See id.*

According to Bank Melli's 2014/15 annual report, "[t]he capital of Bank Melli Iran at the end of the fiscal year 2014-15 equaled to [sic] IRR 99,065,600 million [*i.e.*, 99 trillion rials, equal today to $620 million at the free market exchange rate of 159,000 rials per dollar], all of which belong to the Government of the Islamic Republic of Iran." *Id.*, ¶ 101 (citing Chapter 29, "Capital," at 70; http://www.bmi.ir/En/FinanceReport.aspx?rptId=23). Iran has owned all of Bank Melli's capital since the bank's 1928 founding. While many state-owned enterprises went through processes of mock "privatization" about a decade ago—in which shares were largely transferred

to institutions under government control, such as government-associated pension funds run by political appointees—Bank Melli remains 100 percent openly government-owned. *See id.* All of its distributed profits go to the government. The government appoints the members of the bank's General Assembly (its putative highest governing body), which in theory selects its Board of Directors; in practice, it appears that the government also directly selects the Board of Directors and the Managing Director. *See id.*

### b.    Bank Melli Provided Material Support to the IRGC.

Plaintiffs' experts have opined that during the relevant period Bank Melli provided banking services to the IRGC and the IRGC-QF. *See id.*, ¶¶ 104, 108, 129 ("Bank Melli Iran is owned by the government of Iran and is an agency or instrumentality of Iran. In my expert opinion, during the relevant period it provided material support to the IRGC, knowing that it was actively engaged in terrorism and providing material support to other terrorist groups and, in doing so, Bank Melli was acting at the behest of and under the orders of the government of Iran."); Bauer Decl., ¶¶ 97, 182 ("Bank Melli Iran is owned by the government of Iran and is an agency or instrumentality of Iran. In my expert opinion, based on my professional experience and the detailed findings of the U.S. government, it has knowingly provided material support to the IRGC-QF during the relevant period."). Their conclusions are informed and supported by the Treasury Department's October 25, 2007 press release:

> Bank Melli also provides banking services to the IRGC and the Qods Force. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force. When handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions.

*Id.* (citing PX-5).

Although the Treasury Department originally designated Bank Melli under Executive Order 13882 which relates to WMD proliferation activities, the banking services Bank Melli rendered to the IRGC-QF is notable because the IRGC-QF is central to Iran's support for terrorism and has never had a known role in Iranian proliferation activities. *See id.*, ¶ 105. Furthermore, in a separate press release, the Treasury Department stated:

> Iran Uses its Banks to Finance Terrorism. In a number of cases, Iran has used its state-owned banks to channel funds to terrorist organizations. . . . . Iran's Bank Melli, which has been designated by the United States under E.O. 13382 for proliferation-related activities, was used to transfer at least $100 million to the IRGC-Qods Force between 2002 and 2006.

*Id.* (citing PX-200).

A State Department cable from March 2008 went into more detail about Bank Melli's support to the IRGC-QF, stating:

> Bank Melli and the Central Bank of Iran also provide crucial banking services to the Qods Force, the IRGC's terrorist supporting arm that was headed by UNSCR 1747 designee Commander Ghassem Soleimani. Soleimani's Qods Force leads Iranian support for the Taliban, Hezbollah, Hamas and the Palestinian Islamic Jihad. Entities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services. From 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force.

*Id.*, ¶ 106 (citing https://wikileaks.org/plusd/cables/08STATE24292_a.html).

Bank Melli also obfuscated the involvement of other Iranian entities in financial transactions, including the IRGC:

> Following the designation of Bank Sepah under UNSCR 1747, Bank Melli took precautions not to identify Bank Sepah in transactions.  Bank Melli also has employed similar deceptive practices to obscure its involvement from the international banking system when handling financial transactions on behalf of the IRGC.

Bauer Decl., ¶ 95 (citing PX-200).

On May 8, 2018, Treasury designated Bank Melli an SDGT "for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in

support of, the IRGC-QF," announcing that "[a]s of 2018, the equivalent of billions of dollars in funds have flowed through IRGC-QF controlled accounts at Bank Melli," "Bank Melli has acted as a conduit for payments to the IRGC-QF," and "[t]he IRGC-QF has used Bank Melli to dispense funds to Iraqi Shia militant groups." Treasury specifically announced that "[s]ince the mid-2000s, Bank Melli increasingly provided services to Iranian military-related entities as they became further involved in all aspects of the Iranian economy." Clawson Decl., ¶ 107 (citing PX-212 (Press Release, U.S. Dep't of the Treasury, "U.S. Government Fully Re-Imposes Sanctions on the Iranian Regime As Part of Unprecedented U.S. Economic Pressure Campaign" (Nov. 5, 2018)).

### c.     Bank Melli Provided Material Support to Mahan Air.

In addition, during the relevant time period, Bank Melli financed evasions of U.S. sanctions on behalf of the Iranian-owned airline and SDGT, Mahan Airlines ("Mahan Air"). *See id.*, ¶ 109. Mahan Air was designated an SDGT by the U.S. government in part because of its role supporting terrorist activities in Iraq and its role in transferring funds to acquire controlled goods for the IRGC-QF. The October 12, 2011 designation of Mahan Air by the Treasury Department states:

> The U.S. Department of the Treasury announced today the designation of Iranian commercial airline Mahan Air pursuant to Executive Order (E.O.) 13224 for providing financial, material and technological support to the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF). Based in Tehran, Mahan Air provides transportation, funds transfers and personnel travel services to the IRGC-QF.
>
> "Mahan Air's close coordination with the IRGC-QF – secretly ferrying operatives, weapons and funds on its flights – reveals yet another facet of the IRGC's extensive infiltration of Iran's commercial sector to facilitate its support for terrorism," said Under Secretary for Terrorism and Financial Intelligence David S. Cohen. "Following the revelation about the IRGC-QF's use of the international financial system to fund its murder-for-hire plot, today's action highlights further the undeniable risks of doing business with Iran."
>
> Mahan Air provided travel services to IRGC-QF personnel flown to and from Iran and Syria for military training. Mahan Air also facilitated the covert travel of suspected IRGC-QF officers into and out of Iraq by bypassing normal security

> procedures and not including information on flight manifests to eliminate records of the IRGC-QF travel.

> Mahan Air crews have facilitated IRGC-QF arms shipments. Funds were also transferred via Mahan Air for the procurement of controlled goods by the IRGC-QF.

*Id.* (citing PX-203 (Press Release, U.S. Dep't of the Treasury, "Treasury Designates Iranian Commercial Airline Linked to Iran's Support for Terrorism" (Oct. 12, 2011)). The tangled character of Mahan Air's finances, including deceptive letters of credit it received to purchase controlled items, is discussed in a 2011 decision by the England and Wales Court of Appeal (Civil Division) written by Lord Justice Stanley Burnton, with Lord Justice Gross concurring, in the case of *Mahan Air and Blue Sky Aviation Co FZE v. Blue Sky One Limited et al.*, EWCA Civ 544 (11 May 2011). *See* Clawson Decl. ¶ 110 (citing http://www.bailii.org/ew/cases/EWCA/Civ/2011/544.html). Mahan Air's purported owner, the Mol-Al-Movahedin Finance and Credit Institution, "provided security to Bank Melli for a loan of US$140 million made to Mahan," meaning Bank Melli issued a $140 million loan to Mahan Air. *See id.*

In its May 23, 2018 action designating aircraft and individuals involved in procuring parts for Mahan Air and other U.S. designated airlines, the Treasury Department stated:

> Designated Iranian commercial airlines in general, and Mahan Air in particular, have played a critical role in exporting the Iranian regime's malign influence. Mahan Air was designated in 2011 under Executive Order 13224 for support to the Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF). Mahan Air has ferried IRGC-QF operatives, weapons, equipment, and funds to international locations in furtherance of Iranian state-sponsored terror operations. Mahan Air has provided travel services to IRGC-QF personnel flown to and from Iran and Syria for military training and has facilitated the covert travel of IRGC-QF members by bypassing normal security procedures and flight manifests. Mahan Air has also transported weapons and personnel for Hizballah and regional armed groups promoting conflict and regional instability. Since the onset of the Syrian civil war, Mahan Air and designated Iranian commercial airlines have routinely flown fighters and materiel to Syria to prop up the Assad regime. Iran's military support for Assad has contributed to mass atrocities in the country and the displacement of millions across the region.

*Id.*, ¶ 112 (citing PX-211 (Press Release, U.S. Dep't of the Treasury, "Treasury Targets Procurement Networks and 31 Aircraft Associated with Mahan Air and Other Designated Iranian Airlines" (May 24, 2018)).

> ### d.   Bank Melli Provided Material Support to Iran's Defense Industries Organization.

During the relevant period, Bank Melli also provided support to the Defense Industries Organization ("DIO"). *See id.*, ¶ 113. The DIO is an Iranian government-owned defense manufacturer.

Weapons and munitions made by DIO were a major part of the material used by those attacking U.S. forces in Iraq. This was extensively documented by the U.S.-led forces, MNF-I. A description of MNF-I's findings can be found in a 2008 study released by the U.S. Military Academy at West Point's Center for Countering Terrorism. *See id.* (citing Joseph Felter and Brian Fishman, "Iranian Strategy in Iraq: Politics and 'Other Means,'" available at http://www.dtic.mil/get-tr-doc/pdf?AD=ada488417). The study includes a "compilation and assessment of caches recovered by Coalition and Iraqi Security Forces containing suspected Iranian weapons and munitions," including arms that Iran "openly markets" on the DIO's (now defunct) website. In fact, "[t]his site even offers to allow purchases of lethal munitions by credit card! Significantly, many of the photos of Iranian munitions such as mortar rounds and rockets provided on this open site closely match photos of munitions recovered in Iraq." *Id.*

Bank Melli's support for DIO has also been documented. A State Department cable dated September 20, 2007 stated that "[t]he DIO, which conducts research and development for Iran's defense and military forces and produces a wide variety of military-related weapons, technologies, and other equipment, uses Bank Melli/Hamburg to receive payments and to transfer funds." *Id.*,

¶ 114 (citing Cable 07STATE104801 at https://wikileaks.org/plusd/cables/07STATE104801_a.html, which was made public by Wikileaks, but never released by the U.S. government).

### 3.   NIOC's Provision of Material Support for Iranian Terrorism

#### a.   NIOC is Owned by, and Generates Billions of Dollars in Annual Revenue for, Iran.

Defendant NIOC is responsible for "exploration, drilling, production, research and development, refining, distribution and export of oil, gas, petroleum products." *Id.*, ¶ 115 (citing NIOC at a Glance, http://www.nioc.ir/portal/home/?generaltext/81026/81171/67776/; U.S. Dep't of Energy, Analysis: Iran, *available at* https://www.eia.gov/beta/international/analysis.cfm?iso=IRN ("The state-owned National Iranian Oil Company is responsible for all upstream oil and natural gas projects.")). It also performs state policy functions:

> NIOC, in accordance with Article 44 of the Constitution, gives authority to different sectors, while supervising oil industry activities. The company has taken major steps toward establishing business enterprises, funded financial resources for development, helped to update technologies for exploration, drilling and production with reliance on the knowledge of Iranian experts.

*Id.* (citing https://www.investiniran.ir/en/sectors/oilandgas (the language had also previously been on NIOC's website but has been removed); U.S. Energy Information Administration, Country Analysis Executive Summary: Iran, https://www.eia.gov/international/content/analysis/countries_long/Iran/pdf/iran_exe.pdf at 3 ("The state-owned National Iranian Oil Company is responsible for all upstream oil and natural gas projects.")). According to its website, "it is estimated that the company holds 156.53 billion barrels of liquid hydrocarbons and 33.79 trillion cubic meters of natural gas," making it one of the largest oil companies in the world. *Id.*

NIOC is entirely owned by the government of Iran. *See id.*, ¶ 116 (citing PX-205 (Press Release, U.S. Dep't of the Treasury, "Treasury Submits Report To Congress On NIOC And NITC" (Sept. 24, 2012) ("NIOC, which is owned by the Government of Iran through the Ministry of

Petroleum, is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran.")). Iran's Petroleum Minister Bijan Zanganeh is Chairman of NIOC's Board; his predecessors as minister also held that position with NIOC while in office. *See id.* The day on which the oil industry was nationalized in 1951 is a public holiday in Iran. Government control over the oil industry is such an important principle that Iranian politicians have for years fought over whether it was appropriate to bring foreign investors into the industry even in a *secondary* role. Retaining complete government ownership and control over NIOC has never been brought into question. *See id.*

NIOC generates billions of dollars in revenue each year for the Iranian government. Depending on changes in the price of oil, revenue from NIOC is between one-third and two-thirds of the Iranian government's total revenue (this is in addition to the sums NIOC pays in taxes). *See id.*, ¶ 117.

NIOC structures many of its oil sales in deliberately non-transparent ways that obscure the ultimate beneficiary accounts to which its revenues flow. *See* Bauer Decl., ¶ 103. For example, as a part of its "General Terms and Conditions," it has required purchasers of Iranian crude oil to obtain letters of credit from multinational banks. A number of these banks, as shown in examples below, have enabled unlawful economic sanctions evasion activities. *See id.*, ¶ 102 (citing Annex B of Defendant NIOC–Tehran's General Terms and Conditions for purchasing crude oil, *available at* https://www.nioc-intl.com/en/petroleumgtc.aspx).

**b.      NIOC Supports the IRGC and Iranian Terrorism.**

Plaintiffs' experts have opined that NIOC knowingly provided material support to the IRGC and IRGC-QF during the relevant period. *See id.*, ¶ 183; Clawson Decl., ¶ 130 ("NIOC is owned by the government of Iran and is an agency or instrumentality of Iran. In my expert opinion, during the relevant period it provided material support to the IRGC, knowing that it was actively

engaged in terrorism and providing material support to other terrorist groups and in doing so, it

was acting at the behest of and under the orders of the government of Iran."). The Treasury

Department reported to Congress in 2012 that "NIOC is an agent or affiliate of the IRGC."

Clawson Decl., ¶ 118 (citing PX-206 (Letter from Adam J. Szubin, OFAC Director, to Congress,

dated September 24, 2012)). The Treasury's finding was made pursuant to section 104(c)(2)(E)(i)

of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 ("CISADA")

and section 312 of the Iran Threat Reduction and Syria Human Rights Act of 2012 ("ITRSHRA").

ITHSHRA Section 312 reads in part:

> (a) SENSE OF CONGRESS.—It is the sense of Congress that the National Iranian
> Oil Company and the National Iranian Tanker Company are not only owned and
> controlled by the Government of Iran but that those companies provide significant
> support to Iran's Revolutionary Guard Corps and its affiliates.

*Id.*

> Treasury also reported to Congress that:
>
> Under the current Iranian regime, the IRGC's influence has grown within National
> Iranian Oil Co. For example, on August 3, 2011, Iran's parliament approved the
> appointment of Rostam Qasemi, a Brigadier General in the IRGC, as Minister of
> Petroleum. Prior to his appointment, Qasemi was the commander of Khatam Al-
> Anbia, a construction and development wing of the IRGC that generates income
> and funds operations for the IRGC. Even in his new role as Minister of Petroleum,
> Qasemi has publicly stated his allegiance to the IRGC.

*Id.*, ¶ 119 (citing https://www.treasury.gov/resource-center/sanctions/Programs/Documents/

report_to_congress_09242012.pdf).

NIOC was already blocked as an entity of the Government of Iran under E.O. 13599, which

was issued pursuant to the International Emergency Economic Powers Act ("IEEPA"), as

amended, among other authorities. *See id.*, ¶ 120 (citing Exec. Order No. 13599, 77 Fed. Reg. 6659

(Feb. 5, 2012), *available at* https://www.treasury.gov/resource-center/sanctions/Programs/

Documents/iran_eo_02062012.pdf). Several months later, the United States sanctioned foreign

financial institutions found to have knowingly conducted or facilitated significant financial transactions with NIOC under Executive Order 13622. *See id.* (citing Exec. Order No. 13662, 77 Fed Reg. 45897 (July 30, 2012), *available at* https://www.treasury.gov/resource-center/sanctions/Programs/Documents/13622.pdf). Executive Order 13622 also provides authority for the Secretary of the Treasury to block the property and interests in property of persons determined to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, NIOC. *See id.*

In addition, on November 8, 2012, NIOC was placed on the Office of Foreign Assets Control's ("OFAC") List of Specially Designated Nationals and Blocked Persons ("OFAC SDN List") under Executive Order 13382 for its role in assisting the IRGC with the proliferation of weapons of mass destruction. As explained in the fact sheet issued by the Treasury Department on that day:

> NIOC is being designated for providing, or attempting to provide, financial, material, or other support for and services in support of the IRGC. Under the current Iranian regime, the IRGC's influence has grown within NIOC and Iran's overall energy sector. As the IRGC has become increasingly influential in Iran's energy sector, IRGC's construction and development wing, Khatam Al-Anbia, has obtained billions of dollars' worth of contracts from NIOC, often without participating in a competitive bidding process.

*Id.*, ¶ 121 (citing PX-13).

As explained above, the vast sums NIOC generates in oil sales and taxes were the principal source of the revenue used by the Iranian government to fund terrorist activities during the relevant period. The revenues generated by NIOC provided Iran with an important source of funding for its material support to terrorist groups. *See id.*, ¶ 122.

On January 23, 2020, Treasury reaffirmed that NIOC "helps to finance Iran's [IRGC-QF] *and its terrorist proxies*," and designated four international petrochemical and petroleum companies that "have collectively transferred the equivalent of hundreds of millions of dollars'

worth of exports from the National Iranian Oil Company (NIOC), an entity instrumental in Iran's petroleum and petrochemical industries, which helps to finance Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxies." *Id.*, ¶ 123 (citing PX-218 (Press Release, U.S. Dep't of the Treasury, "Treasury Targets International Network Supporting Iran's Petrochemical and Petroleum Industries" (Jan. 23, 2020)) (emphasis added).

A month later, Treasury designated five additional United Arab Emirates-based companies for having "purchased hundreds of thousands of metric tons of petroleum products from []NIOC[]." Treasury again stressed that "Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime, which has used these funds to support the Islamic Revolutionary Guard Corps-Qods Force's (IRGC-QF) malign activities throughout the Middle East, including the support of terrorist groups." *Id.*, ¶ 124 (citing PX-219 (Press Release, U.S. Dep't of the Treasury, "Treasury Targets Companies Facilitating Iran's Petroleum Sales" (Mar. 19, 2020)).[46]

Treasury also designated a worldwide Iranian petroleum shipping network originating with NIOC for "financially support[ing] [the IRGC-QF] and its terror proxy Hizballah" in a "vast oil-for-terror shipping network." *Id.*, ¶ 125 (citing PX-216 (Press Release, U.S. Dep't of the Treasury, "Treasury Designates Vast Iranian Petroleum Shipping Network That Supports IRGC-QF and Terror Proxies" (Sept. 4, 2019)). It found that the shipping network "*is directed by* [the IRGC-QF] and its terrorist proxy Hizballah," and declared "that those purchasing Iranian oil *are directly*

---

[46]     Treasury also designated Iran's largest petrochemical holding group, Persian Gulf Petrochemical Industries Company, for providing financial support to U.S.-designated Khatam al-Anbya Construction Headquarters, the engineering conglomerate of the IRGC, along with its vast network of 39 subsidiary petrochemical companies and foreign-based sales agents. *Id.*, ¶ 124 (citing PX-214 (Press Release, U.S. Dep't of the Treasury, "Treasury Sanctions Iran's Largest Petrochemical Holding Group and Vast Network of Subsidiaries and Sales Agents" (June 7, 2019)).

*supporting Iran's militant and terrorist arm*, [the IRGC-QF]." *Id.* (emphasis added). Notably, according to Treasury, the network was overseen by senior IRGC-QF official and former Iranian Minister of Petroleum (2011-2013) Rostam Qasemi. Prior to serving as Minister of Petroleum (and Chairman of NIOC), Qasemi was Commander of the IRGC construction affiliate Khatam al Anibya, which further underscores the close relationship between various IRGC affiliates and NIOC. Qasemi was first designated under E.O. 13382 for his role with Khatam al Anibya in 2010 and under E.O. 13224 in September 2019, along with the broader petroleum-shipping network that he oversaw. *See* Bauer Decl., ¶ 109 n.75 (citing PX-202 (Press Release, U.S. Dep't of the Treasury, "Treasury Targets Iran's Islamic Revolutionary Guard Corps" (Feb. 10, 2010)). In recently designating a Chinese company, Zhuhai Zhenrong Company Limited ("Zhenrong"), for purchasing hundreds of millions of dollars in oil from NIOC, Secretary of State Mike Pompeo explained the designation was intended to "deny the [Iranian] regime critical income to fund terror around the world, engage in foreign conflicts, and advance its ballistic missile development." *Id.*, ¶ 110 (citing PX-215 (Press Release, U.S. Dep't of State, "The United States to Impose Sanctions on Chinese Firm Zhuhai Zhenrong Company Limited for Purchasing Oil from Iran" (July 22, 2019)).

On October 26, 2020, Treasury designated NIOC an SDGT, along with the Iranian Ministry of Petroleum and the National Iranian Tanker Company, "for their financial support to Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF)." *See* PX-230 (Press Release, U.S. Dep't of the Treasury, "Treasury Sanctions Key Actors in Iran's Oil Sector for Supporting Islamic Revolutionary Guard Corps-Qods Force" (Oct. 26, 2020). According to the press release announcing the designations, "[t]he regime in Iran uses the petroleum sector to fund the destabilizing activities of the IRGC-QF." *Id.* Treasury also found that "[t]he cooperation and

coordination between the IRGC-QF and these entities extends well beyond the simple sale of oil, including coordination between NIOC and the Central Bank of Iran to facilitate the collection of tens of millions of dollars in proceeds from the sale of oil that benefitted the IRGC-QF." *Id.*

**F.     Mechanisms Defendants Used to Launder Funds Through the International Financial System**

All three Defendants played crucial roles in moving billions of dollars through the international financial system for the benefit of the IRGC and other elements of Iran's terror apparatus. *See* Bauer Decl., ¶ 111. The scope of Iran's money-laundering scheme was massive, and the amount of U.S. dollar-denominated funds Defendants were able to access and transfer surreptitiously, enabling the diversion of funds in U.S. dollars to the IRGC and Hezbollah in support of Iranian-sponsored terrorism, was significant. *See id.*, ¶ 129. Iran's money-laundering scheme also helped the regime acquire items restricted for their military applications and use in terrorism. *See id.*, ¶ 131.

**1.     Defendants' Money Laundering Scheme Enabled Them to Divert U.S. Dollar Funds to the IRGC and Hezbollah in Support of Iranian-Sponsored Terrorism.**

For decades, transactions with Iranian banks and entities linked to the Iranian government were heavily restricted. *See id.*, ¶ 116. In order to allow NIOC to continue selling Iranian crude oil denominated in U.S. dollars for the Iranian regime's legitimate purposes and needs, OFAC enacted the abovementioned "U-Turn exemption," which permitted U.S. banks to process certain U.S. dollar-denominated transactions for Iran's benefit, but only those that involved no blocked entities and where payments were initiated offshore by a non-Iranian, non-U.S. financial institution and only passed through the U.S. financial system *en route* to another offshore, non-Iranian, non-U.S. financial institution—hence the term "U-turn." *See id.* Defendants here, with the cooperation of several non-Iranian financial institutions, exploited the U-Turn exemption so thoroughly that

Treasury revoked it altogether in 2008 explicitly to prevent "the significant terrorist financing and proliferation risks posed by Iran," concluding that "Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation." *Id.*, ¶ 117 (citing PX-200). Significantly, the revocation attempted to "close the last general entry point for Iran to the U.S. financial system." *Id.* Yet, Defendants and their co-conspirators were able to continue accessing the U.S. financial system through the means described below.

Defendants' roles in moving billions of dollars through the international financial system for the benefit of the IRGC and other elements of Iran's terror apparatus centered around manipulation of the U.S. and global financial system. *See id.*, ¶ 111. The vast majority of U.S. dollar-denominated funds transfers effected abroad must ultimately clear across the books of the U.S. Federal Reserve Bank of New York ("FRB-NY"), providing the United States with a key opportunity to monitor these transfers for misuse, including terror financing. *See id.* Only a limited number of banks, all of which must be physically located in the United Sates, are capable of directly processing cross-border U.S. dollar-denominated transactions through a private funds transfer processing system called CHIPS ("Clearing House Interbank Payments System"); all other financial institutions must hold accounts with those banks called "correspondent" or "interbank" accounts. *See id.*, ¶ 112 (citing *United States v Union Bank for Sav. & Inv. (Jordan)*, 487 F.3d 8, 15 (1st Cir. 2007) ("Interbank accounts, also known as correspondent accounts, are used by foreign banks to offer services to their customers in jurisdictions where the banks have no physical presence, and otherwise to facilitate transactions involving such jurisdictions")). Smaller foreign banks or foreign banks otherwise unable to hold an account in the United States may hold a correspondent account with another foreign bank that itself holds a correspondent account with a New York bank capable of processing cross-border funds transfers. *See id.*

CHIPS collects and offsets ("clears") transactions that participating banks submit for themselves and for correspondent accountholders. The remaining balances are "settled" by transferring those balances across the CHIPS participants' accounts at the FRB-NY. Thus, a transfer of funds from a foreign originator to a foreign beneficiary may pass through several banks before completion (e.g., (1) the originator's bank, (2) that bank's correspondent bank in New York, (3) the beneficiary bank's correspondent bank in New York, and (4) the beneficiary's bank). *See id.*, ¶ 113. During the relevant period, Iranian banks, long since banned from holding correspondent accounts in the U.S., held correspondent accounts with foreign banks that themselves clear and settle U.S. dollar-denominated transactions, either through the New York branches of foreign banks or U.S. banks. *See id.*

To monitor these transactions, banks operating in the United States are required to screen transaction messages against blacklists promulgated by OFAC, usually using compliance software. Transactions involving a blacklisted or blocked party cannot be processed unless certain conditions are met (for example, OFAC issues licenses for Iranian transactions involving medical supplies and other humanitarian items). *See id.*, ¶ 114. The message types of three major financial messaging services are relevant here:

- "SWIFT" messages, designed and operated by the Society for Worldwide Interbank Financial Telecommunication, a global private messaging network;

- "CHIPS" messages; and

- "Fedwire" messages, designed and operated by the Federal Reserve System's Fedwire Funds Service, for transferring "central bank" money.

*See id.*, ¶ 115.

Both before and after OFAC's revocation of the U-Turn exemption, Iran and the Defendants used illegal methods to blind correspondent banks in New York, and U.S. and state regulators, from identifying Iranian parties to cross-border electronic funds transactions—

112

constituting many of the "deceptive practices" repeatedly identified by Treasury as central to Iran's terror financing. *See id.*, ¶ 118. The deceptive practices included:

- Removing or altering identifying information in the SWIFT messages —typically Message Type ("MT") 103 funds transfer messages[47]—that CBI, Bank Melli, and other Iranian banks acting in concert with them sent through U.S. correspondent banks (commonly referred to as "stripping").

- Converting SWIFT payment messages through U.S. banks from ones that disclosed Iranian parties to the transactions into ones that did not (called "cover payments"), typically using MT-202 "bank to bank" transfer messages.

- Altering or otherwise facilitating Iranian-financed letters of credit to evade compliance with OFAC, the State Department's U.S. Munitions List ("USML") of defense-related export controlled items, the Bureau of Industry and Security's Commerce Control List ("CCL") of dual-use export controlled items, and Denied Persons List ("DPL") of export denied entities.

*See id.*

These methods were uncovered and identified during several U.S. federal and state investigations into financial institutions operating in the United States that were found to have been actively assisting Defendants in laundering funds clandestinely through U.S. financial institutions. The subjects of these investigations, including some of the largest global banks like BNP Paribas, HSBC, Standard Chartered Bank ("SCB"), and Credit Suisse, admitted to significant wrongdoing in a series of deferred prosecution agreements ("DPAs"), agreeing to forfeit, in total, billions of dollars in fines. *See id.*, ¶ 119.

---

[47]  According to SWIFT, an MT-103 message "is used to convey a funds transfer instruction in which the ordering customer or the beneficiary customer, or both, are non-financial institutions from the perspective of the Sender." *Id.* (citing "Message Reference Guide, Category 1–Customer Payments and Cheques" at 190, SWIFT SCRL (July 19, 2019), *available at* https://www2.swift.com/knowledgecentre/rest/v1/publications/us1m_20190719/2.0/us1m_20190 719.pdf).

a.       **The CBI Orchestrated Illicit Transactions on Behalf of Iran.**

The August 6, 2012 Consent Order between SCB and the New York Department of Financial Services ("NY-DFS") is attached to the Bauer Declaration as Exhibit B ("SCB Consent Order"), and reflects how CBI "approached SCB to act as its recipient bank for U.S. dollar proceeds from daily oil sales made by the National Iranian Oil Company." SCB accepted, as it "viewed this engagement as 'very prestigious' because 'in essence, SCB would be acting as Treasurer to the CBI . . . .'" *Id.*, ¶ 121 (citing Bauer Decl., Exhibit B, ¶ 22). As part of CBI's agreement with SCB, SCB instructed its staff that "our payment instructions [for Iranian Clients] should not identify the client or the purpose of the payment." *Id.*, ¶ 122 (citing Bauer Decl., Exhibit B, ¶ 24). Furthermore, "SCB's Iranian Clients"—including CBI and Bank Melli— "insisted that 'no other banks processed their payments with full disclosure and it was not industry practice to do so.'" *Id.* (citing Bauer Decl., Exhibit B, ¶ 25). SCB "instructed" CBI to transmit MT-202s with SCB's "business identifier code" ("BIC" or SWIFT "address") rather than CBI's, so that "*the payments going to NY do not appear to NY to have come from an Iranian Bank.*" *Id.*, ¶ 123 (citing Bauer Decl., Exhibit B, ¶ 27) (emphasis original to the SCB Consent Order).[48] As a result, "wire stripping was 'the process for effecting Bank Markazi's payment instructions.'" *Id.*, ¶ 124 (citing Bauer Decl., Exhibit B, ¶ 29).

NY-DFS concluded that, "[i]n short, SCB operated as a rogue institution." *Id.*, ¶ 126 (citing Bauer Decl., Exhibit B, ¶ 7). SCB admitted that, between 2001 and 2007 alone, it illegally

---

[48]      SCB also accomplished this subterfuge by: (a) inserting special characters (such as ".") in electronic message fields used to identify transacting parties; (b) inserting phrases such as "NO NAME GIVEN" or "NOT STATED" in lieu of requested information that would identify Iranian Clients; and (c) employing a system known as SCB's "repair procedure," whereby SCB overseas employees screened payment messages – before they were communicated to its New York branch – in order to ascertain if any messages contained information that identified Iranian Clients. *See id.*, ¶ 123 n.85.

processed approximately 59,000 transactions through its New York branch for Iranian customers, totaling approximately *$250 billion*. *See id.*, ¶ 130 (citing Bauer Decl., Exhibit B at 1 & ¶¶ 1, 18). The purpose of the manipulated transactions was clear, according to NY-DFS—in addition to financing its WMD program, "[t]he U.S. also suspected that Iran was using its banks to finance terrorist groups, including Hezbollah … and engaging in deceptive conduct to hide its involvement in various other prohibited transactions, such as assisting OFAC-sanctioned weapons dealers." *See id.*, ¶ 125 (citing Bauer Decl., Exhibit B, ¶ 17).

### b.     Bank Melli Orchestrated Illicit Transactions on Behalf of Iran.

Around the same time, Bank Melli in London approached HSBC with a similar proposal to the one the CBI broached with SCB. *See id.*, ¶ 127. In a letter drafted in April 2001, an HSBC Bank plc Business Development Manager explained to Bank Melli how to send payments to HSBC Bank plc in a manner that would allow HSBC Bank plc to process its payments successfully through its U.S. subsidiary, HSBC Bank USA, N.A.:

> The key is to always populate field 52 ... this means that the outgoing payment instruction from HSBC will not quote "Bank Melli" as sender -just HSBC London and whatever is in field 52. This then negates the need to quote "DO NOT MENTION OUR NAME IN NEW YORK" in field 72 (emphasis in original).

*Id.*, ¶ 128 (citing PX-227 (Settlement Agreement, U.S. Dep't of the Treasury (Dec. 11, 2012)), ¶ 4.

The U.S. Senate also investigated HSBC for this conduct, issuing a 339-page report on HSBC's practices in manipulating the U-turn exemption on behalf of CBI and Bank Melli, two of its clients. *See id.*, ¶ 120 (citing Senate Perm. Subcomm. on Investigations, "U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History" (July 17, 2012), available at https://www.hsgac.senate.gov/imo/media/doc/PSI%20REPORT-HSBC%20CASE%20HISTORY%20(9.6).pdf (pages 123-24 identify CBI and Bank Melli as HSBC customers) ("HSBC Senate Report")). HSBC admitted to processing nearly $20 billion in transfers during the

same period, the vast majority of which were for Iran. *See id.*, ¶ 130 (citing HSBC Senate Report

at 6, 14). Other banks moved similarly large amounts on Iran's behalf. *See id.*

c.     **NIOC, Aided by CBI, Orchestrated Illicit Transactions on Behalf of Iran.**

The CBI and NIOC worked together to structure transactions to avoid scrutiny in the

United States. *See id.*, ¶ 145.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████

███████████████████████████ the Italian bank Intesa Sanpaolo (which later admitted it illegally processed funds worth over $11 billion USD for Iranian entities, paying a $325 million dollar fine to NY-DFS)████████████████████████████████████

█████████████████████████ *See id.*, ¶ 155 (citing PX-228 (Consent Order, *In the Matter of Intesa Sanpaolo S.p.A., Intesa Sanpaolo S.p.A. New York Branch*, NY-DFS, at *19 (Dec. 15, 2016)) (Between 2002 and 2006, Intesa Sanpaolo–Milan "conducted more than $11 billion of U.S. dollar transactions for Iranian entities through its non-transparent protocol," including U.S. dollar clearing for the benefit of Defendants)). The United States sanctioned Zhenrong in 2012 under the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, Pub. L. No. 111-195, 124 Stat. 1312 (July 1, 2010) and again in 2019 under Executive Order 13846 ("Reimposing Certain Sanctions With Respect to Iran"). *See id.*, ¶ 156. ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

2.      **Defendants' Money Laundering Scheme Enabled Iran to Acquire Restricted Items for Use in Terrorism.**

Iran's money-laundering scheme also helped the regime acquire items restricted for their military applications and use in terrorism. *See id.*, ¶ 131. Examples of some of these transactions facilitated by Bank Melli are detailed in an internal audit report SCB commissioned from Promontory (the "Promontory Report"), excerpts of which are annexed to the Bauer Declaration as Exhibit C.

For instance, Bank Melli facilitated (with SCB's assistance) the purchase of restricted components of hydraulic presses of the type used to create EFPs, the signature Iranian weapon used against Coalition Forces in Iraq. *See id.*, ¶ 133 (citing Bauer Decl., Exhibit C at 19). In another example, Bank Melli facilitated the illegal purchase of a restricted General Electric aircraft engine for a subsidiary of Iran's Mahan Air, the abovementioned SDGT designated for flying IRGC and Hezbollah weapons and personnel, including into Iraq. *See id.*, ¶ 134 and n.88 (citing PX-203); PX-224 (FinCEN, Advisory on the Iranian Regime's Illicit and Malign Activities and Attempts to Exploit the Financial System, (Oct. 11, 2018)) ("For many years, the Iranian commercial airline Mahan Air has transferred weapons, funds, and people on behalf of the IRGC-QF and provided support to the Syrian Assad regime and Lebanese Hizballah. In 2011, OFAC designated Mahan Air for providing financial, material, and technological support to the IRGC-QF. To evade sanctions, Mahan Air front companies have negotiated sales contracts and obtained U.S. parts and services for Mahan Air's aircraft in violation of U.S. sanctions."). The transaction was structured so as to omit Bank Melli's role in financing the letter of credit from the component of the transactions processed in the United States. *See id.*, ¶¶ 134-43 (describing transaction details).

### III.    THE BELLWETHER ATTACKS

Messrs. Barker and Lutz were tasked with assessing the six bellwether attacks presented at the *Karcher* trial involving EFPs; *i.e.*, the attacks that occurred on May 3, 2005, October 22, 2006, March 17, 2008, March 23, 2008, May 9, 2009, and May 17, 2009. Mr. Barker, having reviewed the available evidence, concluded that "each of [these] attacks [involved] an EFP, engineered and specifically designed to penetrate armor." Barker T3-6:4-15. Mr. Lutz (agreeing with Mr. Barker's assessment, Lutz T5-49:20-23), concluded that "the six attacks that have been presented, all involved explosively formed penetrators that were provided by the IRGC." Lutz T5-16:15-17. *See also id.* at 52:2-5 ("So through those sources, my own experience, I concluded those are all EFPs that were provided by the IRGC and probably facilitated in some way through the Lebanese Hezbollah, if not jointly.").

### A.    The May 3, 2005 Attack – Baghdad

On the morning of May 3, 2005, Plaintiff Robert Bartlett was working as a scout and a sniper in a reconnaissance team from 1st Battalion, 64th Armor Regiment. Bartlett T2-50:22-51:3; PX-158 (Expert Report of Captain (Ret.) Donald Wade Barker) at 19. Mr. Bartlett testified at trial that he had a "dual role" in his unit. Bartlett T2-51:2-3. Mr. Bartlett and his unit would "clear sectors and clear areas" as well as "check on the Sheikhs . . . trying to win the hearts and minds . . . try[ing] to stand up the local governments and help, you know, the poor people." *Id.* at 51:4-10.

Mr. Bartlett was the driver of the team's up-armored M1141 HMMWV. *Id.* at 53:11-13; PX-158 at 19. He testified that "[t]hat day I was doing a scouting mission, so we had cleared a couple of sectors. We did some presence patrols in a few sectors just south of Sadr City. . . . When we got on [Route] Pluto, we were on our way to clear the third sector for the day and we would have been done for the day." Bartlett T2-57:2-6. Mr. Bartlett was driving the lead vehicle in a

three-vehicle convoy. *Id.* at 57:7-10. As they were crossing on Route Pluto on an overpass, Mr. Bartlett's vehicle was struck by a roadside bomb as he was negotiating a Jersey barrier (concrete traffic obstacles that were often used in Iraq to slow down traffic) installed on the overpass. Bartlett T2-57:11-21; Barker T3-39:20-40:15.

Mr. Bartlett testified that his vehicle was struck by an EFP, and an EFP slug "cut me from the left corner of my temple down through my jaw. And then it took my truck commander's head — well, it took my gunner's legs and then took the top of my truck commander's head off." Bartlett T2-51:22-52:3. The fourth occupant, riding in the backseat behind Mr. Bartlett, was blown out of the HMMWV's back door by the strength of the EFP's blast overpressure and rendered unconscious. *Id.* at 54:16-55:3. Mr. Bartlett recalled smelling "burning flesh and burning hair and diesel fuel," and recalled that his "truck was still running." *Id.* at 55:7-10.

Mr. Bartlett suffered severe facial trauma that has required him to undergo numerous facial reconstructive surgeries. *Id.* at 62:8-63:7. He suffers from permanent nerve pain in his face, lips and hands, a traumatic brain injury, post-traumatic stress disorder ("PTSD"), and short-term memory loss. *Id.* at 63:9-65:9.

Mr. Bartlett's former Battalion Commander, U.S. Army Colonel (Ret.) Kevin Farrell, also provided eyewitness testimony regarding the May 3, 2005 attack. Mr. Farrell testified that Mr. Bartlett's unit was providing overwatch for other soldiers in his Company who were, at the time, largely engaged in operations against JAM personnel in the areas just south of Sadr City, Baghdad. Farrell T2-72:14-73:16. Mr. Farrell explained that Sadr City is "obviously affiliated with Muqtada al-Sadr. And I'd say there were, we guessed, about 1.5 million inhabitants in a teeming slum . . . . And we inferred, I think quite rightly, that this was a sanctuary. The connection between Sadr City

and Iran or Iranian agents was clear, and that many of the attacks that we were subjected to, the planning and the stockpiling of munitions we believed were done in Sadr City." *Id.*

Mr. Farrell testified that on the day of the attack, he was on a routine patrol outside the forward operating base ("FOB") when "we heard the explosion, and . . . heard the call over the radio, and we traveled to the location where Robert Bartlett's vehicle had been struck…. And we — as I recall, we were the first element on the scene after the attack." *Id.* at 78:16-79:3. He described Mr. Bartlett's injury as "ghastly." *Id.* at 80:11-25.

Mr. Barker testified that the May 3, 2005 attack that injured Robert Bartlett was caused by an EFP array, based upon his review of PX-123 (SIGACT Report titled "IED ATTK ON 1-64AR IN BAGHDAD (ZONE 30): 1 CF KIA, 3CF WIA/M114 DAMAGE") and PX-124 (Casualty Report). Barker T3-34:19-25.[49] He also reviewed 26 photographs Mr. Bartlett obtained of his vehicle that were taken in the immediate aftermath of the attack, which the Court received into evidence. PX-126 (Post-attack photographs provided by Robert Bartlett); Bartlett T2-65:10-66:19.

The May 3, 2005 attack was a relatively early EFP attack against U.S. armor in Iraq. PX-158 at 19. As a result, the SIGACT provided little information beyond the fact that Staff Sergeant ("SSG") Bartlett's HMMWV "struck an IED…." *Id.*; PX-123. Because Mr. Bartlett's fellow soldiers opted to self-evacuate their wounded back to the nearest Forward Operating Base (in this case, FOB Rustamiyah), it appears from the record that no EOD detachment was dispatched to the attack site to perform a post-blast analysis or sensitive site exploitation at the site of the attack. PX-158 at 19; PX-123.

---

[49]   Mr. Barker also relied upon a sworn declaration provided by Mr. Farrell, PX-125, which was not received into evidence because Mr. Farrell provided testimony during the trial. Barker T3-34:19-25.

The Casualty Report indicates that Mr. Bartlett was the driver "on [a] route securing mission when an IED exploded from the right of the vehicle. [Mr. Bartlett] arrived at 86th C[ombat] S[upport] H[ospital] with an emergency placement of a tracheostomy… [diagnosed with] massive facial trauma [and] dental injuries." PX-158 at 19-20; PX-124 at 5.

Mr. Barker testified that the photographs of the wreckage of Mr. Bartlett's HMMWV, PX-126, confirm that the blast was caused by a sophisticated EFP that sent multiple penetrating slugs approximately 3-5 inches in size through the vehicle along its left side, with the blast seat located roughly at Mr. Bartlett's 11 o'clock. Barker T3-35:15-37:1; PX-158 at 20. The weapon launched multiple slugs directly into the crew compartment along a diagonal path, with one slug exiting via the rear right passenger window. Barker T3-38:2-20; PX-158 at 20; PX-126. Another partial EFP slug exited through the roof of the up-armored vehicle, which Mr. Barker testified was covered with approximately two inches of RHA. Barker T3-36:15-23; PX-158 at 20; PX-126.

Mr. Barker also testified that the holes visible in the photos of the hardened steel suspension of the HMMWV were "telltale signs of smaller pieces of copper penetrating the steel. If it had been anything else . . . [it] would have broken off large chunks of [the suspension]. The EFP pierces the steel. You can even see little pieces of copper residue left behind." Barker T3-37:5-15; PX-126; PX-158 at 20-21. Mr. Barker explained that the discovery of copper residue on a vehicle further supports his conclusion that this attack involved a copper-lined EFP. Barker T3-38:25-39:17. Mr. Barker confirmed that copper is ideal for EFPs ("the next best thing" after tantalum), and that there is no copper in the vehicle or in any other weapons that would have been fired at the vehicle. *Id.*

Mr. Lutz's assessment was similar: "The penetrations to the armor and ballistic glass bear all the characteristics of strike points made by a copper-lined EFP array, and the photos below

show copper residue (1) embedded by an EFP fragment in the driver's side ballistic glass and (2) present on an entry hole in the left front wheel." PX-159 (Expert Report of Col. (Ret.) Kevin Lutz) at 29.

Mr. Barker testified that he assessed the attack to have involved a multi-warhead EFP array that was RF-armed and PIR-triggered. Barker T3-39:20-40:15; PX-158 at 22-23. Mr. Barker reached his conclusion as to the arming and triggering of the device based upon the lack of enemy presence both before and after the attack, the fact that no command wire was discovered at the scene, the accuracy of the EFP warhead impact points, and his experience that "99 times out of 100, the EFP is set off with a PIR." Barker T3-40:8-15. He also concluded that the EFP was packed with HE explosives, as home-made explosives lack "the brisance . . . the cutting or shearing force of the explosives [required] to penetrate the armor." *Id.* at 40:16-41:1. Mr. Lutz concluded that the EFP was made of high-quality components linkable to Hezbollah and the IRGC. He found that the attack "involved an early example of the use of an EFP of original Hezbollah and IRGC design that was supplied by the IRGC…. [T]he weapon was likely assembled and emplaced by an IRGC-sponsored Special Group." PX-159 at 25, 30-31.

Based upon the foregoing evidence, the *Karcher* court found that "Iran bears responsibility with its proxies for this EFP strike," because it was caused by "'an EFP of original Hezbollah and IRGC design that was supplied by the IRGC'" and "'likely assembled and emplaced by an IRGC-sponsored Special Group.'" 396 F. Supp. 3d at 33 (quoting Lutz Rep. at 25).

### B.     The October 22, 2006 Attack – Baghdad

On the afternoon of October 22, 2006, a personal security detachment of 2nd Platoon, 6th Infantry division, consisting of four up-armored M1114 HMMWVs equipped with Level 5 Interim Fragmentary Armor Kits ("Frag 5 Kits"), was traveling northwest on Route Jackson in central

Baghdad. PX-158 at 23. Seated in the left back seat of the lead vehicle was bellwether Plaintiff (and then-U.S. Army Major) David Haines. Haines T4-163:20; PX-158 at 23; PX-132 (CENTCOM documents relating to the October 22, 2006 attack). Mr. Haines was participating at that time in "what the Army calls a RIPTOA, a relief in place [/] transfer of authority. I was the incoming unit, 2[-]6 Infantry. Major Dave Taylor and his crew were the outgoing unit . . . . And on this specific patrol here, we were rehearsing the route between FOB Falcon and the Baghdad hospital." Haines T4-162:7-16.

According to Mr. Haines, his vehicle was struck by a dual-array EFP. *Id.* at 164:7-165:15. The EFP's warheads struck the passenger front door, killing an officer, Major Taylor, who was riding in the front seat. *Id.* at 164:8-11. Mr. Haines testified that as a result of the EFP strike, the vehicle's driver lost his right leg below the knee, the passenger seated behind Major Taylor lost his left leg below the knee, and the vehicle's gunner lost both of his legs below the knees. *Id.* at 165:7-15. Mr. Haines was "struck by EFP shrapnel in my right hand, my left arm, my right leg about mid shaft on my femur and in my side." *Id.* at 165:13-15. Mr. Haines also provided seven photographs of the damaged vehicle taken shortly after the attack, which the Court received into evidence. PX-135 (post-attack photographs); Haines T4-161.

Mr. Haines testified that the "metacarpals in my right hand were shattered, and it looked like somebody had taken a bite out of the side of my hand. I had shrapnel lodged in my left arm. It segmented my ulna and ulnar nerve, and it locked my hand back so it was not functional. . . . The shrapnel in my right femur broke my leg, and there had been some metal and probably part of my rifle that somehow jammed my feet into the Humvee." Haines T4-168:12-20.

Mr. Haines testified that his arm required multiple skin grafts, *id.* at 171:19-25, and his body was "compared to Swiss cheese" due to the number of holes created by the shrapnel. *Id.* at

167:10-17. Mr. Haines further testified that he still carries shrapnel in his body from the attack, and that as recently as June 2018, Army doctors removed a foreign body from his right forearm that was tested and determined to be copper. *Id*. at 167:19-25.

Mr. Barker testified that the October 22, 2006 attack that injured Mr. Haines involved the use of an EFP array, based upon his review of PX-132 and PX-135. Barker T3-41:3-42:2. According to Mr. Barker's expert report, the SIGACT report noted that an IED detonated on the right side of the lead vehicle as it was traveling northbound on Route Jackson. PX-158 at 24. Mr. Barker's expert report also notes that "EOD was dispatched to the attack site" and that a Weapons Intelligence Team ("WIT")[50] was "spun up," meaning that the WIT members received orders to investigate the attack. *Id*.

Mr. Barker testified that the CEXC laboratory performed a chemical analysis on the copper slugs recovered from Mr. Haines's HMMWV that detected the presence of RDX and TNT. Barker T3-42:25-43:3. Mr. Barker further testified that RDX is a high-energy explosive that was often employed in EFPs. *Id.* at 43:2-3; 43:25-44:2. The CEXC reports concluded that Mr. Haines's HMMWV was struck by an array consisting of multiple EFP warheads and a shaped charge, but Mr. Barker reached a different conclusion. Barker T3-43:10-44:8. According to Mr. Barker, shaped charges, such as High-Energy Anti-Tank ("HEAT") rounds, require a delivery method, such as a rocket or mortar. *Id.* at 43:17-24. Mr. Barker explained that HEAT rounds "[have] a core of tungsten. So when it's fired at a tank, it impacts the tank. Then there's a second explosion that forces the tungsten through the tank." *Id.* at 43:21-24. EFPs, by contrast, use the HE explosive packed behind the liner to transform the liner into a warhead and deliver it. *Id.* at 43:25-44:2.

---

[50]     WITs were teams of U.S. military personnel sent to investigate an IED event, adapted from the British model developed during the conflict in Northern Ireland. *See* PX-156 at 37-38. *See also* PX-158 at 4 n.5.

Accordingly, Mr. Barker concluded that the EFP employed against Mr. Haines's up-armored HMMWV contained "somewhere between an eight- and ten-inch warhead with two or three smaller warheads stacked around them." *Id.* at 44:5-6. Mr. Lutz testified that he agreed with Mr. Barker's assessment that the blast involved an EFP array without an accompanying shaped charge, Lutz T5-50:10-12, stating that a shaped charge "would have [left] a much smaller hole. What it looked like to me was an EFP that was probably 10 to 12 inches if you look at the hole. And there [were] multiple [EFP warheads], because there was also three other holes on that door." *Id.* at 51:2-6.

Mr. Barker testified that the EFP array made four penetrations in the armored front-passenger door of the HMMWV, Barker T3-45:15, which was equipped with "standard RHA, but…also had the Rhino…. So they angled the PIR, the warheads, and then the warheads struck the vehicle as designed." Barker T3-45:24-46:8. Mr. Barker further testified that "the armor was completely overwhelmed…. The steel is still flat. It's not deformed. It just has a puncture in it. [RHA] is so hard that you can't cut it with a cutting torch. But yet something passed through it like a hot knife through butter." *Id.* at 46:14-19.

One of the CEXC reports admitted into evidence indicated: "The array [was] positioned on the curb running parallel to RTE JACKSON in order to provide the optimum angle of attack and camouflaged with dead foliage to prevent visual detection by passing C[oalition] F[orces]. The vehicle was engaged at a distance of approximately 16 ft." PX-132 at 29. The report's analysis section is partially redacted but notes that a "copper slug created an internal hole approximately 12" in length and 9 1/2" wide" inside the vehicle and that there was "minimal copper splattering around [the] points of penetration." *Id.*; *see also* PX-158 at 26.

Regarding the EFP's initiation systems, the CEXC report concluded that it was "highly likely that the array was remotely armed and PIR initiated." PX-132 at 30. The report contains an assessment that the attackers "would have identified the average speed of M1114 convoys" and the length of their Rhino anti-PIR devices and concludes that the "EFP array would then be angled accordingly to target the passenger areas of the HMMWV when the [Rhino] activated the PIR[']s pyro electric sensor." *Id.* Mr. Barker testified that "[t]his was a sophisticated EFP array. They used a dual-initiation system. The accuracy of it is [due to] nothing but a PIR with an RF setup. CEXC . . . found the high-energy explosives. Even without the RDX present, the damage to the vehicle could be nothing but HE." Barker T3-47:11-16.

Mr. Lutz reviewed the same evidence and concluded that "the October 22, 2006 attack that injured then-Major ("MAJ") David Haines involved the use of an EFP array of original Hezbollah and IRGC design that was supplied by the IRGC." PX-159 at 31. He further concluded that "the weapon was likely assembled and emplaced by an IRGC-sponsored Special Group." *Id.* Mr. Lutz also concluded that "the attack that injured MAJ Haines was a well-planned and coordinated attack that was part of the EFP campaign orchestrated by the IRGC and Hezbollah and conducted by one of the IRGC's Special Group proxies, involving the use of a uniquely concealed, copper-lined EFP array …." *Id.* at 38. Based upon the foregoing evidence, the *Karcher* court found that "Iran bears responsibility with its proxies for the EFP attack on Mr. Haines's vehicle" which was "'a well-planned and coordinated attack that was part of the EFP campaign orchestrated by the IRGC and Hezbollah and conducted by one of the IRGC's Special Group proxies.'" 396 F. Supp. 3d at 35 (citing Lutz Rep. at 38).

### C.      The March 17, 2008 Attack – New Baghdad

During the afternoon of March 17, 2008, a convoy of five up-armored HMMWVs from D Company, 2nd Battalion, 30th Infantry Regiment was traveling west on Route Predators, en route to FOB Rustamiyah. PX-158 at 29. As the convoy passed through the intersection of Routes Predators and Gold, a roadside bomb that had been placed between two small Jersey barriers detonated on the right side of an up-armored HMMWV commanded by bellwether Plaintiff (and then-U.S. Army Specialist) Christopher Levi. *Id.*; Levi T4-182:2-19.

Mr. Levi testified that he was riding in the middle vehicle when it was "struck from the right side by an EFP." *Id.* at 182:18-19. Mr. Levi recalled maintaining consciousness for a few moments after the blast, after which he blacked out. *Id.* at 183:5-20. He recalled awakening still in the vehicle, but unable to see because of the smoke from the blast that obscured his vision. *Id.* at 183:19-84:4. Mr. Levi testified that he then performed a "self-assessment," at which point he discovered that the "EFP . . . went directly through my thighs, a transfemoral amputation, catastrophic at site. Double transfemoral amputation. And a piece of shrapnel that if I had my hands in my lap would have hit me in my throat . . . [b]ut it entered my forearm, bounced off my ulna, hit my radius, took five of my wrist bones out and two-thirds of my second metacarpal and just deflected away from my face saving my life." *Id.* at 184:4-185:7.

Mr. Levi testified that he was eventually medevaced to Germany and then to Walter Reed Medical Center in the United States for treatment. *Id.* at 187:24-188:13. He remained at Walter Reed for three months and had more than 100 surgeries performed to correct his injuries. *Id.* at 189:15-22. After his legs healed, he was fitted for leg prosthetics, and he now has "an 8-inch plate from the tip of my knuckle to the middle of my forearm with six to eight screws holding the separate parts together" in his hand. *Id.* at 189:7-23. Mr. Levi could not ambulate well with his

prosthetic legs until more than a year after his discharge. *Id.* at 191:13-19. Mr. Levi testified that prior to his medical discharge from the Army, he was moved into the barracks at the Walter Reed complex, where he developed pulmonary embolisms, bed sores, and infections. *Id.* at 192:17-193:23.

Mr. Levi testified that he experiences nerve pain on a continuous basis, for which he takes prescription medication. *Id.* at 194:3-12. During the years following the attack, he has found and removed shrapnel from his body. *Id.* at 194:15-195:1.

Mr. Barker opined that the March 17, 2008 attack that injured Mr. Levi involved the use of a multi-array EFP that was RF-armed and PIR-triggered based upon his review of PX-131 (a SIGACT Report; an IED Report; a WIT 3 Report; an Event Storyboard; CEXC Report 18530-08; and the Casualty Report for then-Specialist Christopher Levi). Barker T3-47:20-48:11; PX-158 at 29.

The SIGACT report categorized the mode of attack as "Directional IED," describing the "IED Type" as "EFP" and noting an "IED Description" as a "4 array copper EFP." PX-131 at 8. The SIGACT report also contains an assessment by the EOD team that the weapon employed against Mr. Levi's vehicle was a "4 array copper EFP." *Id.* at 9. CENTCOM redacted a portion of the "Vehicle Status" field, which would have indicated what (if any) C-IED equipment was installed on the vehicle. *Id.* at 8. However, based upon the unredacted portions of the documents and the photographs provided by CENTCOM, Mr. Barker concluded that the vehicle was equipped with a Rhino. PX-158 at 30; Barker T3-51:8-9. The Battalion's intelligence staff officer (referred to as the "S2") noted that this was the third IED attack at "this particular section of RTE Predators since 6FEB08," and assessed that the attack was "conducted by S[pecial] G[roup] elements possibly operating out of Mashtal." PX-131 at 9.

The IED report describes the Main Charge Configuration of the IED as "EFP," *id.* at 5, and notes that the "EFP was placed between two small jersey barriers used to create a mandatory turn lane to filter traffic in [the] right lane onto Route Gold," *id.* at 3. The EOD team "recovered pieces of a D cell battery…. Small pieces of copper slugs were [also] recovered from the vehicle, soldiers [sic] eye protection, and the blast site." *Id.*

The report notes that an Iraqi Police ("IP") station was located "on the northeast corner of Route[s] Predators and Gold," and that the "IPs should have been able to see the device or suspicious persons placing the device." *Id.* at 4. According to Mr. Barker's report, these comments "indicate that the site investigators were suspicious of the local IPs' failure to observe the installation of the EFP or to warn Coalition Forces of the danger." PX-158 at 31.

The IED report also contains comments from WIT 3, which noted that "[f]our strike points were identified on the right side of the vehicle. Two strike points were located on the engine compartment and two strike points where [sic] on the [front passenger] door. EOD assessed that the device was a 4-array [copper] lined EFP." PX-131 at 4. Again, the IED report notes that the EOD/WIT investigators recovered pieces of a D cell battery and a "copper slug embedded in one of the soldiers [sic] eye protection," but that "[n]o other initiation system or components [were] found . . . ." *Id.*

At the trial, Mr. Barker explained that the WITs "were trained to go out and collect evidence. As you can imagine, it's difficult to be on an active battlefield when people are shooting at you and calmly collect evidence. So we trained up teams that can both defend themselves and collect data." Barker T3-49:1-5. Mr. Barker further testified that the WITs were trained by the Asymmetric Warfare Group. *Id.* at 49:12-14.

Mr. Barker also explained at the trial that the discovery of pieces of a D-cell battery was significant because these types of batteries were often used "to power the PIR as well as provide backup power to the cell phone if [the EFP] sits for too long." *Id.* at 49:24-50:3. Mr. Barker explained that "[s]ome of these devices sat for weeks before they detonated them. It got us into a sense of complacency before they detonated on us." *Id*. at 50:4-6.

Mr. Barker testified the CEXC laboratories performed a chemical analysis on the recovered fragments and detected the presence of RDX, a high-energy explosive. *Id.* at 50:22-51:1.

In reviewing the images of Mr. Levi's HMMWV that were provided as part of the CEXC and WIT 3 reports, Mr. Barker testified that "this [was] a devastating EFP. Again, [the vehicle] had a Rhino in an effort to defeat the PIR. The enemy had taken measures to aim the warheads properly towards the armor. So it took out both the engine and the cab." *Id.* at 51:4-12. He also confirmed that the WIT identified the presence of copper residue on the vehicle. *Id.* at 51:15-16.

Mr. Barker testified that this attack involved a "precision-built and -manufactured, purposely built EFP for penetrating armor. Multiple warheads: Anywhere from three to five of these warheads did the damage it did. The CEXC identified HE; but again, the overwhelming damage to the vehicle even without the chemical analysis was high-energy explosives. It was a dual-trigger system. Again, [the HMMWV] had the Rhino, which set off the PIR. The PIR was turned on by [an] RF device." *Id*. at 52:3-10.

Mr. Lutz reviewed the same evidence and concluded that "the March 17, 2008 attack that injured Specialist ('SPC') Christopher Levi involved the use of a copper-lined EFP array of original Hezbollah and IRGC design that was supplied by the IRGC." PX-159 at 38. He further concluded that "the weapon was likely assembled and emplaced by an IRGC-sponsored Special Group." *Id*. Elsewhere, Mr. Lutz concluded that "the attack that seriously injured SPC Levi was

part of the EFP campaign orchestrated by the IRGC and Hezbollah that was conducted by one of the IRGC's Hezbollah-trained Special Group proxies. The attack involved a 4-array copper-lined EFP concealed between two jersey barriers that was likely RF remotely armed and PIR triggered." *Id.* at 47. Based upon the foregoing evidence, the *Karcher* court found that "Iran bears responsibility with its proxies for this EFP strike," 396 F. Supp. 3d at 38, because it was caused by an EFP array, and because "'the IRGC and Hezbollah played a key role in this attack carried out by a Special Group proxy.'" *Id.* at 37 (citing Lutz Rep. at 47).

### D.     The March 23, 2008 Attack – Baghdad

On March 23, 2008, at approximately 4:00 p.m., a patrol consisting of two armored M2 Bradleys, between six and eight Iraqi National Police vehicles, and an M1151 HMMWV carrying a U.S. Army Tactical Psychological Operations ("PSYOP") team departed FOB Falcon, located a short distance outside Baghdad. PX-158 at 37; [Plaintiff Rusty] Mason T4-58:22-59:3; PX-94 (U.S. Army AR 15-6 Report). The patrol from A Company, 4th Battalion, 64th Armored Regiment, *id.* at 52:8-10, had several mission objectives, including searching a house suspected of containing a weapons cache, and escorting the PSYOP team as it conducted loudspeaker broadcasts and placed signs discouraging the local Iraqi nationals from attacking Coalition Forces. PX-158 at 37; PX-94 at 2-3; Mason T4-55:6-58:18. At approximately 10:30 p.m., the lead Bradley was struck by a roadside bomb. PX-158 at 38. The weapon caused the lead Bradley to catch fire, killing bellwether Plaintiffs' decedents Christopher Hake, Andrew Habsieger, and George Delgado. Sergeant Steve McCoy, the Bradley's commander, escaped the vehicle but was badly burned and succumbed to his wounds approximately three months later in a military hospital. *Id.*

At the trial, the Court heard testimony from Russell Mason, who was decedents' Platoon Leader and was commanding the other Bradley in the patrol that evening. Mason T4-52:23-53:20. According to Mr. Mason, the "patrol consisted of a lead Bradley Fighting Vehicle . . .; about three

or four Iraqi National Police vehicles; the PSYOPs[' HMMWV] . . . in the middle; an additional three to four Iraqi National Police; and then followed by my [Bradley] vehicle in the rear. . . ." *Id.* at 58:22-59:3.

Mr. Mason testified that he was manning the independent operating turret in his Bradley, and that his turret was facing the rear position when he heard "a loud pop" through his headset, and that he "immediately knew that something was not right." *Id.* at 62:1-13. He positioned his turret forward and "saw that our lead Bradley had stopped." *Id.* at 62:14-16. Mr. Mason ordered his driver to approach the lead vehicle, but maintained an initial distance of approximately 100 meters, because he was taught that the insurgents "would do multiple IEDs. So they would try to engage and disable the first vehicle, and then they would have a secondary IED waiting for an additional vehicle when they come up to try to provide aid to the first vehicle." *Id.* at 64:8-20.

Mr. Mason testified that he knew that the lead vehicle had been attacked "probably within 20 seconds of getting a little closer. . . ." *Id.* at 65:3-6. Mr. Mason further testified that "this whole time I'm trying to call [the lead Bradley crew] on the radio with no response. So it was pretty clear when I got closer that something was not right and that it was an IED attack." *Id.* at 65:7-10. Roughly one or two minutes later, Mr. Mason saw "a person running back to our vehicle, and they were completely engulfed in flames." *Id.* at 65:12-16. At first, Mr. Mason believed this person to be the "trigger man" for the IED who, he assumed, had been too close to the bomb when it detonated. But, "half a second later" he "realized it was Sergeant Steve McCoy. . . . [D]ue to his running style, [he] knew it was him." *Id.* at 65:19-66:1. At this time, Mr. Mason also noted that "the rest of the [Bradley] was starting to become engulfed in flames." *Id.* at 69:8-12.

Mr. Mason testified that between two and five minutes elapsed between the moment he heard the "loud pop" and when he saw Sergeant McCoy on fire and running toward his vehicle.

*Id.* at 66:23-67:3. Mr. Mason further testified that after Sergeant McCoy was placed in the undamaged Bradley, the dismounted soldiers began "to receive small arms fire from a nearby building." *Id.* at 67:9-12, 21-24. Shortly thereafter, Mr. Mason's platoon "started to get more support from [the] battalion and some tanks rolled in and the small arms fire dissipated." *Id.* at 67:24-68:1.

While this engagement was ongoing, other members of Mr. Mason's platoon "tried and attempted to gain access to the now burning Bradley fighting vehicle." *Id.* at 69:13-15. Mr. Mason testified that his fellow soldiers "could not gain [access] — while they could open some of the hatches, when they opened them up, flames would come shooting out and they could not gain access." *Id.* at 69:17-19. Due to the lack of firefighting services available in Baghdad at the time, it took "about three or four hours" to assemble sufficient local resources and extinguish the burning Bradley. *Id.* at 69:20-70:2. Mr. Mason testified that, accordingly, "the Bradley fighting vehicle didn't get back to the FOB where we were at until we returned [from accompanying Sergeant McCoy to the Green Zone hospital]. And then that's when the doctors were able to go in and . . . see that there was [the remains of] four service members inside still." *Id.* at 70:3-7.

Mr. Barker opined that the March 23, 2008 attack that killed bellwether Plaintiffs' decedents Christopher Hake, Andrew Habsieger, and George Delgado involved the use of an EFP array that was command wire-armed and PIR-triggered, based upon his review of PX-94 (U.S. Army AR 15-6 Report); PX-129 (SIGACT Report; an IED Report; an Event Storyboard; a CJTF-Troy Report; CEXC Reports, and the Casualty Reports for Christopher Hake, Andrew Habsieger, and George Delgado); PX-136 (Post-attack photographs of the destroyed Bradley (not offered into evidence)); and PX-95 (Video of the attack made by the PSYOP team (not published or offered into evidence)). PX-158 at 36-37; *see also* Barker T3-60:23-61:9.

135

According to the AR 15-6 report's Table of Exhibits, the investigating officer interviewed the soldiers who took part in the patrol, those who responded to the attack as part of a "Quick Reaction Force," and the soldiers responsible for conducting the recovery of the damaged Bradley. PX-94 at 30. The investigating officer also interviewed the Battalion Intelligence Officer, Electronic Warfare Officer, the EOD detachment, and the WIT that examined the Bradley after it was returned to FOB Falcon. *Id.* at 11. The sworn statements of 13 of the soldiers are annexed to the officer's final AR 15-6 report, and the PSYOP team also used their onboard video recorder to capture a video of the attack immediately following the EFP strike. *Id.* at 30. In addition to these interviews, the investigating officer also personally examined the damaged Bradley vehicle hours after it was returned to FOB Falcon. *Id.* at 67.

> The investigating officer concluded that the lead Bradley vehicle was struck by a:

> Command [Wire]-Initiated Explosively Formed Penetrator; a portion of which defeated the armor on the right-hand side of the Bradley Fighting Vehicle, passed through the fuel tank of the vehicle, and exited the vehicle through the armor of the left-hand side of the vehicle. The resulting blast energy ignited the fuel within the fuel tank immediately.

PX-94 at 125.

The investigating officer also found that, immediately after the EFP strike, the patrol came under small arms fire from "ground level and second-floor window positions to the south." *Id.* According to the investigating officer:

> The intense fire [within the Bradley] incapacitated [] Hake…[] Habsieger and [] Delgado, resulting in their inability to extricate themselves from the vehicle. Their state ultimately resulted in their deaths. [] McCoy, who exited [via] the vehicle commander's hatch completely engulfed in flames, was the sole survivor.

*Id.*

Mr. Barker testified that, in his opinion, the investigating officer "did a good job doing what he had to do." Barker T3-55:13-15. Mr. Barker agreed the attack involved a sophisticated

EFP: "[T]o kill a Bradley is a significant event," *id.* at 55:18-22, because a Bradley is "almost 13 feet tall," "25 to 28 feet long," *id.* at 58:14-16, and "has far more armor than a Humvee. It has twice the armor." *Id.* at 61:1-2. Ultimately, Mr. Barker agreed with the investigator's conclusions except as to the manner in which the EFP was triggered. According to Mr. Barker, the investigating officer believed that "the enemy soldier was sitting at the battery. And as the Bradley drove by, he set it off. That's not what happened. It was too accurate. So it's the middle of the night. Our enemy has no night vision. The Bradley may be big, but it's a long way away. It's a lot of things going on. So what they did was they . . . powered the PIR on [via command wire]; and when the Bradley drove in front of it, it was a very accurate shot. It was just off center, just above the road wheel through the armor." Barker T3-56:16-57:3.

Mr. Barker concurred with the AR 15-6 report's conclusion that the EFP slug passed through the Bradley's armor on its right side, passed through the vehicle's fuel tank, and exited out the armor on its left side, setting the vehicle ablaze. *Id.* at 57:19-25.

The AR 15-6 report accords with Mr. Mason's testimony that, notwithstanding the efforts of the soldiers from the Quick Reaction Force, which arrived at the scene approximately 15 to 20 minutes after the attack, the intense heat from the fire, and the subsequent "cooking off"[51] of the ammunition within the Bradley, made extraction of the soldiers within the vehicle impossible. PX-94 at 126. After the fire was finally extinguished, and the damaged Bradley returned to FOB Falcon, the bodies of Messrs. Hake, Habsieger, and Delgado were finally removed. According to the medical examiner's notes annexed to the AR 15-6, the bodies of all three men were "burned beyond visual recognition." PX-94, Exhibits R-1, R-3 and R-4. Indeed, the fire within the Bradley

---

[51]     "Cooking off" is military slang for ammunition exploding prematurely due to heat in the surrounding environment.

was so severe that, over four hours later, when the investigating officer personally examined the vehicle, he "could still feel excessive amounts of heat emanating from the metal." *Id.*, Exhibit O.

The SIGACT report sets forth the timeline of the attack and also contains an assessment from the S2 that the "EFP was command wire detonated. It was likely a defensive emplacement intended to deter [Coalition Forces] from conducting raids in the area." PX-129 at 16. As noted *supra*, Mr. Barker disagrees that this weapon was *detonated* via command wire. Rather, his expert report and his trial testimony were unequivocal that the command wire was used to initiate the EFP's PIR trigger, and that the head and motion of the lead Bradley as it crossed the PIR detonated the EFP. PX-158 at 43; Barker T3-56:14-57:3.

Mr. Barker's expert report also cites the investigation performed by CJTF-Troy, which concluded that the Bradley was struck by a "2 array[, 6 to 8 inch,] EFP . . . in between the fourth and fifth road wheel breaching the Armor [and] causing a fire from the ammunition storage compartment. Personnel reported command wire was found at blast seat." PX-129 at 3; PX-158 at 41. Mr. Barker testified that he assessed the attack to involve a single EFP warhead, rather than dual array, because "[i]f there had been more than one warhead, [it] would have struck the vehicle. It's just too large of a target to miss. . . . They think there were two [warheads]. I say there was one of them. . . . [T]he PIR, when it set[s] [an EFP array] off, it sets them all off together. The Bradley is just so large that the warhead would not have missed. [The warhead] moves so fast, moves at 26,000 feet per second. It would not have missed if there had been two." Barker T3-58:4-59:22.

Mr. Barker's report notes that the Storyboard prepared by the responsible division's operations section contains the assessment that the "attack was most likely an EFP attack conducted by S[pecial] G[roup] C[riminals] in West Rashid . . . . SGC most likely conducted this

attack in response to the recent detention of SGCs from the West Rashid Area." PX-129 at 1; PX-158 at 42. The Storyboard's battle damage assessment notes that the Bradley was destroyed, and that "10X suspected JAM S[pecial] G[roup] members [were] detained." PX-129 at 1.

The CEXC report notes that a "bundle of wire" was recovered from the attack site, which supports the conclusion of the AR 15-6 and the CJTF-Troy reports that the EFP was armed via command wire. *Id.* at 31. Mr. Barker explained at trial that, unlike a command-detonated IED, here, the command wire was used to activate the PIR sensor, which triggered the EFP when the Bradley passed through the passive infrared footprint. Barker T3-60:9-19.

Mr. Barker concluded that this attack involved "a precision-made, very effective EFP" that was "powered on by the command wire and then detonated in a victim-operated sense with the PIR." *Id.* at 60:25-61:6. Mr. Barker further testified that this attack "absolutely" involved the use of HE explosives. *Id.* at 61:7-9.

Mr. Lutz reviewed the same evidence and concluded that "the March 23, 2008 attack that killed Staff Sergeant ("SSG") Christopher Hake, Private First Class ("PFC") Andrew Habsieger and Private ("PV2") George Delgado involved the use of an EFP array of original Hezbollah and IRGC design that was supplied by the IRGC." PX-159 at 47. He further concluded that "the weapon was likely deployed by an IRGC-sponsored Special Group." *Id*. Mr. Lutz also concluded that "the attack that killed SSG Hake . . . PFC Habsieger, and PV2 Delgado was part of the EFP campaign orchestrated by the IRGC and Hezbollah, and that the attack was likely conducted by one of the IRGC's Special Group proxies." *Id.* at 55-56. He further concluded "that this attack involved the use of an Iranian-manufactured, military-grade EFP." *Id.* at 56. Based upon the foregoing evidence, the *Karcher* court found that "Iran bears responsibility with its proxies for this EFP strike" because it was caused by a "'a well-manufactured EFP that was a signature of EFPs

provided to Iranian-backed Special Groups by the IRGC and Iran's Hezbollah proxy.'" 396 F. Supp. 3d at 40 (quoting Lutz Rep. at 56).

### E.    The May 9, 2008 Attack – Baghdad

During the late evening of May 9, 2008, a convoy of three up-armored M1151 HMMWVs and one MRAP from C Company, 2nd Battalion, 30th Infantry Regiment was traveling west on Route Buzz when the second vehicle in the order of march was struck on the passenger side by a roadside bomb. PX-158 at 44; PX-130 (CENTCOM documents related to the May 9, 2008 attack). The vehicle sustained major damage to its passenger side above the front door. PX-158 at 44. The attack severely wounded the vehicle's gunner, bellwether Plaintiff Wesley Williamson, severely injured two other occupants, and destroyed the HMMWV. *Id.*

Mr. Williamson testified that his unit was conducting a "blocking position" outside Sadr City, Baghdad, to control the flow of arms and munitions in and out of the notorious slum. Williamson T4-141:23-142:7. Mr. Williamson described Sadr City as "the worst place in Baghdad you could be. It's the hotbed of the insurgency." *Id.* at 142:8-10.

Mr. Williamson testified that, prior to the attack, he had received extensive military briefings on EFPs in Iraq. *Id.* at 138:2-140:19. Mr. Williamson testified that he was aware that the EFP employed "a copper disk with high explosives to send a molten copper slug that will penetrate any armored vehicle we have." *Id*. at 140:3-5. He further testified that, while in Kuwait, he personally viewed "a graveyard full of vehicles that had been hit in Iraq" by EFPs. *Id*. at 140:6-10. Mr. Williamson recalled how each vehicle "had a hole punched in it. . . ." *Id.* at 140:12-15.

Mr. Williamson explained that, on the day of the attack, his platoon had completed their mission, been relieved, and were on their way back to their FOB. *Id.* at 142:16-19. Shortly after

passing through an Iraqi National Police checkpoint, Mr. Williamson's vehicle, an up-armored M1151 HMMWV second in the order of movement, was struck by an EFP. *Id.* at 143:5-11.

According to Mr. Williamson, the EFP entered the vehicle after passing through the ballistic glass of the front passenger window. *Id.* at 145:5-6. One piece of the slug struck the driver of the vehicle in the face, and the other struck Mr. Williamson in his right arm. *Id.* at 145:9-18. The slug shattered Mr. Williamson's ulna and radius, and severed his post interosseous nerve, which Mr. Williamson explained is the nerve that controls the use of one's digits. *Id.* at 146:3-25.

Mr. Williamson recalled seeing his wounded arm "dangling like a dead fish" and "pouring blood all over the place." *Id.* at 147:9-12. He attempted to apply a tourniquet to the wound, but was unable to tighten it with only the use of his left arm, so he asked his fellow soldiers to assist him. *Id.* at 147:22-148:10. Mr. Williamson testified that he now always carries a tourniquet with him, just in case the need should ever arise that one is needed. *Id.* at 148:22-149:13. He described this compulsion as "irrational." *Id.* at 149:6.

Mr. Williamson provided further details of the immediate aftermath of the attack. He recalled being placed in his Platoon Sergeant's HMMWV and driven to his FOB, after which he was injected with morphine and his arm was packed with gauze. *Id.* at 149:16-25. His next memory is of waking up on a stretcher being loaded into the back of a Blackhawk helicopter. *Id.* at 149:25-150:4. His stretcher was anchored to the helicopter below the stretcher of the HMMWV driver from the same attack, whose "bodily fluids pour[ed] down onto" Mr. Williamson, who was strapped down and unable to move. *Id.* at 150:5-15. Mr. Williamson testified that he had nightmares of this incident for years following the attack. *Id.* at 150:16-21.

Mr. Williamson testified that he was medevaced to a military hospital in the Green Zone, where his arm was fitted in an external fixation device. *Id.* at 150:24-151:2. When he was assigned

141

to Brooke Army Hospital in San Antonio, Texas, the external fixation device was removed, and two metal plates and 16 screws were surgically implanted in Mr. Williamson's right arm. *Id*. at 151:12-20. Mr. Williamson testified that these implanted devices cause him "general discomfort" at all times, with increased discomfort if he applies any pressure to his right arm. *Id*. at 151:21-152:4.

Mr. Williamson further testified that it took him over seven years after his discharge from the U.S. Army to "regain [his] sanity and try to be a regular civilian. . . ." *Id*. at 152:22-153:1. He explained that being a "regular civilian" is a daily struggle, and that he isolated himself and slept with a rifle by the side of his bed for years. *Id.* at 153:2-20. He also testified that he takes anti-anxiety medications in order to attend his college classes. *Id*. at 153:21-24.

Mr. Barker opined that the May 9, 2008 attack that injured bellwether Plaintiff Wesley Williamson involved the use of a command wire armed, PIR triggered EFP, based upon his review of PX-130 (SIGACT Report; an IED Report; a CJTF-Troy Report; an Event Storyboard; a CJTF-Troy "Quick Look" report; and the Casualty Report for then-PFC Wesley Williamson). Barker T3-61:13-62:18; PX-158 at 43-44.

The SIGACT report categorizes the attack as one involving a "Directional IED," and describes the "IED Type" as "EFP." PX-130 at 17. The report also contains an assessment by the EOD team that "the IED was a[n] 8-10 in[ch] copper EFP with a command wire detonation device." *Id.* at 18. The S2 assessed that the attack was "from a S[pecial] G[roup] cell that lives in the Muh[alla] 732 area. The cell would leave the Muh[alla], conduct their operation, then return to that Muh[alla]."[52] *Id.*

---

[52]    Russell Mason testified that "muhalla" or "mahalla" is an Iraqi term for neighborhood, to which the U.S. military had assigned individual numbers. Mason T4-61:8-10.

The IED report describes the Main Charge Configuration of the IED as "EFP," and notes that the "[d]evice was placed at the end of an alley on the north side of RTE Buzz." *Id.* at 13-14. The investigating EOD team concluded that "the IED was a command wire initiated[,] single[,] copper lined EFP," and noted that "[o]ne hundred meters of command wire was recovered from the blast seat which led north down an alley." *Id.*

The CJTF-Troy Report concludes that Mr. Williamson's vehicle "sustained major damage to the [right] side above the [front] door," and that the EOD Team "determined [that the] damage [to the HMMWV] was consistent with a single copper lined EFP." *Id.* at 3. The CJTF-Troy Report contained two images of the vehicle, one redacted and one unredacted, both of which Mr. Barker discussed at the trial. *Id.* at 9-10; Barker T3-61:10-62:15.

According to Mr. Barker, the images depict where an EFP slug penetrated Mr. Williamson's HMMWV, just above the right passenger door. *Id.* at 61:20-22. The EFP warhead left "a very large bore hole. An eight- to ten-inch warhead went through that." *Id.* at 62:13-15.

The Event Storyboard, prepared by the responsible battalion operations section, contains an assessment that the "attack was likely conducted by S[pecial] G[roup] C[riminals] operating out of Muhalla 732 in New Baghdad…. This attack was likely conducted to limit C[oalition] F[orces] freedom of movement within New Baghdad and draw attention away from Sadr City. SGC will continue to move away from traditional attack locations in an attempt to distract CF\I[raqi] S[ecurity] F[orces] as SGC perceive an impending assault into Sadr City." PX-130 at 1. Mr. Barker's expert report describes the CJTF-Troy "Quick Look" report as a one-page synopsis of eight IED attacks reported within one kilometer of the attack on Mr. Williamson's convoy. PX-158 at 48. According to the "Quick Look" report, "[r]ecent IEDs in this area have included EFPs

(8-12 inch) and conventional IEDs . . . packed with various amounts of U[nidentified] B[ulk] E[xplosive]. The most common switch has been command wire." PX-130 at 22.

Mr. Barker testified that, based upon his review of the evidence, this attack involved "a sophisticated manufactured warhead designed to penetrate armor." Barker T3-62:21-23. Mr. Barker concluded that the EFP "struck the vehicle exactly the way it was supposed to and penetrated the armor." *Id*. at 63:1-2. He further concluded that the EFP "absolutely" had a copper liner and was packed with HE explosives. *Id*. at 63:3-5.

Mr. Lutz reviewed the same evidence and concluded that "the May 9, 2008 attack that injured Private First Class ("PFC") Wesley Williamson involved the use of an EFP of original Hezbollah and IRGC design that was supplied by the IRGC." PX-159 at 56-57. He further concluded that "the weapon was likely assembled and emplaced by an IRGC-sponsored Special Group." *Id*. at 56. Mr. Lutz also concluded that "the attack that injured PFC Williamson was part of the EFP campaign orchestrated by the IRGC and Hezbollah, that was conducted by one of the IRGC's Special Group proxies. The attack involved a concealed, copper-lined EFP likely command wire initiated. The EFP copper liner forming into a slug, moving in an upward trajectory, defeated the vehicle's one-inch thick RHA, penetrated and destroyed the vehicle frame and struck PFC Williamson." *Id.* at 63. Mr. Lutz further concluded that an "IRGC-sponsored Special Group was likely involved in the assembly and emplacement of the EFP." *Id*.

Based upon the foregoing evidence, the *Karcher* court found that "Iran bears responsibility with its proxies for this attack," 396 F. Supp. 3d at 42, because it was caused by an EFP that "'was part of the EFP campaign orchestrated by the IRGC and Hezbollah, that was conducted by one of the IRGC's Special Group proxies.'" *Id.* (quoting Lutz Rep. at 63).

### F.      The May 17, 2009 Attack – Baghdad

During the late evening of May 17, 2009, a convoy of four up-armored M1151 HMMWVs from B Company, 1st Battalion, 18th Infantry Regiment was traveling northeast on Alternate Supply Route ("ASR") Mets conducting a counter IRAM patrol, *see* PX-158 at 51 n.88, when its lead vehicle was struck on the passenger side by a roadside bomb emplaced adjacent to a solar-powered light pole. PX-158 at 50-51. Immediately thereafter, the patrol came under small arms fire from both north and south of its position. *Id.* at 51. The attack severely wounded the vehicle's commander, bellwether Plaintiff Robert Canine, who would require below-the-knee amputations of both of his legs. *Id.*

Mr. Canine testified that at the time of the attack, he was a Staff Sergeant in the U.S. Army and an Infantry Squad Leader. Canine T4-107:1-7. On the day of the attack, his unit was on a routine patrol in Baghdad that consisted of four up-armored HMMWVs. *Id.* at 107:17-22. Mr. Canine testified that as the Truck Commander for the lead HMMWV, he was riding in the front passenger seat when the attack occurred. *Id.* at 107:23-24; 109:1-4. According to Mr. Canine, his HMMWV was equipped with "two EFP countermeasures . . . . It had a Duke electronic jammer . . . [t]hat blocks electronic signals from initiating EFPs or IEDs. [It] also had a Rhino early initiation device . . . to simulate engine heat so it will trigger an EFP early." *Id.* at 108:13-22.

Mr. Canine testified that his squad had concluded their patrol and was returning to base, traveling east on ASR Mets when his vehicle "triggered an EFP." *Id.* at 109:8-15. Mr. Canine partly based his belief that his vehicle was struck by an EFP upon a five-page report prepared by his unit, which the Court admitted into evidence. *Id.* at 110:4-111:4; PX-134 (Post-attack photographs and report).

Mr. Canine also testified that:

> [W]e were trained in Iraq that EFP was the number one threat. So we were trained by the signatures. And when I was initially hit, I has assumed it was an EFP. And then when my soldiers got on the ground, we had also thought it was an EFP. And then we had engineers come and do some blast site analysis, and they confirmed it was an EFP.

Canine T4-111:2-11.

According to Mr. Canine, after the EFP entered the vehicle, "it splattered and did a considerable amount of damage to the inside of the Humvee." *Id.* at 113:8-10. Mr. Canine testified that he believes that the EFP "was triggered early by the Rhino. So it entered early — instead of cutting me in half, it entered the vehicle early and hit me in the feet. And it also did a considerable amount of damage to the engine and transmission and disabled the Humvee." *Id.* at 113:17-21.

Mr. Canine testified that he "heard the initial blast which could have been the precursor to the main charge." *Id.* at 114:9-10. He further testified that he blinked, and when he opened his eyes he "saw golden sparks flying from right to left" and then lost consciousness. *Id.* at 114:10-12. When he regained consciousness, Mr. Canine was still seated in the HMMWV. *Id.* at 114:13-19. He could not see, but he recalled smelling and tasting the explosives in the air. *Id.* at 114:22-25.

Mr. Canine further testified that, upon opening his eyes, regaining his vision and conducting a self-assessment, he realized that his "right leg was pretty much blown off." *Id.* at 115:13-14. He tried to use the vehicle's radio to call for help, but it was destroyed. *Id.* He then realized that his weapon had been blown in half, that he was unable to use either of his feet and that his vehicle had "skidded to a halt on the curb" and his "door was pinned up against the curb," preventing him from exiting the vehicle and leaving him trapped. *Id.* at 115:14-22.

Eventually, two soldiers from the medevac truck dismounted and came to extract Mr. Canine from his HMMWV, but as they pulled him from the vehicle, his right leg began to rip off, causing him severe agony. *Id.* at 116:5-117:2. Mr. Canine was eventually removed from the

vehicle and evacuated to the 28th Combat Support Hospital in Balad, Iraq, where his right leg and left toes were amputated. *Id*. at 117:16-22. He testified that, by this point, he had lost so much blood that he almost died. *Id*. at 117:23-24.

Mr. Canine spent approximately 18 months at the Walter Reed Medical Center, *id.* at 118:14-16, where he was fitted with an external fixation device for his left leg, his leg wound was treated for multiple infections, and he suffered from phantom limb and severe nerve pain. *Id.* at 119:4-121:14. While at Walter Reed, Mr. Canine was advised that, due to the extensive damage caused by the EFP, his left leg would likely eventually also need to be amputated. *Id*. at 121:15-24. Mr. Canine opted to have the amputation performed at that time, rather than wait for his remaining leg to deteriorate further. *Id.* at 121:25-122:1.

Mr. Canine testified that he was ultimately fitted with leg prosthetics, which took him approximately two years to learn how to use consistently. *Id.* at 124:9-16. Mr. Canine described the process of learning to use his prosthetic legs as "painful" and "grueling." *Id.* at 123:12-15; 124:11-13. He testified that, at discharge, he was still suffering from nerve pain, depression, and sleep disorders. *Id.* at 125:17-126:1. Mr. Canine also testified that he suffers from PTSD, which at one point he self-treated by over-consuming alcohol. *Id.* at 126:5-20.

Mr. Canine testified that he can wear his prosthetic legs for approximately 12 hours per day, after which he "start[s] to have some . . . skin breakdown" that can lead to "hot spots where the residual limb contacts the socket and becomes extremely painful." *Id*. at 128:6-10. He also will experience pain in his hips, back and neck from overuse of his prosthetics. *Id.* at 128:10-12.

Mr. Barker opined that the May 17, 2009 attack that injured bellwether Plaintiff Robert Canine involved the use of an RF armed and PIR triggered EFP array, based upon his review of PX-133 (SIGACT Report; an IED Report; a CJTF-Troy Report; an Event Storyboard; and CEXC

Reports) and PX-134 (five-page report with photographs prepared by Mr. Canine's unit). Barker T3-63:6-21, 65:2-66:8; PX-158 at 50.

The SIGACT report categorizes the attack as one involving a "Directional IED," and notes that Mr. Canine's unit reported that "one of their vehicles got hit with an EFP and received S[mall] A[rms] F[ire] from the north." PX-133 at 24-25. The report also contains an assessment by the EOD team that "the [lead] vehicle was struck by multiple EFPs." *Id.* at 27. The Battalion S2 likewise assessed that the attack involved an EFP, and that the suspected spotter "most likely used an associates'[sic] home with line of sight to the incident, line of sight being required both for receiving payment from Iran, as well as triggering the incident, being able to determine the composition of the convoy, and triggering a possible PIR sensor." *Id.* at 28.

The IED report notes that the EOD "Team Leader [believes] that the vehicle was struck by multiple EFPs due to the damage [to] the vehicle." *Id.* at 18. The WIT comments within the report note that this route was patrolled "between 4-8 times each day." *Id.* at 19. Based upon this report, Mr. Barker opined that the frequency with which the soldiers were patrolling this route made the location a target of opportunity for the IRGC's local Special Group proxies. PX-158 at 52.

According to the WIT, "the copper slug [from an EFP] traveled into the center portion of the engine block and through a large portion of the armor ahead of the [SSG Canine's] legs, sending several large fragments into [SSG Canine]." PX-133 at 19. The WIT noted that the EFPs were angled upwards from ground level, "indicating an aiming point of the occupant level of an [up-armored] HMMWV or MRAP travelling westbound on RTE [Mets]." *Id.*

The WIT further noted that "portions of the copper slug and several secondary fragments" were recovered from the struck HMMWV. *Id.* The WIT conducted a "forensic site exploitation" of the blast crater left by the EFP, but "was unable to locate fragmentation of the device."

148

Accordingly, "[n]o method of initiation was recovered." *Id.* Regardless, the WIT concluded that the device was possibly "cell phone armed and PIR fired due to three previous EFP attacks within 3 miles and 25 days of this event…. It is likely [that] the initiation system was small and compact, and possibly placed directly in front of the EFP, which consumed all evidence." *Id.* at 20. The WIT also estimated that the EFPs were packed with approximately 10-15 lbs. of explosives. *Id.*

The WIT also recovered a piece of black cloth that was believed to have been tied around one of the light poles, likely used by the attackers as a way of timing the arming of the device as the convoy approached from the east. *Id.*; PX-158 at 53. Mr. Barker testified that "bomb makers will hire locals to scout an area where — for what we call a choke point, maybe a hard turn or something that narrows, where it's hard for us to defend ourselves. And so what they'll do is they'll mark it with something; in this case, a black cloth. . . . [S]omething so that the insurgent knows where to place the device." Barker T3-64:16-24.

CJTF-Troy assessed that the vehicle was struck by a single EFP due to the damage to the vehicle (and not multiple EFPs, as EOD initially assessed), and that the initiation system was likely a PIR trigger placed in front of the EFP "due to the lack of components found and the direct hit on the engine." PX-133 at 6.

The CJTF-Troy report contains a few largely redacted images. However, the accompanying text for these images includes language such as "[p]enetrated armor plate from right front side of truck," and "armor plate penetrated." *Id.* at 9-10. There is also an image of "[r]ecovered copper slugs," which was not redacted. *Id.* at 16. Based on these images and the accompanying text, Mr. Barker opined that it was likely that the attack on Mr. Canine's patrol involved the use of a copper-lined EFP array, remotely armed and PIR triggered. PX-158 at 54.

According to Mr. Barker's expert report and trial testimony, the CEXC reports produced by CENTCOM contain, *inter alia*, chemical analysis that was conducted on the fragmentation and copper samples recovered by the WIT from Mr. Canine's vehicle. *Id.* at 55; PX-133 at 35. According to the analysis, CEXC detected the presence of RDX- and TNT-based explosives, both of which are consistent with the use of HE explosives. PX-158 at 55; PX-133 at 35; Barker T3-64:4-10. Mr. Barker also testified regarding his review of the photographs included in the report prepared by Mr. Canine's unit. Specifically, Mr. Barker observed that "the warhead went into the engine bay [of Mr. Canine's HMMWV]. It also separated the armor from the firewall, allowing penetration into the cab[in]." Barker T3-65:4-6. Mr. Barker explained that the firewall is "the organic part of the vehicle that separates the engine from the crew compartment. It's just made of stamped sheet metal, much like in [a] civilian vehicle." *Id.* at 65:7-10.

According to Mr. Barker, "the extreme overpressure — it's the blast, the movement of the air as it passes through — it shears the bolts and pushes the armor out of the way, allowing steel and more copper to pass through the very thin sheet metal and then into [Mr. Canine]." *Id.* at 65:12-17. Mr. Barker observed that the "passenger side [of the cabin was] completely decimated" by the EFP strike. *Id.* at 65:21-25.

Mr. Barker concluded this attack involved "a manufactured, purposed-built EFP for defeating armor, copper liners. CEXC did a great job identifying the HE; but again, with the devastation of the vehicle, it had to be an EFP with HE. And it was RF armed and PIR initiated." *Id.* at 66:3-8.

Mr. Lutz reviewed the same evidence and concluded "that the May 17, 2009 attack that injured Staff Sergeant ("SSG") Robert Canine involved the use of an EFP of original Hezbollah and IRGC design that was likely supplied by the IRGC." PX-159 at 63. He further concluded that

"the weapon was likely assembled and emplaced by an IRGC-sponsored Special Group" *Id.* Elsewhere, Mr. Lutz concluded that "the attack that injured SSG Canine was part of the EFP campaign orchestrated by the IRGC and Hezbollah, that was conducted by one of the IRGC's Special Group proxies. The attack involved the use of a concealed, copper-lined EFP that was likely remotely armed and PIR triggered. The copper slug from the weapon penetrated the HMMWV's engine block and defeated the armor protecting SSG Canine's legs, which were severely wounded by the EFP's copper liner (ultimately forming into a slug) and associated fragmentation created by the penetration of the vehicle." *Id.* at 71. Mr. Lutz further concluded that an "IRGC-sponsored Special Group was likely involved in the assembly and emplacement of the EFP." *Id.*

Based upon the foregoing evidence, the *Karcher* court found that "Iran bears responsibility with its proxies for this EFP attack," 396 F. Supp. 3d at 45, because it was caused by "at least one EFP," *id.* at 44, and "was an initiative of IRGC and Hezbollah, as facilitated 'by one of the IRGC's Special Group proxies.'" *Id.* at 45 (quoting Lutz Rep. at 71).

### G.      The January 20, 2007 Attack on the Karbala PJCC

The January 20, 2007 raid and attack on the Provincial Joint Coordination Center ("PJCC") in Karbala claimed the lives of five American service members, including Private Johnathon Millican and Captain Brian Freeman, whose estates and family members are Plaintiffs, and injured more than a half dozen American service members, including bellwether Plaintiffs Billy Wallace, Johnny Washburn, Marvin Thornsberry, and Evan Kirby. PX-155 at 20-27. The PJCC was an Iraqi government facility situated near the center of Karbala, a city in central Iraq located approximately 60 miles southwest of Baghdad that is home to two shrines considered holy by Shi'a Muslims. PX-155 at 15. At the time of the attack, the PJCC was a mixed civilian and military compound that

served as the nexus of the local provincial governmental authority, housing Karbala's provincial Governor, Council and Police Directorate, and U.S. soldiers, U.S. military police, and their interpreters (referred to as the "Karbala Provincial Team"). *Id.* On the day of the attack, January 20, 2007, the Karbala Provincial Team was assisting the Karbala provincial government with security planning for the upcoming Shi'a religious observation of Ashura. Saddam Hussein's regime had banned Shi'a Muslims from celebrating Ashura, and, in the years that followed the 2003 invasion by Coalition Forces, the holiday was targeted by Sunni Muslim extremists seeking to create sectarian strife. PX-155 at 16; Pregent T5-190:24-191:17.

Mr. Pregent testified, based on his professional experience and the substantial evidentiary record, that the January 20, 2007 terrorist operation was conducted by an AAH strike team that was trained and directed by the IRGC-QF and Hezbollah. Pregent T5-233:5-9. These conclusions are consistent with the Court's findings in *Fritz*, 320 F. Supp. 3d at 71-73.

The assault on the PJCC began around 6 p.m. on January 20, 2007. *Id.* at 66. Between seven and nine American model SUVs approached from the south, driving up to the first of two gated checkpoints. PX-96 (Karbala AR 15-6 investigative report) at 4; PX-155 (Expert Report of Michael P. Pregent) at 17; Pregent T5-187:2-14. The attackers had outfitted themselves and their vehicles (predominantly black Chevrolet Suburban SUVs) to appear as though they were American soldiers or security contractors: the SUVs were rigged with false antennae on their front bumpers and carried placards directing others to stay back a hundred meters (indicia of American vehicles in Iraq), and the attackers spoke English, wore U.S. Army Combat Uniforms, and had helmets and weapons resembling those of U.S. soldiers. PX-96 at 4-5; PX-155 at 17; Pregent T5-187:2-188:10. Most of the vehicles then continued on to a second security checkpoint, located due north of the first checkpoint. PX-96 at 4-5; PX-155 at 17.

At both gates, the attackers pretended that they were Americans, and demanded—in English—that the Iraqi police turn over their weapons. PX-96 at 5. One vehicle stayed behind at each checkpoint. *Id*.; PX-155 at 17; PX-87 (Karbala Animation); Pregent T5-198:9-199:22. The passengers got out, one member of the AAH assault team held the Iraqi police at gunpoint at each checkpoint, and the remaining members of the AAH assault team fanned out to take positions from which they could fire on the PJCC building once the operation began. PX-96 at 4-5; PX-155 at 17-18. A third vehicle positioned itself between the two checkpoints. PX-96 at 5; PX-155 at 17. The remaining SUVs continued north toward the PJCC's main building and entered the parking lot. PX-96 at 4-5; PX-155 at 17. An unknown subset of the AAH assault team disembarked and immediately subdued the Iraqi police stationed around the gated entrance to the courtyard. PX-96 at 4-5; PX-155 at 17.

Five members of the AAH assault team then crossed through the gated entrance into the courtyard and approached the front door of the PJCC's main building. PX-96 at 5; PX-155 at 18. At this time, Freeman and First Lieutenant Jacob Fritz were in their room at the front of the building, *see* PX-96 at 4, while Specialist Johnathan Bryan Chism and Private First Class Shawn Falter occupied an armored HMMWV in the courtyard next to the building's entrance, *id*. at 5. Chism manned the machine gun mounted on top of the turret; Falter sat in the HMMWV's driver's seat. *Id.*; Pregent T5-196:7-11. The five members of the AAH assault team, who wore the uniforms of American troops and spoke English, greeted Chism and Falter and walked toward the PJCC as though they were arriving for a meeting. PX-96 at 5; PX-155 at 18-19. Falter exited the HMMWV and started to approach the SUVs near the front gate, presumably to determine the reason for their arrival. PX-96 at 5; PX-155 at 18-19; Pregent T5-201:2-3. About five seconds later, three more AAH assault team members entered the courtyard, greeted Chism and Falter, and followed the

initial group of five to the front entrance of the PJCC. PX-96 at 5; PX-155 at 19. Like the others, these AAH assault team members were dressed in American uniforms and greeted Chism and Falter in English. PX-96 at 5; PX-155 at 19.

Each of the last three insurgents to enter the courtyard had specific tactical roles, and they executed their assignments more or less simultaneously. PX-96 at 5. The last of the three walked past Falter, turned around, and shot him in the neck from behind. *Id.* and Ex. A (Autopsy Report); PX-155 at 19. The second climbed on the back of the HMMWV and shot Chism, who was facing the courtyard gate and "had no chance to react." PX-96 at 5; PX-155 at 19. Despite the seriousness of their injuries, neither Chism nor Falter was killed by these initial gunshot wounds. PX-96 at 5 and Ex. A; Pregent T5-202:5-10.

Seconds after the sound of gunfire erupted in the courtyard, "a well-coordinated and synchronized attack occurred in the building, in the back, and against the barracks area." PX-96 at 5; PX-87. The AAH assault team that was staged outside the building began to fire at the building, which had the effect of diverting the U.S. military personnel on the second floor of the PJCC to the roof of the building, where they responded to what they believed to be a small arms assault on the complex. PX-96 at 7-8; PX-155 at 24. At the same time, other members of the AAH assault team launched an attack on the PJCC command and control room, which was located next to the room where Fritz and Freeman were working. PX-96 at 6-7; PX-155 at 20; Pregent T5-202:15-203:4.

The command and control room housed five U.S. soldiers—the only soldiers other than Fritz and Freeman located on the first floor of the main PJCC building—as well as radios for communicating between the PJCC and Coalition Forces. PX-96 at 6; PX-155 at 20; Pregent T5-202:15-203:4. By attacking that room, the AAH assault team was able to aid its exfiltration by

delaying communications regarding the attack, and members of the AAH assault team were able to subdue the soldiers that "posed the largest threat," to the AAH assault team. PX-96 at 6. The fact that the assailants "knew the layout of the building ahead of time" evidences that they had inside information and that the attack was a highly sophisticated one. *Id.*

The U.S. soldiers working in the command and control room were able to prevent the attackers from taking control of their room, but the AAH assault team was able to direct gunfire and a grenade into the room. *Id.* at 6-7; Pregent T5-203:12-19, 209:12-17; PX-155 at 20-21; PX-87. Three of these five soldiers were injured, and one, Private First Class Millican, was killed. PX-96 at 6; PX-155 at 20-21; Pregent T5-203:12-19. PFC Millican thwarted the AAH assault team's effort to take the command and control room when he threw himself on the grenade. PX-96 at 6; PX-155 at 20-21; Pregent T5-203:12-19.

As the soldiers in the command and control room continued to fight back, they heard gunshots in the hallway and heard a grenade explode in or near Fritz and Freeman's room next door. PX-96 at 6-7; PX-155 at 22. During this period of time, the AAH assault team forced Fritz and Freeman from the officers' room and led them out of the building. PX-96 at 7; Pregent T5-209:6-7; PX-155 at 22-23; PX-87. While exiting the PJCC, the AAH assault team threw a grenade into the hallway near the two rooms. PX-96 at 7; PX-155 at 23. That grenade blast, along with increased gunfire, prevented the surviving soldiers in the command and control room from exiting the room. PX-96 at 7; PX-155 at 23. Both Fritz and Freeman were alive at this time, although it appears that Fritz was injured and bleeding. PX-96 at 7; PX-155 at 22-23. Significantly, the AAH assault team did not attack the soldiers on the second floor of the PJCC, providing further evidence that their mission was to abduct U.S. soldiers. PX-96 at 6. Upon returning to the courtyard, the AAH assault team destroyed the HMMWV that Chism and Falter had manned, as well as a second

155

(unmanned) HMMWV, *id.* at 7; PX-155 at 23; Pregent T5-208:10-13, and they used "smoke grenades" to obscure their exfiltration. PX-96 at 8.[53] They then handcuffed Freeman and Chism and put them in one SUV and handcuffed Fritz and Falter together and put them in a second SUV. *Id.* at 7, 10; PX-155 at 23. Up to this point, the entire attack had taken only between ten to fifteen minutes. PX-96 at 8-9; PX-155 at 24; *Fritz*, 320 F. Supp. 3d at 68.

The assailants fled, splitting up into at least two separate convoys. PX-96 at 10; Pregent T5-209:22-10:1; PX-155 at 25-27; PX-87. The AAH assault team with the hostages drove toward the city of Hillah in the general direction of Iran. PX-155 at 26. But instead of taking the road that directly connected Karbala with Hillah, they took a long detour southeast. *Id*. at 25; PX-87. Their route tracked a well-known "ratline," a path along which Iran smuggled weapons and ammunition into Iraq. Pregent T5-210:24-11:6; PX-155 at 25. Iraqis who were sympathetic to Iran controlled the checkpoints along the ratline and facilitated the passage of smuggled goods. PX-155 at 25. According to the Investigating Officer:

> [The convoy] followed the known ratlines through the Albu Alwan area where [AAH] could actually control the passage. In order to do that, they would have to coordinate with the OMS, the Office of the Martyr Sadr, and the JAM folks we spoke of earlier, Jaysh al-Mahdi….. The only way someone coming from outside of a province that would have known to take these routes is if they had already pre-coordinated those ratlines. And because they followed that, based on the reporting from checkpoint to checkpoint, we [could] see that they were basically being led through there facilitated by the local help support which is something the IRGC …is known for doing ….
>
> I briefed the Multi-National Corps Commander and my Commanding General as well, because it just showed that connection to Iran. There's no way anybody from an outside province would have known to take those roads unless they were being helped and facilitated, and that was an Iranian — that's how Iran got their weapons through there. No one else from the outside would have known to take those routes.

---

[53]     Daqduq's journal does not mention the use of smoke grenades, but it does reference barrels filled with fuel and "burning oil," *see* PX-103 at 6, which may be what created the obscuring smoke described by the witnesses in the Karbala AR 15-6.

*Id.*

Ultimately, however, this escape route failed. Approximately one hour after the AAH assault team exfiltrated the PJCC compound, members of the Iraqi Army stationed at a checkpoint in the town of Mahawil received word that an attack had occurred in Karbala and stopped the convoy carrying the hostages. PX-96 at 9 ("1930: Five of the enemy SUVs traveling at a high rate of speed passed through . . . Checkpoint 21J, "Karib," . . . north of Mahawil."); Pregent T5-211:12-25; PX-155 at 25-26. Earlier that day, three men had approached the Iraqi Army soldiers stationed at the checkpoint and told them that a convoy would be coming through and that they needed to let the convoy proceed. PX-96 at 2-3. In doing so, they provoked suspicion, asserting at times that those in the convoy were Americans and at other times saying that they were Israelis. PX-96, Ex. FF. Later, the three men came back to make sure that the Iraqi soldiers would facilitate the passage of the convoy, and, as the convoy approached, they yelled out to the guards not to fire on the approaching convoy. *Id.* The Iraqi soldiers figured out what was happening and, accordingly, detained the three men and pursued the convoy. *Id.*; PX-155 at 26; PX-96 at 2-3. It was later determined that one of the three men who had visited the checkpoint was a high-ranking official from a Shi'a-affiliated militia. PX-96 at 2-3.[54]

With the guard posts now on alert, the AAH assault team knew that its escape route was compromised. PX-155 at 26. As a result, they "took a back road, changed out of" the U.S. Army Combat Uniforms that they wore, "abandoned most of [their] equipment," and shot Fritz, Chism, Falter, and Freeman. PX-96 at 3; PX-155 at 26-27; PX-87; Pregent T5-216:7-217:5. By the time

---

[54]     The individuals were later identified as including one Iraqi Policemen and the number two ranking Office of the Martyr Sadr (OMS) official for the area. The latter individual identified himself to the soldiers as "in charge of my tribe's office of JAMs [Jaysh al-Mahdi]" and stated that he "belong[ed] to JAM." Members of JAM later came to the checkpoint and asked the soldiers to release the three detainees. PX-96 at 2-3 and Ex. FF.

the Iraqi Army arrived, only Freeman was still alive, and he died a short time later. PX-96 at 7; PX-155 at 26-27; Pregent T5-215:2-5.

Mr. Pregent testified that the attack on the Karbala PJCC was a seminal event during the Iraqi conflict that ultimately led Coalition Forces to re-evaluate their threat priorities: "[W]e knew we had a bigger problem than Al-Qaeda. We were now dealing with a level of sophistication from an enemy that we weren't fighting that was targeting us. And that ended up being Lebanese Hezbollah and IRGC-Qods Force." Pregent T5-215:8-11.

On March 20, 2007, Coalition Forces raided a house in the southern port city of Basra, Iraq. PX-106 at Bates No. 1149. The operation was intended to capture and detain Laith Khazali but resulted in the detention of seven men, including Qais Khazali and an Arab male who "claimed to be a deaf mute," *id.*, thus earning him at the time the moniker "Hamid the Mute" from his interrogators, PX-155 at 31. "Hamid" later confessed that he was, in fact, Hezbollah senior commander Ali Musa Daqduq. PX-106 at Bates No. 1149. *See also* PX-155 at 31.

As noted *supra* at 69-70, the British and American special operators also seized computers and documents during the raid, including a 22-page memorandum that "detailed the planning, preparation, approval process and conduct of the [Karbala] operation," as well as Daqduq's role in overseeing other Special Groups operations. PX-103; PX-155 at 31. According to MNF-I spokesman Brig. Gen. Kevin Bergner, the captured documents also showed that the IRGC-QF had gathered detailed information on "soldiers' activities, shift changes and defenses" at the PJCC "and this information was shared with the attackers." PX-155 at 31; PX-71 (MNF-I Report on Captured Special Groups in Iraq); Pregent T5-206:5-11.

According to U.S. military officials, both Daqduq and Qais Khazali admitted that senior leadership within the IRGC-QF knew of and helped plan the Karbala attack. PX-81 at Bates Nos.

01189-93, 01257-61 and 01343-47 (6th, 18th, and 34th Tactical Interrogation Reports of Qais Khazali). As noted in an MNF-I memorandum dated May 31, 2007:

> [Daqduq] has knowledge of Iranian surrogate networks operating in Iraq and has admitted to meeting Iranian Revolutionary Guard Corps-Quds Force (IRGC-QF) personalities on multiple occasions including Hajj Yusif, who is assessed to be Abdul Reza Shahlai, the Department 9000 (Lethal Aid) Deputy Commander.

PX-56. General Bergner also stated that the IRGC-QF and Hezbollah were jointly operating camps near Tehran in which they trained Iraqi fighters before sending them back to Iraq to conduct attacks. PX-155 at 32. According to General Bergner, Daqduq was the liaison between the IRGC-QF, Hezbollah, and AAH, and Daqduq confirmed that AAH operatives carried out the Karbala attack. *Id.* Daqduq also told his interrogators that the Karbala attackers "could not have conducted this complex operation without the support and direction of the [IRGC-QF]." PX-155 at 32.

As noted *supra* at 69-70, in April 2007, General Petraeus gave a briefing in which he described the "22-page memorandum on a computer that detailed the planning, preparation, approval process and conduct of the operation that resulted in five of our soldiers being killed in Karbala" and stated that the Khazali network (AAH) received Iranian financing that was "taking place through the Quds force of the Iranian Republican Guards Corps." PX-155 at 32-33; PX-103.

Coalition Forces also learned that the AAH assault team that conducted the raid was led by Azhar al-Dulaimi, an AAH commander who was killed by Coalition Forces on May 19, 2007. PX-155 at 33. Subsequent forensic investigations of the Karbala assailants' SUVs resulted in the recovery of fingerprints, some of which were identified as belonging to Dulaimi. *Id.* Indeed, AAH's official website credited Dulaimi with the Karbala attack:

> He was especially known for his sophisticated operations, like setting up ambushes to kidnap enemies and attacking their sites in order to kill or kidnap them. He achieved unrivalled successes. One of the sophisticated operations that he participated in took place in the provincial council of Karbala. Resistance fighters from Asa'ib Ahl al-Haq entered the provincial council, as they passed through U.S.

checkpoints while driving U.S. GMC vehicles, dressed as U.S. officers, carrying American weapons and identity cards and speaking in a perfect American accent. The goal of the operation was to kidnap U.S. soldiers and officers. They had indeed successfully kidnapped a group of them [and headed with them] towards Hillah, where they were surrounded and had to kill the Americans.

PX-118 (AAH Website Claim of Responsibility).

The documents collected and the statements made by Daqduq and Qais Khazali all corroborated the evidence that AAH operatives were responsible for the Karbala attack under the direction of the IRGC-QF and Hezbollah, which planned, funded, and directed the attack. Pregent T5-179:5-21, 180:19-81:6, 222:18-23:3. *See also* PX-81 at Bates Nos. 1189-93, 1257-61, 1343-47. For example, a May 22, 2009 memorandum summarizing the interrogations of Ali Musa Daqduq noted:

Detainee is a Lebanese Hizballah Commander and was an advisor to AAH leadership. Detainee was involved in the planning of the Karbala PJCC attack in January 2007 and the reconnaissance of various CF bases and ports. Detainee took his direction from IRGC-QF Officer Hajji Yusif [alias of General Shahlai] and LH [Lebanese Hezbollah] Unit 2800 Commander Yusif Hashim.

PX-107 at Bates No. 000328 (May 22, 2009 Memorandum on Ali Musa Daqduq).

An August 13, 2007 Memorandum recounted the data retrieved from the Basra location of the March raid:

Of note, photographs were also found of items from the wallet of ███ a U.S. soldier killed in a complex attack on the Provincial Joint Coordination Cell in Karbala on 20 Jan 07—including his SSA card, credit cards, identification cards, and family photographs. Documents seized include: spreadsheets detailing weapons and targets; step-by-step instructions for operations/attacks; and numerous letters equivalent to after-action reports detailing attacks.

PX-57 at Bates No. 000324 (Department of Defense Memorandum dated August 13, 2007).

An October 5, 2008 Memorandum further noted:

[Daqduq] admitted to being Lebanese Hezbollah and admitted to an active role in Iraq as an agent of Iranian state-sponsored terrorism. [Daqduq] admitted that Abdul Reza Shahlai, Iranian Revolutionary Guard Corps - Quds Force (IRGC-QF)

> Department 9000 (Lethal Aid) Deputy Chief facilitated [Daqduq]'s illegal entry into Iraq on four separate occasions. IRGC-QF is one of the primary agents of Iranian state sponsored terrorism. [Daqduq] admitted that his role was to arrange for training of Shi'a extremist groups, facilitating training and weapons procurement for Special Groups. Special Groups have conducted numerous AIF and ACF attacks throughout Iraq. [Daqduq] admitted to a significant operational planning role in the abduction and murder of 5 U.S. Service Members.

PX-107 at Bates No. 000330.

On September 16, 2008, the U.S. Department of the Treasury designated several individuals under Executive Order 13438 for fueling violence in Iraq. PX-9. Among them was General Abdul Reza Shahlai—a deputy commander in the IRGC-QF who was designated for, among other things, having "planned the January 20, 2007 attack by JAM Special Groups against U.S. soldiers stationed at the Provincial Joint Coordination Center in Karbala, Iraq. Five U.S. soldiers were killed and three were wounded during the attack." *Id.* at 1.

On November 19, 2012, the U.S. Department of the Treasury designated Ali Musa Daqduq an SDGT:

> Daqduq is a senior Hizballah commander responsible for numerous attacks against Coalition Forces in Iraq, including planning an attack on the Karbala Joint Provincial Coordination Center (JPCC) on January 20, 2007, which resulted in the deaths of five U.S. soldiers.
>
> On March 20, 2007, Coalition Forces in southern Iraq captured Daqduq, who falsely claimed to be a deaf mute at the time and produced a number of false identity cards using a variety of aliases. From January 2009 until December 2011, U.S. military forces held Daqduq in Iraq under the terms of the 2008 "Agreement Between the United States of America and the Republic of Iraq on the Withdrawal of United States Forces from Iraq and the Organization of Their Activities during Their Temporary Presence in Iraq" (the Security Agreement).

PX-102.

Based upon the foregoing evidence, the *Karcher* court "attributed this attack to Iran based on numerous grounds," 2019 WL 4305482, at *2, adopting Mr. Pregent's conclusion "'that Iran's IRGC and Hezbollah planned and orchestrated the January 20, 2007 attack on the Karbala

Provincial Joint Coordination Center in Iraq, which was carried out at their direction by AAH,'" which itself "'was created by the IRGC and trained by Hezbollah.'" *Karcher*, 396 F. Supp. 3d at 52 (quoting Pregent Rep. at 7, 37).

## IV.   THE COURT SHOULD TAKE JUDICIAL NOTICE OF FACTUAL FINDINGS IN *KARCHER*

In addition to making its own findings, this Court may judicially notice findings in *Karcher*. As stated above, the *Karcher* court, in the course of a three-day trial, heard testimony from many preeminent expert witnesses (and admitted their expert reports) and reviewed considerable documentary evidence, including many dozens of exhibits, and concluded that Iran is liable for the bellwether attacks. This Court may take judicial notice of the *Karcher* decisions under Federal Rule of Evidence 201, which provides that a court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). "Because of the multiplicity of FSIA-related litigation in this jurisdiction, Courts in this District have thus frequently taken judicial notice of earlier, related proceedings." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010).

As relevant here, "when a court has found facts relevant to a FSIA case involving material support to terrorist groups, courts in subsequent, related cases may 'rely upon the evidence presented in earlier litigation … without necessitating the formality of having that evidence reproduced.'" *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31 (D.D.C. 2012) (quoting *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011)), *vac'd on other grounds*, No. 10-cv-1689 (RCL), 2019 WL 8060796 (D.D.C. Sept. 11, 2019). *See also Brewer v. Islamic*

*Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009) ("[r]elying on the pleadings and the …

findings of other judges in this jurisdiction").

While evidence need not be "reproduced," "taking *notice* of another court's finding of fact

does not necessarily denote *adoption* or *finding* of that fact." *Harrison*, 882 F. Supp. 2d at 31

(emphasis in original). Instead, "courts in subsequent related cases [may] rely upon the evidence

presented in earlier litigation," but must still "reach their own, independent findings of fact in the

cases before them." *Rimkus*, 750 F. Supp. 2d at 172. Here, Plaintiffs have provided the expert

reports and accompanying exhibits filed in *Karcher* and relied upon by Judge Kollar-Kotelly to

support this Court's judicial notice of the *Karcher* findings described above.

Specifically, Plaintiffs request that this Court take judicial notice of the following *Karcher*

findings detailed above:

- Iran formed the IRGC as a paramilitary structure to "protect[] the revolution," generally; 396 F. Supp. 3d at 22 (citing Levitt T1-28:3-8).

- The IRGC-QF is an IRGC directorate "responsible for its international operations, including training Muslim groups to support the revolution through insurgency and terrorism." *Id.*, at 22.

- Iran long sought to develop its influence in Iraq's Shi'a community and political groups to undermine Saddam Hussein's regime. *Id.*, at 22 (citing McIntyre Rep. at 14; Levitt Rep. at 16).

- Iran also exerted influence in Lebanon, shaping Hezbollah into a terrorist group and Iranian proxy, which in turned attacked Western targets at Iran's behest. *Id.* at 23.

- Hezbollah developed EFPs as an anti-armor weapon during its conflicts with Israel. *Id.* at 27.

- Iran employed Hezbollah's expertise to use EFPs in Iraq, beginning in 2004. *Id.* at 28.

- The IRGC-QF and Hezbollah trained leaders from their Iraqi Shi'a proxy groups, including training critical to using sophisticated EFPs against armored vehicles. *Id.* at 29.

- The EFP's effectiveness against armor "requires precision craftsmanship," beyond the capabilities of the proxies themselves. *Id.* at 26, 29.

- The IRGC-QF and Hezbollah trained their Iraqi proxies in the effective use of EFPs, which "called for a further layer of technical know-how combined with substantial strategic planning," including "[i]dentifying precisely the right directional focus, distance from the target, and timing of the PIR-enabled weapon…." *Id.* at 27. Training taught EFP emplacers to camouflage EFPs and evolve tactics "in step with the U.S. military's countermeasures …." *Id.*

- "[T]he IRGC-QF spearheaded a closely coordinated campaign to equip the Shi'a militia for proxy warfare" and that the "campaign is well attested to in U.S. Government documents." *Id.* at 24.

- Iran supported Shi'a political groups in Iraq and their armed wings, and that support facilitated militia infiltration of Iraqi police and security forces. *Id.* at 23.

- After JAM's tremendous defeat in the 2004 battle of Najaf, JAM Special Groups "operated with some autonomy from Mr. al-Sadr and 'received their training, weapons and operational direction directly from Hezbollah and the IRGC-QF,'" receiving "an estimated $750,000 to $3 million per month by August 2007" from the IRGC-QF. *Id.* at 24.

- However, al-Sadr's own militia, the Promised Day Brigades, was also "supported by the IRGC-QF and Hezbollah, 'in keeping with the IRGC's long-time policy of investing in all Shi'a factions.' And it was responsible for its own string of attacks on U.S. and Coalition forces." *Id.* at 25.

- AAH "'operated as Iran's direct terror proxy targeting U.S. personnel at the direction of Hezbollah and the IRGC-QF' from 2006 through 2011." *Id.* at 25.

- "Iran directed the formation of still another militia group—Kata'ib Hezbollah ('KH' or 'Hezbollah Brigades')—in 2007." *Id.* (citing Oates Rep. at 33; Oates T1-123:24-25 (calling KH a "whole-cloth creation of the IRGC")).

- "Iranian arms, funding, and operatives flowed into Iraq through the Sheibani Network and other smuggling operations, while some Iraqi allies made the reverse trip to Iran for training." *Id.* at 23.

- Iran is responsible for the six bellwether attacks committed using EFPs. In each of these attacks, the victims' vehicle was hit with a sophisticated EFP of Hezbollah and IRGC design. In each of the attacks, the evidence showed the EFPs were emplaced by the IRGC's and Hezbollah's Iraqi terror cells, operating under the IRGC's direction. *Id.* at 33 (May 3, 2005 attack), 35 (October 22, 2006 attack), 37-38 (March 17, 2008 attack), 40 (March 23, 2008 attack), 41-42 (May 9, 2008 attack), and 45 (May 17, 2009 attack).

- Iran is responsible for the seventh bellwether attack, the January 20, 2007, raid and attack on the Karbala PJCC, which the IRGC and Hezbollah "orchestrated" and was carried out by AAH, a proxy "created by the IRGC and trained by Hezbollah." *Id.* at 52; *Karcher*, 2019 WL 4305482, at *2.

## V.   CONCLUSIONS OF LAW: JURISDICTION

### A.   This Court Has Subject Matter Jurisdiction

United States district courts have original jurisdiction over personal injury claims against a foreign state where an exception to that state's sovereign immunity applies:

> The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

28 U.S.C. § 1330(a).

All of section 1330(a)'s requirements are met in this case. First, this is a nonjury civil action. Second, this suit is against Defendants as legal persons, not against property; therefore, Plaintiffs seek relief *in personam. Cf. Gang Luan v. United States*, 722 F.3d 388, 399 n.15 (D.C. Cir. 2013) ("*In personam* jurisdiction is jurisdiction over the defendant. *In rem* jurisdiction is jurisdiction over the property."). Third, this suit is against a "foreign state" that is not entitled to immunity under the state-sponsored terrorism exception to sovereign immunity set forth in 28 U.S.C. § 1605A. For the purposes of the FSIA, a "foreign state … includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state …." 28 U.S.C. § 1603(a). Subsection § 1603(b) of the FSIA defines an "agency or instrumentality of a foreign state" as any entity:

> (1) which is a separate legal person, corporate or otherwise, and
>
> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

    (3) which is neither a citizen of a State of the United States as defined in section
        1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b).

Each Defendant is an "agency or instrumentality" of Iran as defined by 28 U.S.C. § 1603(b) because each is a separate legal corporate person, wholly owned by Iran, and not a citizen of the United States or created under the laws of a third country. Regarding the first requirement, "[t]he D.C. Circuit has adopted a 'categorical approach' to determining the legal status of foreign government-related entities for purposes of the FSIA's jurisdiction and service of process provisions: 'if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state.'" *Shoham v. Islamic Republic of Iran*, No. 12-cv-508 (RCL), 2017 WL 2399454, at *10 (D.D.C. June 1, 2017) (citing *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003)). CBI and Bank Melli are instrumentalities because "[t]he business of banking is plainly commercial in nature," *id.*, as is the business of NIOC, *see Havlish v. Usama Bin Laden (In re Terrorist Attacks on Sept. 11, 2001)*, No. 03 MDL 1570 (GBD), 2011 WL 13244047, at *7 (S.D.N.Y. Dec. 22, 2011) (finding that NIOC "has a legal corporate existence outside the government and core functions which are commercial, not governmental, in nature").

Regarding the second and third requirements, as shown in the summary of allegations above, each Defendant was created as a state-owned entity prior to the events alleged in the Second Amended Complaint and remain state-owned to this day. As Dr. Clawson explained, each was "owned by the government of Iran and is an agency or instrumentality of the Iranian government." Clawson Decl., ¶ 128 (CBI), ¶ 129 (Bank Melli), ¶ 130 (NIOC). Courts have also found each to be owned by, and agencies or instrumentalities of, Iran in cases in which they have appeared— meaning they are collaterally estopped from arguing otherwise, had they appeared here. *See*

*Weinstein v. Islamic Republic of Iran*, 175 F. Supp. 2d 13, 18-19 (D.D.C. 2001) (distinguishing

default cases from contested cases in terms of collateral estoppel). Public records, and Defendants'

own statements agree. These cases, records and statements include the following:

- CBI "is wholly owned by the Iranian government." *Peterson v. Islamic Republic of Iran*, 758 F.3d 185, 188 (2d Cir. 2014), *aff'd sub nom. Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016). In *Peterson*, in which CBI appeared, the court found that a bank "instrumentality of Iran" was not protected by the Takings Clause. *Id.* at 192 (citing *Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 54 (2d Cir. 2010)).

- Bank Melli Iran is "state-owned."[55] In *Bennett v. Islamic Republic of Iran*, 825 F.3d 949, 954, 957 (9th Cir. 2016), in which Bank Melli appeared, the court found that "Bank Melli is an instrumentality of Iran…. It is undisputed that Bank Melli qualifies as an instrumentality of Iran under the FSIA." *See also Estate of Heiser v. Bank of Tokyo Mitsubishi UFJ, New York Branch*, 919 F. Supp. 2d 411, 418-19 (S.D.N.Y. 2013) ("[T]he Central Bank of Iran expressly recognizes Bank Melli Iran as a 'commercial government-owned bank.' Bank Melli states in a financial report available on its website that '[t]he capital is completely owned by the Government of the Islamic Republic of Iran.' Based on the express statements of Bank Melli, the petitioners have established that Bank Melli is an 'instrumentality' of the government of Iran. 28 U.S.C. § 1603(b).") (citations omitted).

- NIOC is owned by Iran through its Ministry of Petroleum and has operated as an "agent or affiliate of the [IRGC]." *See* PX-206. *See also In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *8 ("[T]he National Iranian Oil Company is owned, controlled, and managed by the Government of Iran."). In *National Iranian Oil Co. v. Ashland Oil, Inc.*, 817 F.2d 326, 333 (5th Cir. 1987), in which NIOC appeared, the court found that NIOC is "an instrumentality of the Islamic Republic of Iran." According to its website, "NIOC, in accordance with Article 44 of the Constitution, gives authority to different sectors, while supervising oil industry activities." *See* Clawson Decl., ¶ 115.

## B.    Defendants Are Not Entitled to Sovereign Immunity

The terrorism exception to foreign sovereign immunity establishes that a foreign state has

no immunity "in any case … [1] in which money damages are sought [2] against a foreign state

---

[55]     *See* PX-5 (U.S. Dep't of the Treasury, "Fact Sheet: Designation of Iranian Entities and Individuals for Proliferation Activities and Support for Terrorism" *available at* https://www.treasury.gov/press-center/press-releases/Pages/hp644.aspx (describing Bank Melli Iran as state-owned)).

[3] for personal injury or death that was [4] caused by [5] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or [6] the provision of material support or resources for such an act [7] if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1) (numbering added). Each of these requirements is met.

### 1.     Elements One Through Four

*First*, the Second Amended Complaint identifies and seeks only monetary remedies for Plaintiffs' injuries. *Second*, as established above, Defendants qualify as a foreign state as defined by the statute. *Third*, Plaintiffs' claims are for personal injury or death. Under section 1605A, such injury or death need not be suffered directly by the claimant; instead, it "must merely be the bases of a claim for which money damages are sought." *Valore*, 700 F. Supp. 2d at 66. Jurisdiction is also not restricted to physical injury suffered directly by each claimant. *Id.* Thus, Plaintiffs' various claims for the physical and emotional injuries and economic losses constitute the type of claims sufficient for jurisdiction. *Id.*

*Fourth*, "jurisdictional causation" requires showing that the "material support or resources were the 'proximate cause' of Plaintiffs' personal injuries or deaths." *Karcher*, 396 F. Supp. 3d at 54 (quoting *Owens*, 864 F.3d at 794). Because "evidence sufficient to establish jurisdictional causation will almost always establish a theory of 'personal injury' necessary to prevail under § 1605 A(c)," "most courts conduct the analysis together," *Allan v. Islamic Republic of Iran*, No. 17-cv-338 (RJL), 2019 WL 2185037, at *6 (D.D.C. May 21, 2019), and Plaintiffs provide the supporting evidence in the liability section *infra*.

### 2.      Fifth Element: Terrorist Acts

*Fifth*, each Plaintiff were injured as a result of a successful or attempted extrajudicial killing, kidnapping, or torture.

#### *Extrajudicial Killing*

The term "extrajudicial killing" incorporates by reference (*see* 28 U.S.C. § 1605A(h)(7)) the definition set forth in the Torture Victims Protection Act of 1991 ("TVPA"), 28 U.S.C. § 1350 note. That definition proves that an "extrajudicial killing" is: [1] "a deliberated killing [2] not authorized by a previous judgment pronounced by a regularly constituted court [3] affording all the judicial guarantees which are recognized as indispensable by civilized peoples" and [4] that, "under international law," is not "lawfully carried out under the authority of a foreign nation." 28 U.S.C. § 1350 note. As the D.C. Circuit Court of Appeals summarized, an extrajudicial killing is "(1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 770. *See also Han Kim,* 774 F.3d at 1050 ("With respect to extrajudicial killing, the Kims need demonstrate only that the DPRK killed the Reverend without due process.").

It also includes *attempted* extrajudicial killings, and thus "material support for an incomplete act of extrajudicial killing falls within the scope of Section 1605A(a)(1)." *Karcher*, 396 F. Supp. 3d at 57. *See also id.* (agreeing with "several sister courts [that] have found that injuries resulting from 'deliberated' attempts to kill fall within the scope of Section 1605A(a)(1)" and citing cases); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017) (holding that § 1605A "allows plaintiffs to assert liability for a defendant's attempted extrajudicial killing, even if no one died as a result of that attempt"). Moreover, where a killing has occurred, "[i]t is not necessary . . . for one of the plaintiffs [themselves] to have died in the attack in order for the

169

state-sponsor-of-terrorism exception to apply." *Id.* (quoting *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017)).

Naturally, deaths resulting from terrorist attacks by definition qualify as extrajudicial killings and, as the Court in *Karcher* held, so do EFP strikes, specifically. 396 F. Supp. 3d at 56 ("By virtue of this deadly weapon's design, its delivery to Shi'a militia proxies, and its effective deployment against U.S. military vehicles, the Court finds that the intended extrajudicial killings were deliberate."). As explained at length above, EFPs are designed to kill. *See supra* at 54 ("That's all it takes . . . . And everybody's dead." (quoting Barker T3-32:5-7)). Likewise, Iran's goal, and the goal of its proxies and agents, was to kill U.S. service members. *See supra* at 72 ("The [Sheibani] network's first objective is to fight U.S. forces, attacking convoys and killing soldiers." (quoting PX-8)). Finally, the Attacks were certainly not ordered by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples, and the victims were not accorded due process in any sense in these Attacks.

### *Hostage Taking*

The FSIA incorporates the definition of hostage taking from Article 1 of the International Convention Against the Taking of Hostages. *See* 28 U.S.C. § 1605A(h)(2). As the *Karcher* court explained, under that definition, hostage taking occurs when one "'seizes or detains and threatens to kill, to injure or to continue to detain another person … in order to compel a third party,' for example, a state, 'to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage.'" 396 F. Supp. 3d at 56 (quoting International Convention Against the Taking of Hostages, art. 1, ¶ 1, Dec. 17, 1979, 1316 U.N.T.S. 205). *See also Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 16 (D.C. Cir. 2015).

The *Karcher* court found that the Karbala bellwether attack qualified as a hostage taking because it "was intended to capture U.S. servicemembers who could be exchanged for Iranian detainees." 396 F. Supp. 3d at 57. Moreover, "[t]hat the attack did not result in the hostage exchange is irrelevant for these purposes, as is the fact that Mr. Freeman and the other hostages were not detained for long before they were killed or fatally injured." *Id.* at 57. Another court came to the same conclusion regarding the Karbala attack. *See Fritz*, 320 F. Supp. 3d at 78 ("The Court concludes that AAH committed acts of 'hostage taking' when it seized and (briefly) detained Fritz, Chism, and Falter.").

### *Torture*

The FSIA incorporates the definition of torture from the TVPA. *See* 28 U.S.C. § 1605A(h)(7). Thus, torture is defined as: "[1] any act, [2] directed against an individual in the offender's custody or physical control, [3] by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, [4] is intentionally inflicted on that individual [5] for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind." Torture Victim Protection Act of 1991 (set forth as a note to 28 U.S.C. § 1350). One Plaintiff's decedent in a non-bellwether attack, Steven Vincent, was kidnapped, then beaten, before being killed—treatment which qualifies as torture under the TVPA.

### 3.        Sixth and Seventh Elements

*Sixth*, Iran's use of the Defendants to transfer billions of U.S. dollar-denominated assets to the IRGC and Hezbollah, described above and summarized again below, constitutes "material

support" for "such acts." The FSIA defines "material support or resources," 28 U.S.C. § 1605A(h)(3), by incorporating by reference 18 U.S.C. § 2339A, which states:

> [T]he term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1). Material support thus includes "financial services," as well as "currency or monetary instruments," which Defendants provided the IRGC and Hezbollah. *See, e.g.*, *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1130 (D.C. Cir. 2004) (holding that providing "financial assistance" to a terrorist group meets the FSIA's jurisdictional requirements).

Furthermore, liability for the "provision of material support and resources" under the FSIA applies to foreign states and their agencies and instrumentalities alike. *See, e.g., In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *8, 9, 39 (finding defendants NIOC and CBI liable under 28 U.S.C. § 1605A for having "provided several kinds of material support to al Qaeda," detailing "[a] large cash flow of money was funneled to terrorist organizations through the NIOC" and how "the Central Bank of Iran facilitates the transfer of money to terrorist groups.").

*Seventh*, the material support Defendants provided for the acts described above was engaged in by their officials, employees, and/or agents while acting within the scope of that office, employment, or agency. Of course, "corporations can act only through agents and employees." *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 225 (3d Cir. 2007) (citation omitted). *See also Tavoulareas v. Piro*, 759 F.2d 90, 104 n.13 (D.C. Cir. 1985), *vac'd other grounds,* 763 F.2d 1472 (D.C. Cir. 1985), and 817 F.2d 762 (D.C. Cir. 1987). Moreover, as described above,

Defendants' provision of material support was part of their *official* policies, not the act of some rogue employees.

### 4.        Additional Jurisdictional Requirements

Section 1605A conditions subject matter jurisdiction on fulfilling three additional requirements: "The court shall hear a claim under this section if" (1) "the foreign state was designated as a state sponsor of terrorism at the time the" terrorist attacks at issue occurred and "remains so designated when the claim is filed," (2) "the claimant or the victim was … a national of the United States, a member of the armed forces," or a U.S. government employee or contractor at the time of the attack, and (3) if the attack occurred in the foreign state against whom the claim is brought, the foreign state was afforded the opportunity to arbitrate the claim. 28 U.S.C. § 1605A(a)(2)(A). Each of these requirements is met here. First, Iran was designated a State Sponsor of Terrorism in 1984 and has been so designated since that time. *See* 22 C.F.R. § 126.1(d) (2006); 31 C.F.R. § 596.201 (2006); Determination Pursuant to Section 6(i) of the Export Administration Act of 1979-Iran, 49 Fed. Reg. 2836-02 (Jan. 23, 1984). *See also Karcher*, 396 F. Supp. 3d at 54. Second, all of the victims and claimants at issue here—that is, Plaintiffs to whom the *Karcher* court found Iran was liable—were United States nationals and/or members of the U.S. armed forces at the time of the relevant attack.[56] Third, the attacks did not occur in Iran, so Iran is not entitled to the opportunity to arbitrate the dispute. Therefore, this Court has subject matter

---

[56]        Plaintiffs will present evidence as to the citizenship of the victims of the remaining Attacks at the appropriate stage of this and related litigations. A small number of *claimants* (rather than victims) are not U.S. nationals, but they are immediate family members of victims who are. The terrorism exception to sovereign immunity still applies to their claims. *See Owens*, 864 F.3d at 807 ("In sum, by its plain text, the FSIA terrorism exception grants a court jurisdiction to hear a claim brought by a third-party claimant [Kenyan or Tanzanian family members] who is not the legal representative of a victim physically injured by a terrorist attack."). The federal cause of action in § 1605A(c) does not, however, so they bring their claims under other laws, as discussed further *infra* in section VI.D (Federal Cause of Action).

jurisdiction over this matter. *See, e.g.*, *Holland v. Islamic Republic of Iran*, 496 F. Supp. 2d 1, 13 (D.D.C. 2005) (finding subject matter jurisdiction over claims relating to murders of U.S. servicemen in attack committed by Hezbollah and supported by Iran).

## C.     This Court Has Personal Jurisdiction

Plaintiffs have the "burden of proving personal jurisdiction," which they can do "with a *prima facie* showing." *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005) (quoting *Edmond v. United States Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991)). Plaintiffs "are not limited to evidence that meets the standards of admissibility required by the district court. Rather, they may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Id.* To meet that burden, Plaintiffs must demonstrate adequate service, a statutory basis for personal jurisdiction, and a constitutionally sufficient relationship between defendants and the forum. *Id.* at 8.

### 1.     Statutory Basis for Personal Jurisdiction Over Defendants.

Under the FSIA, this Court has personal jurisdiction "over a foreign state … as to every claim for relief over which the district courts have jurisdiction under [§ 1330(a)] where service has been made under section 1608 of this title." 28 U.S.C. § 1330(b). *See also Brewer*, 664 F. Supp. 2d at 50 ("a court can obtain personal jurisdiction over a defendant if the plaintiff properly serves the defendant in accordance with 28 U.S.C. § 1608"). As shown below, Plaintiffs have served each Defendant in accordance with 28 U.S.C. § 1608.

### 2.     Plaintiffs Have Served Each Party.

Service of process upon agencies and instrumentalities of foreign states is governed by 28 U.S.C. § 1608(b), which provides that:

(b)     Service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:

(1)     by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or

(2)     if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or

(3)     if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—

(A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or

(B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or

(C) as directed by order of the court consistent with the law of the place where service is to be made.

No special arrangement exists between Plaintiffs and Defendants, and Defendants have no officer or agent authorized to receive service of process in the United States. No applicable international convention exists between the United States and Iranian parties. *See Brewer*, 664 F. Supp. 2d at 51 (finding that "[t]he first two methods of service are inapplicable to" cases against Iran). Thus, pursuant to § 1608(b)(3)(B), the Clerk of this Court addressed and dispatched copies of the Summons and Second Amended Complaint in this matter (both in English and translated into Farsi) via DHL Express to CBI (Waybill No. 2826447702), Bank Melli Iran (Waybill No. 7695887581) and NIOC (Waybill No. 7695917272). *See* ECF No. 21. Representatives of Bank Melli Iran and CBI signed for their packages on May 8, 2017, ECF Nos. 29 and 30, respectively, and a representative of NIOC signed for its package on May 6, 2017. ECF No. 28. Thus, service

has been made on all Defendants under the FSIA. None of the Defendants responded, and the Clerk entered default on them on July 11, 2017. ECF Nos. 31-33.

### 3. Constitutional Basis for Personal Jurisdiction Over All Defendants

Foreign states are not entitled to due process protections in determining personal jurisdiction—and neither are their agencies and instrumentalities if they are controlled by the foreign state.[57] "Whenever a foreign sovereign controls an instrumentality to such a degree that a principal-agent relationship arises between them, the instrumentality receives the same due process protection as the sovereign: none." *GSS Grp. Ltd v. Nat'l Port Auth.*, 680 F.3d 805, 815 (D.C. Cir. 2012). *See also TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 301 (D.C. Cir. 2005) ("If the State of Ukraine exerted sufficient control over the SPF to make it an agent of the State, then there is no reason to extend to the SPF a constitutional right that is denied to the sovereign itself."). Where the constitutional right is denied, "no further minimum contacts analysis is required, and the Court may exercise personal jurisdiction over defendant … based solely on service under 28 U.S.C. § 1330." *Shoham*, 2017 WL 2399454, at *15.

All three Defendants were (and are) controlled by Iran and were "acting at the behest of and under the orders of the government of Iran" when they provided material support to the IRGC and Hezbollah. Clawson Decl., ¶ 128 (CBI), ¶ 129 (Bank Melli), ¶ 130 (NIOC). Although each had significant commercial functions, each also had roles in setting government policy, and their activities are governed by the constitution and legislative acts of Iran. *See TMR*, 411 F.3d at 301-02 (describing features of defendant that make it an agent of the foreign state). *See* Clawson Decl., ¶ 58 (CBI's policy roles); ¶ 97 (Bank Melli's role "central to the government's banking needs"); ¶ 115 (NIOC's constitutional authorities and "state policy functions"). The *Shoham* court came to

---

[57]   For a federal claim, it is the United States as a whole that is the appropriate forum for measuring defendant's contacts. *Mwani*, 417 F.3d at 13.

the same conclusion regarding Bank Saderat, a state-controlled commercial Iranian bank similar

to Defendant Bank Melli:

> Here, Bank Saderat was nationalized by the Iranian government in 1979 and has operated as a state-run bank since. It is funded, regulated by, and primarily owned by Iran or persons and entities under control of the Iranian government. Further, it is used by the Iranian government to further state policies of supporting and funding terrorist organizations around the world. The Court therefore finds that Iran exercises sufficient control over Bank Saderat to make it an agent of the state, barely distinguishable from an executive department of the government of Iran. As a result, no further minimum contacts analysis is required, and the Court may exercise personal jurisdiction over defendant Bank Saderat based solely on service under 28 U.S.C. § 1330.

*Shoham*, 2017 WL 2399454, at *15. The same is true for each Defendant here.

Defendants also aided and abetted and conspired with the IRGC and Hezbollah, whose acts

of terrorism specifically targeting Americans establishes their minimum contacts with this forum.[58]

In *Mwani*, the D.C. Circuit credited "plaintiffs' allegations and evidence … that bin Laden and al

Qaeda orchestrated the bombing of the American embassy in Nairobi, not only to kill both

American and Kenyan employees inside the building, but to cause pain and sow terror in the

embassy's home country, the United States." 417 F.3d at 13. The district court had personal

jurisdiction over bin Laden and al Qaeda because they "'"purposefully directed" [their] activities

at residents' of the United States, and [] this litigation results from injuries to the plaintiffs 'that

"arise out of or relate to" those activities.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S.

462, 472 (1985)). *See also Morris v. Khadr*, 415 F. Supp. 2d 1323, 1334 (D. Utah 2006) ("[C]ourts

have held that the Due Process Clause's 'minimum contacts' requirement for personal jurisdiction

---

[58]    *See, e.g.*, Bauer Decl., ¶ 82 ("It is appalling, but not surprising, that Iran's senior-most banking official would conspire with the IRGC-QF to facilitate funding of terror groups like Hizballah") (quoting PX-210).

is met when terrorists 'engage[] in unabashedly malignant actions directed at [and] felt in' the forum.").

*Mwani* also noted that the Nairobi embassy attacks were part of "an ongoing conspiracy to attack the United States, with overt acts occurring within this country's borders." 417 F.3d at 13. Likewise, Iran's targeting of U.S. service members in Iraq relied on a conspiracy with overt acts occurring within the United States. As explained in the Bauer Declaration, Defendants have engaged in a conspiracy to launder U.S. dollar-denominated assets through the United States to support Iran's terror apparatus.[59] Defendants played key roles in funding Iran's terror campaign, which had targeted Americans since its inception following the 1979 Islamic Revolution. In addition to bankrolling decades of terrorist acts against Americans, NIOC itself deployed "helicopters and border guards" to the scene of Iranian-backed attacks on MNF-I forces. *See* Clawson Decl., ¶ 125. Defendants therefore directed their actions at the United States and should anticipate being haled into a U.S. court. *See also Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013) (finding personal jurisdiction over Lebanese bank for processing transactions through New York for Hezbollah's benefit). Accordingly, this Court has personal jurisdiction over Defendants.

## VI.    CONCLUSIONS OF LAW: LIABILITY

The terrorism exception "creates a cause of action for the same conduct that gives rise to subject-matter jurisdiction under the terrorism exception to sovereign immunity." *Karcher*, 396 F.

---

[59]    *See* Bauer Decl., Section I (describing the mechanisms each Defendant used to launder money through the United States), ¶ 82 ("[CBI governor] Seif has conspired with the IRGC-QF to move millions of dollars through the international financial system in a variety of foreign currencies to allow the IRGC-QF to fund its activities abroad."), ¶ 117 ("Defendants and their co-conspirators were able to continue accessing the U.S. financial system"), ¶ 123 ("[Standard Chartered Bank] conspired with Iranian Clients to transmit misinformation to the New York branch by removing and otherwise misrepresenting wire transfer data that could identify Iranian parties").

Supp. 3d at 59. As a result, "[m]ost courts conduct the analysis together, since evidence sufficient to establish jurisdictional causation will almost always establish a theory of 'personal injury' necessary to prevail under § 1605[A]." *Id.* (quoting *Allan*, 2019 WL 2185037, at *6). *See also Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017) (discussing overlapping aspects of jurisdiction and liability).

Specifically, the FSIA creates a "private right of action" for any national of the United States or member of the armed forces, "for personal injury or death caused by [extrajudicial killing or hostage-taking] of that foreign state or of an official, employee, or agent of that foreign state…." 28 U.S.C. § 1605A(c). Furthermore, "damages may include economic damages, solatium, pain and suffering, and punitive damages." *Id.* As explained above, each Plaintiff was injured in an act of extrajudicial killing or hostage-taking, either directly or as relatives of those injured directly in that act.

### A.    Defendants Are Vicariously Liable for Plaintiffs' Injuries

Section 1605A(c) includes vicarious liability: "One may be liable for the acts of another under theories of vicarious liability, such as conspiracy, aiding and abetting, and inducement." *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 26 (D.D.C. 2008).[60] Courts in terrorism exception cases have repeatedly relied on these theories, more often conspiracy. *See, e.g.*, *Gill*, 249 F. Supp. 3d at 100-01 (finding conspiracy theory sufficient); *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 21 (D.D.C. 2009) (same); *Certain Underwriters at Lloyd's London v.*

---

[60]    Section 1605A(c) also states "[i]n any such action, a foreign state shall be vicariously liable for the acts of its officials, employees, or agents." As stated above in section V.B, Defendants necessarily operated through their officials, employees, and agents.

*Great Socialist People's Libyan Arab Jamahiriya*, 811 F. Supp. 2d 53, 73 (D.D.C. 2011) (holding that vicarious liability theories under § 1605A include conspiracy).

Defendants aided and abetted the IRGC and Hezbollah. "Aiding-abetting includes the following elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). The defendant need not know of the specific "wrongful act," but that act must be "a natural and foreseeable consequence of the activity" the defendant helped the aided party undertake. *Id.* 488.[61] Here, the IRGC and Hezbollah performed the wrongful acts—the terrorist attacks—that injured Plaintiffs. Defendants here clearly aided and abetted the IRGC and Hezbollah by transferring (and laundering) vast amounts of money on their behalf and subverting international counter-terror-financing controls. Defendants engaged in this illicit activity knowing that it was illegal, that they were providing substantial assistance to terrorist entities, and that acts of terrorism were a foreseeable result of their conduct.

Defendants also conspired with Iran, the IRGC, and Hezbollah to provide a significant proportion of the funding for Iran's terror campaign. "The elements of civil conspiracy consist of: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the

---

[61]     In *Halberstam*, defendant Hamilton assisted her boyfriend's "personal property crimes" enterprise. Her boyfriend killed the plaintiff's decedent Dr. Halberstam during a botched burglary. Because violence was a foreseeable result of an enterprise to commit personal property crimes at night, she was liable for the murder as an aider and abettor. 705 F.2d at 488.

common scheme." *Acosta*, 574 F. Supp. 2d at 27 (citing *Halberstam*, 705 F.2d at 477). Furthermore, "[a]s this Court has previously held, '[s]ponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks.'" *Id.* (quoting *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 84 (D.D.C. 2006)). Injuries from attacks are "a reasonably foreseeable consequence of the scheme," *Halberstam*, 705 F.2d at 487, to sponsor terrorist activities.

Here, Defendants—agents of Iran—agreed to (and did) provide financial services and funds to the IRGC and Hezbollah at Iran's direction. They did so knowing that they were joining in an agreement to criminally evade U.S. sanctions meant to prevent Iranian terror financing, and provide illicit financing to the IRGC and Hezbollah. Plaintiffs were injured by overt acts performed by the IRGC and Hezbollah pursuant to the terror campaign conspiracy in Iraq. Finally, the deaths and injuries described herein were the natural and foreseeable consequence of Defendants' participation in the conspiracy.

### B.   Defendants Met the *Mens Rea* Requirements for Vicarious Liability

Aside from a mental state associated with vicarious liability (general awareness for aiding and abetting, agreement to join a conspiracy for conspiracy), the terrorism exception has no *mens rea* requirement beyond showing proximate causation:

> Nothing in the FSIA … requires a greater showing of intent than proximate cause. Indeed, we dispatched a similar argument in *Kilburn*, along with a hypothetical raised by the sovereign defendant:
>
>> A terrorist organization is supported by two foreign states. One specifically instructs the organization to carry out an attack against a U.S. citizen. Can the state which only provides general support, but was not involved with the act giving rise to the suit, also be stripped of its immunity?
>
> Yes, we said. Because material support "is difficult to trace," requiring more than proximate cause "could absolve" a state from liability when its actions significantly and foreseeably contributed to the predicate act.

*Owens*, 864 F.3d at 798-99 (quoting *Kilburn*, 376 F.3d at 1128). Thus, while foreseeability would require Defendants, in supporting the IRGC and Hezbollah, to have "general awareness of the group[s'] terrorist aims," Plaintiffs need not show Defendants "specifically knew of or intended its support to cause" the Attacks. *Id.* at 798. As shown below, Defendants here, core members of Iran's terror financing operation, clearly know of the violent character of the IRGC and Hezbollah—Iran's principal tools for committing terrorist attacks abroad.

### C.     Defendants Proximately Caused Plaintiffs' Injuries

As stated in the jurisdiction section above, "Plaintiffs must establish that [the] material support or resources were the 'proximate cause' of Plaintiffs' personal injuries or deaths." *Karcher*, 396 F. Supp. 3d at 54 (quoting *Owens*, 864 F.3d at 794). "Proximate cause requires 'some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.'" *Id.* at 54-55 (quoting *Owens*, 864 F.3d at 794). Proximate cause is not an exacting standard: "It 'normally eliminates the bizarre,' 'preclud[ing] liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity.'" *Owens*, 864 F.3d at 794 (first quote from *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536 (1995); second quote from *Paroline v. United States*, 572 U.S. 434, 445 (2014)). The elements of proximate cause are, "[f]irst, the defendant's actions must be a 'substantial factor' in the sequence of events that led to the plaintiff's injury," and "[s]econd, the plaintiff's injury must have been 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Owens*, 864 F.3d at 794 (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013)). *See Karcher*, 396 F. Supp. 3d at 55 (same).

However, "that material support or resources need not be '*directly* traceable to a particular terrorist act.'" *Karcher*, 396 F. Supp. 3d at 55 (quoting *Kilburn*, 376 F.3d at 1130). Furthermore,

Plaintiffs need not show that the injuries would not have occurred "but for" Defendants' actions, as "the application of a 'but for' standard to joint tortfeasors could absolve them all…." *Kilburn*, 376 F.3d at 1129. *See Karcher*, 396 F. Supp. 3d at 55 ("It is enough, the D.C. Circuit held [in *Kilburn*], to show that the material support or resources went to the terrorist organization that perpetrated the act, and that the support was a 'proximate cause' of the terrorist act.") (quoting *Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 13 (D.D.C. 2005)).

In *Karcher*, the court concluded that "[t]here is more than a 'reasonable connection' between Iran's material support and the personal injuries and deaths in the bellwether attacks, as the Court shall discuss below." *Id.* at 55. Thus, as against Iran, "[t]he 'substantial factor' and 'reasonable foreseeability' prongs of the proximate cause analysis are easily satisfied." *Id.* at 56-57. Although that support included provision of weapons, training, and other types of "kinetic" support, courts routinely find financial services, such as those Defendants here provided, as sufficient material support for proximate cause purposes. *See Kilburn*, 376 F.3d at 1130 (holding that providing money to a terrorist group can establish causation for violent acts as "[m]oney, after all, is fungible"). For instance, in *Shoham*, this Court found that Bank Saderat's provision of material support satisfied this jurisdictional "proximate cause" standard. 2017 WL 2399454, at *11-12 (quoting *Kilburn*, 376 F.3d at 1128).

Likewise, the D.C. Circuit Court of Appeals in *Owens* credited evidence of Sudan's "financial assistance" for al Qaeda as grounds for establishing proximate cause. 864 F.3d at 795. The evidence showed that "the partially state-owned al Sharmal Islamic Bank gave al Qaeda access to the formal banking system, which proved useful for laundering money and financing terrorist operations." *Id.* (citations and internal quotation marks omitted). The court concluded that "although Sudan did not directly fund al Qaeda or its business, the court reasonably concluded its

in-kind assistance had the same practical effect." *Id.* Similarly, the court credited evidence showing "that after al Qaeda started its businesses, Sudan fostered their growth through tax exceptions and customs privileges," "allow[ing] al Qaeda nearly to monopolize the export of several agricultural commodities, plowing its profits back into its broader organization." *Id.* at 794.

As shown below, Defendants here actually transferred much of the money Iran provided to the IRGC and Hezbollah. As Ms. Bauer concluded: "Put simply, the CBI, NIOC and Bank Melli were significant players in Iran's efforts to 'disguise [] its involvement in proliferation and terrorism activities through an array of deceptive practices specifically designed to evade detection.' The illicit flow of funds detailed above could not have been effectuated without the guidance and complicity of the Defendants in this case." Bauer Decl., ¶ 180.

### 1. CBI's Provision of Material Support Was a Substantial Factor in the Sequence of Events that Led to Plaintiffs' Injuries.

As described above, the CBI was specifically designated under Executive Order 13224 for having "provided billions of dollars to the Islamic Revolutionary Guards Corps (IRGC), its Qods Force (IRGC-QF) and its terrorist proxy, Hizballah." PX-217. The Treasury Department explicitly noted that "Iran's Central Bank was complicit in the IRGC-QF's scheme and actively supported this network's currency conversion and enabled its access to funds that it held in its foreign bank accounts." PX-209.

The Treasury Department had already identified CBI's provision of material support for terrorism in 2007, when it cited findings that "from 2001 to 2006, Bank Saderat transferred $50 million from the Central Bank of Iran through its subsidiary in London to its branch in Beirut for the benefit of Hizballah fronts in Lebanon that support acts of violence." PX-5.[62] The State

---

[62]     *See also* July 12, 2007 Press Roundtable with Under Secretary of the Treasury Stuart A. Levey, *available at* http://germany.usembassy.gov/levey-roundtable.html ("The [Iranian] regime

Department in 2008 cited those findings as well: "Bank Melli and the Central Bank of Iran also provide crucial banking services to the Qods Force, the IRGC's terrorist supporting arm that was headed by UNSCR 1747 designee Commander Ghassem Soleimani."[63]

These billions of dollars required processing through the United States, where U.S. federal and state authorities could monitor transfers for terror financing. *See* Bauer Decl., ¶ 111 ("The vast majority of U.S. dollar-denominated funds transfers effected abroad must ultimately clear across the books of the U.S. Federal Reserve Bank of New York ('FRB-NY'), providing the United States with a key opportunity to monitor these transfers for misuse, including terror financing."). The CBI, along with Bank Melli and NIOC, therefore directed a conspiracy to move billions of dollars through the United States circumventing the oversight of U.S. counter-terror financing controls and "blinding … U.S. and state regulators." *See id.*, ¶ 118.

> As FinCEN reported:
>
> Through state-owned banks, the Government of Iran disguises its involvement in proliferation and terrorism activities through an array of deceptive practices specifically designed to evade detection. The Central Bank of Iran and Iranian commercial banks have requested that their names be removed from global transactions in order to make it more difficult for intermediary financial institutions to determine the true parties in the transaction.

---

does ***use its banks*** to pursue not only its proliferation ambitions but also its funding of terrorism … we in the United States have taken action against Bank Saderat for its role in funneling money ***from the Central Bank of Iran*** to terrorist organizations [including] Hezbollah … Iran not only uses its banks for that purpose, but also ***its banks engage in deceptive practices in order to engage in that business***.") (emphasis added).

[63]     https://wikileaks.org/plusd/cables/08STATE24292_a.html.

*Id.*, ¶ 178.[64] Iran used these "deceptive practices in order" "to pursue … its funding of terrorism." *See id.*, ¶ 72. Specifically, CBI approached non-Iranian banks to develop these deceptive techniques. *See id.*, ¶ 121 ("CBI 'approached SCB to act as its recipient bank for U.S. dollar proceeds from daily oil sales made by the National Iranian Oil Company.' SCB accepted, as it "viewed this engagement as 'very prestigious' because 'in essence, SCB would be acting as Treasurer to the CBI . . . .'") (quoting Bauer Decl., Exhibit B, ¶ 22). These deceptive practices included stripping information indicating Iranian entities out of payment order messages. *See id.*, ¶ 118. *See also id.* ¶ 124 ("[for SCB], "wire stripping was 'the process for effecting Bank Markazi's payment instructions.'") (quoting Bauer Declaration, Exhibit B ¶ 29).

This scheme was ultimately wildly successful. From 2001-2007 alone, SCB alone illegally moved *$250 billion* worth of transactions for Iran. *See id.*, ¶ 130. HSBC moved nearly $20 billion for sanctioned countries, the vast majority of which transfers were for Iran. *See id.* Iran, through its state-owned banks, "exploited the U-Turn exemption so thoroughly that Treasury revoked it altogether in 2008 … to prevent 'the significant terrorist financing and proliferation risks posed by Iran….'" *Id.*, ¶ 117 (quoting PX-200). Treasury concluded that "Iran's access to the international financial system enables the Iranian regime to facilitate its support for terrorism and proliferation." *Id.* However, "Defendants and their co-conspirators were able to continue accessing the U.S. financial system"—for instance, Treasury reiterated its findings in identifying Iran as a jurisdiction of primary money laundering concern in 2011 and 2019. *See id.*, ¶¶ 76-77, 80, 117. In fact, in the 2019 findings, Treasury noted that Iran's "covert methods for accessing the international financial

---

[64]    *See also id.* ¶¶ 75, 76 (describing "the illicit and deceptive financial activities that Iranian financial institutions – including the Central Bank of Iran – and other state-controlled entities engage in to facilitate Iran's illicit conduct and evade sanctions").

system … including those at the Central Bank of Iran," "often serve[d] to fund the Islamic Revolutionary Guard Corps (IRGC), its Islamic Revolutionary Guard Corps Qods Force (IRGC-QF), Lebanese Hizballah … terrorist groups." *Id.*, ¶ 80 (quoting PX-226).

A Southern District of New York district court has also found CBI liable for its provision of material support to Hezbollah, noting that "[t]he transfers of huge sums of Iranian money to terrorist organizations such as HAMAS and Hizballah … can only be accomplished with the complicity and/or knowledge and acquiescence of [CBI]. The same must be true in the case of banking transactions between Iranian agencies and instrumentalities and terrorist organizations. ***The Central Bank of Iran facilitates the transfer of money to terrorist groups***." *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *9 (citations omitted; emphasis added).

The same court also found that:

> The entire apparatus of the Iranian state and government, and many parts of Iran's private sector, including corporations (*e.g.*, National Iranian Oil Company, Iran Air, Iran Shipping Lines); ***banks (e.g., Central Bank [of Iran]***, Bank Sepah); state-run media (e.g., IRIB television, the Islamic Revolution News Agency ("IRNA"), KAYHAN, and other daily newspapers); private individuals; and even charities are at the service of [Iran's] Supreme Leader, the IRGC, and the [Ministry of Intelligence] ***when it comes to support of terrorism***.

*Id.* at *6 (emphasis added).

Dr. Clawson concluded: "In my expert opinion, during the relevant period [the CBI] provided material support to Hezbollah and the IRGC, knowing that they were actively engaged in terrorism and providing material support to other terrorist groups and, in doing so, the CBI was acting at the behest of and under the orders of the government of Iran." Clawson Decl., ¶ 128. Ms. Bauer likewise concluded: "In my expert opinion, based on my professional experience and the detailed findings of the U.S. government, CBI has knowingly provided material support to Hezbollah and the IRGC during the relevant period." Bauer Decl., ¶ 181.

2.      **Bank Melli's Provision of Material Support Was a Substantial Factor in the Sequence of Events that Led to Plaintiffs' Injuries.**

Bank Melli was also specifically designated for its provision of material support to terrorism. Specifically, the Department of Treasury imposed sanctions against Bank Melli "for assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, the IRGC-QF," announcing that "[a]s of 2018, the equivalent of billions of dollars in funds have flowed through IRGC-QF controlled accounts at Bank Melli," "Bank Melli has acted as a conduit for payments to the IRGC-QF," and "[t]he IRGC-QF has used Bank Melli to dispense funds to Iraqi Shia militant groups."[65] Treasury specifically announced that "[s]ince the mid-2000s, Bank Melli increasingly provided services to Iranian military-related entities as they became further involved in all aspects of the Iranian economy."[66] Those sanctions reiterated the original sanctions imposed against Bank Melli on October 25, 2007, which reported that "[f]rom 2002 to 2006, Bank Melli was used to send at least $100 million to the Qods Force," and explained that "[w]hen handling financial transactions on behalf of the IRGC, Bank Melli has employed deceptive banking practices to obscure its involvement from the international banking system. For example, Bank Melli has requested that its name be removed from financial transactions." PX-5.[67]

The State Department reported that "Bank Melli and the Central Bank of Iran also provide crucial banking services to the Qods Force, the IRGC's terrorist supporting arm" which "leads

---

[65]     Press Release, U.S. Dep't of the Treasury, "U.S. Government Fully Re-Imposes Sanctions on the Iranian Regime As Part of Unprecedented U.S. Economic Pressure Campaign" (Nov. 5, 2018), *available at* https://home.treasury.gov/news/press-releases/sm541.

[66]     *Id.*

[67]     *See also* PX-200 (Iran's Bank Melli, which has been designated by the United States under E.O. 13382 for proliferation-related activities, was used to transfer at least $100 million to the IRGC-Qods Force between 2002 and 2006).

Iranian support for … Hezbollah," and that "[e]ntities owned or controlled by the IRGC or the Qods Force use Bank Melli for a variety of financial services." Clawson Decl., ¶ 106 (quoting https://wikileaks.org/plusd/cables/08STATE24292_a.html).[68] In addition to providing services to the IRGC, Bank Melli has provided funding to entities that support the IRGC's terrorism, providing at least $140 million in direct financing for Mahan Air[69] as well as financial services to Iran's DIO.[70]

Bank Melli has also helped Iran illegally acquire U.S.-sourced items restricted from export to Iran due to their use for terrorist purposes. Bank Melli facilitated the illegal purchase of a restricted General Electric aircraft engine for a subsidiary of Iran's Mahan Air, the SDGT designated for flying IRGC and Hezbollah weapons and personnel, including into Iraq. *See* Bauer Decl., ¶ 134. As detailed in Ms. Bauer's declaration, Bank Melli, working with SCB, structured the transaction to omit references to Bank Melli's role in financing the letter of credit from the component of the transactions processed in the United States. *See id.* ¶¶ 134-43. Bank Melli also facilitated (with SCB's assistance) the purchase of restricted components of hydraulic presses of the type used to create EFPs. *See id.* ¶ 133.

Dr. Clawson concluded: "In my expert opinion, during the relevant period [Bank Melli] provided material support to the IRGC, knowing that it was actively engaged in terrorism and providing material support to other terrorist groups and, in doing so, Bank Melli was acting at the behest of and under the orders of the government of Iran." Clawson Decl., ¶ 129. Ms. Bauer

---

[68]     The cable also reports that the IRGC "relies heavily" on Bank Melli, along with CBI and other Iranian banks.

[69]     *Supra* at 102 (citing http://www.bailii.org/ew/cases/EWCA/Civ/2011/544.html).

[70]     *Supra* at 103-04 (citing Cable 07STATE104801 at https://wikileaks.org/plusd/cables/07STATE104801_a.html).

likewise concluded: "In my expert opinion, based on my professional experience and the detailed findings of the U.S. government, it [Bank Melli] has knowingly provided material support to the IRGC-QF during the relevant period." Bauer Decl., ¶ 182.

### 3. NIOC's Provision of Material Support Was a Substantial Factor in the Sequence of Events that Led to Plaintiffs' Injuries.

As the Treasury Department reported to Congress in 2012, "NIOC is an agent or affiliate of the IRGC." Clawson Decl., ¶ 118 (citing PX-206).[71] The ITRSHRA states that "[i]t is the sense of Congress that the National Iranian Oil Company and the National Iranian Tanker Company are not only owned and controlled by the Government of Iran but that those companies provide significant support to Iran's Revolutionary Guard Corps and its affiliates." *Id.* (quoting ITRSHRA, § 312). Later in 2012, Treasury further designated NIOC for, *inter alia*, "providing, or attempting to provide, financial, material, or other support for and services in support of the IRGC." *Id.* ¶ 121.

As Dr. Clawson explained:

> Treasury also designated a worldwide Iranian petroleum shipping network originating with NIOC for "financially support[ing] [the IRGC-QF] and its terror proxy Hezbollah" in a "vast oil-for-terror shipping network." It found that the shipping network "*is directed by* [the IRGC-QF] and its terrorist proxy Hezbollah," and declared "that those purchasing Iranian oil *are directly supporting Iran's militant and terrorist arm*, [the IRGC-QF]."

*Id.* ¶ 125 (quoting PX-216) (emphasis added in Clawson Decl.).

As one of the largest oil companies in the world, *see id.* ¶ 115, NIOC provided crucial funding for the IRGC throughout the relevant period. As Treasury explained, "Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime, which has used these funds to support the Islamic Revolutionary Guard Corps-Qods Force's (IRGC-QF) malign

---

[71]     As Treasury reported in PX-206, an IRGC Brigadier General was appointed to head up the Petroleum Ministry, owner of NIOC, who even in that "new role … has publicly stated his allegiance to the IRGC." *Id.*

activities throughout the Middle East, including the support of terrorist groups." PX-219. To move these revenues undetected, "CBI and NIOC worked together to structure transactions to avoid scrutiny in the United States." Bauer Decl., ¶ 145. Moreover, a significant portion of NIOC's revenues simply go missing, "making it available for nefarious purposes such as corruption or support for terrorism." Clawson Decl., ¶ 54 (citing "Iran looking for missing oil revenue," UPI (Nov. 20, 2009) https://www.upi.com/Business_News/Energy-Industry/2009/11/20/Iran-looking-for-missing-oil-revenue/UPI-97311258729114/). As Dr. Clawson explained, "[c]redible reports provide strong reasons to suspect that some of this missing revenue is directly controlled by the IRGC itself." *Id.* (citing Mark Gregory, "Expanding Business Empire of Iran's Revolutionary Guards," BBC News, July 26, 2010, *available at* http://www.bbc.com/news/world-middle-east-10743580).

More recently, Treasury has reaffirmed that NIOC "helps to finance Iran's [IRGC-QF] *and its terrorist proxies*" and has described NIOC as "an entity … which helps to finance Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxies." *Id.*, ¶ 123 (quoting PX-218) (emphasis added). Treasury also stressed that "Iran's petroleum and petrochemical industries are major sources of revenue for the Iranian regime, which has used these funds to support the Islamic Revolutionary Guard Corps-Qods Force's (IRGC-QF) malign activities throughout the Middle East, including the support of terrorist groups." *Id.*, ¶ 124 (quoting PX-219). Finally, as stated above, NIOC *itself* deployed "helicopters and border guards" to the scene of Iranian-backed attacks on MNF-I forces. *See id.*, ¶ 125.

As stated above, the Southern District of New York district court has identified NIOC as an agency or instrumentality of Iran that materially supports terrorism. *See In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *8 ("[T]he National Iranian Oil Company is owned,

controlled, and managed by the Government of Iran. A large cash flow of money was funneled to terrorist organizations through the NIOC.") (citations omitted).

Dr. Clawson concluded: "In my expert opinion, during the relevant period [NIOC] provided material support to the IRGC, knowing that it was actively engaged in terrorism and providing material support to other terrorist groups and in doing so, it was acting at the behest of and under the orders of the government of Iran." Clawson Decl., ¶ 130. Ms. Bauer likewise concluded: "In my expert opinion, based on my professional experience and the detailed findings of the U.S. government, [NIOC] has knowingly provided material support to the IRGC and IRGC-QF during the relevant period." Bauer Decl., ¶ 183.

### 4.    The Attacks Were a Foreseeable Result of Defendants' Conduct.

If a defendant provides substantial material assistance to a terrorist organization knowing of its violent character generally, it is objectively foreseeable that this may lead to terrorist attacks. In *Owens*, the court found that, "as its relationship with al Qaeda deepened, Sudan undoubtedly became aware of al Qaeda's hostility to the United States and its intention to launch attacks against American interests." 864 F.3d at 798. The court further found evidence of Sudan's knowledge because, although al Qaeda openly boasted about attacking Americans, "Sudan continued to assist the group in moving people and resources throughout the region." *Id.* A defendant need not have awareness of specific attacks: "Sudan's claimed ignorance of al Qaeda's specific aim to bomb American embassies focuses too narrowly upon those events; Sudan could not help but foresee that al Qaeda would attack American interests wherever it could find them." *Id.*

Here, Defendants, as key Iranian institutions, were obviously aware of the nature of the IRGC and Hezbollah. As the State Department has explained, the IRGC's "support for terrorism is foundational and institutional" and the IRGC "has engaged in terrorist activity or terrorism since its inception 40 years ago." PX-213. *See also* Clawson Decl., ¶ 31. Treasury found that "[t]he

IRGC has played a central role to Iran becoming the world's foremost state sponsor of terror." PX-6. Hezbollah is "Iran's main terrorist ally," *Karcher*, 396 F. Supp. 3d at 23 (quoting Annual Threat Assessment of the Director of National Intelligence for the Senate Select Comm. on Intelligence (Feb. 2, 2006), PX-16, at 13), and Hezbollah has been "open about the fact that Hezbollah's budget, its income, its expenses, everything it eats and drinks, its weapons and rockets, are from the Islamic Republic of Iran." *Supra* at 19. *See, e.g.*, *Brewer*, 664 F. Supp. 2d at 54 ("From defendants' actions of supplying resources and training to Hezbollah for this attack, it was entirely foreseeable that innocent people would be killed or injured by the detonation of a van filled with explosives."). Moreover, the IRGC and Hezbollah were Defendants' co-conspirators in their massive money-laundering and terror-financing scheme and, as explained above, Congress found in 2011 that NIOC was an "agent and affiliate" of the IRGC.

The implicated attacks in Iraq were also foreseeable. As explained above, the *Karcher* Court found that "[a]mong Iran's foreign activities, its campaign in Iraq figures prominently." 396 F. Supp. 3d at 22. The *Karcher* court noted that "[t]he 2003 invasion therefore provided Iran with a historic opportunity to reshape its relationship with Iraq and, in the process, increase its influence in the region. To that end Iran employed an 'all elements of national power' approach in exploiting the outcome of this seminal event. This included both soft and hard power, from the use of political, economic, religious, and cultural leverage to the support of militant proxies." 396 F. Supp. 3d at 22-23 (quoting Levitt Rep. at 7).

### D.    Federal Cause of Action

#### 1.    Generally

Section 1605A(c) creates a federal cause of action for four categories of plaintiff: a national of the United States, a member of the U.S. armed forces, a U.S. Government employee or contractor, or a legal representative of any of the three prior persons. All of the bellwether Plaintiffs

at issue here (*i.e.*, Plaintiffs also in *Karcher*) are U.S. nationals. A small set of other Plaintiffs are not, and therefore must bring their claims under other laws. The court in *Fritz* explained that D.C. choice of law rules govern that question, and generally results in a choice of domestic U.S. law when the victim was a U.S. national targeted for that nationality (as is always the case here). 320 F. Supp. 3d at 89-90. *See also Owens*, 826 F. Supp. 2d at 155-57 (applying D.C. law to foreign national family members of victims of terrorist attacks).[72]

Some of Plaintiffs' claims were filed outside of the FSIA's statute of limitations.[73] However, the D.C. Circuit Court held that a federal court has no "discretion to *sua sponte* invoke the terrorism exception's statute of limitations on behalf of defendants who have not entered an appearance or otherwise sought to respond to complaints against them." *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1106–07 (D.C. Cir. 2019). *See also Karcher*, 396 F. Supp. 3d at 20 (holding that *Maalouf* "squarely prohibits district courts from raising, *sua sponte*, 'the FSIA terrorism exception's statute of limitations on behalf of an entirely absent defendant.'") (quoting *Maalouf*, 923 F.3d at 1112).

## 2. Theories of Liability

The FSIA's private right of action includes claims for "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). However, Plaintiffs must provide *theories* of tort liability, as required for § 1605A claims. *See, e.g.*, *Schertzman Cohen v. Islamic Republic of Iran*, No. 17-cv-1214 (JEB), 2019 WL 3037868, at *5 (D.D.C. July 11, 2019) ("Although § 1605A provides a private right of action, it requires plaintiffs 'to prove a theory of

---

[72]    Plaintiffs will brief whether D.C. or some other domestic law applies to any non-U.S. national Plaintiff when presenting the relevant evidence for that Plaintiff at a later stage.

[73]    These Plaintiffs were formerly in the *Brooks* and *Field* cases before they were consolidated into *Hake.*

liability.'") (quoting *Valore*, 700 F. Supp. 2d at 73). Courts in this District—in reviewing theories of liability in FSIA claims—"'rely on well-established principles of law, such as those found in Restatement (Second) of Torts,' to determine liability under the FSIA." *Id.* (citing *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009)). *See also Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003) ("using Restatement 'as a proxy for state common law' in determining FSIA liability").[74]

The principal theories of tort liability are:

    a.    Intentional infliction of emotional distress for victims who survived attacks or those who experienced pain and suffering before dying;

    b.    Assault for victims who survived attacks;

    c.    Battery for victims who survived attacks and those who experienced pain and suffering before dying;

    d.    Wrongful death for "direct" victims;

    e.    "Survivorship" for "direct victims; and

    f.    Solatium for Family Member Plaintiffs.

These theories are discussed below; as Plaintiffs present additional claims at later stages of this and related litigations, Plaintiffs will brief additional theories as necessary.

### a. Intentional Infliction of Emotional Distress

*Heiser*, quoting the Restatement, defined intentional infliction of emotional distress as follows: "One who by extreme and outrageous conduct intentionally or recklessly causes severe

---

[74]    Under the FSIA, "plaintiffs who have claimed assault, battery, and IIED may recover under only one of any such theories, as multiple recovery is prohibited," *Valore*, 700 F. Supp. 2d at 77. Family member plaintiffs only bring solatium claims (in their own name). Estate plaintiffs bring wrongful death and survivorship claims, which cover separate types of damages (loss of economic opportunities and pain experienced before dying, respectively). Plaintiffs provide each of these tort theories to ensure the Court is able to capture the extent of injuries each Plaintiff suffered.

emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (quoting Restatement (Second) of Torts § 46). Bodily harm is not required—under D.C. law, for instance, "emotional distress that might be seen as caused by something other than the battery itself—for example, the more general trauma associated with being the target of a terrorist bombing"—is cognizable as IIED. *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 275 (D.D.C. 2005). For an IIED claim, "Intent or recklessness can be inferred from the outrageousness of the acts, and the plaintiff need not prove accompanying physical injury." *Id.* (citation omitted).

As explained in *Heiser*, terrorist attacks are by their nature designed to inflict IIED: "'All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience: The more extreme and outrageous, the greater the resulting distress.' Indeed, as this Court put it, the 'intent to create maximum emotional impact,' particularly on third parties, is terrorism's *raison d'etre*." *Heiser*, 659 F. Supp. 2d at 27 (quoting *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78, 89 (D.D.C. 2002) and *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 9 (D.D.C. 2000)).

As the evidence showed above, terrorist attacks exposed survivors to horrifying sights, even if they were physically unscathed. *See* Phelps T5-150:20-151:7[75] (describing the scene inside of a HMMWV struck by an EFP as a "Cuisinart inside: pieces of metal splicing through everyone and everything, human, equipment"); Mason T4-65:15-25 (describing seeing "a person running

---

[75]     Dr. Shean Phelps was one of the *Karcher* plaintiffs' medical experts. He was a former member of the Army's Special Forces, as well as the Senior Flight Surgeon for the Army's Special Forces in Iraq. *See* Phelps T5-119-129. Dr. Phelps was qualified as an expert on the treatment of combat injuries, including polytrauma and blast injuries, particularly with respect to Iraq. Phelps T5-129:22-130:2.

back to our vehicle, and they were completely engulfed in flames, and "half a second later" "realiz[ing] it was Sergeant Steve McCoy.").

### b.      Assault

Assault liability arises where actors "intend[] to cause a harmful or offensive contact with the person ... or [to cause] an imminent apprehension of such a contact, and the other is thereby put in such imminent apprehension." *Gill*, 249 F. Supp. 3d at 101 (quoting Restatement (Second) of Torts § 21(1)). As the *Gill* court explained, terrorism by definition meets this standard, as "[t]he objective of terrorism is to use violence and fear to achieve political means." *Id. See also id.* at 101-02 (noting that "[o]ther members of this Court have held that acts of terrorism constitute assault under the Act," and citing cases).

### c.      Battery

"[B]attery liability arises when" an actor "acted '[(1) intending to cause a harmful or offensive contact with, or an imminent apprehension of such a contact by, those attacked and (2) a harmful contact with those attacked directly or indirectly resulted.'" *Schertzman Cohen*, 2019 WL 3037868, at *5 (quoting *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 36 (D.D.C. 2012)). Each of the Attacks was intended to cause, and did result in, harmful contact with its victims.

### d.      Wrongful Death

"A wrongful-death action is one brought by a decedent's heirs at law, and may be brought through the estate of the decedent, 'for economic losses which result from a decedent's premature death.'" *Valore*, 700 F. Supp. 2d at 78 (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 27 (D.D.C. 1998)).

### e.    Survival

Survival claims provide damages for pain and suffering experienced before a victim's death—even for periods as short as 30 seconds:

> In suits involving acts of terrorism, the federal courts have routinely awarded survival damages to the deceased's estate for the physical and emotional pain and suffering endured by the victim in the moments before death. The courts have recognized that even very short periods of pain and suffering prior to death in a terrorist attack are compensable.

*Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 300 (D.D.C. 2003). Courts have awarded $1 million in cases of pain and suffering for periods as short as "at least something like 30 seconds." *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 113 (D.D.C. 2000). *See also Stern*, 271 F. Supp. 2d at 299-300 (awarding $1 million in damages for "several minutes of extreme pain and suffering"); *Eisenfeld*, 172 F. Supp. 2d at 5, 8 ($1 million for "several minutes" of suffering).

### f.    Solatium

The FSIA cause of action provides a solatium claim for a victim's immediate family members. *See* 28 U.S.C. § 1605A(c)(4). Aside from the family restriction, the solatium claim operates as an IIED claim. *Valore*, 700 F. Supp. 2d at 85 ("Under the FSIA, a solatium claim is indistinguishable from an IIED claim.").

Although the Restatement generally limited IIED claims to those who were physically present at the time of the attack, it included an important exception for conduct that "is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present." *Id.* at 80. Courts have found this test "easily" met in the case of terrorism:

> [T]he Restatement's caveat "suggests that … [i]f the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents liability." As this Court has noted, "[t]errorism, unique among the types of tortious activities in both its extreme methods and aims, passes this test easily." One therefore need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result.

*Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 75-76 (D.D.C. 2010) (quoting *Heiser*,

659 F. Supp. 2d at 27). *See also Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 14 (D.D.C.

2010) ("[T]he function of the presence requirement—to ensure that a plaintiff actually suffered a

high degree of emotional distress—is, in state-sponsored terrorism cases, fulfilled by the horrific

and terrifying nature of terrorism itself ….").

Family member Plaintiffs here not only learned of the relatives' injuries or deaths, but often

learned of the horrific nature of those injuries.

## CONCLUSION

For the foregoing reasons, this Court should:

- Find that Defendants are not entitled to sovereign immunity;

- Judicially notice the *Karcher* court's findings that the IRGC and Hezbollah committed acts of terrorism directed at U.S. service members (and others) in Iraq between 2004 and 2011;

- Judicially notice the *Karcher* court's findings that the IRGC and Hezbollah are responsible for the bellwether attacks; and

- Find that Defendants are liable for the Attacks, committed in Iraq by the IRGC and Hezbollah during the relevant period.

Plaintiffs respectfully intend to update the Court as soon as practicable as to the next steps in this

litigation, including relevant findings in other cases and determining punitive damages and other

outstanding issues.

Dated: November 2, 2020

                                       Respectfully Submitted,

                                        OSEN LLC

By:     /s/ Gary M. Osen
           Gary M. Osen (DC Bar No. NJ009)
           Michael J. Radine (DC Bar No. NJ015)
           Ari Ungar (DC Bar No. NJ008)
           Dina Gielchinsky (DC Bar No. NJ011)
           Aaron Schlanger (DC Bar No. NJ007)
           Patrick J. Duprey (DC Bar No. NJ029)
           2 University Plaza, Suite 402
           Hackensack, NJ 07601
           Tel. (201) 265-6400

           TURNER & ASSOCIATES, P.A.
           C. Tab Turner
           4705 Somers Avenue, Suite 100
           North Little Rock, AR 72116
           Tel. (501) 791-2277

           *Attorneys for Plaintiffs*