# Exhibit B

NEW YORK STATE DEPARTMENT
OF FINANCIAL SERVICES

In the Matter of

STANDARD CHARTERED BANK,
NEW YORK BRANCH,
New York, New York

**ORDER PURSUANT TO BANKING LAW § 39**

Pursuant to the statutory powers vested in him by the People of the State of New York,

Benjamin M. Lawsky, Superintendent of the New York State Department of Financial Services

(the "Department" or "DFS") caused an investigation to be made of Standard Chartered Bank

("SCB"), a wholly owned subsidiary of Standard Chartered plc ("SC"), for apparent grave

violations of law and regulation.  The Department's extensive investigation included the review

of more than 30,000 pages of documents, including internal SCB e-mails that describe willful

and egregious violations of law.

For almost ten years, SCB schemed with the Government of Iran and hid from regulators

roughly 60,000 secret transactions, involving at least $250 billion, and reaping SCB hundreds of

millions of dollars in fees.  SCB's actions left the U.S. financial system vulnerable to terrorists,

weapons dealers, drug kingpins and corrupt regimes, and deprived law enforcement investigators

of crucial information used to track all manner of criminal activity.[1]

---

[1] The Department's initial focus is on SCB's apparent systematic misconduct on behalf of Iranian
Clients.  However, the Department's review has uncovered evidence with respect to what are apparently
similar SCB schemes to conduct business with other U.S. sanctioned countries, such as Libya, Myanmar
and Sudan.  Investigation of these additional matters is ongoing.

Having determined that good cause exists, the Superintendent has directed SCB to: (1) appear and explain apparent violations of law; (2) demonstrate why SCB's license to operate in the State of New York should not be revoked; (3) demonstrate why SCB's U.S. dollar clearing operations should not be suspended pending a formal license revocation hearing; and (4) submit to and pay for an independent, on-premises monitor of the Department's selection to ensure compliance with rules governing the international transfer of funds.

As demonstrated below, the evidence presently before the Department indicates that:

## PRELIMINARY STATEMENT

1.  For nearly a decade, SCB programmatically engaged in deceptive and fraudulent misconduct in order to move at least $250 billion through its New York branch on behalf of client Iranian financial institutions ("Iranian Clients") that were subject to U.S. economic sanctions, and then covered up its transgressions.  These institutions included no less than the Central Bank of Iran/Markazi ("CBI/Markazi"), as well as Bank Saderat and Bank Melli, both of which are also Iranian State-owned institutions.

2.  In its evident zeal to make hundreds of millions of dollars at almost any cost, SCB undertook a course of conduct that included:

- falsifying business records;

- offering false instruments for filing;

- failing to maintain accurate books and records of all transactions effected and all actions taken on behalf of SCB;

- obstructing governmental administration;

- failing to report misconduct to the Department in a timely manner;

- evading Federal sanctions; and

- numerous other violations of law that, as with the above, have an impact upon the safety and soundness of SCB's New York branch and the Department's confidence in SCB's character, credibility and fitness as a financial institution licensed to conduct business under the laws of this State.

3.      From January 2001 through 2007, SCB conspired with its Iranian Clients to route nearly 60,000 different U.S. dollar payments through SCB's New York branch after first stripping information from wire transfer messages used to identify sanctioned countries, individuals and entities ("wire stripping").[2]

4.      Specifically, SCB ensured the anonymity of Iranian U.S. dollar clearing activities through SCB's New York branch by falsifying SWIFT wire payment directions.[3]  When SCB employees determined that it was necessary to "repair" unadulterated payment directives,[4] they did so by stripping the message of unwanted data, replacing it with false entries or by returning the payment message to the Iranian Client for wire stripping and resubmission.  Thus, SCB developed various ploys that were all designed to generate a new payment message for the New York branch that was devoid of any reference to Iranian Clients.

---

[2] According to SCB's independent consultant, this figure represents about 30,000 messages that were sent to SCB's New York branch by SCB's London office, mainly on behalf of state-owned Iranian banks, and approximately 30,000 messages from SCB's branch in Dubai, United Arab Emirates, to SCB's New York branch on behalf of Iranian-owned banks, corporations and other unknown entities.

[3] U.S. dollar clearing is the process by which U.S. dollar-denominated transactions are satisfied between counterparties through a U.S. bank. The Society of Worldwide Interbank Financial Telecommunications ("SWIFT") is a vehicle through which banks exchange wire transfer messages.

[4] Under SCB's "repair procedure" overseas employees screened payment messages – before they were communicated to its New York branch – in order to ascertain if any messages contained information that identified Iranian Clients.

5.     SCB utilized such schemes to cloak the dollar clearing activities of Iranian Clients and thereby shield those transactions from regulatory scrutiny.  During the relevant period, the U.S. Office of Foreign Assets Control ("OFAC") required U.S. financial institutions to filter all dollar clearing transactions so as to identify those involving sanctioned entities, and then to freeze suspect transactions pending investigation.  This system could (a) significantly delay transaction processing; (b) require that OFAC be advised of information surrounding a transaction; and (c) ultimately result in the rejection of a transaction.  SCB therefore wire-stripped to ensure the automatic and unobstructed clearance of Iranian transactions in New York.

6.     SCB intentionally withheld material information from New York and Federal regulators in its effort to service Iranian Clients.  SCB carefully planned its deception and was apparently aided by its consultant Deloitte & Touche, LLP ("D&T"), which intentionally omitted critical information in its "independent report" to regulators.  This ongoing misconduct was especially egregious because – during a key period between 2004 and 2007 – SCB's New York branch was subject to a formal supervisory action by the Department and the Federal Reserve Bank of New York ("FRBNY") for *other* regulatory compliance failures involving the Bank Secrecy Act (BSA"), anti-money laundering policies and procedures ("AML"), and OFAC regulations.

7.     In short, SCB operated as a rogue institution.  By 2006, even the New York branch was acutely concerned about the bank's Iran dollar-clearing program.  In October 2006, SCB's CEO for the Americas sent a panicked message to the Group Executive Director in London.  "Firstly," he wrote, "we believe [the Iranian business] needs urgent reviewing at the Group level to evaluate if its returns and strategic benefits are . . . still commensurate with the potential to cause *very serious or even catastrophic reputational damage* to the Group."  His plea

4

to the home office continued: "[s]econdly, there is equally importantly potential of risk of subjecting management in US and London (e.g. you and I) and elsewhere to personal reputational damages and/or *serious criminal liability*."[5] (emphasis added)

8.        Lest there be any doubt, SCB's obvious contempt for U.S. banking regulations was succinctly and unambiguously communicated by SCB's Group Executive Director in response.   As quoted by an SCB New York branch officer, the Group Director caustically replied:  "You f---ing Americans.  Who are you to tell us, the rest of the world, that we're not going to deal with Iranians."[6]

## FACTUAL BACKGROUND

### SCB's Business, Organization, and Assets

9.        Headquartered in London, England, and with over 1,700 offices in 70 markets globally, SC is a leading international banking institution. Through its subsidiary SCB, SC offers a wide range of banking products and services to its personal, business and wholesale banking clients worldwide.   SCB clients include some of the largest corporations and financial institutions in the world.[7]

---

[5]Memorandum entitled *Business with Iran – USA Perspective* by SCB's CEO, Americas to SCB's Group Executive Director for Risk, its Group Head of Compliance and its Group Head of Public Affairs dated October 5, 2006, SCB INT 0005759-5762.

[6]Note of Interview with SCB's Head of Cash Management Services (2002-2005), Head of Compliance (2005-2007) at the New York branch, SCB INT 0004733-4734.

[7] According to SCB, its success as a bank is due in part because it is "trusted worldwide for upholding high standards of corporate governance."   SCB prides itself for having a "distinctive culture and values [that] act as a moral compass."   It boasts "openness" as one of its "core values" and claims to aspire to be "trustworthy."   It also markets itself to clients and the investing public as "always trying to do the right thing." http://www.standardchartered.com

10.    SC's 2011 Annual Statement states that it generated $17.6 billion in income and roughly $5 billion in profits – greater than at any other time in SC's 150-year history.  SCB's New York branch U.S. dollar clearing operation adds substantially to that revenue.

11.    In 1976, SCB's New York office was licensed by the then-New York State Banking Department[8] to operate as a foreign bank branch.  It primarily conducts a U.S. dollar clearing business, which clears approximately $190 *billion* per day for its international clients.  It also engages in corporate lending, project and structured finance, trade finance, cash management, foreign exchange trading, and wire transfer services.  As of March 31, 2012, SCB's New York branch held $40.8 billion in total assets.

## <u>Iranian Sanctions and U-Turn Transactions</u>

12.    Through OFAC, the U.S. Government administers and enforces a sanctions regime against those who attempt to use the U.S. financial system in contravention of U.S. foreign policy and those foreign countries, entities, and individuals who may present a threat to national security.   OFAC imposes these sanctions in an effort to prevent U.S. dollars from being used to finance terrorist organizations, proliferators of weapons of mass destruction, drug traffickers and other hostile enterprises.   Foreign governments currently subject to OFAC sanctions include Iran, North Korea and the Sudan.

---

[8] In 2011, the State Banking and Insurance Department's were merged to create the Department of Financial Services.

13.    Financial transactions with Iran have been subject to U.S. economic sanctions since 1979.  These measures were strengthened by Executive Orders in 1995, which set strict requirements for U.S. banks to follow in clearing U.S. dollar transactions with Iran.[9]

14.    Until November 2008, OFAC rules had permitted, under limited circumstances and with close regulatory supervision, U.S. financial institutions to process certain transactions for Iranian banks, individuals, and other entities.  Pursuant to federal regulations, such transactions were permissible in some circumstances provided that they were initiated offshore by non-Iranian foreign banks and only passed through the U.S. financial system on the way to other non-Iranian foreign banks.  31 CFR 560.516.  Such transactions are commonly referred to as "U-Turns."

15.    OFAC imposed exceedingly stringent standards on U.S. banks involved in U.S. dollar clearing U-Turns.  For example, OFAC regulations required that "*[b]efore* a United States depository institution initiates a payment on behalf of any customer, or credits a transfer to the account on its books of the ultimate beneficiary, *the United States depository institution must determine that the underlying transaction is not prohibited by this part*." 31 CFR 560.516 (c) (emphasis added).  The obligation to determine that a U-Turn complied with U.S. law thus fell squarely on U.S. banks.  In satisfying this obligation, U.S. clearing banks relied heavily on the accuracy and completeness of wire transfer messages they received from correspondent banks and overseas branches.  When such information was properly provided to clearing banks it became available to law enforcement agencies to use in tracking suspicious conduct.

16.    In instances where an Iranian-related wire transfer instruction did not provide sufficient information to determine that a U-Turn was permissible under federal law, OFAC

---

[9]  Under the International Emergency Economic Powers Act, Title 50, United States Code Section 1705, it is a crime willfully to evade, or attempt to evade OFAC sanctions.

required that the assets be frozen until such information was provided to the U.S. bank or the U.S. bank rejected the transaction.  If an Iranian transaction was not a permissible U-Turn, a U.S. bank could release the funds only if OFAC granted a special license.

17.     By 2008 it was clear that this system of wire transfer checks had been abused, and that U.S. foreign policy and national security could be compromised by permitting U-Turns to continue.  In November 2008, the U.S. Treasury Department revoked authorization for "U-Turn" transactions because it suspected Iran of using its banks – including the CBI/Markazi, Bank Saderat and Bank Melli – to finance its nuclear weapons and missile programs.  The U.S. also suspected that Iran was using its banks to finance terrorist groups, including Hezbollah, Hamas and the Palestinian Islamic Jihad, and engaging in deceptive conduct to hide its involvement in various other prohibited transactions, such as assisting OFAC-sanctioned weapons dealers.

## SCB's Deceptive Business Plan

18.     For at least 9 years, from early in 2001 through 2010, SCB concealed from New York and U.S. regulators roughly sixty thousand U-Turns for Iranian Clients.   These U.S. dollar transactions originated and terminated in European banks in the United Kingdom and the Middle East, and were cleared through SCB's New York branch.   They amounted to at least $250 billion in the aggregate, and generated hundreds of millions of dollars in fees for SCB.

19.     SCB's success in U.S. dollar clearing for Iranian Clients stems from the documented willingness of its most senior management to deceive regulators and violate U.S. law.  Worse yet, SCB apparently adopted this strategy with full knowledge of the risks involved.

20.     As early as 1995, soon after President Clinton issued two Executive Orders announcing U.S. economic sanctions against Iran, SCB's General Counsel embraced a

framework for regulatory evasion.  He strategized with SCB's regulatory compliance staff by advising that "if SCB London were to ignore OFACs regulations AND SCB NY were not involved in any way & (2) had no knowledge of SCB Londons [sic] activities & (3) could not be said to be in a position to control SCB London, then IF OFAC discovered SCBLondons [sic] breach, there is nothing they could do against SCB London, or more importantly against SCBNY."  He also instructed that a memorandum containing this plan was "highly confidential & MUST NOT be sent to the US."[10] (emphasis in original)

21.    Years later, another SCB executive closely weighed the costs and benefits of concealing the identities of Iranian Clients.  He observed that "the current process under which some SWIFT messages are *manually 'repaired' to remove reference to Iran could (despite accepted SWIFT protocols) be perceived by OFAC as a measure to conceal the Iranian connection from SCB NY, and therefore evade their controls for filtering Iran-related payments.* Unless transactions are repaired they face delays caused by investigations in the U.S. banking system, subjecting SCB to interest claims."   He described SCB's repair procedures as a "process to check that a payment is, prima facie, an acceptable U-turn transaction (i.e. offshore to offshore)," and fully acknowledged that  "they *do not provide assurance that it does not relate to*

---

[10]  Email from SCB's General Counsel to SCB's Group Compliance Manager dated June 1, 1995, SCB-00038523 (emphasis in original). SCB's General Counsel added that "when dealing with OFAC countries that are not on the UK's list SCB London should use another US Dollar clearer in NY.  It should not in any event use SCB NY."  In fairly mercenary terms, he recommended that "SCB should use eg [National Westminister Bank] who in processing the transactions would breach OFAC regulations & would expose themselves to a penalty."

*a prohibited transaction, and therefore SCB NY is exposed to the risk of a breach of sanctions*."[11] (emphasis added).

22.    In early 2001, CBI/Markazi, a state-owned OFAC-sanctioned institution, approached SCB to act as its recipient bank for U.S. dollar proceeds from daily oil sales made by the National Iranian Oil Company.  SCB viewed this engagement as "very prestigious" because "in essence, SCB would be acting as Treasurer to the CBI . . . ."[12]

23.    A critical component of the deal between SCB and CBI/Markazi was the timing of $500 million in daily U.S. dollar payments.  A senior manager of SCB's Iranian business noted that "the most important aspect to CBI/Markazi of this relationship with SCB" was SCB's "willingness to pay away funds in advance of receipts (intraday of up to USD 200m)."  He stressed that providing rapid U.S. dollar payments for CBI/Markazi "could lead to increased business activity with [other Iranian] banks."[13]

24.    In March 2001, SCB's Group Legal Advisor counseled several of SCB's officers that, "our payment instructions [for Iranian Clients] should not identify the client or the purpose of the payment."[14]

---

[11] Memorandum entitled *Project Gazelle*, by SCB's Group Head of Compliance and Regulatory Risk and its CEO, United Arab Emirates, to SCB's Group Executive Director for Risk and its Group Head of Global Markets dated December 1, 2005, SCB INT 0017483.

[12] Email from SCB's Head of Inbound Sales, Institutional Banking, to SCB's Head of Group Market Risk, and SCB's Group Head of Institutional Banking and Global Head of Business Segment, and its Head of Funds Management dated February 19, 2001, SCB INT 0005352.

[13] Id.

[14] Email from SCB's Group Legal Advisor to its Product Manager, Corporate & Institutional Banking and its General Counsel dated March 23, 2001, SCB INT 0005368; forwarded to SCB's Group Head of Audit, its Head of Institutional Banking & Global Head of Business Segment, and its Head of Inbound Sales, Institutional Banking, SCB INT 0005367.

25.    Indeed, Iranian Clients apparently pressured SCB by warning that disclosure of their identities to U.S. banks would cause unacceptable delays in clearing funds.    SCB well understood that "given that these are large wholesale sums they are worried by any delay."[15] SCB's Iranian Clients were concerned "not only [with] what delays would be caused by [SCB's New York branch], but also what delays could be caused by any other U.S. institution through which the payment was routed."    SCB's Iranian Clients insisted that "no other banks processed their payments with full disclosure and it was not industry practice to do so."[16]

26.    SCB sought outside legal advice regarding its U-Turn policy and was apparently instructed that compliance with U.S. law required a process by which its New York branch received "foreknowledge of such authorized [U-Turn] payments" so as to "otherwise ascertain that the payments are authorized." SCB was advised that its New York branch needed to "assure itself that it is making permissible payments."[17]

27.    Rather than institute any such procedure, SCB instead conspired with Iranian Clients to transmit misinformation to the New York branch by removing and otherwise misrepresenting wire transfer data that could identify Iranian parties.  For example, regarding necessary wire transfer documentation, SCB instructed CBI/Markazi to "send in their MT

---

[15] Email from SCB's Head of Transactional Banking Solutions, UK/Europe Corporate & Institutional Banking to SCB's outside U.S. legal counsel, SCB's New York branch Head of Legal & Compliance, Americas and Head of Legal for Corporate & Institutional Banking and SCB's Product Manager, Corporate & Institutional Banking dated October 3, 2003, SCB INT 0020023.

[16] Note of Interview with SCB's Head of Transactional Banking Solutions, UK/Europe Corporate & Institutional Banking, SCB INT 0001338-1340.

[17] Legal Memorandum from SCB's U.S. outside legal counsel entitled *OFAC Regulations-Iranian Payments/Standard Chartered London/New York* to SCB's Group Legal Advisor and Head of Compliance, Americas dated May 15, 2001 - referencing also an earlier guidance from the same outside counsel on March 21, 2001 - SCB INT 0001131.

202's[18] with a [SCB London's business identifier code] *as this is what we required them to do in the initial set up of the account. Therefore, the payments going to NY do not appear to NY to have come from an Iranian Bank.*"[19] (emphasis added). SCB also accomplished this subterfuge by: (a) inserting special characters (such as ".") in electronic message fields used to identify transacting parties; (b) inserting phrases such as "NO NAME GIVEN" or "NOT STATED" in lieu of requested information that would identify Iranian Clients; and (c) employing a system known as SCB's "repair procedure," whereby SCB overseas employees screened payment messages – before they were communicated to its New York branch – in order to ascertain if any messages contained information that identified Iranian Clients.

28.    SCB understood that simply omitting Iranian Client information on SWIFT MT 202 payment messages going to New York was insufficient because the electronic payment system would automatically fill in blank data fields, identifying the Iranian Client. Consequently, in order to disguise the transactions effectively and thereby avoid regulatory scrutiny, SCB made false and misleading entries in SWIFT "field 52," a data field that would identify the Iranian party.

29.    Documents show that SCB's attorney in charge of BSA/AML compliance knew that wire stripping was "the process for effecting Bank Markazi's payment instructions." He was

---

[18]Two common SWIFT payment messages were used for U-Turn transactions: the "MT-103" and the "MT-202." In a given U.S. dollar clearing transaction, the MT-103 identified all parties involved in the transaction, as funds flowed from the initial remitter, through correspondent banks, to the ultimate beneficiary's bank account. MT-202s are merely bank-to-bank credit transfers, however, and consequently lacked the detailed transaction party information contained in MT-103s.

[19] Email from SCB's Manager, Cash Management Services, London to SCB's Product Manager, Corporate & Institutional Banking and its Head of Cash Management Services, UK dated October 15, 2003,  SCB INT 0001471; forwarded to SCB's Head of Transactional Banking Solutions, UK/Europe Corporate & Institutional Banking and SCB's Head of Legal & Compliance, Americas and Head of Legal for Corporate & Institutional Banking, SCB INT 0001469.

specifically told that "field 52 (ordering institution) is quoted by Bank Markazi in their MT202 as [SCB London]" or SCB would manually "repair" or "over-type field 52 as [SCB London]." He understood that these actions would leave "no reference to Bank Markazi," and would thereby "send[] incorrect information."[20]

30.    Senior SCB management memorialized many of these procedures in formal operating manuals. One such manual entitled, "Quality Operating Procedure Iranian Bank Processing," directed SCB London employees to "repair payment[s] by making appropriate changes" to transacting party codes. It provided step-by-step wire stripping instructions for any payment messages containing information that would identify Iranian Clients. An example directive read: "[e]nsure that if the field 52 of the payment is blank or displays [sic] any SWIFT code that it is overtyped at the repair stage to a '.' This will change the outgoing field 52 on the MT103 to a field 52D of '.' Or, in the case of a 'normal' MT202 instruction change the field 52 on the outgoing MT202 to [SCB's New York branch] to a '.' (Note: if this is not done then the Iranian Bank SWIFT code may appear – depending on routing – on the payment message being sent to [the New York branch])."[21]

31.    An instruction on that manual's cover stressed that "this procedure is a mandatory requirement" and that "[a]mendment is not permitted without prior approval of the Head of Cash Management Services UK Quality System."[22] SCB's chief lawyer in charge of Legal & Compliance for its Wholesale Bank division commented to other senior legal and compliance

---

[20] Note of Interview with SCB's head of Legal and Compliance Wholesale Bank, UK/Europe, SCB INT 0003674.

[21] Manual entitled, *Standard Chartered Bank, Cash Management Services, UK Quality Operating Procedure, Iranian Bank Processing*, SCB INT 0005722.

[22] Id. SCB INT 0005719.

staff that the document, "read in isolation, is clearly . . . designed to hide, deliberately, the Iranian connection of payments."[23]

32.    These masking procedures evolved to meet SCB's growing volume demands. When SCB anticipated that its business with Iranian Clients would grow too large for SCB employees to "repair" manually the instructions for New York bound wire transfers, SCB automated the process by building an electronic repair system with "specific repair queues," for each Iranian Client.[24]

33.    And as SCB vigorously cultivated U.S. dollar clearing business from Iranian Clients, the bank's outside counsel continued to admonish SCB not to evade regulatory requirements.  In 2003, one of SCB's outside legal counsel in the U.S. warned that the bank's system for executing U-Turns anonymously through the New York branch did "not comport with the law or the spirit of OFAC rules, which lay out explicit details on how such transactions are to be conducted."  She further instructed that "OFAC insists on full disclosure of all parties in transactions to ensure that transactions meet the terms of the rule."[25]

34.    Prompted by this guidance, one SBC executive observed that, "historically, [for Iranian U-Turns] we have not transparently declared the remitting/receiving entity details, and of course this past practice makes it harder for internal and external parties to accept our views

---

[23] Email from SCB's Group Head of Legal & Compliance, Wholesale Bank, forwarding the *Quality Operating Procedure to* SCB's Group Head of Compliance and Regulatory Risk, its Group Legal Advisor and its Head of Financial Crime Risk Systems and Monitoring dated October 1, 2005, SCB INT 0005715-5716.

[24] Note of Interview of SCB's Manager, Cash Management Services, London, SCB INT 0001620-1621.

[25] Email from SCB's U.S. outside counsel to SCB's Head of Transactional Banking Solutions, UK/Europe Corporate & Institutional Banking and SCB's New York branch Head of Legal & Compliance, Americas and Head of Legal for Corporate & Institutional Banking dated October 6, 2003, SCB INT 0020020.

now."[26] An executive SCB compliance attorney made the point more sharply, observing that SCB's London staff believed "that any payment that could conceivably give rise to an OFAC problem should always be dealt with [in a way to avoid detection]."[27]

35.    Beginning in 2003, other banks with significant Iran portfolios began exiting the U-Turn business.    For instance, SCB's business managers learned that Lloyds TSB London were "withdrawing their services" with one of its Iranian client banks "primarily for reputational risk reasons."[28]    Rather than follow suit, and despite concerns regarding reputational risk and OFAC sanctions, SCB positioned itself to take the abandoned market share.[29]

36.    As described in a December 2005 internal memorandum written by SCB's CEO for the United Arab Emirates and the Group Head of Compliance and Regulatory Risk, entitled "*Project Gazelle, Report on Iranian Business* – which was circulated among SCB's key legal, compliance, and Iranian Client business managers – SCB's "short to medium term strategy [was] to grow the wholesale business by growing our wallet share from existing relationships with

---

[26]Email from SCB's Head of Transactional Banking Solutions, UK/Europe Corporate & Institutional Banking to SCB's Head of Institutional Banking and Global Head of Business Segment and its Group Head of Compliance and Regulatory Risk and forwarding the email referenced, supra, on October 7, 2003, SCB INT 0020019.

[27] Email from SCB's Legal Counsel and Head of Compliance, Wholesale Bank, UK/Europe to SCB's Head of Legal, Wholesale Bank and SCB's Group Head of Legal & Compliance dated September 4, 2003, SCB INT 0005690.

[28] Email from SCB's Head of Transactional Banking Solutions, UK/Europe Corporate & Institutional Banking (via her assistant) to several of SCB's wholesale bank business managers dated March 9, 2003, SCB INT 0001419.

[29] Memorandum entitled, *Summary of the Risks/Issues to be Addressed with Regard to Iranian Bank USD Clearing that Require Management Direction from Middle East Senior Management Team*, accompanying the email, supra, and noting that additional Iranian business may "trigger an action" from OFAC, "leaving SCB exposed, with potential reputational damage,"  SCB INT 0001420.

Financial Institutions and Iranian companies and establishing new relationships with Iranian companies and [intermediaries] in oil and gas related businesses."[30]

37.    Consistent with its historical views, SCB apparently decided that regulatory compliance would impede any such business expansion.  Summarizing the bank's linchpin consideration, SCB's chief legal and compliance officer for its wholesale banking business explained that SCB wire stripped because "there would be a delay in the OFAC que [sic] if an Iranian name was spotted by the OFAC filter in New York and the payment would get held up." Any such delay, he concluded, would be "a deal-breaker" in SCB's efforts to develop new business.[31]

38.    To avoid such deal-breakers, SCB instituted a system of so-called "offshore OFAC due diligence."  The entire concept was a sham.  Any off-shore substitute for OFAC compliance would have necessarily caused the exact delay threatened by OFAC compliance at the New York branch.  Under the law governing at the time, any legitimate due diligence was premised on investigative delay.  SCB undertook its off shore due diligence program, however, specifically to escape OFAC's watchful eye, not to be examined by it.

39.    SCB's overseas due diligence staff members were responsible for both SCB's U-Turn "repair procedures" and OFAC "compliance" – a paradoxical task to say the least.  These staff members did not know the elements of a lawful U-Turn transaction other than that the payment "had to be offshore to offshore," and they were not trained to determine whether the

---

[30] Memorandum entitled *Project Gazelle*, by SCB's Group Head of Compliance and Regulatory Risk and its CEO, United Arab Emirates to SCB's Group Executive Director for Risk and its Group Head of Global Markets dated December 1, 2005,  dated December 1, 2005, SCB INT 0017481.

[31] Note of Interview with SCB's Head of Legal & Compliance, Wholesale Bank, U.K./Europe, SCB INT 0003675.

underlying transactions were valid according to the Iranian Trade Regulations.[32] In fact, as late as August, 2006, SCB's operations staff still "resolve[d] 'hits' on sanctioned names *directly with the customer*" – a method ill-designed to detect client misconduct.[33] (emphasis added).

40.    Yet senior SCB management knowingly embraced the bank's fraudulent U-Turn procedures.  Their ongoing and deliberate actions are evidenced by:

- A 2005 report in which senior SCB executives noted "the current process under which some SWIFT messages are manually 'repaired' to remove reference to Iran could . . . be perceived by OFAC as a measure to conceal the Iranian connections from SCB NY, and therefore evade their controls for filtering Iranian related payments."  The report additionally observes that if "a non-complying payment were discovered, OFAC would undoubtedly ask to see control procedures, and SCB's use in certain instances of the repair process may result in heavier penalty than might otherwise be applied, and significant criticism."[34]

- A 2005 e-mail from SCB's Group Legal Counsel to senior compliance staff in the U.K. communicating OFAC's stated concern that "some banks may suppress information" on SWIFT payment messages, and warning that bankers must take OFAC sanctions "seriously" or risk penalties ranging from civil enforcement actions to criminal prosecutions.[35]

- A note to file describing a December 29, 2005 meeting attended by SCB's General Counsel, Head of Legal and Compliance, and outside UK counsel, at which they considered whether the new CEO for the Americas – who was the former CEO for the United Arab Emirates – was obligated to report to US regulators any suspicions he may have had about SCB's Iran business conducted in Dubai and "*whether his physical presence in the USA heightens the prospect of*

---

[32] Note of Interview with Manager, Cash Management Services, London, SCB INT 0001628-1629.

[33] Memorandum entitled *Sanctions Compliance Report* dated August 3, 2006, SCB INT 0002051.

[34]Memorandum entitled *Project Gazelle*, by SCB's Group Head of Compliance and Regulatory Risk and its CEO, United Arab Emirates to SCB's Group Executive Director for Risk and its Group Head of Global Markets dated December 1, 2005,  dated December 1, 2005, SCB INT 0017483.

[35] Memorandum entitled, *OFAC meeting – 18 September 2005*, by SCB's Group Legal Counsel to SCB's Group Executive Director and senior SCB staff, SCB INT 0002985 – 0002987.

*[him] becoming a more available witness of fact for SCB's Iran Business.*"[36] (emphasis added)

- A 2006 memorandum from SCB's General Counsel advising SCB's Audit and Risk Committee that "certain US$ clearing transactions handled in London were processed with the name of the Iranian Bank excluded or removed from the 'remitter field'" despite the "requirement that due diligence in respect of 'U-turn' payments should be undertaken by our office in New York." SCB's chief legal counsel strategized, much as he had in 1995, that "it is reasonable to undertake due diligence on behalf of New York outside the US" even though "we are potentially placing our SCB New York office and the Bank at risk if our due diligence procedures are not fully effective."[37]

### SCB Defrauds Safety and Soundness Examiners

41.     By 2003, New York regulators had discovered *other* significant BSA/AML violations at SCB's New York branch, including deficiencies in its suspicious activity monitoring and customer due diligence policies and procedures. In October 2004, SCB consented to a formal enforcement action and executed a written agreement with the Department and FRBNY, which required SCB to adopt sound BSA/AML practices with respect to foreign bank correspondent accounts (the "Written Agreement"). The Written Agreement also required SCB to hire an independent consultant to conduct a retrospective transaction review for the period of July 2002 through October 2004. The review was intended to identify suspicious activity involving accounts or transactions at, by, or through SCB's New York branch.

42.     Besides imposing specific operational reforms, the Written Agreement created negative "implications for [SCB's] growth ambition and strategic freedom that [went] way

---

[36] Memorandum to summarize meeting on December 29, 2005, between SCB's Head of Legal & Compliance, its General Counsel, and its U.K. outside legal counsel, SCB INT 0017508.

[37] Memorandum entitled *Iranian Business* from SCB's General Counsel to SCB's Audit and Risk Committee dated February 23, 2006, SCB INT 0017372.

beyond just the US." In consequence, SCB had every incentive "to exit the Written Agreement in a timely fashion." It stood as a significant obstacle to SCB's growth and evolving business strategies.[38]

43. SCB vowed to the regulators that it would comply with the Written Agreement.

44. To that end, SCB retained D&T to conduct the required independent review and to report its findings to the regulators. In August and September 2005, D&T unlawfully gave SCB confidential historical transaction review reports that it had prepared for two other major foreign banking clients that were under investigation for OFAC violations and money laundering activities. These reports contained detailed and highly confidential information concerning foreign banks involved in illegal U.S. dollar clearing activities.[39]

45. Having improperly gleaned insights into the regulators' concerns and strategies for investigating U-Turn-related misconduct, SCB asked D&T to delete from its draft "independent" report any reference to certain types of payments that could ultimately reveal SCB's Iranian U-Turn practices. In an email discussing D&T's draft, a D&T partner admitted that "we agreed" to SCB's request because "this is too much and too politically sensitive for both SCB and Deloitte. That is why I drafted the *watered-down* version."[40]

---

[38] Memorandum entitled *Business with Iran – USA Perspective* by SCB's CEO, Americas to SCB's Group Executive Director for Risk, its Group Head of Compliance and its Group Head of Public Affairs dated October 5, 2006, SCB INT 005762.

[39] Email from Deloitte and Touche's Global Leader of Anti-Money Laundering/Trade Sanctions Division to SCB's Project Manager for the Lookback Review, dated August 30, 2005, AUS_001_00000001-00298. Email from Deloitte and Touche's Global Leader of Anti-Money Laundering/Trade Sanctions Division to SCB's Project Manager for the Lookback Review, dated September 17, 2005, MCM_001_00000001-1728.

[40] Email from Deloitte and Touche's Global Leader of Anti-Money Laundering/Trade Sanctions Division to SCB's Head of Compliance, Project Manager for the Lookback Review, Compliance Officer and a Manager from Deloitte and Touche dated October 8, 2005. SCBNYR00001915.

46.    In September 2005, SCB's CEO of the Americas met with the Department's Deputy Superintendent for Foreign Banks to discuss, among other things, SCB's Iranian business. The Deputy Superintendent advised SCB to comply with all regulations pertaining to Iranian transactions. In addition, the Deputy Superintendent warned SCB that other banks were being investigated in connection with Iranian financial dealings. In response, SCB's CEO assured the Deputy Superintendent that the bank was compliant in all matters related to Iran.[41] Thus, when given the specific opportunity to discuss with Department officials the propriety of wire stripping, SCB instead lied to them.

47.    As a result of high-profile enforcement actions at several prominent foreign banks, New York regulators in 2006 began to focus on SCB Iranian U-Turns.

48.    In September 2006, New York regulators requested from SCB statistics on Iranian U-Turns, including the number and dollar volume of such transactions for a 12 month period.[42] In response, SCB searched its records for 2005 and 2006, and uncovered 2,626 transactions totaling over $16 billion.[43] SCB's Head of Compliance at the New York branch provided the data to SCB's CEO for the Americas, who in turn, sent it to the SCB Group Executive Director in London. In his memorandum to the Executive Director, the CEO expressed concern that this data would be the "wildcard entrant" in the ongoing review of U-Turns by regulators and could

---

[41] Email from SCB's CEO, Americas to SCB Group Executive Director and Group Head of Compliance dated September 14, 2005, SCB INT 0004623-4638.

[42] SCB's *Log of Documentation Requested for BSA/AML/OFAC Pre-Exam*, dated September 28, 2006, SCB INT 0004968; Note of Interview with SCB's Head of Cash Management Services (2002-2005), Head of Compliance (2005-2007) at the New York branch, SCB INT 0004725.

[43] Email from SCB's Project Manager for the Lookback Review to SCB's Head of Cash Management Services (2002-2005) and Head of Compliance (2005-2007) at the New York branch , SCB's Head of Operations and Head of Cash Management Operations dated September 26, 2006, SCB INT 0002852.

lead to "catastrophic reputational damage to the [bank]." [44]  Based on direction from "the powers that be," SCB's Head of Compliance in New York provided only *four days* of U-Turn data to regulators.[45]

49.    This evidence shows that members of SCB's top management were involved in yet another staggering cover up.

50.    They achieved their goal.  Using D&T's "watered-down" report and the fraudulent data, SCB convinced the Department and FRBNY to lift the Written Agreement in 2007.  In other words, SCB successfully misled New York regulators to believe that it had corrected serious flaws in its BSA/AML program.

51.    But the opposite was true.  By forging business records over many years to circumvent OFAC restrictions, SCB undermined all aspects of its BSA/AML program.  Because SCB regularly concealed the names of the high risk clients, it could not accurately track and evaluate their risk levels.  Nor could SCB effectively screen for suspicious activity and financial transactions – monitoring that is essential to any institution's BSA/AML program.  Perhaps worst of all, SCB's actions prevented regulators from doing their job in detecting potential threats to the U.S financial system and other national security breaches.

52.    SCB's pledge to implement adequate procedures for assessing customer risk and suspicious activity was a critical component of the Written Agreement.  Consequently, at the

---

[44] Memorandum entitled *Business with Iran – USA Perspective* by SCB's CEO, Americas to SCB's Group Executive Director for Risk, its Group Head of Compliance and its Group Head od Public Affairs dated October 5, 2006, SCB INT 0005759-5762.

[45] Note of Interview with SCB's Head of Cash Management Services (2002-2005) and Head of Compliance (2005-2007) at the New York branch, SCB INT 0004733-4734.

very least, the Department would have kept the Written Agreement rigidly in place had SCB not meticulously disguised its willful misconduct.

53.    In early 2009, after being contacted by certain law enforcement authorities, SCB conducted an internal investigation into its OFAC procedures.  In May 2010, more than a year after it had commenced its own investigation, and notwithstanding its obligation to notify the Department of these matters promptly, SCB finally informed the Department of its review.

54.    At a meeting in May 2010, SCB assured the Department that it would take immediate corrective action.  Notwithstanding that promise, the Department's last regulatory examination of the New York branch in 2011 identified continuing and significant BSA/AML failures, including:

- An OFAC compliance system that lacked the ability to identify misspellings and variations of names on the OFAC sanctioned list.

- No documented evidence of investigation before release of funds for transactions with parties whose names matched the OFAC-sanctioned list.

- Outsourcing of the entire OFAC compliance process for the New York branch to Chennai, India, with no evidence of any oversight or communication between the Chennai and the New York offices.

## CONCLUSION

Motivated by greed, SCB acted for at least ten years without any regard for the legal, reputational, and national security consequences of its flagrantly deceptive actions.  Led by its most senior management, SCB designed and implemented an elaborate scheme by which to use its New York branch as a front for prohibited dealings with Iran – dealings that indisputably helped sustain a global threat to peace and stability.  By definition, any banking institution that engages in such conduct is unsafe and unsound.

The evidence uncovered by the Department indicates that SCB has committed regulatory transgressions of the highest order, to wit:

## APPARENT VIOLATIONS OF LAW

### FIRST VIOLATION OF LAW
(Failure to Maintain Accurate Books and Records NYBL §200-c )

SCB failed to maintain or make available at its New York branch office true and accurate books, accounts and records reflecting all transactions and actions, including but not limited to, true and accurate books, accounts and records to reflect Iranian U-turn transactions, effected by or on behalf of SCB and its New York branch.

### SECOND VIOLATION OF LAW
(Obstructing Governmental Administration P.L. § 195.05)

SCB obstructed governmental administration at its New York branch by intentionally obstructing, impairing and compromising the Department's administration of law, regulation and supervisory authority and prevented examiners of the Department and of other US regulatory agencies from performing their official functions by means of withholding, stripping and distorting information to identify numerous transactions of its OFAC-sanctioned clients to evade OFAC regulations.

### THIRD VIOLATION OF LAW
(Failure to Report Crimes and Misconduct 3 N.Y.C.R.R.§ 300.1)

SCB failed to submit a report to the Superintendent immediately upon the discovery of fraud, dishonesty, making of false entries and omission of true entries, and other misconduct,

whether or not a criminal offense, in which an SCB director, trustee, partner, officer, employee or agent was involved.

### FOURTH VIOLATION OF LAW
(Falsification of Books and Reports N.Y.B.L. § 672.1)

SCB's officers, directors, employees and agents made false entries in SCB's books, reports and statements and willfully omitted to make true entries of material particularly pertaining to the US dollar clearing business of SCB at its New York branch with the intent to deceive the Superintendent and examiners, supervisors and lawyers of the Department and representatives of other US regulatory agencies who were lawfully appointed to examine SCB's condition and affairs at its New York branch.

### FIFTH VIOLATION OF LAW
(Offering False Instrument for Filing P.L. § 175.35)

SCB offered written instruments to examiners of the Department and of other US regulatory agencies, with the knowledge that such instruments contained false information, and with the intent to defraud the Department and with the knowledge that it would be filed with, registered or recorded in or otherwise become part of the records of the Department.

### SIXTH VIOLATION OF LAW
(Falsifying Business Records P.L. § 175.10)

SCB falsified business records with the intent to defraud examiners and the intent to aid and assist sanctioned countries to engage in US dollar clearing transactions in violation of 31 CFR 560.516.

**SEVENTH VIOLATION OF LAW**
(Unauthorized Iranian Transactions 31 C.F.R. 560.516)

SCB engaged in transactions within the United States without complying with the requirements of 31 C.F.R. 560.516 in that SCB prevented its New York branch from determining whether the underlying transactions were permissible under by 31 C.F.R. 560.516 before effecting them.

**NOW THEREFORE**, the Superintendent directs that:

**WHEREAS**, having considered the foregoing evidence of SCB's apparent fraudulent and deceptive conduct toward the Department and other industry regulators; and

**WHEREAS**, having considered additional and substantial evidence presently before the Department of this egregious misconduct; and

**WHEREAS**, apparent violations of law enabled SCB to evade strict regulatory obligations established to ensure the safety and soundness of foreign banking institutions licensed to operate in the State of New York, as well as to support the national security of the United States; and

**WHEREAS**, the Superintendent has determined that grounds exist for revocation of SCB's license to operate in the State of New York and that interim measures must be taken to protect the public interest,

25

**IT IS NOW HEREBY ORDERED** that, pursuant to Banking Law § 39(1), SCB shall appear before the Superintendent or his designee on Monday, August 15, 2012, at 10:00 a.m., at the Department's offices located at One State Street Plaza, New York, NY 10004, to explain these apparent violations of law and to demonstrate why SCB's license to operate in the State of New York should not be revoked; and

**IT IS HEREBY FURTHER ORDERED** that, on August 15, 2012, SCB shall also demonstrate why, pursuant to Banking Law § 40(2), SCB's U.S. dollar clearing operations should not be suspended pending a formal license revocation hearing; and

**IT IS HEREBY FURTHER ORDERED** that, pursuant to Banking Law §§ 36(4) and 39(5), and Financial Services Law § 206(c), SCB shall immediately submit to and pay for an independent, on-premises monitor of the Department's selection, which will ensure that SCB's New York operations fully comply with all BSA/AML requirements.  The monitor will also review the accuracy of SCB's books and records pertaining to the processing of wire payments from New York to U.S. sanctioned foreign jurisdictions that are either direct or ultimate beneficiaries of the transaction; and

**IT IS HEREBY FURTHER ORDERED** that, any assessment of monetary penalties shall await a formal hearing to be scheduled upon further notice by the Superintendent.

By Order of the Superintendent, effective this 6th day of August, 2012.

New York, New York

By:
        Benjamin M. Lawsky,
        Superintendent of Financial Services