# Exhibit C



Confidential

Washington Atlanta New York San Francisco Dubai London Milan Paris Singapore Sydney Tokyo Toronto

# Sanctions Compliance Transaction Review – Standard Chartered Bank

*Report on Iranian Trade Finance Transactions*

*March 11, 2011*

**CONFIDENTIAL**

# 1. Approach - Scope of Review

- **This Report**. This Report ("Report") summarizes the results of a Review ("Review") by Promontory Financial Group, LLC ("Promontory") of Iranian Trade Finance Transactions involving Standard Chartered Bank ("SCB" or the "Bank"). The Report addresses Iranian business only. Subsequent reports will summarize Promontory's review of payments and trade transactions involving U.S. sanctioned countries other than Iran (i.e. Burma, Cuba, Iraq, Libya, North Korea, Sudan, and Syria).

- **Time period.** January 1, 2001 to December 31, 2007 (the "Review Period").

- **Terms used in this Report.** Capitalized terms used but not defined in this Report have the same meaning as those used in the report entitled "Sanctions Compliance Transaction Review – Standard Chartered Bank – Report on Iranian Payments" (the "Payments Report") previously submitted on January 21, 2011.

- **SCB locations.** SCB, with advice of external counsel and Promontory, determined in scope countries and the level of review to which they were to be subjected. Countries were assigned to one of three tiers or to "Other" as follows:

  - **Tier 1**. Evidence has been identified of a policy/practice of repair or cover payments specific to transactions involving U.S. sanctioned countries.

  - **Tier 2**. No evidence has been identified of a policy/practice of repair or cover payments specific to transactions involving U.S. sanctioned countries. During the Review Period, credit-related trade values with U.S. sanctioned countries exceeded $100 million or Wholesale Banking revenues involving U.S. sanctioned countries exceeded 2.5% of SCB's global Wholesale Banking (ex-U.S.) revenues with U.S. sanctioned countries.

  - **Tier 3**. No evidence has been identified of a policy/practice of repair or cover payments specific to transactions involving U.S. sanctioned countries. During the Review Period, credit-related trade values with U.S. sanctioned countries were between $5 million and $100 million and Wholesale Banking revenues involving U.S. sanctioned countries were 2.5% or less of SCB's global Wholesale Banking (ex-U.S.) revenues with U.S. sanctioned countries.

  - **Other**. No evidence has been identified of a policy/practice of repair or cover payments specific to transactions involving U.S. sanctioned countries. During the Review Period, credit-related trade values with U.S. sanctioned countries were less than $5 million and Wholesale Banking revenues involving U.S. sanctioned countries were 2.5% or less of SCB's global Wholesale Banking (ex-U.S.) revenues with U.S. sanctioned countries.

©2011 Promontory Financial Group, LLC. All rights reserved.

CONFIDENTIAL

## 1. Approach - Scope of Review (continued)

- **Trade Finance Transactions.** For the purposes of this Report, Trade Finance Transactions include all cross-border Trade Finance Transactions other than the import/export of goods paid for through the "open account" method (i.e. through a direct payment from buyer to seller, normally upon receipt of goods or following invoicing from the seller). Payments through the open account method are addressed as part of the Payments Review. Trade Finance Transactions include:
  - Import and Export Letters of Credit
  - Import and Export Documentary Collections
  - Discounting of Bills of Exchange
  - Guarantees.

  A "transaction" consists of both the initial activity associated with the establishment/set-up of the transaction, and all other recorded activity associated with that transaction, except as otherwise noted. For example, one Export Letter of Credit transaction could include the establishment of the Export Letter of Credit, a number of amendments and multiple negotiations associated with that Letter of Credit.

  This Report does not consider medium and long term trade transactions (e.g. those related to structured trade finance), which are addressed in the report entitled "Standard Chartered Bank, Dubai and London, Iranian Trade Finance Business, Part B: Medium/Long Term Trade Business, 2001 – 2007" previously submitted on January 21, 2011.

- **Currencies.** The Review included both USD denominated and non-USD denominated transactions. Non-USD transactions were reviewed as part of the hard copy review of selected transactions discussed on page 10 to determine whether they involved exportation, re-exportation or trans-shipment of U.S. origin goods to a sanctioned country.

- **Value of Transactions.** In this Report, except as otherwise noted, the term "value" refers to the aggregate invoice value of the transaction as seen in the electronic trade data or hard copy files reviewed, excluding any amount of an invoice value confirmed by Promontory as having been paid prior to January 1, 2001 or after December 31, 2007 and excluding any subsequent discounting or refinancing payments related to the same transaction. Where Promontory identified payments made prior to January 1, 2001, that related to transactions involving entities with transactions reported elsewhere in this Report, information regarding those transactions is provided in the section of this Report entitled "Transactions Outside of the Review Period".

©2011 Promontory Financial Group, LLC. All rights reserved.

5

**CONFIDENTIAL**

# 1. Approach - Review of Tier 1 Electronic Data

**Tier 1: Electronic Data Review – All Available USD SWIFTS Filtered**

- All trade-related USD denominated SWIFT messages from the relevant SCB locations were filtered using Promontory's filtering methodology and criteria, as described in the Payments Report previously submitted. Any potential matches against Promontory's SDN list were escalated for further review. The search terms used included:
  - A list of SDNs designated at any time from January 1, 2001 to March 31, 2010.
  - Any Islamic Republic of Iran Shipping Lines ("IRISL") related entities or vessels designated between March 31, 2010 and June 30, 2010.
  - A list of bank identifier codes and bank names of sanctioned banks, banks in sanctioned countries, and the foreign affiliates of sanctioned banks.
  - A list of geographic identifiers (cities, towns, regions, and ports) of sanctioned countries.

- The filtering included all in scope USD denominated SWIFTs sent and received in the Review Period to and from SCB, London and SCB, Dubai, including:
  - All MT700 messages (relating to the establishment of a Letter of Credit).
  - All MT400 messages (relating to the establishment of a Guarantee).
  - Messages types MT701 to MT799 and MT401 to MT499 (being messages relating to the administration and amendment of Letters of Credit and Guarantees, respectively).

- Therefore, in conjunction with the results of the Payments Report previously submitted, all cross-border USD SWIFT messages within scope have been filtered against Promontory's filtering methodology. In addition, where payments-related SWIFT messages were identified in the Payments Review as being associated with a trade finance transaction, those SWIFTs were considered as part of the Trade Finance Review work stream and were not included in the Payment Review results.

**Tier 1: Electronic Data Review – Electronic Trade Data Filtered**

- All electronic trade data from the relevant SCB locations (e.g. from the electronic trade platforms Exim Bills and TC Exim in Dubai, and Tradewinds and TC Imex in London), for all currencies utilized during the Review Period, were also filtered using the same criteria and escalation procedures.

- The limitations of the data available are discussed on the following page.

**Results Of The Electronic Data Review**

- The results of the filtering were used to select transactions for hard copy review, for which the detailed approach is described below.

- Where a transaction was selected for further review, Promontory sought to identify and review all SWIFTs related to that transaction, including related payments messages such as MT202s and MT103s, and any other relevant electronic trade data.

©2011 Promontory Financial Group, LLC. All rights reserved.

7

# 1. Approach - Review of Tier 1 Electronic Data (continued)

**Limitations Of Electronic Data Available**

- Promontory considered a number of sources of electronic data during its work:
    - SCB's Trade Approval System ("TAS") was reviewed at a high level at an early stage of the project for the purposes of determining the initial number of transactions to be selected for further review.[1] However, during the Review Period TAS was used primarily by the SCB Group Risk function to capture trade activity for risk management purposes, and was intended to capture only transactions of up to $1m in value. As a result it included duplicated trades recorded by different parties for early approval, held little transactional detail, and did not record many high value transactions. Our subsequent work suggests TAS understated the volume and value of trade business undertaken (see below).
    - SCB provided information from its core banking and other transaction processing systems upon request, for instance, when establishing the account history of an entity under review.
    - The trade finance systems used during the Review Period in SCB, Dubai and SCB, London were of limited functionality and scope, and many of the systems were decommissioned (either during the Review Period or subsequently) and had to be restored to enable access to the underlying data. Once restored, the data were extracted and rebuilt on Promontory servers in London and Dubai to enable analysis.
- The detail available within the Tier 1 electronic-trade data was limited. The data normally identified the key parties involved in the transaction, the timing and currency of the transaction, and associated amendments. The full payments routing of the transaction was sometimes available. However:
    - The data were not 'linked', i.e., each activity within a transaction was counted as a separate, independent line of data. For example, an Export Letter of Credit could have had one line of data for when it was advised, a later line for an amendment, and then three separate, unlinked, lines within the data set for individual negotiations.
    - There was no metadata available, no audit trails, and no recording of associated correspondence with a transaction.
    - The electronic data did not include scanned hard copy documents, and detailed shipping documentation was not available, which meant that information was limited when considering areas such as the origin of the goods, the shipping lines used, and the full range of related parties to a transaction.
- As a result of these limitations, greater focus was placed on the review of the available hard copy, and greater weight was given to hard copy evidence when assessing a transaction.

---

[1] See page 9 for further detail on how the number of total transactions in the Review Period was estimated.

©2011 Promontory Financial Group, LLC. All rights reserved.

**CONFIDENTIAL**

## 1. Approach - Review of Tier 1 Electronic Data (continued)

**Estimates of Total Transactions in the Review Period**

- As stated above, the trade finance systems in place during the Review Period had limited reporting functionality, and in all cases data had to be extracted on a "line by line" basis in order to enable analysis.
- As a result, there is no reliable single source of data for estimating the total trade finance transactions undertaken during the Review Period.
- Consideration was given to a number of sources of data:
  - TAS was used for early estimates, and records 9,981 Tier 1 credit-related trade finance transactions involving sanctioned countries during the Review Period, of which 9,816 were Iranian. As stated above, this is likely to be an underestimate.
  - The SWIFT data can provide a count of the MT700 and MT400 messages used to initiate Letters of Credit and Guarantees. However, Promontory's SWIFT database only holds USD transactions, and the scope of the Trade Review is all currencies. In addition, there is no country identifier code in a SWIFT message which would necessarily identify the location of all parties involved in a transaction (e.g., the domicile of the Importer and the Exporter). Given the context of the Review, these factors prevent the data supporting a meaningful estimate of the number of SWIFT trade finance messages with an Iranian nexus. The table below provides a count of the <u>total</u> number of MT700 and MT400 series messages that were filtered during our work (i.e., messages relating to all countries, whether sanctioned or unsanctioned).
  - The electronic trade data have country identifiers, and covers all currencies. However, as discussed above, the data were unstructured and unlinked. To estimate the number of transactions during the period, analysis was undertaken of the electronic trade data sets to automatically "link" lines of data using mentions of reference numbers in different fields available in the data sets. The results of this analysis are likely to be an overestimate, as our work indicates that 'links' are often only identified from hard copy review (i.e., a data line for a transaction has no reference data matching it to the "main" part of the transaction, but such a 'link' can be identified from the associated hard copy). As a result, the trade data estimate is likely to double count many transactions, by counting two or more data line sets as independent of one another, when they should be counted as part of the same deal.
- Further details on the estimated total number and aggregate value of transactions involving sanctioned countries is provided in Appendix 4.

| | SWIFT Trade Messages Subject to Filtering in London & Dubai servers (all countries) | |
|---|---|---|
| | Estimated Total Messages | Unique Tag 20 identifiers[1] |
| MT400 | 76,979 | 69,500 |
| MT700 | 171,221 | 165,117 |
| MT401 to MT499 | 166,940 | 82,480 |
| MT701 to MT799 | 1,460,130 | 545,516 |

| | Trade Transactions from Electronic Trade Systems Subject to Filtering (Iran only) | |
|---|---|---|
| | Estimated Total Number | Estimated Total Value |
| London | 1,205 | $8,034,070,556 |
| Dubai | 23,249 | $10,282,510,554 |

[1] Tag 20 is commonly used to hold a transaction reference number, e.g., for the trade finance transaction.

©2011 Promontory Financial Group, LLC. All rights reserved.

**CONFIDENTIAL**

# 1. Approach - Review of Tier 1 Hard Copy

**Tier 1: Hard Copy Review – Hard Copy Indexing**

- In both SCB, London and SCB, Dubai, initial hard copy file retrieval requests failed to produce a sufficient body of documentation to enable a review of the transactions in question. As stated above, the electronic trade data were often not sufficient to enable an assessment of the transaction, which meant that the hard copy files were necessary for a meaningful review to take place.
- It was therefore decided to manually re-index all available hard copy trade files for the Review Period.
- The re-indexing process was a substantial logistical exercise, and involved staff from Promontory, SCB, Crown (SCB's records manager in Dubai), Iron Mountain (SCB's records manager in London), and Ernst & Young. Over 100 people in Dubai were involved in total, and 47 people worked in the UK on this exercise. The exercise ran from June, 2010 to August, 2010.

**Tier 1: Hard Copy Review – Selected Hard Copy "Linked" and Reviewed**

- During the course of our Review, 2,438 transactions were selected for hard copy review, using the three separate selection criteria described below.
- Each transaction was then "linked" by an investigator, who used the available electronic data and the available hard copy records to rebuild the steps of the transaction into a full case for review. This was done by identifying a new transaction reference number mentioned in one hard copy file (e.g., for an amendment or a negotiation) and then retrieving the referenced file as part of the "case building" process. This was often an iterative process, as new hard copy records would provide more information on other linked files.
- Transactions continued to be "built" until no further transaction steps or records could be identified. An assessment was then made of the amount of information available regarding that transaction:
    - In 1,731 cases, there was sufficient hard copy to enable an investigator to undertake a full hard copy review, and the findings of those reviews are included in this Report.
    - In 707 cases in SCB, Dubai, the hard copy available was insufficient to enable an investigator to make an assessment of the case (for instance, if only a small number of very limited negotiation files were available). These transactions have been categorised as "Transactions Selected, Insufficient Evidence Available", as best efforts were made to undertake a full hard copy review, but no other records were available, so an adequate assessment of the transaction could not therefore be made.
- Further details on the transactions selected for Tier 1 hard copy review are provided in Appendix 1.

©2011 Promontory Financial Group, LLC. All rights reserved.

CONFIDENTIAL

## 1. Approach - Tier 2 Investigative Methodology

**Phase 1: Information Capture And Initial Review**

- Investigators reviewed the electronic trade data relating to transactions selected for that country in order to determine the parties involved in each transaction, banking relationships, payment flows, currencies used, involvement of sanctioned countries, SDNs and u-turn compliance.

- The volume and granularity of the information available was often less than was available for an equivalent Tier 1 transaction, as the SWIFTs and the hard copy files were not in scope for Tier 2. However, the electronic trade data available normally identified the key parties involved in the transaction, the timing and currency of the transaction, and associated amendments. The full payments routing of the transaction, and the detailed shipping documentation, was not normally available from the electronic trade data alone.

- Potential discrepancies and issues related to a transaction were noted by investigators as part of the analysis.

**Phase 2: Assessment Of Case**

- All entities involved in a transaction were researched and reviewed, including applicants, beneficiaries of manufacturers, shipping agents, insurance companies, vessels, consignees, notify parties, second applicants, second beneficiaries, carriers.

- Research activities included:
    - SDN status
    - Verification of address
    - Media searches for negative news, including reporting of enforcement actions
    - Research on the existence of a possible U.S. nexus
    - Consideration of the status of goods under potentially applicable U.S. regulations (e.g. EAR, ITR).

- Tools used included:
    - Lexis-Nexis
    - World Check
    - World Compliance
    - Internet search engines.

- In addition, SCB's external counsel was consulted on questions of interpretation and clarification regarding the application of U.S. regulations to specific transactions.

**Quality Assurance:**

This review was subjected to extensive quality assurance procedures. Any identified errors were corrected and the trade finance investigators counseled on how to avoid the error in the future.

©2011 Promontory Financial Group, LLC. All rights reserved.

CONFIDENTIAL

# 1. Approach - Classification of Findings

The findings in this Report have been classified into the following categories:

### Transactions Involving U.S. Origin Goods

- The review identified transactions for which there was evidence of goods of U.S. origin. Where the origin of the goods could be confirmed by looking at the Certificate of Origin, the transactions are included in the categories "Transactions Involving Non-EAR 99 U.S. Origin Goods" or "Transactions Involving EAR 99 U.S. Origin Goods — Inconclusive Direct Export". Where there was some evidence that the goods were of U.S. origin, but the Certificate of Origin was not available or was not certified, the transactions are included in the category entitled "Transactions With Some Evidence of U.S. Origin Goods". In cases where it could be shown that all the goods in the transaction were of U.S. origin, the whole transaction value was included when valuing the transaction. In other cases, where some goods were shipped that appeared from the evidence to be of U.S. origin, and others were not, the value of the transaction for reporting purposes was the sum of the invoice value of the U.S. origin parts.

- The U.S. Origin goods transactions were reviewed to consider (in consultation with SCB's external counsel) whether the goods, based on their description, were listed on the Commerce Control List ("CCL"), or otherwise subject to licensing requirements under the EAR. Based on this analysis, the transactions were divided into two categories:

    - "Transactions Involving Non-EAR 99 U.S. Origin Goods"—This category includes transactions that involved U.S. origin goods which, based on their description in the relevant documentation, have been assessed likely to be listed on the CCL. Based on this assessment, it was determined that these transactions were unlikely to be considered EAR 99 goods, i.e., goods eligible for export from the United States without an export control license. For these transactions, consideration was also given to the status of the goods under the ITR re-export controls:

        - As assessment was made as to whether certain CCL-listed items would have been exempted from re-export controls on Iran under ITR § 560.414 because they were outside the United States and not the property of a U.S. person on and since May 7, 1995 and were not subject to re-export (as opposed to export) license requirements under U.S. regulations in effect prior to May 6, 1995.

        - Further, an assessment was made as to whether any non-exempt CCL-listed items were excluded from re-export controls because it was likely they comprised less than 10% of the value of a foreign-manufactured end product or were substantially transformed in accordance with ITR § 560.205(b).

    - "Transactions Involving EAR 99 U.S. Origin Goods—Inconclusive Direct Export"—This category includes transactions that involved U.S. origin goods not likely to be listed on the CCL but still subject to the EAR (i.e., not specifically exempted under EAR § 734.3). EAR 99 items are eligible for export from the United States to most of the world without an export license. Generally such items can be exported to Iran from third countries by non-U.S. persons without violating the EAR as long as Iran was not the intended destination when the items were exported from the United States.

        - For these transactions, consideration also was given to the probability that the underlying trade could be interpreted as a "direct" trade between the United States and Iran. The factors considered included the nature of the U.S. nexus in the transaction (e.g. if any U.S. parties were involved in the export of the goods), and the business of the Exporter (e.g. if the entity was involved in the import and export of goods to a range of counterparties and destinations, and if the entity appeared to only service one or more Iranian entities on a subsidiary, shell or agency basis). These features are noted in the commentary for each transaction set.

### Transactions That Involved U.S. Persons

- This category consists of transactions that involved a U.S. nexus other than U.S. origin goods or payments cleared by a U.S. clearing bank. The "U.S. person" in these transactions was either a U.S. legal entity that played a role in a transaction (for example a U.S. shipping agency or a U.S. registered vessel), or a U.S. citizen. The Review considered U.S. citizens related to the transaction entities, but did not seek to identify the nationalities of SCB employees who may have been involved in the processing of the transaction.

### Transactions Identified as Non U-Turn Payments

- This category contains transactions involving a U.S. clearing bank, and where the U.S. cleared payment relating to the transaction did not appear to follow u-turn routing.

©2011 Promontory Financial Group, LLC. All rights reserved.

18

**CONFIDENTIAL**

# 1. Approach - Classification of Findings (cont.)

**Transactions That Appeared to Follow U-turn Routing**
- This category contains transactions which either:
  - Involved a U.S. clearing bank, and the U.S. cleared payment relating to the transaction appeared to follow u-turn routing; or
  - Involved a U.S. clearing bank and another confirmed U.S. nexus and the U.S. cleared payment relating to the transaction appeared to follow u-turn routing, but based on available data there appeared to be a reasonable basis for concluding that the transaction was not otherwise prohibited.

**Transactions With No U.S. Nexus**
- This category contains transactions which were selected for hard copy review, but for which no U.S. nexus was confirmed (for example, where the transaction was in a currency other than USD, or where the transaction was cancelled or unutilized).

**Potentially Licensable Or Exempt Transactions**
- This category consists of transactions that, based on a review of available data, were found to fall within certain sub-categories based on OFAC exemptions, licenses, and statements of policy set out in the ITR applicable at the time the relevant transaction took place. These sub-categories are:
  - Agricultural; and
  - Medical.

**Transactions With Some Evidence of U.S. Origin Goods**
- Transactions with some evidence of U.S. origin are transactions which, during our review, were identified as having some indication of U.S. origin goods, but where there was no Certificate of Origin certified by a Chamber of Commerce. In addition to some specific transactions described in Section 7, there are two types of transactions included in this category:
  - **Mixed Origin:** Where the goods description, in the shipping documentation, for example, lists the United States as one of a number of countries from which the goods may have originated, and there is no conclusive evidence to prove or disprove which goods or portion of goods originated from the U.S.
  - **Unconfirmed Certificate of Origin:** Where there was a reference in electronic data or documentary evidence to some or all of the goods being of U.S. origin, but there was no Certificate of Origin certified by a Chamber of Commerce to prove or disprove the origin of the goods.

**Transactions Selected, Insufficient Evidence Available**
- This category consists of transactions that were selected for hard copy review, but the hard copy available was insufficient to enable an investigator to make an assessment of the case (for instance, if only a small number of very limited negotiation files were found).

**Transactions Outside Of The Review Period**
- Promontory reviewed a number of transactions where the hard copy review for these transactions established that a whole transaction, or some payments relating to a transaction, fell outside of the Review Period. In the interests of disclosure and transparency, further information regarding such transactions has been included in the "Transactions Outside of the Review Period" section.

©2011 Promontory Financial Group, LLC. All rights reserved.

**CONFIDENTIAL**

## 3. Transactions Involving Non-EAR 99 U.S. Origin Goods

- The approach to the classification of transactions involving U.S. origin goods is detailed on page 18.
- This category includes transactions that involved U.S. origin goods which, based on their description in the relevant documentation, have been assessed likely to be listed on the CCL. Based on this assessment, it was determined that these transactions were unlikely to be considered EAR 99 goods, i.e., goods eligible for export from the United States without an export control license. For these transactions, consideration was also given to the status of the goods under the ITR re-export controls:
    - An assessment was made as to whether certain CCL-listed items would have been exempted from re-export controls on Iran under ITR § 560.414 because they were outside the United States and not the property of a U.S. person on and since May 7, 1995 and were not subject to re-export (as opposed to export) license requirements under U.S. regulations in effect prior to May 6, 1995.
    - Further, an assessment was made as to whether any non-exempt CCL-listed items were excluded from re-export controls because it was likely they comprised less than 10% of the value of a foreign-manufactured end product or were substantially transformed in accordance with ITR § 560.205(b).

©2011 Promontory Financial Group, LLC. All rights reserved.

**CONFIDENTIAL**

## 3. Transactions Involving Non-EAR 99 U.S. Origin Goods (continued)

- Promontory's research (as described in Section 1 of this Report) identified trade finance transactions involving three former SCB customers—Monarch Aviation Pte Ltd, a Singapore trading company and former customer of SCB, Singapore ("Monarch Aviation"), Mac Aviation Limited, an Irish trading company and former customer of SCB, London ("Mac Aviation"), and Jetpower Industrial Ltd, a Hong Kong trading company and former customer of SCB, Hong Kong ("Jetpower")—that were either indicted themselves and/or had principals that were indicted, in each case, in the U.S. for, among other things, violations of the IEEPA, the ITR and U.S. export controls.

- The identification of these transactions prompted Promontory to conduct a further review to identify additional transactions involving Monarch Aviation, Mac Aviation, Jetpower, and related parties, and parties engaged in similar activity. This further review involved:
  - Running searches for key words (such as, "aviation") across available electronic data (including USD SWIFT messages and electronic trade data) to identify additional transactions for further review; and
  - To the extent available, reviewing the Bank's records (including Know Your Customer ("KYC") data and account statements) on any SCB customer identified in the Review to analyze the customer's activity through SCB during the Review Period.

- As mentioned with respect to Promontory's overall approach to its trade finance Review, the approach to reviewing trade finance transactions identified in this review differed depending on whether the SCB office involved was in a Tier 1 or Tier 2 country. An overview of the results of Promontory's Review, as well as the available evidence reviewed for each customer, is set forth in the commentary for each transaction set in this section.

| Transactions Involving Non-EAR 99 U.S. Origin Goods | Volume | Value | Post April 12, 2005 Volume | Post April 12, 2005 Value |
|---|---|---|---|---|
| a. Monarch Aviation | 10 | $1,559,127 | 0 | $0 |
| b. Mac Aviation | 3 | $627,850 | 0 | $0 |
| c. Jetpower Industrial | 7 | $1,006,915 | 0 | $0 |
| d. Downtown Trading | 4 | $624,727 | 0 | $0 |
| e. Blue Sky Group | 2 | $1,300,000 | 1 | $600,000 |
| f. Other Transactions | 7 | $3,124,411 | 1 | $2,790,000 |
| Total | 33 | $8,243,030 | 2 | $3,390,000 |

©2011 Promontory Financial Group, LLC. All rights reserved.

**CONFIDENTIAL**

## 3.e. Transactions Involving Non-EAR 99 U.S. Origin Goods - Blue Sky Group – Relationship Overview [1]

**Overview**

- Blue Sky Aviation ("Blue Sky") is a UAE registered corporation in the Ajman Free Zone. According to its Articles of Association dated May 28, 2001, it was, at that time, 50/50 owned by Mr. Ali Reza Habib Moghimi and Gholam Reza Ghodrat Mahmoudi. By 2003, the Ajman Free Zone company certification records the latter individual as the sole owner.

- Blue Sky appears to act as a general ticketing and procurement agency for the sale and/or lease of aircraft to Mahan Air.

- Mahan Air ("Mahan") is a Tehran-based commercial airline operating in Iran, the Middle East, Europe, CIS and Asia. Account documentation shows Mahan to be 96% owned by Mol-Al-Movahedin Organization (a Tehran-based Credit Co-Operative), for which the ultimate beneficial ownership is unclear from the account file. Our research of publicly available sources has also been inconclusive in this regard. There are 3 other minority owners. Mahan Air also had a branch office in Dubai ("Mahan, Dubai").

- Mahan Air General Trading LLC ("Mahan Air General Trading") is a Dubai-based company for which its 2001 Articles of Association lists the owners as: Mr. Khalid Ismail Abdul Jabbar Al Rahma, UAE National (51%); Mr. Hamid Hossein Arabnegad Khanooki, Iranian National (25%); and Mr. Ali Reza Habibollah Moghimi (see also Blue Sky above), Iranian National (24%). Mr. Khanooki is the Managing Director of Mahan Air, Tehran and also a Director of Mahan, Dubai, as is Mr. Hamid Zoka Azadi, who is the Manager of the Board of Directors of Mahan Air, Tehran.

- Aeronautical & Security (FZE) ("A&S") is a UAE corporation located in Sharjah with its corporate license recording Mr. Edgard Amiel (a French National) as its sole owner. According to the company license dated November 18, 2003, its activity is trading in "Aircraft Equipment, Spare Parts and Aircraft Security Equipment".

- SCB has informed Promontory that, during the Review Period, SCB, Dubai maintained accounts for Blue Sky and certain of the related parties detailed above (together, the "Blue Sky Group"). Details regarding these accounts will be covered in a separate report on SCB's historical relationship with the Blue Sky Group.

**Transaction Overview**

- The Trade Finance Transactions reviewed for the Blue Sky Group during the Review included Export Collections, Letters of Credit, and an Advanced Payment Guarantee. All related to the acquisition and sale of aircraft, or the provision of other financing for Blue Sky and the related entities detailed above. The deals are often complex and, as stated in the footnote, further detail will be provided in a separate report.

[1] This overview does not constitute a full report on SCB's historical business with the Blue Sky Group. Facts gathered in the course of SCB's review of its business with the Blue Sky Group during the Review Period will be the subject of a separate report.

©2011 Promontory Financial Group, LLC. All rights reserved.

**CONFIDENTIAL**

## 3.e. Transactions Involving Non-EAR 99 U.S. Origin Goods - Blue Sky Group - Transaction Details

**U.S. Origin Goods Transactions Likely To Fall Outside The Scope Of EAR 99**

There are two transactions in this category for the Blue Sky Group. The first transaction is described below, and the second is detailed overleaf.

**Export Collection with a Total Value Of $29,750,000, of which an estimated value of $600,000 is believed to relate to U.S. Origin Goods**

- There was 1 Export Collection with a total value of $29,750,000, with approximately $600,000 relating to the shipment of U.S. origin goods.
- The seller of the goods was Blue Sky and the buyer was Mahan, Tehran, Iran; the transaction was collected through Bank Sepah, Tehran, Iran with the Bill of Exchange payable 540 days after the negotiation date.
- The transaction was processed by SCB, Dubai on September 14, 2004. Correspondence on file indicates that the transaction was discounted, 95% being sold down to the following institutions: Deutsche Forfait AG; West LB; Abu Dhabi Commercial Bank; Arab Banking Corporation; and Gulf International Bank.
- Repayment under the Collection was received by SCB, Dubai on February 9, 2006 from Credit Suisse, Zurich on behalf of Bank Sepah/Mahan Air.
- Hard copy documents state that the goods were an Airbus A320-232 plus two IAE engines and one Auxiliary Power Unit. The hard copy evidence includes:
    - Copies of the Collection documents, including Blue Sky's Invoice and a certificate of air worthiness for one Airbus A320-232.
    - A Bill of Sale, referring also to the airbus and two engines, "IAE V2527-A5 MSN V10382 and V10383 and one APU [Auxiliary Power Unit] Hamilton Sundstrand APS 3200 MSN 1060".
- Our research indicates that:
    - This aircraft was first delivered in July 1998 to United Airlines, transferred to Blue Wings on March 5, 2004 and then to Mahan shortly thereafter on March 30, 2004. According to planespotters.net, the aircraft is currently in storage pending transfer to Iran Air.
    - The "V" series engines were manufactured by International Aero Engines ("IAE"), jointly owned by Pratt and Whitney (32.5%), Rolls Royce (32.5%) MTU of Germany (12%) and Japanese Aero Engines Corp (23%). Our research indicates that the location of the manufacture of the engines was likely to be the United Kingdom.
    - Our research indicates that the Auxiliary Power Unit was likely to have been manufactured in the United States.
    - Promontory obtained a current third party valuation of a similar model of the Hamilton Sundstrand Auxiliary Power Unit which estimates its cost at up to $600,000. Given the date of the transaction this is likely to be an overestimate.
- The estimated value of the Auxiliary Power Unit has been included as a Transaction Involving Non-EAR 99 U.S. Origin Goods and, in the absence of a separate price on the evidence available, the value of the third party estimate, $600,000, has been used.
- The remaining $29,150,000 value of the transaction, relating to the Airbus A320-232 and its engines, has been classified as a Transaction That Appeared to Follow U-Turn Routing, as no U.S. nexus has been identified apart from the U.S. cleared USD payment.

©2011 Promontory Financial Group, LLC. All rights reserved.

**CONFIDENTIAL**

## 3.e. Transactions Involving Non-EAR 99 U.S. Origin Goods - Blue Sky Group - Transaction Details (continued)

**Export Letter Of Credit For $700,000:**

- The Letter of Credit was issued by Bank Melli, Sharjah on August 15, 2004, on behalf of Mahan Air General Trading, through SCB, Dubai in favor of A&S.

- The negotiation was for $700,000 and related to the shipment of one Aircraft Engine CF6-50C2, manufactured by GE and shipped from Luxemburg to Tehran, Iran. The date the engine was exported from the United States is not known, although our research indicates that it was manufactured in 1983. Our research indicates that the location of manufacture of the engines was likely to have been within the United States.

- The account statement for A&S shows a payment of $420,000 was made to a company by the name of "Aerowings" on September 9, 2004, the same day as the payment under the Letter of Credit Negotiation of $697,247 was credited to the account of A&S. This may be indicative of the source of the engine.

- The Bill of Sale included in the export documents for the drawing under this Letter of Credit shows that title to the engine was transferred from Aeronautical & Security to Mahan Air in Iran.

- All of the parties involved in this transaction do not, on the current evidence available, appear to be directly related to Blue Sky. However, the transaction involves Mahan Air General Trading, which based on a review of available information, appears to be an entity possibly related to Blue Sky and so has been treated as part of the same Blue Sky Group for reporting purposes.

**Other Transactions Reviewed for the Blue Sky Group**

- There are 3 transactions, with a total value of $60,150,000, that have been classified as Transactions That Appear to Follow U-turn Routing in Section 6 of this Report; there is one transaction, with a total value of $32,500,000 that has been classified under Transactions With No U.S. Nexus, reported in Section 7 of this Report.

| | Volume | USD Amount | Post April 12, 2005 Volume | Post April 12, 2005 Value |
|---|---|---|---|---|
| Transactions Involving Non-EAR 99 U.S. Origin Goods - Blue Sky Group | 2 | $1,300,000 | 1 | $600,000 |

©2011 Promontory Financial Group, LLC. All rights reserved.

**CONFIDENTIAL**

## 3.e. Transactions Involving Non-EAR 99 U.S. Origin Goods - Blue Sky Group



Importer Mahan Air wished to purchase an Airbus aircraft, engines and an APU from Exporter Blue Sky Aviation

**1** An Export Collection for $29,750,000 was processed by SCB, Dubai on September 14, 2004, on behalf of Blue Sky Aviation with Mahan Air as drawee and the collecting bank, Bank Sepah, Iran. The Bill of Exchange was payable 540 days after the negotiation date and guaranteed for payment by Bank Sepah.

**2** E-mails indicate that the transaction was fully discounted on the basis of 95% selldown to the following: Deutsche Forfait AG, West LB, Abu Dhabi Commercial Bank, Arab Banking Corporation, and Gulf International Bank.

**3** Repayment from Mahan under the collection was received by SCB, Dubai from Credit Suisse, Zurich on behalf of Bank Sepah/Mahan Air on February 9, 2006.

**Airbus Aircraft and Engines**

– Mixed Origin Goods

**EAR 99** – No (APU only)

CONFIDENTIAL

68

## 3.e. Transactions Involving Non-EAR 99 U.S. Origin Goods - Blue Sky Group

**Importer Mahan Air General Trading wished to purchase an aircraft engine from Exporter Aeronautical & Security**

1. On behalf of Importer Mahan Air General Trading, a Letter of Credit was issued by Bank Melli, UAE and sent to SCB, Dubai to advise Beneficiary Aeronautical & Security (FZE) Sharjah.
2. Documents were presented to SCB, Dubai, which forwarded them to Bank Melli, UAE for acceptance and payment.
3. Bank Melli instructed Credit Suisse, Zurich, which in turn instructed Bank of New York, New York (its USD clearing bank) to pay USD to SCB, New York for account of SCB, Dubai, which then credited Aeronautical & Security's account.

**Aircraft Engine**

– 100% U.S. origin

***EAR 99***- No

CONFIDENTIAL

**Applicant: Mahan Air General Trading / Iran**
**Beneficiary: Aeronautical & Security / UAE**

| Value: | $700,000 |
| --- | --- |
| Transaction Date: | 9/9/2004 |

| Program: | Iran | | Product Type: | Export Letter of Credit |
| --- | --- | --- | --- | --- |
| Case Reference: | 3.e.ii | | Post April 12, 2005: | No |
| Letter of Credit Amount: | $700,000 | | Payment Status: | Confirmed |
| Payments for U.S. Goods: | $700,000 | | Total Payments: | $700,000 |
| U.S. Persons: | Clearer: | SCB, New York | Certificate of Origin: | 100% U.S. origin |
| Description: | Purchase of U.S. origin goods by a UAE company, Mahan Air General Trading, for shipment to Iran. | | Goods Description: | 1 U.S. origin Aircraft Engine CF6-50C2 (Serial number 517950) |
| EAR 99 Item: | No – Aviation engine | | Consistent with Line of Business: | Yes |
| Shell Company Involvement: | No | | Trading Company: | Yes |
| Agent, Affiliate, or Subsidiary of Iranian Entity: | Yes | | Other Possible U.S. Connection: | No |
| Other Details: | | | | |

©2011 Promontory Financial Group, LLC. All rights reserved.

CONFIDENTIAL

## Applicant: Khoram Sanat Producing Co. / Iran
## Beneficiary: Diamonds Steel FZE. / UAE

| Value: | $2,790,000 |
|---|---|
| Transaction Date: | 6/20/2005 |

| | | | |
|---|---|---|---|
| **Program:** | Iran | **Product Type:** | Export Negotiation Under Letter of Credit: Discounted Export Documents: Risk Participation Loan |
| **Case Reference:** | 3.f.i | **Post April 12, 2005:** | Yes |
| **Letter of Credit Amount:** | $2,790,000 | **Payment Status:** | Confirmed |
| **Payments for U.S. Goods:** | $2,790,000 | **Total Payments:** | $2,790,000 |
| **U.S. Persons:** | **Clearer:** SCB, New York | **Certificate of Origin:** | 100% U.S. origin |
| **Description:** | Shipment of goods by a UAE steel manufacturer to an affiliate entity in Iran. | **Goods Description:** | "Hydraulic Pump 160 Liter; Electromotor For Hydraulic Press With All Accessories" |
| **EAR 99 Item:** | No | **Consistent with Line of Business:** | Yes |
| **Shell Company Involvement:** | No | **Trading Company:** | No |
| **Agent, Affiliate, or Subsidiary of Iranian Entity:** | Yes | **Other Possible U.S. Connection:** | No |
| **Other Details:** | The goods would likely have required a license for re-export to Iran. Pumps designed for industrial service and for use with an electrical motor of 5 HP or greater require a license for re-export to Iran under ECCN 2B999.j. | | |



©2011 Promontory Financial Group, LLC. All rights reserved.

77

**CONFIDENTIAL**

## 6. Transactions That Appeared to Follow U-Turn Routing

- This category contains transactions which either:
  - Involved a U.S. clearing bank, and the U.S. cleared payment relating to the transaction appeared to follow u-turn routing; or
  - Involved a U.S. clearing bank and another confirmed U.S. nexus and the U.S. cleared payment relating to the transaction appeared to follow u-turn routing, but based on available data there appeared to be a reasonable basis for concluding that the transaction was not otherwise prohibited.
- All U.S. cleared transactions were reviewed for u-turn compliance (being allowable payments made by a U.S. bank involving Iran, that are by order of a third country bank for payment to another third country bank, provided they do not directly credit or debit an Iranian account). In considering the u-turn compliance of a transaction, the following steps were taken:
  - The relevant SWIFT MT202 messages were reviewed, indicating routing of final clearing payments to and from the U.S. banks involved.
  - The hard copy for the transaction was reviewed to confirm it was consistent with u-turn routing of the payment.
  - Where MT202 messages were not present in files, reimbursement claims and account ledgers within hard copy files were reviewed to verify U.S. clearing payment flow and u-turn compliance.
  - Transactions were subsequently verified via review of SWIFT MT940 statements of account which served as final confirmation of payment.
- This category includes 4 Blue Sky Group transactions for a total value of $92,650,000, which were considered in detail during our work, and involved U.S. cleared payments. In certain cases where the underlying transactions involved U.S. origin items, for the reasons discussed in "Other Details" in the transaction tables on pages 104-107, it has been determined that the underlying transactions did not appear to be subject to U.S. regulatory prohibitions under the EAR and ITR. More information is provided in this section on these transactions, for the purposes of disclosure and transparency. Further details on the circumstances surrounding these transactions identified from document and email reviews will be covered in a separate report on SCB's historical relationship with the Blue Sky Group.

©2011 Promontory Financial Group, LLC. All rights reserved.

**CONFIDENTIAL**