**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

KELLI D. HAKE *et al.*,

       *Plaintiffs*,

   v.

BANK MARKAZI JOMHOURI ISLAMI
IRAN *et al.*,

       *Defendants*.

Civil Action No. 17-114 (TJK)

## <u>MEMORANDUM OPINION</u>

    This case is about several attacks on American soldiers in Iraq between 2004 and 2011. Plaintiffs—survivors, estates of the deceased, and their family members—allege that the Islamic Republic of Iran facilitated these attacks with help from certain state-owned and -operated companies. Other courts have already found Iran itself liable to some of the same plaintiffs for some of the same attacks. Here, Plaintiffs sue the companies, Defendants Bank Markazi Jomhouri Islami Iran, Bank Melli Iran, and National Iranian Oil Company. Given the scope of their claims, Plaintiffs start by moving for partial default judgment on the same bellwether claims for which Iran was found liable in *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019). As in that case, they ask the Court to consider only Defendants' liability, leaving damages determinations for another day. For the reasons explained below, the Court will grant Plaintiffs' motion.

## I.    Background

### A.    Factual Background

    Plaintiffs focus on seven bellwether attacks against U.S. soldiers in Iraq from 2005 through 2009. Six of the attacks allegedly involved the use of an explosively formed penetrator ("EFP")

on armored vehicles in Baghdad.  The seventh was a targeted assault on a compound in Karbala.

The Court describes each attack in turn.[1]

### 1.      May 2005 Attack

On May 3, 2005, Robert Bartlett, an Army sniper and calvary scout, was leading a three-vehicle convoy when an EFP hit his vehicle.  Tr. 2 at 51:2–13, 57:7–21; Tr. 3 at 39:20–40:15.  A projectile "pierced the top edge of the vehicle, between the door frame and the roof, and 'cut [Bartlett] from the left corner of [his] temple down through [his] jaw,' leaving him with third degree burns and lodging shrapnel in his hands."  *Karcher*, 396 F. Supp. 3d at 31 (quoting Tr. 2 at 51:24–25, 53:18–23, 55:13–14, 17–18, 57:11–13).  A witness described the injury as "ghastly." Tr. 2 at 80:11–25.  Bartlett has since undergone several facial reconstructive surgeries.  *Id.* at 62:8–63:7.  He also suffers from permanent nerve pain in his face, lips, and hands; a traumatic brain injury; post-traumatic stress disorder; and short-term memory loss.  *Id.* at 63:9–65:9.

### 2.      October 2006 Attack

The next year, on October 22, 2006, four armored Humvees were travelling through central Baghdad when an EFP struck.  At the time, Major David Haines was sitting in the left-side back seat of the lead vehicle.  Shrapnel hit Haines in his right hand, left arm, right leg, and side.  Tr. 4

---

[1] As noted, all seven attacks were the subject of the court's August 2019 opinion in *Karcher*, which was issued after a three-day bench trial.  Four were addressed again in *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475 (D.D.C. 2021).  And the Karbala attack was also considered in *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48 (D.D.C. 2018).  The Court takes judicial notice of these cases under Federal Rule of Evidence 201(b).  *See Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 163, 171 (D.D.C. 2010).  The Court also relies on the evidence presented to the *Karcher* court.  *See Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 59 (D.D.C. 2010) (in FSIA cases, the court can "review evidence considered in an opinion that is judicially noticed, without necessitating the re-presentment of such evidence").  The Court will use "Tr." and a number 1 through 5 to reflect the volume in which the cited testimony appears.  And exhibits from the trial are denoted by their title and "PX," followed by the exhibit number assigned.  All that said, the Court, as it must, reaches its own, independent findings of the facts here.  *Rimkus*, 750 F. Supp. 2d at 172.

at 165:13–15.  He testified in *Karcher* that "the metacarpals in [his] right hand were shattered, and it looked like somebody had taken a bite out of the side of [his] hand."  *Id.* at 168:12–20.  A Vietnam veteran and mentor to Haines commented that he had "never seen anybody with more holes in him than [Haines]," and even compared him to "Swiss cheese one time."  *Id.* at 167:10–17.  To this day, Haines carries shrapnel in his body from the attack.  *Id.* at 167:19–25.

### 3.    First March 2008 Attack

Specialist Christopher Levi was travelling in a convoy on March 17, 2008.  Tr. 4 at 182:2–19.  As the convoy passed through an intersection, an EFP struck Levi's armored Humvee on the right side.  *Id.* at 182:18–19.  Levi recalled remaining conscious "for what . . . may have been either seconds or days at that point."  *Id.* at 183:6–7.  He then lost consciousness, only to wake up again in the truck.  *Id.* at 183:18–20.  He was doing a head-to-toe "self-assessment" when he realized that the EFP had gone "directly through [his] thighs."  *Id.* at 184:4–25.  He had lost most of both his legs; it was, in medical terms, "a transfemoral amputation, catastrophic at site.  [A] [d]ouble transfemoral amputation."  *Id.* at 184:25–185:1.  On top of that, a piece of shrapnel "entered [his] forearm, bounced off [his] ulnar, hit [his] radius, took five of [his] wrist bones out and two-thirds of [his] second metacarpal," just barely "deflect[ing] away from [his] face."  *Id.* at 185:1–7.  He eventually had more than 100 surgeries to correct his injuries.  *Id.* at 189:15–22.  He now has prosthetic legs and experiences nerve pain regularly.  *Id.* at 194:3–12.

### 4.    Second March 2008 Attack

Six days after the first attack in March 2008, a patrol team in armored vehicles was on a mission in Baghdad "focused on securing an area known for launching mortar attacks on a nearby base."  *Karcher*, 396 F. Supp. 3d at 38; *see also* Tr. 4 at 56:2–13, 57:16–24.  As the team was returning to base, an EFP struck the lead vehicle.  *See* Barker Report, PX-158 at 38.  The slug

"penetrated the armor on the [vehicle's] right side, [and] passed through the vehicle's fuel tank," causing the vehicle to catch fire.  *Id.*  Soldiers "tried and attempted to gain access to the now burning . . . fighting vehicle."  Tr. 4 at 69:14–15.  But it was hours before doctors could enter and recover the charred remains of those inside, including soldiers George Delgado, Christopher Hake, and Andrew J. Habsieger.  *Id.* at 70:3–7.

### 5.      May 2008 Attack

The next attack happened late in the evening on May 9, 2008.  A convoy was returning to base when, just after passing an Iraqi National Police checkpoint, an EFP ripped through the second vehicle.  *See* Tr. 4 at 143:5–11, 145:5–18.  The slug hit the driver in the face and Private First Class Wesley Williamson in the right arm.  *Id.* at 145:9–18.  Williamson testified that "the shrapnel traveled right below [his] elbow through [his] forearm.  And it severed [his] ulna and [his] radius as well as [his] post interosseous nerve."  *Id.* at 146:5–7.  He suffered nightmares after the attack for "quite a while" and still feels daily "general discomfort" because of the plates and screws doctors permanently placed into his arm.  *Id.* at 150:19–21, 151:21–152:4.

### 6.      May 2009 Attack

About a year later, on May 17, 2009, Staff Sergeant Robert Canine was on a routine patrol in a convoy composed of four Humvees.  Tr. 4 at 107:7–24.  Suddenly, an EFP struck Canine's armored Humvee—which was leading the convoy—on the passenger side, where Canine was sitting.  *See* Barker Report, PX-158 at 51.  Small arms fire followed.  *Id.*  Canine testified that he "heard the initial blast which could have been the precursor to the main charge."  Tr. 4 at 114:9–10.  He blinked and opened his eyes to "golden sparks flying from right to left."  *Id.* at 114:10–12.  After losing and then regaining consciousness, Canine says that he could smell and seemingly taste explosives.  *Id.* at 114:22–25.  When he tried to get out of the vehicle, he realized that his "right

leg was pretty much blown off."  *Id.* at 115:13–14.  Eventually, both his legs were amputated.  *Id.* at 117:16–22, 121:25–122:1.

### 7.    January 20, 2007 Attack

The final attack did not involve an EFP.  On January 20, 2007, a team of soldiers was stationed at the Provincial Joint Coordination Center ("PJCC") "to assist the Karbala Provincial team with their security planning for the upcoming Ashura religious period."  U.S. Army Report Pursuant to AR 15-6 ("Karbala AR 15-6"), PX-96 at 3.  That afternoon, several American-looking SUVs approached the first of two Iraqi police checkpoints.  *Id.* at 4.  What happened next is not entirely clear, but the Iraqi police surrendered their weapons and allowed the convoy to pass.  *Id.* at 5.  Then, four to six SUVs entered the PJCC's parking lot; some assailants "detained at gunpoint" Iraqi police officers who were posted nearby; and others secured the perimeter while the "remainder headed toward the gated entrance to the PJCC."  *Karcher*, 396 F. Supp. 3d at 47 (quoting Expert Report of Michael P. Pregent ("Pregent Report"), PX-155 at 17); *see also* Karbala AR 15-6, PX-96 at 1, 5.  Several assailants made their way through the courtyard and into the main building, passing as Americans.  Karbala AR 15-6, PX-96 at 5.

As some assailants took control of the main building's entrance, others inside attacked the command room where Staff Sergeant Billy Wallace, Specialist Johnny Washburn, Private First Class Johnathon M. Millican, and other American troops were located.  *Karcher*, 396 F. Supp. 3d at 47 (citing Pregent Report, PX-155 at 20).  The assailants could not force their way in but tossed a grenade through a cracked door.  Karbala AR 15-6, PX-96 at 6.  Millican fell on the grenade, absorbing the greater part of the blast and allowing other soldiers to fend off the attack.  *Id.*

Another group of the assailants abducted four soldiers, including Captain Brian S. Freeman.  They handcuffed the soldiers and put them into two separate SUVs before fleeing.  Pregent

Report, PX-155 at 22–23; *see also* Karbala AR 15-6, PX-96 at 6–7.  Apparently, their plan was to kidnap Americans to "exchange[] for high-value prisoners that Iran wanted back." Tr. 5 at 174:1–4.  They then "followed a . . . route used by [Iran's Islamic Revolutionary Guard Corps ("IRGC")] to smuggle weapons and explosive devices from Iran into Iraq." *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 489 (D.D.C. 2021).  But when the assailants came across checkpoints along the route, they realized that they "could not escape with hostages."  Karbala AR 15-6, PX-96 at 3, 9.  So they killed the soldiers.  *See* Prevent Report, PX-155 at 25–26.  Freeman was found alive "amongst the abandoned SUVs" with a gunshot wound to the head, but he died on the way to the regional embassy office.  *Id.* at 27.

Meanwhile, back at the PJCC, the assailants still in the building had withdrawn and tossed a "powerful" grenade into a hallway.  Prevent Report, PX-155 at 23.  That grenade "left a hole in the concrete floor and blew the doors in the hallway off their hinges, injuring . . . Wallace."  *Id.* (footnote omitted).  Washburn, Evan Kirby, and Marvin Thornsberry were also injured.  ECF No. 118 at 6–8 (second *Karcher* opinion).[2]

### B.    Procedural History

In 2017, three groups of survivors, estates, and their families sued Bank Markazi Jomhouri Islami Iran ("Bank Markazi"), Bank Melli Iran ("Bank Melli"), and National Iranian Oil Company ("National Oil") under the Foreign Sovereign Immunities Act ("FSIA") for their roles in helping Iran facilitate the above attacks and others.  *See* ECF No. 1; *Brooks et al. v. Bank Markazi Jomhouri Islami Iran et al.*, No. 17-cv-737 (TJK); *Field et al. v. Bank Markazi Jomhouri Islami Iran et al.*,

---

[2] Plaintiffs moved this Court to take judicial notice of a second Memorandum Opinion in *Karcher* discussing Washburn's, Kirby's, and Thornsberry's injuries, ECF No. 117, which they filed under seal at ECF No. 118.  The same opinion, with certain material redacted, is on the *Karcher* docket at ECF No. 106.  *Karcher et al. v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), ECF No. 106 (D.D.C. Sept. 11, 2019).  The Court grants that motion.

No. 17-cv-2126 (TJK).[3]  In each case, the Clerk of Court sent to Defendants copies of the Summons and Second Amended Complaint via DHL Express.  And in each case, Defendants signed for the packages but never appeared.  Thus, the Clerk entered default against all three Defendants in all three cases.  *See* ECF Nos. 31–33; *Brooks et al*, No. 17-cv-737, ECF Nos. 23–25; *Field et al*, No. 17-cv-2126, ECF No. 18.

In September 2020, the Court consolidated the three cases.  *See* Minute Order of Sept. 17, 2020.  A few months later, Plaintiffs filed their proposed findings of fact and conclusions of law.  *See* ECF No. 107.  And they later moved for default judgment on the liability claims of certain soldiers injured or killed by the above bellwether attacks—the same "bellwether plaintiffs" to whom Iran was found liable in *Karcher*.  ECF No. 111; *see also* ECF No. 107 at 173, 193–94.[4]  Plaintiffs ask the Court to reserve damages determinations for a later time.

## II.    Legal Standards

Under Federal Rule of Civil Procedure 55(b)(2), a court may consider entering a default judgment when a party applies for that relief.  *See* Fed. R. Civ. P. 55(b)(2).  "[S]trong policies favor resolution of disputes on their merits," and so "[t]he default judgment must normally be

---

[3] Plaintiffs in *Hake* and *Field* originally sued Melli Bank PLC as well, but later voluntarily dismissed their claims against it.

[4] Although Plaintiffs never spell it out with precision, the group includes, as detailed above, Robert Bartlett, David W. Haines, Christopher Levi, Wesley Williamson, Robert Canine, Billy Wallace, Evan Kirby, Johnny Washburn, and Marvin Thornsberry, as well as the estates of Christopher Hake, George Delgado, Johnathon M. Millican, and Brian S. Freeman.  These are the same plaintiffs to whom the *Karcher* court found Iran liable.  *See Karcher et al.*, No. 16-cv-232 (CKK), ECF No. 102 at 1 n.1 (D.D.C. Sept. 9, 2019); *see also* ECF No. 111 at 3 n.1 (listing the same individuals).  The *Karcher* court also included Andrew Habsieger in its list of bellwether plaintiffs.  But neither Andrew Habsieger nor his estate are plaintiffs in this consolidated case.  Like the *Karcher* court, this Court will leave all family members' claims for another day.  *See Karcher*, 396 F. Supp. 3d at 65.

viewed as available only when the adversary process has been halted because of an essentially unresponsive party." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (cleaned up).

Even then, "entry of a default judgment is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) (footnote omitted). A court retains its "affirmative obligation" to determine whether it has subject-matter jurisdiction over the action. *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996). Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6. And "plaintiffs retain the burden of proving personal jurisdiction," which they can satisfy "with a *prima facie* showing." *Id.* at 7 (cleaned up). In doing so, "they may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Id.*

"When default judgment is sought under the FSIA, a claimant must 'establish[] his claim or right to relief by evidence satisfactory to the court.'" *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 42 (D.D.C. 2018) (quoting 28 U.S.C. § 1608(e)). And courts must apply that standard mindful that "Congress enacted the terrorism exception expressly to bring state sponsors of terrorism . . . to account for their repressive practices," *Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048 (D.C. Cir. 2014), and to "punish foreign states who have committed or sponsored such acts and deter them from doing so in the future," *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 88–89 (D.C. Cir. 2002).

As a result, the D.C. Circuit has instructed that "courts have the authority—indeed . . . the obligation—to adjust evidentiary requirements to . . . differing situations." *Kim*, 774 F.3d at 1048 (cleaned up). To be sure, courts must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Id.* at 1049 (cleaned up).

But uncontroverted factual allegations supported by admissible evidence may be taken as true.  *See Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015).  And § 1608(e) "does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated & remanded on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

In an FSIA default proceeding, a court can find that the evidence presented is satisfactory "when the plaintiff shows her claim has some factual basis, . . . even if she might not have prevailed in a contested proceeding." *Owens*, 864 F.3d at 785 (cleaned up).  "This lenient standard is particularly appropriate for a[n] FSIA terrorism case, for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Id.* Thus, courts have "an unusual degree of discretion over evidentiary rulings in a[n] FSIA case against a defaulting state sponsor of terrorism." *Id.*  This discretion extends to admitting expert testimony, which is often "of crucial importance in terrorism cases . . . because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain," "[v]ictims of terrorist attacks . . . are often . . . unable to testify about their experiences," and "[p]erpetrators of terrorism typically lie beyond the reach of the courts and go to great lengths to avoid detection." *Id.* at 787 (citations omitted).  Moreover, "[e]yewitnesses in a state that sponsors terrorism are similarly difficult to locate," and "[t]he sovereigns themselves often fail to appear and to participate in discovery." *Id.* For these reasons, the Circuit has recognized that "reliance upon secondary materials and the opinions of experts is often critical in order to establish the factual basis of a claim under the FSIA terrorism exception." *Id.*

### III.    Analysis

To find Defendants liable on the bellwether claims identified above, the Court must answer three questions in the affirmative: (1) whether it has subject-matter jurisdiction over the claims, (2) whether it can exercise personal jurisdiction over Defendants, and (3) whether there is enough evidence to find Defendants liable.  The Court takes each in turn.

#### A.    Subject-Matter Jurisdiction

Federal district courts have original jurisdiction over "(1) nonjury civil actions (2) for claims seeking relief *in personam* (3) against a foreign state (4) when the foreign state is not entitled to immunity either under sections 1605 to 1607 of the FSIA or under any applicable international agreement."  *Shoham v. Islamic Republic of Iran*, No. 12-cv-508 (RCL), 2017 WL 2399454, at *10 (D.D.C. June 1, 2017); 28 U.S.C. § 1330.  The claims here meet all these conditions.

##### 1.    Non-Sovereign Immunity Conditions

The first two conditions are straightforward.  This is a nonjury civil action.  ECF No. 107 at 165.  And Plaintiffs are seeking relief *in personam*, rather than *in rem*.  *See Shoham*, 2017 WL 2399454, at *10 (explaining that suing defendants "as legal persons" rather than "property" means that the claims "seek relief *in personam*").

The suit also meets the third condition, as it is against a "foreign state."  This may seem counterintuitive at first, given that Defendants are two banks and an oil company.  But the FSIA defines a "foreign state" as including "an agency or instrumentality of a foreign state," and Defendants here are agencies or instrumentalities of Iran.  28 U.S.C. § 1603(a).

An "agency or instrumentality of a foreign state" includes any entity which is (1) "a separate legal person, corporate or otherwise"; (2) "an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or

political subdivision thereof"; and (3) "neither a citizen of a State of the United States . . . , nor created under the laws of any third country." *Id.* § 1603(b).  Under Circuit precedent, an entity meets the first element if its "core functions" are "commercial." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003).  Relying on the opinion of Dr. Patrick L. Clawson— who in turn relies on government reports, government designations, Iranian and U.S. officials' speeches, and his own experience and research—Plaintiffs have shown that Defendants check all three boxes, as other courts have repeatedly found.[5]

Bank Melli is Iran's "largest bank."  ECF No. 95 ¶ 68 (Clawson Decl.).  It "provides commercial banking services in Iran and internationally including foreign exchange transactions, foreign currency accounts, long-term and short-term foreign currency investment deposits and term deposits, money transfer and remittances, plastic card services, and imports services in industry and commercial economic zones." *Est. of Fishbeck v. Islamic Republic of Iran*, No. 18-cv-2248 (CRC), 2021 WL 6808189, at *2 (D.D.C. Mar. 1, 2021) (cleaned up);[6] *see also* ECF No. 95 ¶¶ 96– 103.  In other words, its core function is commercial.  It is also "100 percent openly government-owned.  All of its distributed profits go to the government."  ECF No. 95 ¶ 101.  Thus, this Court agrees with others that have found it to be an agency or instrumentality of Iran. *See, e.g.*, *Est. of Fishbeck*, 2021 WL 6808189, at *2; *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 59

---

[5] Clawson was not an expert witness in *Karcher*, but Plaintiffs proffer him as an expert here.  He is a "widely-renowned expert on Iranian affairs" who has served as an expert witness in several federal cases. *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 62 (D.D.C. 2010) (cleaned up); *see also* ECF No. 95 ¶ 6.  Given his skill, knowledge, education, experience, and training, this Court finds—as others have—that he is qualified "as an expert on Iran's economy and support of terrorist organizations." *Est. of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 119 n.4 (D.D.C. 2018).

[6] The Court takes judicial notice of this case and the others that have decided whether Bank Melli, Bank Markazi, and National Oil are agencies or instrumentalities of Iran. *See infra.*

(D.D.C. 2019) ("*Holladay I*"); *Henkin v. Islamic Republic of Iran*, No. 18-cv-1273 (RCL), 2021 WL 2914036, at *18 (D.D.C. July 12, 2021).

Bank Markazi is a "joint-stock company" formed under Iranian law and "wholly owned by the Government," so it easily meets the FSIA's last two requirements for an agency or instrumentality. ECF No. 95 ¶ 62 (quoting State Monetary and Banking Law of 9 July 1972, amended 2017, art. 10(e) (Iran)). Whether it "performs predominantly commercial functions, and whether it is thus 'a separate legal person, corporate or otherwise,'" however, is more "difficult to discern." *Holladay v. Islamic Republic of Iran*, 523 F. Supp. 3d 100, 111 (D.D.C. 2021) ("*Holladay II*") (quoting 28 U.S.C. § 1603(b)(1)).

Central banks, like Bank Markazi, "by their nature, straddle the line between governmental and commercial activity; they often both set the parameters for financial markets and operate within those markets." *Id.* Indeed, Clawson notes that Bank Markazi has been the "principal implementer" of some of Iran's financial policies, and its "lack[]" of "independence from the government" is well known. ECF No. 95 ¶¶ 73–74.

Still, the Court agrees with others that the available evidence sufficiently establishes "the predominance of Bank Markazi's commercial functions." *Est. of Hartwick v. Islamic Republic of Iran*, No. 18-cv-1612 (CKK), 2021 WL 6805391, at *7 (D.D.C. Oct. 1, 2021). It issues loans and reports its profits. ECF No. 95 ¶¶ 72, 63; *see also Holladay II*, 523 F. Supp. 3d at 111–12. And its role in setting policy is minimal. *See* ECF No. 95 ¶ 66; *see also Holladay II*, 523 F. Supp. 3d at 112. Plus, Bank Markazi self-identified as an "agency or instrumentality of Iran" to the United States Supreme Court, even while describing itself as "an independent and distinct legal entity, separate from the Iranian government." Brief for Petitioner, *Bank Markazi v. Peterson*, 578 U.S. 212 (2016) (No. 14-770), 2015 WL 7294865, at *9 (Nov. 16, 2015); *see also Peterson v. Islamic*

*Republic of Iran*, No. 10-cv-4518 (KBF), 2013 WL 5538652, at *3 (S.D.N.Y. Oct. 8, 2013) ("Bank Markazi does not dispute that it is an instrumentality of Iran.  Indeed, its acknowledgement of that fact forms the premise of its motion that it is entitled to FSIA immunity." (citation omitted)).

Finally, National Oil is "one of the largest oil companies in the world."  ECF No. 95 ¶ 115. It "is responsible for 'exploration, drilling, production, research and development, refining, distribution and export of oil, gas, petroleum products.'"  *Id.* (quoting NIOC at a Glance, http://www.nioc.ir/portal/home/?generaltext/81026/81171/67776/).   These are all commercial activities.  Even its role in promoting state policy by "encouraging the development of the Iranian oil industry" can be linked back to its commercial interests.  *Holladay II*, 523 F. Supp. 3d at 110 (cleaned up).  In other words, National Oil's "commercial functions predominate."  *Id.*; *see also Est. of Fishbeck*, 2021 WL 6808189, at *2.  It is also incorporated in and "entirely owned by the government of Iran."  ECF No. 95 ¶ 116; *Est. of Fishbeck*, 2021 WL 6808189, at *2.  Thus, it too qualifies as an agency or instrumentality of Iran.

In sum, all three Defendants are agencies or instrumentalities of a foreign state, so each is a "foreign state" under the FSIA.  The only remaining question on subject-matter jurisdiction is whether the FSIA or another international agreement entitles Defendants to immunity.

## 2.     Sovereign Immunity

Entities like Defendants are generally immune from lawsuits brought against them in the United States—unless an FSIA exception applies.  *See* 28 U.S.C. § 1604; *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13–14 (D.C. Cir. 2015).  Plaintiffs invoke the FSIA terrorism exception, which sets out that foreign states are not immune in cases where "money damages are sought against a foreign state for personal injury or death that was caused by" an enumerated terrorist act. 28 U.S.C. § 1605A(a)(1); *see also* 28 U.S.C. § 1330.

Plaintiffs must prove three elements to establish subject-matter jurisdiction under the terrorism exception: (1) the foreign state was designated a state sponsor of terrorism when the act of terrorism occurred and when this action was filed; (2) the claimant or victim was a national of the United States at the time of the act;[7] and (3) the damages sought are for personal injury or death caused by the act of terrorism.  *See Akins v.  Islamic Republic of Iran*, 332 F. Supp. 3d 1, 32; 28 U.S.C. § 1605A.[8]  As in *Karcher*, Plaintiffs have met their burden for the bellwether claims here. *See Karcher*, 396 F. Supp. 3d at 53; *Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2019 WL 4305482, at *1 (D.D.C. Sept. 11, 2019).

### a.        Iran Was Timely Designated a State Sponsor of Terrorism

When courts consider the "state sponsor of terrorism" requirement in cases against agencies or instrumentalities, they look to the foreign nation of which the agencies or instrumentalities are a part.  *See Shoham*, 2017 WL 2399454, at *13; *Henkin*, 2021 WL 2914036, at *13.  Here, that is Iran.  And the State Department has designated Iran as a state sponsor of terrorism since 1984. *See* U.S. Dep't of State, State Sponsors of Terrorism (Dec. 20, 2017), PX-1.

### b.        The Bellwether Plaintiffs Were U.S. Nationals

Next up is the status of the relevant victims or claimants.  As noted above, Plaintiffs are only moving for default judgment on the claims of the individuals to whom the *Karcher* court

---

[7] Plaintiffs could also show that the victim or claimant was "a member of the armed forces" at the time of the attack.  28 U.S.C. § 1605A(a)(2)(A)(ii)(II).  And based on the evidence presented here, Plaintiffs could probably meet that requirement for the bellwether plaintiffs.  But Plaintiffs instead focus on the bellwether plaintiffs' nationality.

[8] The statute also requires a plaintiff to offer to arbitrate a claim against a foreign state in that foreign state when the acts causing injury occurred there.  But here, the acts occurred in Iraq, not Iran.  Thus, Plaintiffs need not have offered arbitration to establish subject-matter jurisdiction.  *See* 28 U.S.C. § 1605A(a)(2)(A)(iii).

found Iran liable.  ECF No. 107 at 173.  That group comprises "Plaintiffs injured in the bellwether attacks" and "Plaintiffs representing individuals killed by the bellwether attacks."  *See Karcher*, 396 F. Supp. 3d at 65.  Those injured or killed in the bellwether attacks—*i.e.*, the victims—were at all relevant times United States citizens.  *See* Birth Certificate of Robert Bartlett, PX-172; Birth Certificate of David Haines, PX-139; Birth Certificate of Christopher Levi, PX-143; Birth Certificate of George Delgado, PX-142; Birth Certificate of Christopher Hake, PX-152; Birth Certificate of Wesley Williamson, PX-138; Birth Certificate of Robert Canine, PX-137; Birth Certificate of Johnny Frank Washburn II, PX-64; Birth Certificate of Johnathon Millican, PX-147; Birth Certificate of Evan Kirby, PX-148; Birth Certificate of Marvin Thornsberry, PX-149; Birth Certificate of Brian Freeman, PX-150; Birth Certificate of Billy Wallace, PX-166.  This means that the relevant victims were nationals of the United States for FSIA purposes.  *See* 28 U.S.C. § 1605A(h)(5); 8 U.S.C. § 1101(a)(22).

### c.    Defendants' Actions Qualify for the Terrorism Exception

The last requirement is that the damages sought are for personal injury or death caused by the foreign state's commission of at least one terrorist act enumerated in the statute, including "torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1).  Plaintiffs have met their burden for these bellwether claims.

###### i.      The Bellwether Attacks Were Terrorist Acts

Plaintiffs have shown that the bellwether attacks were terrorist attacks under the FSIA.  The FSIA lists several different kinds of terrorist acts.  28 U.S.C. § 1605A(a)(1).  Two are relevant here: extrajudicial killing and hostage taking.

An "[e]xtrajudicial killing" is "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.  Such term, however, does not include any killing that, under international law, is lawfully carried out under the authority of a foreign nation."  Torture Victim Protection Act, Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350 note); *see* 28 U.S.C. § 1605A(h)(7) (incorporating the Torture Victim Protection Act's definition of "extrajudicial killing").  The D.C. Circuit has interpreted this text to include three elements: "(1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court."  *Owens*, 864 F.3d at 770.  "'[D]eliberated' *attempts* to kill" also "fall within the scope" of the statute.  *Karcher*, 396 F. Supp. 3d at 58 (emphasis added) (citing cases).

The first six bellwether attacks listed above meet these requirements.  Each involved at least an attempt to kill, and some in fact caused deaths.  *See supra*; *see also Karcher*, 396 F. Supp. 3d at 57–58.  Further, the killings and attempted killings were deliberate.  Based on the evidence presented—including military reports, chemical tests, photos, and expert reports relying on the same—the Court finds, as have other courts, that the first six bellwether attacks involved an EFP.  *Karcher*, 396 F. Supp. 3d at 30–45; *Lee*, 518 F. Supp. 3d at 485–87; *see generally* Barker Report, PX-158.  As those courts have explained, detonating an EFP requires "careful consideration."  *Lee*, 518 F. Supp. 3d at 491 (cleaned up).  "EFPs must be strategically placed and later armed via either remote frequency or command wire to properly detonate."  *Id.* at 492.  And "EFPs were specifically

designed to punch through armored vehicles." *Karcher*, 396 F. Supp. 3d at 56.  In fact, "EFPs were constantly retooled to overcome U.S. defenses that attempted to make EFPs less deadly." *Lee*, 518 F. Supp. 3d at 492.  Finally, there is no evidence that EFP-involved attacks were authorized by a judgment of a "regularly constituted court or were lawfully carried out under the authority of a foreign nation." *Id.*  Thus, the six EFP-involved bellwether attacks constitute extrajudicial killings under the FSIA.

Meanwhile, a "hostage taking" is defined as follows:

Any person who seizes or detains and threatens to kill, to injure, or to continue to detain another person . . . in order to compel a third party . . . to do or abstain from doing any act as an explicit or implicit condition for the release of the hostage commits the offense of taking of hostages.

International Convention Against the Taking of Hostages art. 1, Dec. 17, 1979, 18 I.L.M. 1456, 1316 U.N.T.S. 205; *see* 28 U.S.C. § 1605A(h)(2) (incorporating the Convention's definition of "hostage taking").  Hostage taking thus has two elements: (1) the abduction or detention and (2) the purpose of accomplishing "the sort of third-party compulsion described in the [C]onvention"— that is, "some *quid pro quo* arrangement whereby the hostage would have been released upon performance or non-performance of any action by that third party." *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 470 F.3d 356, 359 (D.C. Cir. 2006) (cleaned up).

The seventh bellwether attack—the Karbala attack—satisfies both elements.  As described above, the assailants "patently detained U.S. service members by handcuffing them and driving them away from the Karbala [Coordination Center]." *Lee*, 518 F. Supp. 3d at 492.  And they did so to exchange the service members "for high-value prisoners that Iran wanted back."  Tr. 5 at 174:1–4; *see also Karcher*, 396 F. Supp. 3d at 57 (the Karbala "attack was intended to capture U.S. servicemembers who could be exchanged for Iranian detainees"); *see also Fritz*, 320 F. Supp. 3d at 71 (same).  Thus, as three other courts have already found, that attack was a "hostage taking"

under the FSIA.  *See Karcher*, 396 F. Supp. 3d at 56; *Fritz*, 320 F. Supp. 3d at 78; *Lee*, 518 F.

Supp. 3d at 492.

**ii.**  **Defendants' Material Support for Shi'a Terrorist Cells**
**in Iraq Caused the Bellwether Attacks**

Plaintiffs next must show that Defendants provided "material support" to the actors who

carried out the seven bellwether attacks and that their material support was a "legally sufficient

cause" of the attacks.  *Owens*, 864 F.3d at 778; *see, e.g.*, *W.A. v. Islamic Republic of Iran*, 427 F.

Supp. 3d 117, 135–36 (D.D.C. 2019).  Under the relevant statute, material support or resources is

"any property, tangible or intangible, or service, including currency or monetary instruments or

financial securities, financial services, lodging, training, expert advice or assistance, safehouses,

false documentation or identification, communications equipment, facilities, weapons, lethal sub-

stances, explosives, personnel . . . and transportation, except medicine or religious materials."  18

U.S.C. § 2339A(b)(1); *see* 28 U.S.C. § 1605A(h)(3) (defining "material support or resources" un-

der the FSIA to have the "meaning given that term in section 2339A of title 18.").

To begin with, Plaintiffs have presented sufficient evidence that Shi'a terrorist cells—also

called "Special Groups"—executed the bellwether attacks.  Plaintiffs rely largely on the opinion

of Colonel (Ret.) Kevin Lutz, an expert witness in *Karcher*, who in turn relies on various military

reports, army investigations, witness declarations, and his own field experience.  Lutz explains

that these terrorist cells were often responsible for EFP-involved attacks in the relevant areas.  *See*

Expert Report of Col. (Ret.) Kevin Lutz ("Lutz Report"), PX-159 at 30 (quoting commanding

officer's declaration about first attack); *id.* at 44 (quoting military report about third attack); *id.* at

69 (quoting military report about sixth attack).  In fact, "[t]he EFP is the signature weapon" of the

insurgent groups.  *Id.* at 9.  And various military reports specifically concluded that these groups

were likely behind the six EFP-involved bellwether attacks.  *Id.* at 40–41 (quoting military report

18

about third attack); *id.* at 53, 54 (quoting two military reports about fourth attack); *Id.* at 58, 61–62 (quoting military reports about fifth attack).  Based on the evidence before him, Lutz concluded that a Shi'a "Special Group" conducted each of the EFP-involved bellwether attacks.  *See generally id.* at 25–71.  As for the attack that did not involve an EFP, one Shi'a Special Group "repeatedly claimed responsibility."  *Fritz*, 320 F. Supp. 3d at 71.  Other courts have relied on the same evidence to find Shi'a terrorist groups responsible for all seven bellwether attacks.  *See id.*; *Karcher*, 396 F. Supp. 3d at 30–52; *Lee*, 518 F. Supp. 3d at 485–90.

Plaintiffs have also offered enough proof, at the default stage, that Defendants provided material support and resources to these Special Groups.  They have shown that Iran developed and backed these terrorist cells through intermediary organizations that Defendants funded.

Plaintiffs rely first on several experts' opinions about Iran's activities in Iraq—opinions based on information from the Defense, State, and Treasury Departments, military reports, unclassified intelligence, and the experts' own knowledge or experience.  *See* Expert Report of Russel L. McIntyre ("McIntyre Report"), PX-157 at 3; Expert Report of Lieutenant General Michael L. Oates, United States Army (Ret.) ("Oates Report"), PX-153 at 3; Expert Report of Dr. Michael Levitt ("Levitt Report"), PX-154 at 2; Pregent Report, PX-155 at 3–4.  Using this evidence, the experts describe how Iran used the IRGC, its foreign branch the IRGC-QF, and Hezbollah to "consolidate Shi[']a political control" in Iraq.  Levitt Report, PX-154 at 6–8.  They explain that, using the IRGC-QF and Hezbollah, Iran established Shi'a insurgent groups (the same "Special Groups" described above) and provided them with training, weapons, and financial support.  *See* Pregent Report, PX-155 at 12.  Military reports cited by one expert show that, as of August 2007, Iran was estimated to be "providing between $750,000 and $3 million worth of equipment and funding to Special Groups *every month*."  *Id.*  That equipment included EFPs "professionally manufactured

and specifically designed to target U.S. and Coalition Forces' armor, such as armored patrols and supply convoys." Oates Report, PX-153 at 24. Courts in other FSIA cases have found the evidence on which these experts rely sufficient to show Iran's connection to and support of the Shi'a terrorist cells. *See, e.g.*, *Karcher*, 396 F. Supp. 3d at 22–30; *Lee*, 518 F. Supp. 3d at 482–85; *Fritz*, 320 F. Supp. 3d at 61; *Roberts v. Islamic Republic of Iran*, 581 F. Supp. 3d 152, 158–67 (D.D.C. 2022).

Meanwhile, according to experts Clawson and Katherine Bauer,[9] Defendants Bank Markazi, Bank Melli, and National Oil played critical roles in Iran's efforts to promote terrorism through the IRGC-QF and Hezbollah. Using government reports and terrorist designations, statements by government officials, information from third-party banks, and Defendants' own public reports, *see* ECF No. 110 ¶¶ 14–25 (Bauer Decl.); ECF No. 95 ¶¶ 16–20, they explain that Iran used Bank Markazi for many years "to transfer funds to support terrorism, principally to the IRGC-QF and Hezbollah." ECF No. 110 ¶ 85; *see also* ECF No. 95 ¶ 95. Clawson and Bauer also detail how "Bank Melli provided banking services that provided significant funding to the IRGC-QF." ECF No. 110 ¶ 97; *see also* ECF No. 95 ¶ 108. In fact, according to the Treasury Department, "IRGC-QF has used Bank Melli to dispense funds to Iraqi Shi'a militant groups." ECF No. 95 ¶ 107 (quoting State Department cable); ECF No. 110 ¶ 96 (same). Clawson further describes

---

[9] Like Clawson, Bauer was not an expert witness in *Karcher*. She is a senior fellow in the Reinhard Program on Counterterrorism and Intelligence at the Washington Institute where she studies "Middle East terrorist groups, front organizations and state sponsors, [and] the logistical and financial support networks that facilitate their activities." ECF No. 110 ¶¶ 9–11. She once served as the Assistant Director of the Treasury Department's Office of Terrorist Financing and Financial Crimes. *Id.* ¶ 7. Based on her skill, knowledge, education, experience, and training, the Court finds that she qualifies as an expert on Iran's terrorism financing methods.

Bank Melli's well-documented support for an Iranian organization that made weapons and munitions "used by those attacking U.S. forces in Iraq."  ECF No. 95 ¶ 113.  Both Clawson and Bauer outline the United States government's findings about National Oil's role as financier of the IRGC-QF "*and its terrorist proxies*."  ECF No. 110 ¶ 107 (quoting Treasury Department press release); ECF No. 95 ¶ 123 (same).  And Bauer details how all three laundered money to help "the IRGC and other elements of Iran's terror apparatus."  ECF No. 110. ¶¶ 111–80.[10]  Indeed, Defendants' efforts "helped the regime acquire items restricted for their military applications and use in terrorism."  *Id.* ¶ 131.  Other courts have relied on essentially the same evidence to find that Defendants supported Iran's terrorist activities.  *See Henkin*, No. 18-cv-1273 (RCL), ECF No. 29 at 39–43 (Bank Markazi); *id.* at 46–48 (Bank Melli); *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-1570 (GBD), 2011 WL 13244047, at *8 (S.D.N.Y. Dec. 22, 2011) (National Oil).

Finally, Plaintiffs have shown that Defendants' role in Iran's terror campaign was a legally sufficient cause of the bellwether attacks.  *See Owens*, 864 F.3d at 778 (requiring plaintiffs to show that the foreign state's material support is a legally sufficient cause of the terrorist attack at issue).  Plaintiffs need not show that Defendants specifically intended to cause the attacks; they need only demonstrate proximate cause.  That is, they must show "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered."  *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (quoting W. Page Keeton & William L. Prosser, PROSSER & KEETON ON THE LAW OF TORTS 263 (5th ed. 1984)).  To establish this causal connection, a defendant's actions need only have been a "substantial factor in the sequence of events" that caused the plaintiff's injury, and the injury must be a "reasonably

---

[10] This span includes redacted material.  But the Court notes that it considered the unredacted, sealed version of this document at ECF No. 97-2 in reaching its conclusions.

foreseeable . . . consequence" of defendant's conduct.  *Owens*, 864 F.3d at 794 (cleaned up).  In other FSIA cases, evidence meeting this standard has included financial support for the terrorist organization, logistical support for insurgent training, the provision of weapons, and the bolstering of the organization's operational capacity.  *See, e.g.*, *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 48 (D.D.C. 2019).

Plaintiffs have met their burden.  For one, Defendants' actions were a substantial factor in the bellwether attacks.  As other courts have found based on the same evidence presented here, Iran facilitated the bellwether attacks through the IRGC-QF and Hezbollah.  *See Karcher*, 396 F. Supp. 3d at 30–52; *Lee*, 518 F. Supp. 3d at 485–90.  And Defendants provided critical funding to both groups.  *See* ECF No. 95 ¶ 75 ("Since [Bank Markazi] operates as the Iranian government's banker, it is my expert opinion that Iran could not have transferred millions of dollars to a foreign terrorist group without the funds passing through [Bank Markazi] in one way or another."); ECF No. 110 ¶ 62 ("[A] straight-line links Iran's oil income and its ability to sponsor terrorism, build weapons of mass destruction, and acquire sophisticated armaments." (quoting Iran Oil Sanctions Act of 1996, HR Rep 104-523, pt 1, 104th Cong, 2d Sess. (1996), available at https://www.con-gress.gov/congressional-report/104th-congress/house-report/523/1.)).  Defendants were also "sig-nificant players in Iran's efforts to disguise its involvement in proliferation and terrorism activities through an array of deceptive practices specifically designed to evade detection."  ECF No. 97-1 ¶ 180 (cleaned up).  Bank Melli specifically facilitated the purchase of materials used to make EFPs—the weapon used in six of the seven bellwether attacks.  *Id.* ¶ 133.

The bellwether plaintiffs' injuries were also a reasonably foreseeable consequence of De-fendants' funding of the IRGC-QF and Hezbollah.  *See Roth*, 78 F. Supp. 3d at 394 (stating that the FSIA sets a relatively low bar for proximate cause).  In other cases, sufficient evidence of

foreseeability included backing the organization at issue despite knowledge of its violent tactics and encouraging an escalation of terrorist behavior. *See id.* (finding injuries stemming from a bombing were a foreseeable result of Iran's material support of a terrorist organization because Iran encouraged an increase in terrorist activities); *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 228 (D.D.C. 2012) (finding injuries because of a kidnapping were a foreseeable result of Syria's support of the Kurdistan Workers Party because Syria bankrolled the organization, knowing that they used violent tactics). IRGC-QF and Hezbollah's support for terrorism was well known. *See* ECF No. 95 ¶¶ 28–31; *see also* Designation of the Islamic Revolutionary Guard Corps, PX-213; Ann. Threat Assessment of the Director of Nat'l Intel. for the Senate Select Comm. on Intel., PX-16 at 13. And their role in the bellwether attacks specifically is no surprise: as the *Karcher* court found, "[a]mong Iran's foreign activities, its campaign in Iraq figures prominently." *Karcher*, 396 F. Supp. 3d at 22. Simply put, the deaths of and injuries sustained by American soldiers in Iraq were, at minimum, a predictable—if not intended—consequence of Defendants' support for IRGC-QF and Hezbollah.

\*     \*     \*

For these reasons, the Court finds that it has subject-matter jurisdiction over the bellwether plaintiffs' claims.

### B.      Personal Jurisdiction

The next requirement to impose judgment on a foreign state under the FSIA is personal jurisdiction. Personal jurisdiction over a foreign state turns on a showing of (1) subject-matter

jurisdiction under the FSIA and (2) proper service under the FSIA.  28 U.S.C. § 1330(b).  As Plaintiffs have already satisfied the first requirement, the Court turns to the second.

28 U.S.C. § 1608(b) outlines different methods of serving agencies or instrumentalities of foreign states in the order in which plaintiffs must attempt them:

> (1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or
>
> (2) if no special arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or
>
> (3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state—
>
>> (A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or
>>
>> (B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or
>>
>> (C) as directed by order of the court consistent with the law of the place where service is to be made.

28 U.S.C. § 1608(b).

Taking these methods of service in order, there is no special service arrangement between Plaintiffs and Defendants, no Defendant has an officer or agent authorized to receive service of process in the United States, and there is no applicable international convention on service of judicial documents; so neither § 1608(b)(1) nor (b)(2) provide a viable method of service.  *See* ECF No. 107 at 175; *Est. of Hartwick v. Islamic Republic of Iran*, No. 18-cv-1612 (CKK), 2020 WL 12968924, at *6 (D.D.C. Oct. 10, 2020) (finding that Bank Melli does not have an officer or agent

authorized to receive service in the United States and that there is no applicable international convention for serving it); *Est. of Hartwick*, 2021 WL 6805391, at *8 (same for Bank Markazi and National Oil); *see also Holladay I*, 406 F. Supp. 3d at 61–64; *Williams v. Islamic Republic of Iran*, No. 18-cv-2425 (RDM), 2021 WL 1820263, at *5 (D.D.C. May 6, 2021).  Thus, Plaintiffs properly resorted to § 1608(b)(3)(B), through which they asked the Clerk of the Court to send Defendants copies of the Summons and operative complaint (both in English and translated into Farsi).  The Clerk of Court did so via DHL Express.  *See* ECF No. 21; *Field et al.*, No. 17-cv-2126, ECF No. 13; *Brooks et al.*, No. 17-cv-737, ECF No. 15.  The service package was successfully delivered, and representatives of each Defendant signed for them.  *See* ECF Nos. 24–27; *Field et al.*, No. 17-cv-2126, ECF Nos. 14–16; *Brooks et al.*, No. 17-cv-737, ECF Nos. 19–21.  Thus, service was proper.  *See, e.g.*, *Est. of Hartwick*, 2020 WL 12968924, at *6; *Shoham*, 2017 WL 2399454, at *15.

One wrinkle remains.  Generally, the Due Process Clause allows a court to exercise personal jurisdiction over a defendant not present within the forum when that defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  And while those protections do not extend to foreign states, they can apply to the agencies or instrumentalities of a foreign state.  *See TMR Energy Ltd. v. State Prop. Fund of Ukr.*, 411 F.3d 296, 300 (D.C. Cir. 2005).  "The question turns on whether the foreign state in question exercised sufficient, plenary control over the entity to make it an agent of the state—one that is 'barely distinguishable from an executive department of the government.'"  *Shoham*, 2017 WL 2399454, at *15 (quoting *TMR Energy*, 411 F.3d at 301–02).

Defendants here are sufficiently controlled by Iran to make them agents of the state, alleviating any due process concerns.  Although each has significant commercial functions, each is "funded, regulated by, and primarily owned by Iran or persons and entities under control of the Iranian government."  *Shoham*, 2017 WL 2399454, at *15; *see supra*.  Further, they have roles in setting government policy, and their activities are governed by the constitution and legislative acts of Iran.  *See* ECF No. 95 ¶ 58 (describing Irani governmental control of Bank Markazi); ¶ 97 (Bank Melli's role "central to the government's banking needs"); ¶ 115 (National Oil's constitutional authorities and "state policy functions").  All in all, Defendants are agents of Iran—"barely distinguishable from an executive department."  *Shoham*, 2017 WL 2399454, at *15.  Thus, "no further minimum contacts analysis is required, and the Court may exercise personal jurisdiction over [Defendants] based solely on service under 28 U.S.C. § 1330."  *Id.*

## C.     Liability

Having already concluded that the Court possesses subject-matter jurisdiction, little else is needed to show that Defendants are liable for the bellwether claims at issue.  28 U.S.C. § 1605A(c).  The private right of action in the FSIA terrorism exception provides that a foreign government is liable to a United States citizen "for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1), (c).  "Essentially, liability under § 1605A(c) will exist whenever the jurisdictional requirements of § 1605A(a)(1) are met."  *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 163 (D.D.C. 2017).

As already mentioned, the bellwether plaintiffs who were injured but survived the attacks are United States citizens.  *See* Birth Certificate of Robert Bartlett, PX-172; Birth Certificate of David Haines, PX-139; Birth Certificate of Christopher Levi, PX-143; Birth Certificate of Wesley

Williamson, PX-138; Birth Certificate of Robert Canine, PX-137; Birth Certificate of Johnny Frank Washburn II, PX-64; Birth Certificate of Evan Kirby, PX-148; Birth Certificate of Marvin Thornsberry, PX-149; Birth Certificate of Billy Wallace, PX-166.  So § 1605A(c) gives them a cause of action.

Those who died were also United States citizens.  *See* Birth Certificate of George Delgado, PX-142; Birth Certificate of Christopher Hake, PX-152; Birth Certificate of Johnathon Millican, PX-147; Birth Certificate of Brian Freeman, PX-150.  And although the Court does not have any evidence confirming the citizenship of those representing the estates of those who were killed, there is no need to confirm their citizenship status.  "An estate of a plaintiff who would have had standing to sue 'is expressly covered by, and entitled to bring claims under, Section 1605A(c).'" *Doe v. Democratic People's Republic of Korea Ministry of Foreign Affs. Jungsong-Dong*, 414 F. Supp. 3d 109, 125 (D.D.C. 2019) (quoting *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78–79 (D.D.C. 2017)).  Thus, the legal representatives of their estates can bring suit under § 1605A(c) as well.  *See Braun*, 228 F. Supp. 3d at 78; *Henkin*, 2021 WL 2914036, at *11.[11]

---

[11] Some courts in this District have held that, while § 1605(A)(c) provides a cause of action, it "does not itself provide the 'substantive basis' for claims brought under the FSIA." *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 361 (D.D.C. 2020).  Thus, FSIA plaintiffs must "prove a [specific] theory of liability." *Valore*, 700 F. Supp. 2d at 73.  Such theories of liability are based on "well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises." *Maalouf v. Islamic Republic of Iran*, No. 16-cv-0280 (JDB), 2020 WL 805726, at *5 (D.D.C. Feb. 18, 2020) (quoting *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54 (D.D.C. 2012)).  Even if such a showing is required, the bellwether plaintiffs have met their burden.  The facts they have established prove that Defendants are vicariously liable under theories of intentional infliction of emotional distress, assault, battery, wrongful death, and survivorship.  *See* ECF No. 107 at 179–98.  Plaintiffs also argue that Defendants are vicariously liable under a theory of solatium for family member plaintiffs.  But as the Court has explained, the liability claims of family members will addressed another day.

**IV.      Conclusion**

For all these reasons, the Court will grant Plaintiffs' Motion for Partial Default Judgment.

ECF No. 111.  A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: September 12, 2022